**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**CLARISSA AND ROBERT HERNANDEZ,**
**On behalf of themselves and others similarly situated,**
**SHANNON WOODWORTH, on behalf of**
**herself and others similarly situated,**
**DAVID GALLEGOS, on behalf of himself**
**and others similarly situated,**

      **Plaintiffs,**

**v.**                                     **Case No. 2:20-cv-00942-JB-GBW**

**MICHELLE LUJAN GRISHAM,**
**Individually, Acting Under the Color of Law,**
**RYAN STEWART,**
**Individually, Acting Under the Color of Law,**
**KATHYLEEN M. KUNKEL,**
**Individually, Acting Under the Color of Law,**
**and the STATE OF NEW MEXICO,**

      **Defendants.**

---

**DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS VERIFIED EMERGENCY**
**MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION**
**AND PERMANENT INJUNCTIVE RELIEF**

      Defendants Governor Michelle Lujan Grisham, Secretary Ryan Stewart, Secretary

Kathyleen Kunkel, by and through their counsel of record, and the State of New Mexico, by and

through its counsel of record, hereby provide their joint response to Plaintiffs' Verified Emergency

Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief

[Doc. 6] ("Motion").  As grounds for their response, Defendants state as follows.

**INTRODUCTION**

      In March of this year, governors and public health officials across the nation were forced

to issue directives requiring social distancing measures and limiting mass gatherings. Though

difficult, these restrictions are necessary to save lives and to ensure that those most adversely affected by COVID-19 can obtain medical care.  Although these measures have assisted in stemming transmission of COVID-19, the pandemic is not over.  Accordingly, Governor Lujan Grisham—as the top elected executive official of New Mexico—must continue to balance desire of many New Mexicans to "return to normal" with the reality that any in-person activity presents a threat of spreading a deadly, contagious virus.

Against this factual backdrop, Plaintiffs challenge Defendants' scientifically based reentry guidance for public schools.  Plaintiff specifically request the Court invalidate this guidance's the prohibition of in-person learning in certain counties due to failure to meet objective gating criteria. Yet Plaintiffs fall far short of their burden of demonstrating a likelihood of success on the merits, irreparable harm, or that denying preliminary relief would cause them more harm than the public. Accordingly, this Court should deny Plaintiffs' request for a TRO or preliminary injunction preventing Defendants from protecting the lives of thousands of private schoolchildren and their communities.

## BACKGROUND

### I.    The rapid and dangerous spread of COVID-19 in New Mexico

Since its emergence only a few months ago, the novel coronavirus disease 2019 ("COVID-19") has spread exponentially across the globe, throughout the United States, and here in New Mexico. The confirmed number of infections in the United States provides a good illustration of this spread. There were just 12 confirmed cases in the United States on February 11, 2020; now, less than seven months later, there are more than 6 million confirmed cases and more than 200,000

deaths.[1]  Globally, as of September 17, 2020, the number of confirmed cases has risen to over 32.7 million, with over 991,000 related deaths.[2]  Approximately six months since the first confirmed cases of COVID-19 in New Mexico, there are over 28,800 confirmed cases here and 870 related deaths.[3]  COVID-19's rapid spread is attributable to certain characteristics of the virus that causes it and the ease with which that virus is transmitted.

COVID-19 is a respiratory illness that causes severe complications in some patients, including pneumonia in both lungs, organ failure, and death. Like most respiratory illnesses, COVID-19 spreads easily through close person-to-person contact. Although it has not yet been measured precisely, a significant portion of COVID-19 cases result in mild symptoms or no symptoms.[4]  Additionally, even in cases that are symptomatic, the average time from exposure to symptom onset is five to six days, with symptoms sometimes not appearing until as long as thirteen days after infection.[5]  This means that individuals who have been infected and have the potential

---

[1] *Previous U.S. COVID-19 Case Data*, Centers for Disease Control and Prevention (CDC), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/previouscases.html (last visited Aug. 9, 2020); *Cases in the U.S.*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Sept. 27, 2020).

[2] *WHO Coronavirus Disease (COVID-19) Dashboard*, World Health Organization, https://covid19.who.int/ (last visited Sept. 27, 2020).

[3] *2019 Novel Coronavirus Disease (COVID-19)*, New Mexico Department of Health (DOH), https://cv.nmhealth.org/ (last visited Sept. 27, 2020). These numbers are provided as of September 27, 2020 and are updated daily by NMDOH.

[4] Nathan W. Furukawa et al., *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

[5] *COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus and COVID-19*, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

to infect others usually do not know they are infected for at least several days (and may never know, if they remain asymptomatic).

The ease and rapidity with which COVID-19 spreads and its severe and sometimes fatal symptoms in a certain percentage of the population create a potential for mass deaths and a severely overloaded health care system. Because many individuals who have COVID-19 do not know they have been infected, the only effective way to combat the spread of COVID-19 and to mitigate its impacts is to limit person-to-person contact and large gatherings to the greatest extent possible. Although social distancing guidelines generally advise people to stay six or more feet apart, even that degree of distancing does not guarantee that an individual will not contract COVID-19. This means that every foray by a person into a public space with other people carries some risk of transmission, particularly in indoor environments. For instance, a recent study has shown that the act of speaking can emit thousands of potentially infectious droplets which can linger in an enclosed space for between 8 and 14 minutes and greatly increase the risk of transmission within that space.[6]

## II.     The risk of COVID-19 for children in New Mexico

COVID-19 is a novel pathogen that the global scientific community has never faced before. Since March of 2020 scientific data continues to emerge regarding the implications of COVID-19 for all people, including children. *See* Declaration of Secretary of Human Services David R. Scrase, M.D., M.H.S.A attached hereto as Exhibit A.  Unlike other states, New Mexico started testing children for COVID-19 during the first week the virus was present in the state during. *Id.* at ¶ 5. Positive cases of the virus in children in this state were identified beginning the week of

---

[6] *Id.*

March 15, 2020. *Id.* New Mexico's nationally recognized testing program demonstrates that from the first week of testing children have carried a significant disease burden. *Id., Figures* 1-3.

Initial studies suggested children did not pass on COVID-19; however, recently this proved to be incorrect. Studies now suggest that children can also spread the virus as well. *See* Ex. A at ¶¶ 16-18; Affidavit of Secretary Ryan Stewart attached hereto as Exhibit B, at ¶ 16. Additionally, children are now experiencing complications from the virus such as COVID multisystem inflammatory disorder in addition to other long-lasting impacts like cardiac lesions. Ex. A at ¶ 16, Ex. B at ¶¶ 17-18. The long-term consequences of these complications are still unknown. *Id.*

Since July 14, 2020[7] the State has reviewed and relied upon over 20 studies published between July 16, 2020 and September 15, 2020. Ex. A at ¶ 17. These studies demonstrate everyone in a family, including children, can be susceptible and spread COVID-19. The studies further demonstrate an individual's increased number of contacts with other people increases the chances that an individual family member can bring the virus home and spread it to others both inside and outside the home. *Id.* at ¶ 18. Therefore, the reopening of schools for in-person instruction will result in an increased number of positive cases as the number of contacts for all persons in a community will similarly increase. *Id.* ¶¶ 10-11, 18; Ex. B at Ex. 1.

## III.    New Mexico's public health emergency orders

Recognizing the seriousness of this virus and its ability to spread exponentially through close contacts and public spaces, the Governor declared a public health emergency under the

---

[7] Plaintiffs cite in their Amended Original Complaint and Request for Temporary Restraining Order [Doc. 4] ("Amended Complaint" or "Am. Compl."), ¶ 17, a quote made by Secretary Scrase on July 14, 2020 in an interview. *See* Ex. A at ¶ 18. This quote illustrates the state of knowledge regarding coronavirus spread based on the medical literature at the time. As shown in the pages above, the State has reviewed additional information related to the spread of coronavirus since July of 2020. *Id.*

Public Health Emergency Response Act (the PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015), on March 11, 2020 and invoked the All Hazards Emergency Management Act (the AHEMA), NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007), by directing all cabinets, departments, and agencies to comply with the directives of the declaration and the further instructions of the New Mexico Department of Health (the DOH).[8] Consistent with the powers provided during an emergency under the PHERA and the AHEMA, as well as the Public Health Act (the PHA), NMSA 1978, §§ 24-1-1 to -40 (1973, as amended through 2019),[9] the Secretary subsequently entered a series of public health orders (PHOs) encouraging New Mexicans to stay in their homes to the greatest extent possible and to practice all possible precautions when they are required to enter public spaces.[10]

Immediately after declaring a public health emergency, the Governor ordered the closure of all public schools from March 16, 2020 to April 6, 2020 as a means of proactively implementing social distancing tools to slow the spread of the virus.[11] On March 26, 2020 the Governor ordered the closure of all public schools for the remainder of the 2019-2020 school year due to the increase

---

[8] Governor Michelle Lujan Grisham, *Executive Order 2020-004* (March 11, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/03/Executive-Order-2020-004-r.pdf; *New Mexico closes K-12 public schools to prevent potential spread of COVID-19,* PED (March 13, 2020) https://webnew.ped.state.nm.us/news-releases/.

[9] The PHA broadly authorizes the Secretary—as head of the DOH—to "control and abate the causes of disease, especially epidemics," "respond to public health emergencies," "maintain and enforce rules for the control of conditions of public health importance," and "do all other things necessary to carry out its duties." Section 24-1-3(C), (F), (Q), (Z).

[10] *See generally Public Health Orders and Executive Orders*, DOH, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited July 7, 2020) (collecting PHOs and executive orders relating to COVID-19).
[11] Governor Michelle Lujan Grisham, *Executive Order 2020-005* (March 13, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/03/Executive-Order-2020-005.pdf.

in confirmed COVID-19 positive cases.[12] All New Mexico public schools completed the 2019-2020 school year using remote instruction and at home learning.[13]

In addition, Secretary Kathyleen Kunkel exercised her broad authority under the PHA to "close any public place and forbid gatherings of people when necessary for the protection of the public health"—authority which the New Mexico Supreme Court has upheld[14]—by issuing PHOs prohibiting most public and private gatherings of any significant size and curtail or even prohibit the operations of many businesses. *See* Section 24-1-3(E). The restrictions imposed by the PHOs on businesses have varied over the past few months based on the trajectory of the virus. In May and June, the PHOs gradually eased some restrictions as the rate of transmission fell and testing capacity increased.[15]   On July 13, 2020, the Secretary tightened restrictions in response to a disturbing uptick in positive cases in New Mexico and "significant recent spikes" in neighboring

---

[12] Governor Michelle Lujan Grisham, *Executive Order 2020-012* (March 26, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/03/MLG_EO_2020_012.pdf.

[13] *Governor: K-12 school closings must continue to prevent potential spread of COVID-19*, (March 27, 2020) https://www.governor.state.nm.us/2020/03/27/governor-k-12-school-closings-must-continue-to-prevent-potential-spread-of-covid-19/.

[14] *See* Writ of Superintending Control, *Lujan Grisham v. Romero*, No. S-1-SC-38396 (N.M. Sup. Ct. Aug. 26, 2020); Writ of Superintending Control, *Lujan Grisham v. Reeb*, No. S-1-SC-38336 (N.M. Sup. Ct. Aug. 4, 2020); *see also* Chris McKee, *Supreme Court rules governor has authority to restrict, ban indoor dining* (Aug. 26, 2020), https://www.krqe.com/health/coronavirus-new-mexico/supreme-court-to-hold-hearing-on-public-health-order-business-restrictions/    (reporting that "[t]he New Mexico Supreme Court ruled . . . that the state does have the power to enact a Public Health Order and restrict or close indoor dining at restaurants").

[15] *Governor Announces Limited Reopening for Dine-In Restaurants, Indoor Malls, Gyms, Salons and More*, NMDOH (May 28, 2020), https://cv.nmhealth.org/2020/05/28/governor-announces-limited-reopening-for-dine-in-restaurants-indoor-malls-gyms-salons-and-more/; *Public Health Order*, NMDOH (June 1, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/06/060120-PHO.pdf.

states.[16]  The July 13 Order's restrictions appear to have been effective at reversing this disturbing trend.[17]  As such the August 28, 2020 PHO eased some restrictions due to the improvements containing the spread of the virus.[18] The current PHO continues the same eased restrictions—for the time being.[19]  Unfortunately, new COVID-19 case rates are now rising at alarming levels.[20]

IV.     **The New Mexico Public Education Department's Development and Promulgation of the Reentry Guidance for Schools**

The New Mexico Public Education Department (the "PED") is a constitutionally created entity generally authorized to "have control, management and direction of all public schools." N.M. Const. Art. XII, Sec. 6; NMSA 1978 § 22-2-1(A) (2004); *see also* NMSA 1978, § 22-2-2 (2004) (providing that the PED shall "determine policy for the operation of all public schools . . . [and] supervise all schools and school officials coming under its jurisdiction"); NMSA 1978, § 22-2-8 (2003) (providing that the "[PED] shall prescribe standards for all public schools in the state" including standards for "organization and administration of education," "the physical condition of public school buildings and grounds," and "educational facilities of public schools").

---

[16]  DOH, *Public Health Order*, at 1-2 (July 13, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/07/7.13.20-PHO-1.pdf; *see Coronavirus in New Mexico*, Albuquerque Journal, https://www.abqjournal.com/coronavirus (last visited Sept. 28, 2020) (showing 7-day average of new COVID-19 cases in New Mexico rising significantly beginning in mid-June).

[17] *See* Dan McKay and Dan Boyd, *NM sees significant fall in new virus cases*, Albuquerque Journal (Aug. 6, 2020), https://www.abqjournal.com/1483779/nm-sees-significant-fall-in-new-virus-cases.html (noting that "[t]he state's seven-day rolling average for new cases is now 198 cases a day – a decline of 40% since last week, when the average hit 330 on July 29").

[18]  DOH, *Public Health Order*, (Aug. 28, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/08/082820-PHO.pdf.

[19]  DOH, *Public Health Order*, (September 18, 2020) https://cv.nmhealth.org/wp-content/uploads/2020/09/091820-PHO.pdf .

[20] *See Coronavirus in New Mexico*, *supra* note 16.

The PED has collaborated with the Department of Health regarding decisions about the return of students to school. Ex. B at ¶ 4. The State also partnered with Los Alamos National Labs ("LANL") to develop an ongoing epidemiological modeling for weekly updates on the trajectory of the virus in New Mexico. Ex. A at ¶¶ 15, 17(s); Ex. B at ¶ 5. LANL provided epidemiological modeling which suggested New Mexico would experience a steep and sustained increase in positive COVID-19 cases if schools returned to in-person learning without enhanced safety protocols and limitations on the number of students present in school buildings. Ex. B at ¶ 5, Ex. 1. This modeling further confirms the gating criteria relied upon by the State's Medical Advisory Team that social distancing protocols are still necessary to contain the spread of COVID-19.

The State Medical Advisory Team relies on specific gating criteria when determining New Mexico's phased plan for gradual reopening during this pandemic. The gating criteria consist of the transmission of COVID (measured by rate of spread and NM daily cases), testing capacity (measured by Number of COVID-19 test per day and COVID-19 test positivity rate), contract tracing and isolation capacity (measured by time for COVID-19 positive test result in isolation and as a result to quarantine of case contacts), and statewide healthcare system capacity (measured by adult ICU beds and 7 day supply of personal protective equipment across the 7 NM Hub Hospitals). Ex. A at ¶ 7, *Figure* 4.  The criteria are assessed regularly, and if the levels meet predetermined evidence-based targets, the State may decide to relax certain social distancing restrictions.[21] Ex. A at ¶ 7. This gating criteria is also applied when determining the category of reentry for schools in each county.  Ex. A at ¶ 8, Ex. B at ¶¶ 6, 19, 38.

---

[21]  The current levels of the gating criteria are located on the DOH's website: https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/.

The two gating criteria the State Medical Advisory Team rely upon to define community safety are the NM Daily Cases and the COVID-19 Test Positivity Rate. *Id.* The NM Daily Cases (7 Day rolling Average) is the measurement of how many cases the state or county has adjusted per capita on an average over 7 days. *Id.* at ¶ 8(a).[22] The NM Daily Cases measurement is reflected in the different colors on the New Mexico map of counties. *Id.* at ¶ 8, *Figures* 5, 6. The "green level" for counties on this map is under 80 cases per 1 million per day or 8 cases per 100,000 per day over a 14 day rolling average. *Id.* The COVID-19 Test positivity rate provides information about the effectiveness of testing results in the state or county. *Id.* at ¶ 8(b). If a test positivity rate is above 5%, the consensus is that are there is not enough testing and cases are being missed as a result. *Id.* The State's target at 5% or less for the whole state, and individual counties as well. *Id.* The gating criteria of daily cases and test positivity rate used by the State are widely recognized and recommended epidemiological markers for determining community safety.[23]

In late June of 2020, the PED issued its official reentry guidance (the "Reentry Guidance") to assist public school districts and charter schools safely operate during the 2020-2021 school year. *See* Ex. B at Ex. 28. The PED is using a phased approach to school reentry based on the in order to permit the State to analyze the impact of reentry before moving to full-scale implementation. *Id.* at Ex. 28, 4. The Reentry Guidance sets out the minimum requirements for reentry at public schools. *Id.* at 5. Public schools may operate in three primary reentry categories:

---

[22]     *See Our Criteria & Sources*, COVIDexitStrategy, https://www.covidexitstrategy.org/definitions-and-criteria (last visited Sept. 28, 2020).

[23] *Indicators for Dynamic School Decision-Making,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/indicators.html    (last visited Sept. 28, 2020) (recommending states, tribes, localities, and territories analyze numbers of new cases per 100,000 persons and test positivity rate when deciding to open, close, or reopen schools.

(1) remote, (2), hybrid, and (3) full reentry. *Id.* at 9. The remote category requires students to engage in remote learning with the exception of small groups of special education and K-3 students; the hybrid category permits in-person learning to the extent that students can be spaced six feet apart or 50% of classroom capacity; and the full reentry category permits in-person learning for every student five days per week. *Id.* at 9-10, Ex. 39.

Beginning on September 8, 2020 schools could begin the hybrid reentry category if the county in which the school is located had average daily cases less than 8 cases per 100,000 per day and test positivity under 5%. *See* Ex. A at ¶¶ 8-9; Ex. B at ¶ 38. In addition, a school which meets this gating criteria must also have a PED-approved reentry plan and the superintendent or charter leader sign and return an assurance to abide by safety protocols outlined in PED guidance. *See* Ex. B at ¶ 38. These standards issued by PED are applied uniformly across the state. Ex. B at ¶ 19. As of the date of this Response, certain counties in Southeastern New Mexico have not met the objective gating criteria of 80 cases per 1 million per day and a test positivity rate of 5% or lower.[24]

However, students and parents in school districts in the remote learning setting are not left to their own devices. The PED has issued over 40 supplementary guidance documents, many of which offer resources for providing high quality educational services during remote learning. Ex. B at ¶ 36. This guidance also includes social-emotional supports for students during this time to address concerns about the impact of the Coronavirus on student mental health. *Id.* at ¶ 26. The PED also continues school-based health clinics with school nurses and provides free and reduced lunches and breakfasts. *Id.* at ¶ 3.

---

[24] *See COVID-19 in New Mexico*, DOH, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Sept. 28, 2020).

In addition to providing support all public school students, PED has followed the guidance from the U.S. Department of Education to provide for the needs of students with disabilities while following the requirements of PHOs and executive orders since in March of 2020. Ex. B at ¶¶ 42-52. In July 2020 the PED issued reentry support guidance related to special education which permits students with disabilities to receive in-person instruction in a manner consistent with public health orders and executive orders. Ex. B at ¶¶ 53-56. The Reentry Guidance permits small groups of five students to one teacher to receive in-person instruction even in the remote learning category *Id.* at ¶¶ 57- 60. Additionally, dispute resolution options such as hearings and mediations, available under IDEA and New Mexico rules for education have remained available for parents throughout the pandemic. *Id.* at ¶¶ 58-62.

## V. Plaintiffs' claims in this case.

Plaintiffs challenge the validity of the current prohibition of in-person instruction at public schools in Chaves, Curry, Doña Ana, Eddy, Hidalgo, Lea, Luna, McKinley, Quay and Roosevelt Counties. Plaintiffs allege that the State, the Governor, and Secretaries Kunkel and Stewart's issued a "school reentry plan" that arbitrarily and capriciously delayed in-person learning for children in these counties.  *See generally* Am. Compl. Plaintiffs aver (erroneously) that the current school reentry plan is based on science or law, nor is it directed at preventing COVID-19.[25] Am. Compl. at ¶¶ 18-21.  Instead Plaintiffs claim all Defendants through executive orders, the PHERA, and the Reentry Guidance prohibited in-person learning in certain counties "in retaliation for punitive purposes based upon a perception that these communities were defying the authority of the Governor." *Id.* at ¶ 21. Plaintiffs brought the instant suit pursuant to 42 U.S.C. § 1983 (2018),

---

[25] Plaintiff's counsel has characterized efforts to protect children from the spread of COVID-19 as tantamount to "gestapo policies".  See September 11, 2020 e-mail from Blair Dunn to Matthew L. Garcia attached hereto as Exhibit C.

claiming the prohibition against in-person learning in these counties violates the Due Process Clause, the Equal Protection Clause and the Individuals with Disabilities Act (IDEA), 20 U.S.C. §§ 1400 et.seq. *See* Amend Compl. at ¶¶ 7, 54-74; *see generally* Motion.

Pursuant to Federal Rule of Civil Procedure Rule 23, Plaintiffs seek to have this Court certify "three (3) classes seeking declaratory and injunctive relief." Am. Compl. at ¶ 31. Plaintiffs wish the Court to certify the "Declaratory and Injunctive Relief Classes" to be defined as:

> 1) the parents of the New Mexico school children who are or will be subject to the loss of the constitutionally guaranteed equal education without due process, 2)the parents of the New Mexico school children with special needs who are or will be subject to the denial of a FAPE in violation of the IDEA without any administrative remedy that would not be futile, and 3)school board members, teachers and administrators that who are or will be denied the opportunity to meet their moral and statutory obligations to provide an equal education to the children of the affected counties.

*Id.* at ¶ 32. In their Amended Complaint Plaintiffs request the Court issue a declaratory judgment that the Defendants acted unlawfully and unconstitutionally. *Id.* at ¶¶ 43, b-9. Plaintiffs further request a preliminary and permanent injunction "enjoining Defendant from prohibiting in-person instruction" and attorneys fees. *Id.* at ¶¶ e-g. Plaintiffs request in their Motion a temporary restraining order and/or preliminary injunction prohibiting Defendants from denying in-person learning. Motion at 21.

## DISCUSSION

## I.     Sovereign Immunity Bars Any Claims Against the State or That Allege Violations of State Law.

Although Plaintiffs name the State of New Mexico as a Defendant, they do not offer any basis for a claim or relief against the State as a sovereign entity. The description of the action in the Amended Complaint's introduction, the Amended Complaint's list of parties, and its allegations related to the "actions of the Defendants" all lack allegations concerning the State. Pls.'

Am. Compl. at 1–2 & ¶¶ 4–6, 21. Simply, the Amended Complaint lacks any allegations that support a cause of action against the State. *See Iqbal*, 556 U.S. at 678 (2009) (to survive motion to dismiss, plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged).

Furthermore, if the Amended Complaint did state a claim against the State, it would be barred by sovereign immunity. New Mexico has inherent sovereign immunity, as recognized by the Eleventh Amendment. U.S. Const., amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States . . . ."); *see also Alden v. Maine*, 527 U.S. 706, 713 (1999) ("the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today … except as altered by the plan of the Convention or certain constitutional Amendments"). "The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in a federal court against a state and arms of the state." Peterson v. Martinez, 707 F.3d 1197, 1205 (10th Cir. 2013) (internal quotation marks and citation omitted).

The limited exception to sovereign immunity recognized in *Ex Parte Young*, 209 U.S. 123 (1905), does not apply to Plaintiffs' claims against the State. First, the State is not an individual officer subject to suit for prospective injunctive relief. *See Hill v. Kemp*, 478 F.3d 1236, 1257 (10th Cir. 2007) (*Ex Parte Young* requires that claim be "directed (at least nominally) against state officials rather than the State . . . itself"). Second, any claim under 42 U.S.C. § 1983 (see Am. Compl. at 1 & ¶ 7) cannot be brought against a State. This is because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983[.]" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (Eleventh Amendment bars suits against State agencies and departments).

14

Thus, Section "1983 actions do not lie against a State*." Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997). Finally, the Declaratory Judgment Act alone cannot provide jurisdiction over a claim against the State where none otherwise exists. *See Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006) ("The Declaratory Judgment Act does not extend the jurisdiction of federal courts.") (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).

Sovereign immunity also bars any claim that Plaintiffs raise under the New Mexico Constitution. Although often framed as due process or equal protection claims, much of Plaintiffs' Amended Complaint is grounded in a contention that the State is not maintaining a "uniform system of free public schools … open to, all the children of school age in the state," as provided in Article XII, Section 1 of the New Mexico Constitution. *See, e.g.*, Compl.at 2 & ¶¶ 24, 55–57, 63; Motion at 11, 18 & ¶ 15.

The federal question jurisdiction that Plaintiffs rely upon (Am. Compl., ¶ 7) cannot serve as a basis for a claim raising state constitutional rights. 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" (emphasis added)). Nor can Plaintiffs bring state constitutional claims under the federal courts' supplemental jurisdiction in 28 U.S.C. § 1367. That statute's provision of supplemental jurisdiction does not extend to claims barred by Eleventh Amendment immunity. *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 542 (2002) ("[W]e hold that § 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state defendants."); *see also Pettigrew v. Oklahoma ex rel. Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1213 (10th Cir. 2013). As the Supreme Court held in *Pennhurst State School and Hospital v. Halderman*, supplemental jurisdiction "does not permit such an evasion of the immunity guaranteed by the Eleventh Amendment," such that a claim alleging that state officials violated state law can be brought in

federal court. 465 U.S. 89, 121 (1984); *see also Raygor*, 534 U.S. at 540–42 (recognizing that Pennhurst's holding was not altered by the statutory enactment of supplemental jurisdiction in 28 U.S.C. § 1367). "The supplemental jurisdiction statute does not override the sovereign immunity enjoyed by states under the Eleventh Amendment and related doctrines. Accordingly, absent waiver of immunity, federal courts have no jurisdiction under § 1367 for claims asserted against a state." 13D Wright et al., Fed. Prac. & Proc. Juris. § 3567 (3d ed. 2019), at nn. 54–55.

Any claim by Plaintiffs that Defendants have violated Article XII, Section 1 of the New Mexico Constitution is barred by Eleventh Amendment immunity. "Under the Eleventh Amendment, states are generally immune from suits brought in federal court by their own citizens, by citizens of other states, by foreign sovereigns and by Indian tribes." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010). The three exceptions to Eleventh Amendment immunity are: (1) "a state may consent to suit in federal court"; (2) "Congress may abrogate a State's sovereign immunity . . . under Section 5 of the Fourteenth Amendment;" and (3) "under *Ex Parte Young*, a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief." *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012). As it does not fall under any of these exceptions, "the Eleventh Amendment bars suits brought in federal court seeking to enjoin a state official from violating state law." *Johns v. Stewart*, 57 F.3d 1544, 1553 (10th Cir. 1995). "Indeed, the [Supreme] Court has noted 'it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* (quoting Pennhurst, 465 U.S. at 106).

Nonetheless, if the Court determines that it could otherwise exercise supplemental jurisdiction over state constitutional claims, it should decline to do so. 28 U.S.C. § 1367(c)

provides that "district courts may decline to exercise supplemental jurisdiction . . . if (1) the claim raises a novel or complex issue of State law" or "(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." Here, both exceptions are met. The interpretation of New Mexico's Constitution and its right to education as applied to in-person versus online learning is a quintessential novel or complex issue of state law that should be left to state courts and a "compelling reason[] for declining jurisdiction."

Plaintiffs' claims based on violations of the New Mexico Constitution's right to education—and any claims against the State as a sovereign entity—are barred by sovereign immunity. Because the Court lacks jurisdiction over these claims, Plaintiffs are unlikely to prevail on the merits. Furthermore, such claims should be dismissed for lack of jurisdiction.

## II.     The proposed classes in this case should not be provisionally certified

Although Plaintiffs do not expressly request that the Court provisionally certify classes, it is a necessary prerequisite for the relief they seek in a temporary restraining order. *See* TRO Motion at 21 (requesting TRO requiring in-person learning at all schools). Presumably, the classes they would seek to provisionally certify are:

> a) "all others similarly situated with school-aged children in Chaves, Curry, Doña Ana, Eddy, Hidalgo, Lea, Luna, McKinley, Quay, and Roosevelt Counties";
> b) "all others similarly situated with school-aged children with special needs that are entitled to the protections of the IEDA in Chaves, Curry, Doña Ana, Eddy, Hidalgo, Lea, Luna, McKinley, Quay, and Roosevelt Counties"; and
> c) "all others similarly situated as teachers, administrators, or school board members that have been denied the opportunity to fulfill their constitutional and statutory educational and moral obligations in Chaves, Curry, Doña Ana, Eddy, Hidalgo, Lea, Luna, McKinley, Quay, and Roosevelt Counties."

Am. Complaint, ¶¶ 25–27; *see also* Supp'l Info. Per Sep. 24, 2020 Minute Order (ECF No. 11) at 4–5. Assuming that Plaintiffs are seeking provisional certification of these classes, certification should be denied.

Provisional class certification should be denied for three reasons. First, the IDEA Plaintiffs' failure to exhaust their administrative remedies prevents them from satisfying the commonality and typicality prerequisites set forth in Federal Rule of Civil Procedure 23(a)(2) and (3). Also the fact that the individual circumstances of every member of the proposed class and subclasses are different vis-à-vis the qualifying student's individual education program, in addition to their family situations and personal health status, also prevent Plaintiffs from satisfying the commonality and typicality requirements. Finally, the proposed classes comprise potentially over 60,000 individuals, all with varying educational and medical needs—and consequently different desires for or against in-person learning, and their interests thus cannot be represented by the representatives proffered here as required by Rule 23(a)(4).

When determining whether class certification is appropriate, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). The threshold question for class certification is whether Plaintiffs have satisfied the four requirements set forth in Rule of Civil Procedure 23(a), generally referred to as numerosity, commonality, typicality, and adequacy:

> A.    Prerequisites to a class action. One or more members of a class may sue or be sued as representative parties on behalf of all only if:
> (1)    the class is so numerous that joinder of all members is impracticable;
> (2)    there are questions of law or fact common to the class;
> (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4)    the representative parties will fairly and adequately protect the interests of the class.

If these prerequisites are met, then the Court must determine whether the Plaintiffs also meet one of the requirements set forth in Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(2),

which requires a finding that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Am. Complaint, ¶¶ 29–30.[26]

###### A. Plaintiffs' failure to exhaust administrative remedies precludes class certification

The IDEA Plaintiffs have not attempted to seek administrative remedies in this matter, contending that it would be futile. Am. Complaint, ¶ 71. This failure to exhaust administrative remedies also precludes class certification, as different class members would present different claims and be able to obtain different relief in administrative proceedings.

"Rule 23(a)'s requirements of commonality and typicality merge with the analysis of whether a failure to exhaust administrative remedies can be excused, because both analyses may depend on the resolution of a common question of law or fact, and whether all of the class members possess the same interest and suffer the same injury." *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 455 F. Supp. 2d 1286, 1294–95 (D.N.M. 2006), *aff'd* 565 F.3d 1232 (10th Cir. 2009). For example, in *Association for Community Living in Colorado v. Romer*, the Tenth Circuit held that because IDEA claims "require[d] a determination as to whether any individual child was denied a free appropriate public education" which "is enhanced by the factual details of a particular child's case," administrative exhaustion was required and the class could not be certified. 992 F.2d 1040, 1045 (1993).

Here too, Plaintiffs' IDEA claims require individualized assessments of whether the State's emergency public health laws deny students a free appropriate public education. If Plaintiffs pursued administrative relief for those claims, they could develop records of their particular

---

[26] For the same reasons that Plaintiffs' individualized circumstances prevent them from meeting Rule 23(a)'s commonality and typicality requirements, the predominance and superiority requirements in Rule 23(b) are not met as well.

educational needs and contest whether those can be met while remaining in compliance with public health laws *See infra* Part III(C)(3). Because the putative IDEA Plaintiff class is differently positioned as to whether they have sought administrative relief, and the claims or relief available to them in that administrative process, Plaintiffs cannot satisfy Rule 23(a)'s commonality and typicality requirements.

### B.       The putative classes do not share common facts and legal claims

To meet the commonality requirement, Plaintiffs must demonstrate that "there are questions of law and fact common to the class." Fed. R. Civ. P. 23(a)(2). As the U.S. Supreme Court has observed, "[t]hat language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)) "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (quoting Nagareda, 84 N.Y.U. L. Rev. at 131–32).

Plaintiffs contend that the following question is common to all class members:

[W]hether New Mexico's actions violate their constitutional or statutory rights by denying their children either an equal education or in certain circumstances an owing FAPE without providing them any pre or post deprivation due process.

Am. Complaint, ¶ 37. But due to the varying circumstances of each putative class member, these questions are not likely "to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. The Complaint seeks relief for thousands of individuals,

but fails to address each individual's unique educational needs, family lives, and varying levels of vulnerability to COVID-19.

As a result, the answers to Plaintiffs' asserted questions necessarily vary based on the individual circumstances of each putative class member. For example, whether all children would fare better in an in-person setting, and whether the absence of the in-person setting is depriving each child of an equal education is a question that can only be answered by looking at each individual child. Likewise, the vulnerability of those children, their families, and their communities to COVID-19 will differ based on their individualized circumstances. The same is true of Plaintiffs' putative sub-class of teachers, administrators, and school board members who have different needs and interests in in-person schooling. In sum, Plaintiffs cannot meet the commonality requirement because the individual circumstances of every child, teacher, and administrator will produce a unique answer about whether the right to education requires in-person learning. *Dukes*, 564 U.S. at 350 ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.").

For related reasons, Plaintiffs have failed to establish that the class representatives' claims are typical of the class members' claims. *See* Fed. R. Civ. P. 23(a)(3). "The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest." *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 661 (D.N.M. 2019) (citing *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994). Plaintiffs offer no evidence that the named plaintiffs' needs and desires for in-person education are typical of the parents, teachers, administrators, and school board members that make up the putative class.

C.   **Conflicted Interests of the Class Representatives and Class Prevent Adequate Representation.**

The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf. *Payne*, 332 F.R.D. at 662 (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002)). The named Plaintiffs fail this requirement because there is no indication that every member of the proposed class, given the differences in individual educational and medical needs, and familial situations would benefit from a return to in-person learning. *Id.* at 663 (quoting *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted")).[27] Indeed, given Plaintiffs' allegations that COVID-19 has "a mortality rate less than the typical flu," that the State's public health measures are "wielded in … an unequal manner as to single out and punish children in certain counties," and "were done in retaliation for punitive purposes," it is unlikely that the class representatives and their counsel can adequately represent class members that desire protective measures be taken to prevent the spread of COVID-19. TRO Motion at 3, 8. Because Plaintiffs have failed to meet these prerequisites for class certification, the Court should decline to provisionally certify the plaintiff class.

III.   **Plaintiffs request for request for a TRO and Preliminary Injunction must be denied**

A.   **Standard of review for a TRO and preliminary injunction**

---

[27] The IDEA named Plaintiffs failure to exhaust administrative remedies also makes them inadequate class representatives, in that a jurisdictional defense exists to their claims and they are not similarly situated to any class members who have participated in the administrative process.

To obtain a TRO or preliminary injunction, the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *AG of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) (internal quotation marks and citation omitted); *see also Firebird Structures, LCC v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1505*, 252 F. Supp. 3d 1132, 1173 (D.N.M. 2017) (Browning, J). "The third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). Because preliminary injunctive relief is an "extraordinary remedy, . . . the right to relief must be clear and unequivocal." *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006). The movant "must" satisfy his or her burden for each and every one of these prerequisites. *Diné Citizens Against Ruining Our Env't*, 839 F.3d 1276, 1281 (10th Cir. 2016). These prerequisites do not establish a balancing test—each must be satisfied independently, and the strength of one cannot compensate for the weakness of another. *See id.* at 1282 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Furthermore, "[b]ecause the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," the Tenth Circuit specifically disfavors "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colorado et.al.*, 427 F.3d 1252, 1258-59, (10th Cir. 2005) (alterations, internal quotation marks, and citation omitted). Therefore, "any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a

remedy that is extraordinary even in the normal course[,]" and "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro Espirita Beneficente Uniao do Vegetal ("O Centro") v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

Plaintiffs' requested injunctive relief falls into the category of disfavored injunctions. Plaintiffs' requested relief in their Motion is the same relief sought in their Amended Complaint: an injunction prohibiting Defendants from denying in-person learning in public schools. *Compare* Motion at 21, *with* Am. Compl. at 15. Plaintiffs, therefore, seek all the relief they could be awarded at the end of trial on the merits. *See Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB\SCY, 2020 U.S. Dist. LEXIS 122542, at *229 (D.N.M. July 13, 2020) (Browning, J) (holding that the plaintiff's requested TRO was disfavored because it sought the same injunctive relief requested in its complaint and the plaintiffs' request for attorneys' fees in the plaintiffs' complaint was incidental to the injunctive relief requested). Thus, this Court should closely scrutinize Plaintiffs' Motion and require Plaintiffs to "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro*, 389 F.3d at 975.

### B.      Special considerations for issuing TRO or preliminary injunction interfering with a state's response to the COVID-19 pandemic

Navigating the once-in-a-lifetime health crisis arising from the COVID-19 pandemic necessarily requires difficult choices, but these tough decisions must be made in order to protect the health and safety of the public. As Chief Justice Roberts observed in his special concurrence in *South Bay United Pentecostal Church v. Newsom*, "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"

140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). "When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad[,]'" he continued, "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974) and *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985)); *see also Jacobson*, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease.").[28]

Plaintiffs assume, without cause, that Defendants seek a blank check from the Court to disregard the Constitution. *See* Motion, 1-3, 13-15.[29] Not so. Defendants simply request the Court

---

[28] The Supreme Court recently denied another application for injunctive relief aimed invalidating the Nevada Governor's emergency order allowing casinos and certain other facilities to admit 50% of their maximum occupancy but preventing churches, regardless of their size, from admitting more than 50 persons. *See Calvary Chapel Dayton Valley v. Sisolak*, No. 19A1070, ___ U.S. ___, 2020 U.S. LEXIS 3584, at *1 (July 24, 2020). Numerous courts (including this Court) have acted in accord with Chief Justice Roberts' directive and refrained from issuing TROs and preliminary injunctions that invalidate emergency orders issued in response to the COVID-19 pandemic—despite any reasonable disagreements. *See, e.g.*, *Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB\SCY, 2020 U.S. Dist. LEXIS 122542 (D.N.M. July 13, 2020) (Browning, J); *see also, e.g.*, *4 Aces Enters., LLC v. Edwards*, No. 20-2150, 2020 U.S. Dist. LEXIS 147721 (E.D. La. Aug. 17, 2020); *Murphy v. Lamont*, No. 3:20-CV-0694 (JCH), 2020 U.S. Dist. LEXIS 136961 (D. Conn. Aug. 3, 2020); *Geller v. Cuomo*, 2020 U.S. Dist. LEXIS 137863 (S.D.N.Y. Aug. 3, 2020); *Vill. of Orland Park v. Pritzker*, No. 20-cv-03528, 2020 U.S. Dist. LEXIS 136833 (N.D. Ill. Aug. 1, 2020); *World Gym, Inc. v. Baker*, Civil Action No. 20-cv-11162-DJC, 2020 U.S. Dist. LEXIS 131236 (D. Mass. July 24, 2020); *Ass'n of Jewish Camp Operators v. Cuomo*, No. 1:20-CV-0687 (GTS/DJS), 2020 U.S. Dist. LEXIS 117765 (N.D.N.Y. July 6, 2020); *High Plains Harvest Church v. Polis*, Civil Action No. 1:20-cv-01480-RM-MEH, 2020 U.S. Dist. LEXIS 105247 (D. Colo. June 16, 2020).

[29] Plaintiffs rely heavily on Justice Alito's dissenting opinion in *Calvary Chapel* yet completely ignore the fact that the majority of the Supreme Court denied the request injunctive relief in that

follow established precedent recognizing that state officials' latitude "must be especially broad" when "undertak[ing] to act in areas fraught with medical and scientific uncertainties" (such as a during an unprecedented pandemic) because they have been "entrust[ed] with the safety and the health of the people," not "an unelected federal judiciary." *Id.* (quoting *Marshall v. United States*, 414 U. S. 417, 427 (1974) and *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985)); *see also Jacobson*, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease.").

C.      **Plaintiffs fail to demonstrate a strong likelihood of success on the merits their claims**

1.      **Equal Protection**

i.      **Strict scrutiny does not apply because education is not a fundamental right**

"Strict scrutiny" and "rational basis" are the two primary standards used to determine the validity of a law challenged as denying equal protection. *Edwards v. Valdez*, 789 F.2d 1477, 1482 (10th Cir. 1986). Courts apply strict scrutiny only in those limited instances where a classification involves a suspect class or affects a fundamental right. *Id.* Here, Plaintiffs claim Defendants are unfairly discriminating against citizens of certain counties with high rates of COVID-19 transmission. *See* Motion at 9-16.  But that claim does not, without more, give rise to a viable equal protection claim.  It is well established that "citizens of statutory counties are not a suspect class." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). Therefore, the

---

case. *Calvary Chapel*, 2020 U.S. LEXIS 3584, at *1. What's more, Defendants' methodical and empirically based approach to reopening schools is entirely different from the challenged distinction in Calvary Chapel—which permitted casinos to host thousands of individuals while prohibiting churches from hosting more than 50 congregants. *See id.* Defendants' methodical and empirically based approach to reopening schools would likely assuage even the Dissent's concerns. *See id.*

"classification [must] burden[] the exercise of a fundamental right guaranteed by the U.S. Constitution" in order to be subject to strict scrutiny. *Id.*

The Supreme Court has never recognized education as a fundamental right. Plaintiffs nevertheless request that this Court reach such a holding in this matter.  That request is without legal foundation. Plaintiffs do not (as they cannot) point to any court which has recognized education as a fundamental right under the U.S. Constitution warranting strict scrutiny.[30] Indeed, the Supreme Court has refused to recognize education as a fundamental right every time it has been asked to do so. *See, e.g.*, *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 458 (1988) ("Nor have we accepted the proposition that education is a 'fundamental right' . . . which should trigger strict scrutiny when government interferes with an individual's access to it."); *Papasan v. Allain*, 478 U.S. 265, 284-86 (1986) (declining to resolve question of whether a minimally adequate education is a fundamental right); *Plyler v. Doe*, 457 U.S. 202, 223 (1982) ("Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected.").

---

[30] While Plaintiffs cite Article XII, Section 1 of the New Mexico Constitution (and several other state constitutional rights to education) in their Petition, *see* Petition at 11, state constitutional rights cannot be used as a basis for applying strict scrutiny under the federal Equal Protection clause. *See Save Palisade FruitLands*, 279 F.3d at 1211 (rejecting argument that the power of the initiative is a fundamental right and stating that "every decision of which we are aware has held that initiatives are state-created rights and are therefore not guaranteed by the U.S. Constitution"); *Gould v. Richardson*, No. CIV 08-0505 JB/DJS, 2009 U.S. Dist. LEXIS 58204, at *16-17 (D.N.M. Mar. 28, 2009) (Browning, J.) ("[T]o implicate the higher standard of review on the basis of a "fundamental right" requires that the right be guaranteed by the [U.S.] Constitution." (internal quotation marks and citation omitted). Accordingly, any rights under Article XII, Section 1 of the New Mexico Constitution are immaterial to this Court's determination of what level of scrutiny to apply. Given the Supreme Court's clear precedent, Plaintiffs' contentions must be set aside.

Although Defendants cannot deny the importance of education, "the undisputed importance of education will not alone cause [a c]ourt to depart from the usual standard for reviewing a State's social and economic legislation." *Rodriguez*, 411 U.S. at 35. Plaintiffs argue "the right to a basic education is 'deeply rooted in this Nation's history and tradition,' stretching back at least as far as ratification of the Fourteenth Amendment and is therefore a fundamental right." Motion at 10 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). However, this ignores the fact that public school was "virtually non-existent" at the time of the Constitution's ratification, *Lemon v. Kurtzman*, 403 U.S. 602, 645-47 (1976), and "[t]here was no federal or state-run school system anywhere in the United States as late as 1830." Barry Friedman & Sara Solow, *The Federal Right to an Adequate Education*, 81 Geo. Wash. L. Rev. 92, 117 (2013) (citing Frederick M. Binder, *The Age of the Common School*, 1830-1865, at 20 (1974)). Moreover, even when the Supreme Court has ventured to recognize a right as fundamental, it has typically limited them to "negative rights" (i.e., the right to be free from restraint or barrier). *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989) (recognizing that the Due Process Clause is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security" and thus concluding that "our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual").

Plaintiffs also argue this Court should be the first to recognize education as a fundamental right because "[b]asic learning is also a prerequisite for the activities that form the basis of citizenship in our republic, including 'knowledgeable and informed voting,' comprehending ballot initiatives, and engaging in political speech and dis-course. . . . And lack of basic reading and

writing skills precludes individuals from constitutionally protected access to the justice system." Petition at 11. However, this argument is nearly identical to the one advanced and rejected by the Supreme Court. The appellees in *Rodriguez* argued that "education is itself a fundamental personal right because it is essential to the effective exercise of First Amendment freedoms and to intelligent utilization of the right to vote" and that the "corollary right to receive information becomes little more than a hollow privilege when the recipient has not been taught to read, assimilate, and utilize available knowledge." *Id.* at 35. The Supreme Court disagreed, stating, "The Court has long afforded zealous protection against unjustifiable governmental interference with the individual's rights to speak and to vote. Yet we have never presumed to possess either the ability or the authority to guarantee to the citizenry the most effective speech or the most informed electoral choice." *Id.* at 36. "That these may be desirable goals of a system of freedom of expression and of a representative form of government is not to be doubted[,]" the Court continued, "But they are not values to be implemented by judicial intrusion into otherwise legitimate state activities." *Id.* Left solely with arguments explicitly rejected by the Supreme Court, Plaintiffs provide this Court no principled reason to break from precedent and recognize education as a fundamental right necessitating strict scrutiny.

> ii.     **Heightened scrutiny does not apply, and even if it did, a temporary pause of in-person learning for children in counties with a high spread rate of a deadly virus survives such a standard**

Nor should this Court apply a heightened level of scrutiny. Citing *Plyler*, in which the Supreme Court applied heightened scrutiny to a law allowing schools to deny public education to the children of undocumented immigrants, Plaintiffs claim that a heightened level of scrutiny should likewise apply here. Motion at 12. Plaintiff claims this is so because "Defendants' action are the functional equivalent of excluding Plaintiffs' children—including minority children and

families of limited economic means—from the opportunity to attain an uniform education[.]"
Motion at 12. However, the Supreme Court has refused to extend *Plyler*'s heightened scrutiny
standard "beyond the 'unique circumstances,' that provoked its 'unique confluence of theories and
rationales.'" *Kadrmas*, 487 U.S. at 459 (quoting *Plyler*, 457 U.S. at 239, 243). In *Kadrmas*, the
Court addressed the constitutionality of a school bus service user fee and rejected the appellants'
contention that those who could not afford the fee were denied equal access to education and that
such a denial implicated heightened scrutiny. *Id.* at 458-61. Notably, the Court distinguished *Plyler*
on the ground that the children in *Plyler* were innocent victims of their parents' illegal immigration
and the school bus user fee in question would not "promot[e] the creation and perpetuation of a
subclass of illiterates." *Kadrmas*, 487 U.S. at 459 (quoting *Plyler*, 457 U.S. at 230).

   This case is no less distinguishable. Unlike the plaintiffs in *Plyler*—which involved the
invidious discrimination against a "disfavored" group of undocumented children by completely
denying them access to free public education—Plaintiffs here claim no such class membership.
457 U.S. at 219-225. While Plaintiffs point out that the restricted counties (like all of New Mexico)
are home to minority and low-income children, *see* Motion at 12, the classification at issue in this
case applies across the board and not simply to some "disfavored group"—unlike the challenged
law in *Plyler*, which only targeted the children of undocumented immigrants. *Id.* at 205. Nor can
Plaintiffs claim the same injury as those in *Plyler*; temporarily suspending in-person learning for
students in counties with higher rates of spread during a once-in-a-lifetime pandemic is simply not
comparable to permanently and completely denying a specific group of children access to free
public education.

   Simply put, this case is nothing like *Plyler*. Rather, this case is more akin to *Papasan*, in
which the Supreme Court applied rational basis review to an equal protection claim brought by

30

Mississippi schoolchildren challenging school officials' distribution of public-school land funds. 478 U.S. 265. The funding disparity in *Papasan* was so great that some counties received (in one year) an estimated average of $0.63 per pupil from the public-lands fund, whereas the average public-land income for other counties was approximately $75.34 per pupil—over 100 times greater. *Id.* at 273. The plaintiffs alleged that the unequal distribution of funds denied them the minimally adequate education provided to children in other areas of the state and argued that the state had infringed a fundamental right to a minimally adequate education. *Id.* at 284-85. Although the Court noted it had "not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review[,]" it declined to reach the question because the plaintiffs failed to "allege that schoolchildren in the [lesser-funded counties] are not taught to read or write" or that "they receive no instruction on even the educational basics." *Id.* at 285-86. Accordingly, the Court remanded the case back to the district court for rational basis review. *Id.* at 289.

Like the Plaintiffs in *Papasan*, Plaintiffs make no allegation that schoolchildren in the counties with higher rates of new COVID-19 cases are not being taught to read or write or that Defendants are failing to provide them with any instruction on educational basics. Rather, Plaintiffs essentially claim that virtual learning is not as *effective* as in-person learning.[31] Be that

---

[31] Plaintiffs also claim (without evidence) that "distance learning will effectively preclude children from receiving a basic minimum education because . . . many students in the affected rural counties have no access to the internet[.]" Motion at 12. Thankfully, internet access has expanded exponentially in the past years—even in rural New Mexico. *New Mexico Broadband Map*, NM DoIT Offices of Broadband and Geospatial Technology, https://nmbbmapping.org/mapping/ (last visited Sept. 27, 2020). However, those students with limited internet access may take advantage of internet accessible areas created in school parking lots and school buses. *See* Reentry Guidance at 13, 19. But even if students did not have internet access at their houses, this fact, alone, would not require heightened scrutiny. *Cf. Kadrmas*, 487 U.S. at 461 (holding that although the plaintiffs

as it may, such a claim does not rise to the level of a total and permanent deprivation of any public education involved in *Plyler*. Nor do Plaintiffs' attached exhibits from experts proffering testimony in an *unsuccessful* challenge to the California Governor's approach to reopening schools have much (if any) relevance to this case, which involves a completely different state with a completely different system.[32] Therefore, any heightened review in this case is unwarranted.

Even if a heightened level of review applied here, the temporary pause of in-person learning for children in counties with a high spread rate of a deadly virus would survive such scrutiny. The Court in *Plyler* applied a heightened standard requiring a determination of whether "whether [the classification] may fairly be viewed as furthering a substantial interest of the State." 457 U.S. at 217-18.[33] That standard is obviously met in this case. This Court has already determined that there is a *compelling* (not merely "substantial") state interest in guarding the public health and safety in preventing the spread of COVID-19. *See Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB\SCY, 2020 U.S. Dist. LEXIS 68415, at *88 (D.N.M. Apr. 17, 2020) (Browning, J) (holding that "mitigating a state pandemic is a compelling interest"); *Legacy Church Inc.*, 2020 U.S. Dist. LEXIS 122542 at *304 (Browning, J) (holding that "combatting local outbreaks of the coronavirus amidst a global pandemic" is a compelling governmental interest).

---

[32] Order Denying Plaintiffs' Ex Parte Application for a Temporary Restraining Order, [Doc. 51] *Brach et al., v. Newsom et al*, Case 2:20-cv-06472-SVW-AFM (C.D. Cal.  Aug. 21, 2020).

[33] The standard of review described in *Plyler* appears to have been novel. *See* Laurence H. Tribe, *American Constitutional Law* § 16-32, at 1602-03 (2d ed. 1988) (cataloguing forms of "intermediate review" and referring to the *Plyler* formulation as "a new form of heightened scrutiny").

suffered genuine hardships in having to pay for a private transportation service to school when they were denied access to public school busses, [s]uch facts, however, do not imply that the Equal Protection Clause has been violated").

The State's interest is no less compelling now—when new COVID-19 case rates are greater than or equal to new case rates from March to June and the flu season is upon us.[34] Because combatting local outbreaks of COVID-19 during a global pandemic is indisputably a compelling state interest, Defendants need only demonstrate that the distinction at issue "may fairly be viewed" as furthering that interest in order to meet *Plyler*'s heightened scrutiny standard. 457 U.S. at 217-18. This is clearly the case. Unlike the unconstitutional law in *Plyler*, which "impose[d] its discriminatory burden on the basis of a legal characteristic over which children can have little control," *id.* at 220, the distinction here does not invidiously discriminate against any child on the basis of their parents' transgressions; it simply seeks to protect children (and their communities) in counties with an increased likelihood of contracting and spreading a deadly virus ravaging the country. Defendants—navigating a once-in-a-lifetime pandemic stealing the lives of hundreds of New Mexicans—have determined that it may be relatively safe to provide limited in-person learning under strictly monitored conditions if the rates of new COVID-19 cases are below a certain level. Yet this does not, *ipso facto*, mean that every public school is safe to reopen for in-person learning. Far from it. Unfortunately, recent trends show a significant rise in new COVID-19 infections. *See Coronavirus in New Mexico*, *supra* note 16. This trend underscores the importance of slowly and methodically reopening schools.

"The government need not choose between doing nothing in the face of a pandemic and closing all of society." *Legacy Church, Inc.*, 2020 U.S. Dist. LEXIS 68415, at *118 n.12 (Browning, J.). So too with schools: The State need not choose between allowing in-person learning across the state, despite significantly higher risks of outbreaks in certain counties, or imposing a blanket ban. Plaintiffs argue (without support) that Defendant's actions are not

---

[34] *See Coronavirus in New Mexico*, *supra* note 16.

rationally related to stopping the spread of COVID-19 because "whether a county is on the monitoring list has nothing to do with the prevalence of COVID-19 at schools, or even among children." Motion at 15. Frankly, this argument blinks reality. Unfortunately, Defendants are not soothsayers and cannot simply gaze into some crystal ball to predict where and when the next outbreak will be; they must rely on objective indicators, such as new case rates in a community, to determine the safety (or lack thereof) of allowing thousands of children, teachers, and faculty to congregate for hours each day during a pandemic.[35] Plaintiffs also claim (without evidence) that Defendants' decision to temporarily limit in-person learning is not rational because "the scientific evidence confirms that children are not at risk of being sickened or killed by COVID-19." Motion at 20. Plaintiffs' unfounded assertion is belied by the mountain of evidence Defendants relied on in determining when and how to reopen schools safely. *See generally* Ex. A, Ex. B. Even if Plaintiffs' assertion were true, it would not render Defendants' decision irrational, as limiting in-person learning is not only meant to protect children but their families, teachers, and community members—individuals who include those at a higher risk of becoming seriously sick or dying from COVID-19. Although Plaintiffs may claim "children do not play a significant role in transmitting the virus to adults," Motion at 20, this unfounded assertion is debatable at best—and dangerously wrong at worst.[36]

---

[35] *Preparing K-12 School Administrators for a Safe Return to School in Fall 2020*, CDC (Aug. 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/prepare-safe-return.html (stating that "COVID-19 transmission rates in the immediate community and in the communities in which students, teachers, and staff live" is a key consideration for school administrators to consider in determining when and how to safely to return to school).

[36] *See* Ex. A, Ex. B; Adriana S. Lopez et al., *Transmission Dynamics of COVID-19 Outbreaks Associated with Child Care Facilities — Salt Lake City, Utah, April–July 2020*, CDC (Sept. 18, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6937e3.htm (stating that "[r]eports suggest that children aged ≥10 years can efficiently transmit SARS-CoV-2").

As the evidence cited above clearly demonstrates, Defendants' decision to limit in-person learning to those counties with a lower rate of new COVID-19 cases "may fairly be viewed" as furthering the State's compelling interest in fighting an unprecedented pandemic. *Plyler*, 457 U.S. at 217-18. See Ex. B; Ex. A. While Plaintiffs may disagree with Defendants' choice how to safely reopen schools across the state, such disagreement (even if reasonable) provides no basis for this Court to overturn their decision. *See South Bay*, 140 S. Ct. 1613 (Roberts, C.J., concurring) ("Where those broad limits [on elected officials decisions to lift restrictions on activities during a pandemic] are not exceeded, [their decisions] should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." (internal quotation marks and citations omitted)); *Jacobson*, 197 U.S. at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease."); *Legacy Church, Inc.*, 2020 U.S. Dist. LEXIS 122542, at *376 ("As the Supreme Court has made clear, the judiciary may invalidate such efforts 'only' when they have 'no real or substantial relation' to the public health, or are 'beyond all question, a plain, palpable invasion' of the First Amendment.'" (quoting *South Bay*, 140 S. Ct. 1613 (Roberts, C.J., concurring)). Thus, Defendants' decision to temporarily suspend in-person learning during a pandemic for counties with higher rates of new COVID-19 cases meets *Plyler*'s heightened level of scrutiny (and consequently, rational basis review, should this Court rightfully reject Plaintiffs' assertion that it does not apply). *See Swepi, Ltd. P'ship v. Mora Cty.*, 81 F. Supp. 3d 1075, 1181 (D.N.M. 2015) (Browning, J.) ("Under a rational basis review, the party challenging a classification under the Equal Protection Clause normally has the burden 'to negative any reasonably conceivable state of

facts that could provide a rational basis for the classification.'" (quoting *Bd. of Trustees v. Garrett*, 531 U.S. 356, 367 (2001)).

### 2.    Procedural Due Process

Plaintiffs next claim Defendants violated Plaintiffs' right to procedural due process under the Fourteenth Amendment. Specifically, Plaintiffs allege that they have been deprived of their right to "a uniform system of free public schools" as guaranteed by Article XII, Section 1 of the New Mexico Constitution without any pre-deprivation or post deprivation due process. Motion at 5, 12-13. The Due Process Clause states, "No State shall. . .deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. An alleged violation of the due process clause "prompts a two-step inquiry: (1) whether the plaintiff has shown the deprivation of an interest in 'life, liberty, or property' and (2) whether the procedures followed by the government in depriving the plaintiff of that interest comported with 'due process of law.'" *Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012). In this case, Plaintiffs are unlikely to establish the first required step.

A constitutional right for the purpose of procedural due process can be defined by state law. *Guttman v. Khalsa*, 669 F.3d 1101, 1115 (10th Cir. 2012) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 540-41 (1985)). However, to "have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The New Mexico Constitution guarantees a "uniform system of free public schools sufficient for the education of, and open to, all children of school age in the state[.]" N.M. Const. art. XII, § 1. Yet this provision does not guarantee that every aspect of education is a protected right. In *Norton v. Bd. of Ed. of Sch. Dist. No. 16, Hobbs Mun. Sch.*, 1976-NMSC-045, ¶ 4, 89 N.M. 470, 553 P.2d

1277, the New Mexico Supreme Court construed the "free education" phrase in N.M. Const. art. XII, § 1 to apply to "[o]nly those courses 'sufficient for the education'" of school children. Thus, the New Mexico Supreme Court determined elective courses are not required for students, and reasonable fees could be charged for those courses in public schools. *Id.* ¶ 5.

Plaintiffs have yet to establish that on-line instruction provided in the remote phase of PED's Reentry Guidelines violates the New Mexico Constitution. Plaintiffs do not provide any New Mexico law requiring in-person instruction of students in public schools. None of the individual Plaintiffs allege that the material or content provided to students on-line in New Mexico is deficient. *See* Motion at Exs. B-D. Instead, Plaintiffs only support that on-line instruction is inferior to in-person instruction are affidavits from a case in which the Central District of California denied a request for temporary restring order permitting in-person instruction in California schools. *See Brach*, *supra* note 32. There is similarly no evidence to substantiate Plaintiffs' theory that Defendants are punishing the school districts in the southeastern part of the state. Rather, Defendants's uniform approach to school reentry plan is based on established, clear and objective criteria based on widely accepted epidemiological markers. Ex. B at ¶¶ 19-22, 38. The State is applying this reentry criteria to all school districts throughout the state. *Id.* Therefore, Defendants are upholding the New Mexico Constitution's guarantee of a uniform public school system while taking steps to safeguard the public during this pandemic.

Furthermore, Plaintiffs' alleged deprivation of a property interest is at odds with federal law. The United States Supreme Court has held that state law providing for a free public education creates "a legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause." *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (holding the suspension of students as a disciplinary tool was a "complete deprivation" of education warranting notice and a

hearing). However, Plaintiffs' property interest in a public education pursuant to New Mexico law does not extend to the "particular incidents of education" that compose the "educational process." *Seamons v. Snow*, 84 F.3d 1226, 1234-35 (10th Cir. 1996). The Tenth Circuit has interpreted *Goss* to speak only in general terms regarding the "educational process" and not the specific components of education. *Id.* at 1235 (citing *Albach v. Odle*, 531 F.2d 983 (10th Cir. 1976)). Thus, participation in sports, taking certain classes, or attending a particular school do not create "a property interest subject to constitutional protection." *Id.*; *see Colorado Seminary (University of Denver) v. National Collegiate Athletic Asso.*, 570 F.2d 320, 321 (10th Cir. 1978) ("The 'educational process' is indeed a bundle of diverse situations . . . to the effect that if one stick in the bundle is removed, it does not necessarily mean that a constitutionally protected right of a student has thereby been violated.").[37] This Court has similarly held in cases when there were no allegations that a student was completely excluded from his or her education, the plaintiffs failed to demonstrate a protectable property interest under the Due Process Clause. *See Chavez v. Bd. of Educ. of Tularosa Mun. Sch.*, CIV 05-0380 JB/RLP, 2006 WL 4060667 (D.N.M. Oct. 4, 2006); *Ar v. Las Vegas City Schs*, CIV 13-0720 KBM/KK; CIV 13-0350 KBM/KK; CIV 13-0755 KBM/KK 2014 U.S. Dist. LEXIS 205380, (D.N.M. Sept. 27, 2014) (holding allegations that the child was deprived of electives, physical education class, materials in Braille, and certain text books did not amount to a protected property interest because the child was not entirely excluded from his education).

---

[37] District courts have similarly upheld this interpretation of *Goss*, 419 U.S. 565. *Johnson v. W. State Colo. Univ.*, 71 F. Supp. 3d 1217, 1227-1228 (D. Colo. 2014); *Littlefield v. Piedra Vista High Sch. Admin.*, No. CIV 15-177 RB/SCY, 2015 U.S. Dist. LEXIS 193325 (D.N.M. August 21, 2015) (holding student did not have property interest in participating in interscholastic sports); *Castaneda v. City of Albuquerque*, 276 F. Supp. 3d 1152, 1177 (D.N.M. Feb 4, 2016); *Walker v. Jemez Mt. Sch. Dist.*, 2020 U.S. Dist. LEXIS 107814, *9-11 (D.N.M. June 19, 2020)("Plaintiffs have not met their burden in demonstrating that this claimed [property] right to a revoked diploma or to uncorrected transcripts is 'clearly established' in the Tenth Circuit.").

Plaintiffs allege Defendants' orders impose deprivations of the right to education because students are denied in-person socialization during school hours. *See generally* Motion. Defendants do not deny that socialization of children is an important aspect of education.[38] However, as demonstrated by Tenth Circuit precedent, socialization in education is not a property right subject to due process. *See Seamons*, 84 F.3d at 1234-35. Additionally, public students in New Mexico receiving remote instruction have not been completely excluded from an education. Rather, online instruction ensures there is no lapse in education to public school students. Thus, Plaintiffs are unlikely to establish at any point in this litigation they have been deprived a property right that is subject to procedural protections.

Even if Plaintiffs could establish a protected property interest, a procedural due process violation will not lie when the underlying governmental action affects a general class of persons. *See Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enf't Comm'n*, 889 F.2d 929, 936 (10th Cir. 1989) ("When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process."); *see also 75 Acres, LLC v. Miami-Dade Cty.*, 338 F.3d 1288, 1294 (11th Cir. 2003) ("[I]f government action is viewed as legislative in nature, property owners generally are not entitled to procedural due process."); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir. 1991) ("[I]f a town's action is legislative, an affected party has no right to notice and an opportunity to be heard.").

Although this exception typically applies to laws passed by Congress or state legislatures, courts have held that the exception generally applies regardless of the entity and instead focus on

---

[38] The PED is taking into account the social-emotional impact of the coronavirus on all community members, including public school students. This is seen with PED's steps to provide social and emotional support to students during the remote instruction phase. *See* Ex. Bat ¶¶ 24, 26.

whether the action applies to a larger segment of the population rather than a limited number of individuals. *See, e.g.*, *Curlott v. Campbell*, 598 F.2d 1175, 1181 (9th Cir. 1979) ("At the outset we doubt very much that procedural due process prior to reduction of benefits is required when an agency makes a broadly applicable, legislative-type decision." (citing *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915)); *Clayland Farm Enters., LLC v. Talbot Cty.*, Civil Action No. GLR-14-3412, 2019 U.S. Dist. LEXIS 147122, at *29 (D. Md. Aug. 29, 2019) ("Legislative acts generally include the adoption of prospective rules and the creation of general policies that affect the larger population." (alterations, internal quotation marks, and citations omitted)). Following this principle, courts have held that executive orders issued in response to the current pandemic were legislative in nature, and therefore, did not implicate procedural due process. *See, e.g.*, *Carmichael v. Ige*, No. 20-00273 JAO-WRP, 2020 U.S. Dist. LEXIS 116860, at *29 (D. Haw. July 2, 2020) ("Moreover, because the Emergency Proclamations affect the entire State, they do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." (internal quotation marks and citation omitted)). Defendants' orders and the Reentry Guidelines are similarly legislative in nature, as they apply to every public school across the state. Accordingly, Plaintiffs are not entitled to the procedural due process of individual notice or an opportunity to be heard.

Yet even if Defendants' orders and Reentry Guidelines were not legislative in nature, Plaintiffs would still not be entitled to pre- or post-deprivation due process. As the United States Supreme Court has pointed out, "[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action. Indeed, deprivation of property to protect the public health and safety is '[one] of the oldest examples' of permissible summary action." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981)

(quoting *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599 (1950)).   Because the operative PHO and Reentry Guidelines were issued in the face of an unprecedented and constantly evolving pandemic threatening the lives of thousands of New Mexicans, Plaintiffs are not entitled to any pre-deprivation due process.

Finally, Plaintiffs are extremely unlikely to succeed on a due process claim as to the process provided students with disabilities. As Defendants demonstrate in the following section, Plaintiffs are not excused from IDEA's requirement to exhaust their remedies. Plaintiffs fail to allege how they have been prevented from using the myriad of administrative procedures currently available to parents who believe their child is not receiving a fair appropriate public education. *See* 20 U.S.C. § 1415 (2018); Ex. A at ¶¶ 55-62. A general claim that "officials did not adhere to IDEA procedural safeguards does not amount to a procedural due process claim." *Jump v. Springer Mun. Schs.*, Civ. No. 13-289 KG/KK, 2015 U.S. Dist. LEXIS 194594, *10 (D.N.M. Oct. 14, 2015) (citing *Doe v. Bd. of Educ. of Elyria City Sch.*, No. 96-4008, 1998 U.S. App. LEXIS 10783 (6th Cir. May 27, 1998)); *see also Martinez v. Espanola Pub. Sch.*, No. CIV 04-0737 MCA/LFG, 2005 U.S. Dist. LEXIS 42487, *43-44 (D.N.M. December 22, 2005) (holding that the plaintiffs failed to establish a constitutional due process claim for lack of pre-deprivation procedures where "(1) a student's parents are informed of the deprivation before it occurs, (2) this deprivation arises from the exigent circumstances of an unsafe classroom, and (3) a full array of post-deprivation procedures and remedies are made available under the statutory framework set forth in the IDEA"). Therefore, Plaintiffs are unlikely to prevail on procedural due process claim against Defendants.

### 3.   Individuals with Disabilities Education Act

Plaintiffs will not be successful on their claims on behalf of parents of students with disabilities because the essence of the Individuals with Disabilities Education Act (IDEA), 20

U.S.C. §§ 1400 et.seq., is to provide individualized education plans for students, and Plaintiffs have failed to exhaust their administrative remedies as required by the Act.

> ### i.   Plaintiffs' claims regarding FAPE and LRE misconstrue the very purpose of IDEA.

Plaintiffs allege Defendants are violating IDEA by failing to provide a free appropriate public education to qualifying children. Plaintiffs assume, without basis, that the least restrictive environment requirement of IDEA cannot be met for any student with disabilities in the school districts at issue because students with disabilities are denied in-person social interaction with students without disabilities. Motion at 8, 17-18; Am. Compl. at ¶¶ 14-15, 71. This broad generalization is inaccurate as it blatantly ignores the purpose of IDEA.

IDEA's core purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); *see also Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs*., 565 F.3d 1232, 1235-36 (10th Cir. 2009). IDEA accomplishes this goal as a "spending statute that imposes obligations on the states to provide certain benefits in exchange for federal funds." *Ellenberg v. N.M. Military Inst*., 478 F.3d 1262, 1274 (10th Cir. 2007). "New Mexico has chosen to accept IDEA funds, and has adopted rules to comply with IDEA's requirements accordingly". *Id.* at 1270. For purposes of the IDEA, New Mexico's state enforcement agency is PED, and its local education agencies are the local school districts and

charter schools.[39] *See Id.* Therefore, local school districts are responsible for providing special education and related services to students with disabilities.[40]

IDEA requires that states provide a free appropriate public education (FAPE) to every child between the ages of 3 and 21 who is determined to have a disability within the meaning of the IDEA. 20 U.S.C. § 1412(a)(1)(A). A FAPE is defined as special education and related services that:

(A)    have been provided at public expense, under public supervision and direction, and without charge;

(B)    meet the standards of the State educational agency;

(C)    include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D)    are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9). "[T]he primary vehicle used to deliver a free and appropriate public education is an Individualized Education Program [(IEP).]" *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 743, 749 (2017); *see also Murray by and through Murray v. Montrose Cty. Sch. Dist.*, 51 F.3d 921, 925 (10th Cir. 1995) ("The IEP is the basic mechanism through which th[e] goal of [providing a FAPE] is achieved for each disabled child."). "The IEP is a written statement that sets forth the child's

---

[39] "Each 'State Educational Agency' ('SEA') must enact procedures and policies to implement the IDEA, and ensure both state and local compliance with the Act. 'Local Education Agencies' ('LEAs') are given primary responsibility for overseeing the actual provision of special education services to disabled children." *Ellenberg*, 478 F.3d at 1269 (citing 20 U.S.C § 1412(a)(11); 1413(a)(1); *Gadsby v. Grasmick*, 109 F.3d 940, 942-43 (4th Cir. 1997)). "SEAs ensure LEA compliance through the power of the purse: Federal IDEA funds are distributed to the SEA, and those funds may not be forwarded to LEAs within the state unless they demonstrate compliance with the IDEA to the satisfaction of the SEA." *Id.* (citing § 1413(a), (d)).

[40] The PED's regulations "largely track [IDEA], and are 'binding on each New Mexico public agency that has direct or delegated authority to provide special education and related services, regardless of whether that agency is receiving funds under the [IDEA].'" *Ellenberg*, 478 F.at 1270 (quoting 6.31.2.2 NMAC). "LEAs are tasked with developing IEPs for children within their educational jurisdiction." *Id.* (citing  6.31.2.11(A)(3)(g) NMAC).

present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993); *see* 20 U.S.C. § 1412(a)(4) (instituting IEPs). For special education and related services to a student to constitute a FAPE, they *must* be "provided in conformity with the IEP." 20 U.S.C. § 1401(9)(d).

IDEA also requires that children with disabilities receive a FAPE in the least restrictive environment ("LRE"). *See* 20 U.S.C. § 1412(a)(5). The LRE provision requires school districts ensure that children with disabilities are educated with children who are not disabled "[t]o the maximum extent appropriate," and that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*; *see also L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976 (10th Cir. 2004).

The LRE provision is meant to support Congress' goal to "mainstream" children with disabilities into educational settings with children without disabilities to the "maximum extent appropriate" provided by a student's IEP. *Miller*, 565 F.3d at 1236; § 1412(a)(5). The "basic floor of opportunity provided by the [IDEA] consists of access to specialized instruction and related services which are *individually designed* to provide educational benefit to the handicapped child." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 201, (1982) (internal quotation marks and citation omitted) (emphasis added). The LRE for each child is an individualized determination made by the child's IEP team. 20 U.S.C. § 1414(d)(1). Given the diversity of potential needs of each qualifying student, not all students with disabilities are included in educational settings with children without disabilities. Thus, it is incorrect to assume that every student with disabilities will receive a benefit

from in-person interaction with students in a regular classroom for FAPE. *See Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1049, (5th Cir. 1989) (recognizing that placement in regular education may be detrimental to some students and that "mainstreaming a child who will suffer from the experience would violate the [IDEA]'s mandate for [FAPE]."). Therefore, the determination of whether a child has been provided a FAPE in the least restrictive environment turns in large part on the student's IEP.[41]

Plaintiffs provide no authority to support their argument that the LRE provision in students' IEPs is only satisfied if all students are physically present in a classroom together. The term "social interaction" does not appear in IDEA, let alone any requirement that every child receive in-person social interaction. When a parent alleges that a student with a disability is not being provided with an education in the LRE, the need for examination of the particular child's IEP is necessary. *See Ellenberg*, 478 F.3d at 1277 (holding that without a recent IEP prepared for the child, neither the 10th Circuit nor a district court had a factual record to determine if the school at issue was the LRE for the child). Plaintiffs have failed to provide any IEPs demonstrating how the remote instruction for students without disabilities has affected students with disabilities. Instead, the declaration made by Plaintiff Shannon Woodworth suggests that she is only requesting in-person learning for her daughter.[42] Motion at Ex. B.

---

[41] In determining whether an educational placement is a student's LRE, the 10th Circuit looks to "(1) whether education in a regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily; and (2) if not, if the school district has mainstreamed the child to the maximum extent appropriate." *Ellenberg*, 478 F.3d at 1277 (quoting *L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976 (10th Cir. 2004) (citing *Murray by & Through Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 927 n.10 (10th Cir. 1995) (internal quotations marks omitted)).

[42] Furthermore, as in-person instruction is available for students with disabilities in Ms. Woodworth's school district, if her child has been denied in-person services by the LEA her claim is against the district, not the State.

It goes without saying that IDEA, PED, and the U.S. Department of Education ("USDOE") did not contemplate a global pandemic. Given the once in a lifetime nature of this public health emergency, DOE has provided guidance regarding the pandemic. *See* Ex. B at Exs. 29, 30. In its initial guidance, DOE stated: "If an LEA continues to provide educational opportunities to the general student population during a school closure, the school must ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE." Ex. B at Ex. 29, p. 2 (citations omitted). The school districts identified in Plaintiffs' Amended Complaint are currently able to provide remote instruction. Therefore, the educational opportunities available to the general student population at this time is remote instruction, and there can be no violation of the LRE provision if students with disabilities participate in remote instruction like students without disabilities.

USDOE has since provided additional guidance stating that IDEA should not prevent any school from offering educational programs through distance instruction. Ex. B at Ex. 30 at 1. "[S]chool districts must remember that the provision of FAPE may include, as appropriate, special education and related services provided through distance instruction provided virtually, online, or telephonically." *Id.* Therefore, even USDOE recognizes there must be some flexibility as to students' FAPE due to the exceptional and ever-changing environment of the pandemic. *See Id.* ("The determination of how FAPE is to be provided may need to be different in this time of unprecedented national emergency."); *see also L.V. v. N.Y. City Dep't of Educ.*, 19-CV-05451 (AT) (KHP), 2020 U.S. Dist. LEXIS 120995 (S.D.N.Y. July 8, 2020) (ordering that a 2019 placement order for a student be performed in accordance with local health guidelines due to the COVID-19 pandemic). However, not all services, such as therapy services, in a student's IEP can be provided virtually.  The USDOE also recognizes that due to the needed flexibility, there should

be consideration of providing compensatory education services to students with disabilities who may not have been able to benefit from the changes in delivery of services required by the public health emergency.  Ex. B at Ex. 30, p. 1.

Nor can it be assumed that all students with disabilities will progress well in a remote learning environment. PED's Reentry Guidelines for Schools and Reentry Guidance for Special Education therefore permit the LEAs to provide students with disabilities in-person learning in small groups pursuant to their IEPs during remote instruction. Ex. B at ¶¶ 50-57.  The State's allowance for in-person learning for students with disabilities in groups to ensure social distancing amid a deadly global pandemic is a wholly appropriate construction of the IDEA requirements given existing health circumstances. IDEA's entire structure and purpose is to provide a student with disabilities an IEP tailored to their specific needs. Therefore, Plaintiffs' claim that a one-size fits all LRE of in-person learning for all students is an attempt to misconstrue a requirement that is decided on an individual basis in each student's IEP.

### ii.      Plaintiffs' requested relief is available pursuant to the Reentry Guidance

Plaintiffs' claim regarding IDEA is also unlikely to succeed because students with disabilities may receive in person learning. Plaintiffs claim that the "complete failure" to provide in person services to students with disabilities violates the IDEA. Motion at 18.  However, this is inaccurate, as stated by PED's Reentry Guidance and Reentry Guidance for Special Education clearly allows for in-person learning for students with disabilities. Ex. B at ¶¶ 50-57. All New Mexico school districts, including those identified in Plaintiffs' Amended Complaint, have the choice of providing school-based in-person learning to students with disabilities in small groups in a 5 student to 1 teacher ratio.  *Id.*

### iii.   Plaintiffs have failed to exhaust the available administrative procedures available under IDEA.

Plaintiffs' contention that they have denied in-person learning is an issue that must be first assessed via IDEA's administrative processes before this Court may review their claims. "As part of the bargain of providing children with educational rights and parents with procedural safeguards to protect those rights, Congress required that parents turn first to the statute's administrative framework to resolve any conflicts they had with the school's educational services." *Cudjoe v. Indep. Sch. Dist. No.* 12, 297 F.3d 1058, 1064 (10th Cir. 2002). If a parent does not believe their child is being provided a FAPE, the dissatisfied parent may file a complaint with the LEA or SEA. 20 USC §1415(b)(6). The complaint then initiates a preliminary meeting involving the parties, or the parties may choose to pursue a full-fledged mediation. *Fry*, 137 S. Ct. at 749 (citing 20 USC §1415(f)(1)(B)(i), §1415(e)). If the impasse continues, the matter proceeds to a "'due process hearing' before an impartial hearing officer. §1415(f)(1)(A); *see* §1415(f)(3)(A)(i)." *Id*. "Any decision of the officer granting substantive relief must be 'based on a determination of whether the child received a [FAPE].' §1415(f)(3)(E)(i)." *Id.* If the hearing is conducted at LEA level, it can be appealed to the SEA. *See* §1415(g).

Once administrative procedures are exhausted, "[a]ny party aggrieved by the findings and decision" may file a civil action in state or federal court. § 1415(i)(2); § 1415(l); *see Ellenberg*, 478 F.3d at 1269-70. IDEA's exhaustion requirement "wisely gives educational professionals, well-versed in a child's educational needs and the range of educational services that could ably meet those needs, at least the first crack at formulating a plan to overcome the consequences of educational shortfalls." *Cudjoe*, 297 F.3d at 1065 (internal quotations and citations omitted).

To date, Plaintiffs have not pleaded or provided any evidence to suggest that they have exhausted any remedies or demonstrated they meet an exception to IDEA's exhaustion

requirement. *See* Motion at Ex. C; *Cudjoe*, 297 F.3d at 1063 n.6 (stating a party seeking to avoid exhaustion under IDEA bears the burden of demonstrating an exception applies). One exception to the failure to exhaust remedies requirement is that the "relief plaintiffs seek is not 'available' under the IDEA." *Ellenberg*, 478 F.3d at 1276 (quoting 20 U.S.C. § 1415(i)(2)). Here, Plaintiffs incorrectly argue that there is no administrative remedy to cure the alleged violation of IDEA of denying students in-person learning. Motion at 5. To the contrary, PED permits LEAs (i.e., the school districts) to provide in-person learning to students with disabilities even in the remote instruction phase. *See* Ex. B at ¶¶ 50-62. Therefore, the administrative processes under IDEA can provide Plaintiffs' their requested relief by first changing the student's IEP in an IEP team meeting and, if necessary, using the processes of mediation, a state complaint, and/or a due process hearing if a parent's request of in-person instruction is denied. *See* 20 USC § 1414(d)(4), § 1415; *Ellenberg*, 478 F.3d at 1276 ("Relief is available whenever the plaintiff could attain relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers." (internal quotation marks omitted)).

Additionally, "[e]xhaustion is also not required if pursuing administrative remedies would be futile or if an agency has adopted a policy or pursued a practice of generally applicability that is contrary to the law." *Id.* (alterations, internal quotation marks, and citations omitted); *see also Romer,* 992 F.2d at 1044 ("Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." (citations omitted)); *New Mexico Ass'n for Retarded Citizens v. New Mexico*, 678 F.2d 847, 851 (10th Cir. 1982) (finding plaintiffs allegations under Section 504 that "the entire special education service system offered by the State [was] infirm" warranted excusal from exhaustion of administrative processes under that act). However, Plaintiffs do not allege that New Mexico's entire special education

program is ineffective or has a systemic failure. Instead, Plaintiffs' allegations focus on only one specific component of students' IEPs—in-person instruction during this pandemic. *Cf. Romer*, 992 F.2d at 1044 (holding the class' requested relief regarding a single component of each individual children's IEPs was not a system violation that renders exhaustion requirement futile, "and framing a complaint as a class action challenge to a general policy does not convert it into one"). Again, Plaintiffs incorrectly assume that every student with a disability requires in-person instruction for FAPE or LRE. Yet even if this generalization was correct, all New Mexico school districts are allowed to provide in-person instruction to students with disabilities, and IDEA administrative remedies remain available to address the LRE and FAPE issues for students with disabilities. Accordingly, there is no system violation under the IDEA to support an assertion of futility.

Furthermore, Plaintiffs cannot demonstrate that remote instruction of students without disabilities violates IDEA.  There is no authority to support Plaintiffs' assumption that LRE requires in-person instruction of students with and without disabilities. *See Id.* ("A plaintiff does not necessarily fall within the third exception by challenging a policy of general applicability rather than an IEP formulated pursuant to that policy. The plaintiffs must still show that the policy is contrary to law and that the underlying purposes of exhaustion would not be served." (citations omitted)). IDEA is structured to provide FAPE through an individualized program for each qualifying student.  IDEA does not regulate or require the education programs for children without disabilities adhere to the IEPs of individual students with disabilities. Therefore, Plaintiffs have failed to establish they meet an exception to IDEA's exhaustion of remedies requirement.

Finally, Plaintiffs' suggestion that it was futile for them to exhaust their administrative remedies because the special education due process hearing officers are not authorized to require that the LEA provide in-person learning for students with disabilities in violation of the PHOs is

misplaced for two reasons.  First, as discussed above, the Reentry Guidance from PED specifically allows for in-person learning for students with disabilities in small groups. Ex. B at ¶¶ 53-56. Therefore, there is nothing to prevent a hearing officer from ordering in-person instruction for a student with disabilities.  Second, even assuming that Plaintiffs are correct that a hearing officer could not grant the specific injunctive relief they sought, this would not excuse their failure to exhaust their administrative remedies, as "[t]he mere unavailability of injunctive relief does not render the IDEA's administrative process inadequate." *Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1309 (9th Cir. 1992); *see also, e.g., Student A v. S.F. Unified Sch. Dist.*, No. 19-cv-03101-WHO, 2020 WL 571052, at *4 (N.D. Cal. Feb. 5, 2020) ("[F]utility or inadequacy is not established simply because the body hearing the administrative appeal lacks jurisdiction to provide all or some of the relief requested." (citing *Paul G. ex rel. Steve G. v. Monterey Peninsula Unified Sch. Dist.*, 933 F.3d 1096, 1102 (9th Cir. 2019))); *J.G. ex rel. C.G. v. Knox Cty.*, No. 1:19-cv-63, 2019 WL 4451203, at *5 (E.D. Tenn. Sept. 17, 2019) (rejecting argument that an administrative law judge's inability to "fix practices or policies which will inevitably repeat themselves" excused a failure to exhaust where exhaustion would have promoted "accuracy, efficiency, agency autonomy, and judicial economy as [the IDEA] intended"); *P.G. ex rel. R.G. v. Rutherford Cty. Bd. of Educ.*, 313 F. Supp. 3d 891, 905 (M.D. Tenn. 2018) ("[P]laintiffs [must] exhaust their administrative remedies and build a record even if the plaintiff seeks certain relief, like money damages, that is unavailable in an IDEA administrative proceeding.").

      **D.**      **Plaintiffs have not demonstrated irreparable harm, that the balance of equities tips in its favor, or that the public interest would be served by injunctive relief.**

Plaintiffs cannot demonstrate any form of irreparable harm required for their requested injunctive relief. *See Schrier*, 427 F.3d at 1267. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Id.* (internal quotation marks and citations omitted).

"Irreparable harm is not harm that is merely serious or substantial." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks and citation omitted).  Here, Plaintiffs argue that they will suffer irreparable harm without a TRO or preliminary injunction because the deprivation of their constitutional rights "inexorably creates irreparable harm." Motion at 18-19. This argument fails, however, as Plaintiffs have not established a likelihood of success on the merits of any of their claims. *See Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016) (Browning, J.) ("Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." (citing *Schrier*, 427 F.3d at 1266) (Browning, J.).

Plaintiffs' speculation that "[t]housands will suffer collateral harm, including abuse, depression, suicide and hunger" if Defendants' are not enjoined from prohibiting of in-person learning is similarly unfounded. Motion at 18. Plaintiffs provide no support to establish that any of the alleged harms associated with remote instruction described in the Motion are certain, let alone present, in New Mexico. Plaintiffs only refer to the suicide of one child in April 2020 to support for their broad assumption regarding the mental health of children in New Mexico. *See* Motion at Ex. A. Plaintiffs' use of this tragedy to support their position is as speculative as it is disrespectful, as it is impossible to assign with any certainty a single motive in such a tragic event.[43]

Irreparable harm can similarly not be presumed amongst the individual Plaintiffs. Plaintiff Clarissa Hernandez has failed to establish how the continued remote instruction will cause a certain irreparable injury to her children. Ms. Hernandez takes no issue with the content or the methods

---

[43] Additionally, the incident involving the child took place two months before the PED released its Reentry Guidance. *See* Motion at Ex. A.

used by her children's instructors provided in remote instruction to her children. *See* Motion at Ex. B. She "feels" her son is "falling behind" but does not state if this is due to remote instruction or general difficulty understanding certain subject matter. *Id.* at ¶ 14. Instead Ms. Hernandez's concerns with remote learning are her children's socialization and enthusiasm since receiving remote instruction. *Id.* at ¶¶ 13-14. While socialization is important for children, Plaintiffs fail to demonstrate how a temporary suspension of in-person instruction will permanently impact the remainder of a child's life. *Cf. Doe v. Princeton Univ.*, No. 3:20-cv-4352-BRM-TJB, 2020 U.S. Dist. LEXIS 76827, at *21 (D.N.J. Apr. 21, 2020) (stating that "an interruption in a student's education, while a genuine injury, is not irreparable" (internal quotation marks and citation omitted)). In Plaintiff Shannon Woodard's case there is no irreparable harm, as the relief she seeks is available for her child. *See* Motion at Ex. C.

Finally, Plaintiff David Gallegos does not demonstrate any cognizable injury or any irreparable harm if remote instruction continues. Plaintiffs allege the prohibition of in-person learning deprives Mr. Gallegos the "ability to fulfill his obligations as a school board member under IDEA" and the New Mexico Constitution. Am. Compl. at ¶¶ 24, 27. Plaintiffs do not cite to any provision in IDEA or any other law to support this allegation. All school districts are permitted to provide in-person learning to all students with disabilities. Further, Mr. Gallegos admits his request for in-person learning is based on parents' preferences and requests. Motion at Ex. D. A preference or request for in-person instruction does not overcome Defendants' compelling interest to safeguard the public's health. *See Jacobson*, 197 U.S. at 28-29 (holding "it was the duty of the constituted authorities primarily to keep in view the welfare, comfort and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few").

Plaintiffs also miss the mark by claiming that the balance of harms favors Plaintiffs because the "government's perception of harm is speculative" and it "permits the same speculative harm in other places." Motion at 19. Unfortunately, there is nothing speculative about the harms caused by COVID-19, which has killed hundreds of New Mexicans, hundreds of thousands of Americans, and nearly a million individuals throughout the world. There is also nothing speculative about the possibility of substantially increasing the number of infections by reopening schools which simultaneously bring hundreds of people into contact with each other in a public space. *See* Ex. A at ¶¶ 10-12, 15,18. Additionally, the risk of the spread of COVID-19 is not speculative or minimal for children or adults in contact with children. *Id.* Instead the State has reviewed and relied on over 20 scientific studies which establish that everyone in a family is able to contract and spread COVID-19. *Id.* at ¶¶ 17-18. By contrast, the harms claimed by Plaintiffs are entirely speculative as Plaintiffs have yet to establish any of the alleged deficiencies they claim are associated with remote instruction are present in this State.

Finally, the public interest strongly favors denying Plaintiffs' request for injunctive relief. New Mexico is in the throes of an unprecedented public health crisis. Currently, the most effective means of stemming COVID-19 transmission is through social distancing. That is why State and local governments, here in New Mexico and nationwide, have adopted temporary rules that encourage or require people to stay in their homes and avoid physical proximity to others to the greatest extent possible. In fact, New Mexico's science driven response to the coronavirus has been lauded nationally for preventing the virus from causing additional loss in comparison to other states. *See* Ex A at ¶ 4; Ex. B at ¶¶ 7-8. The Reentry Guidance for public schools relies upon this same scientific data by setting clear, objective criteria for evaluating readiness for in-person learning in schools. *See* Ex A at ¶¶ 7-15; Ex. B at ¶¶ 6, 19, 22, 38. Thus the State's process for

determining eligibility for in-person learning is not arbitrary or capricious but objectively justified by science.

Plaintiffs seek to avoid these rules—and the reality of the situation—by asking this Court to invalidate the Reentry Guidance. Reopening schools without regard for current epidemiological markers of public health conditions within these school districts ignores the established scientific fact that in-person learning in schools will increase the number of COVID-19 cases and spread rates. *See* Ex. A. Thus the strong public interest in continuing to prevent the spread of COVID-19 outweighs the injunctive relief Plaintiffs seek. *See Legacy Church, Inc.*, 2020 U.S. Dist. LEXIS 122542, at *329 (Browning, J.) ("The public's interest in limiting the COVID-19 outbreak in the State, a compelling interest outweighs the right to gather.").

## CONCLUSION

For the foregoing reasons, this Court should deny the Plaintiffs' request for a TRO and preliminary injunction.

Respectfully submitted,

_____
Matthew L. Garcia,
*Chief General Counsel to*
*Governor Michelle Lujan Grisham*
Maria S. Dudley
*Associate General Counsel to*
*Governor Michelle Lujan Grisham*
Kyle P. Duffy
*Associate General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trial, Suite 400
Santa Fe, New Mexico 87501
matt.garcia@state.nm.us
maria.dudley@state.nm.us
kyle.duffy@state.nm.us

and

HECTOR H. BALDERAS
**NEW MEXICO ATTORNEY GENERAL**

By: */s/ Nicholas M. Sydow*

    Nicholas M. Sydow
    Civil Appellate Chief
    Erin Lecocq
    Assistant Attorney General
    P.O. Box 1508
    Santa Fe, NM 87504-1508
    505-717-3571
    nsydow@nmag.gov
    elecocq@nmag.gov
    *Counsel for the State of New Mexico*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2020, I filed the foregoing through the New Mexico Electronic Filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

Matthew L. Garcia