IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CLARISSA HERNANDEZ;
ROBERT HERNANDEZ;
SHANNON WOODWORTH and
DAVID GALLEGOS,

        Plaintiffs,

vs.                                                                No. CIV 20-0942 JB\GBW

MICHELLE LUJAN
GRISHAM; RYAN
STEWART; KATHYLEEN
M. KUNKEL and the
STATE OF NEW MEXICO,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Verified Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief, filed September 21, 2020 (Doc. 6)("Motion"). The Court held a hearing on the Plaintiffs' Motion for a Temporary Restraining Order ("TRO") on September 30, 2020. See Clerk's Minutes at 1, filed September 30, 2020 (Doc. 18). The primary issues are: (i) whether the Plaintiffs have standing to sue Defendants Governor Michelle Lujan Grisham, Secretary Kathyleen Kunkel, and Secretary Ryan Stewart; (ii) whether the Plaintiffs have standing under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.; (iii) whether the State of New Mexico has sovereign immunity with respect to the Plaintiffs' claims; (iv) whether the Court should certify Plaintiffs' proposed classes; (v) whether the Defendants' policy on school reentry ("Reentry Guidance") violates the Plaintiffs' substantive due process rights and equal protection rights under 42 U.S.C. § 1983; (vi) whether the Defendants' Reentry Guidance violates the Plaintiffs'

procedural due process rights; (vii) whether Shannon Woodworth must exhaust her remedies under the IDEA before bringing an IDEA claim in federal court; and (viii) whether the Defendants have violated the Plaintiffs' rights to a free appropriate public education ("FAPE") under the IDEA. The Court concludes that: (i) the Plaintiffs have shown that they likely have standing to bring claims against Secretary Stewart, but have failed to demonstrate that they are likely to have standing to sue Governor Lujan Grisham and Secretary Kunkel because they have not successfully established the causation and redressability prongs of the standing inquiry with respect to these two defendants; (ii) only Woodworth likely has standing under the IDEA, because Hernandez and Gallegos are not parents of special needs children; (iii) New Mexico likely has sovereign immunity with respect to the Plaintiff's § 1983 claims because the statute does not allow plaintiffs to sue states directly for constitutional violations, but likely lacks sovereign immunity under the IDEA because Congress has abrogated state sovereign immunity under the IDEA; (iv) the Court likely will not certify Plaintiffs' proposed subclasses, because Plaintiffs have not established that they are likely to establish commonality and typicality successfully on the merits pursuant to rule 23(a) of the Federal Rules of Civil Procedure; (v) the Plaintiffs' substantive due process and equal protection claims are unlikely to succeed on the merits because the Reentry Guidance is rationally related to a legitimate state interest, and remote instruction does not per se violate a state's duty to provide adequate free public education; (vi) the Defendants have not violated the Plaintiffs' procedural due process rights because the re-entry guidance is quasi-legislative; (vii) Woodworth need not exhaust the available administrative remedies under the IDEA because the deficiencies in her IEP present a purely legal question; and (viii) a temporary restraining order is appropriate with respect to Woodworth alone because she is likely to succeed in demonstrating that her

Individualized Education Plan ("IEP") violates the IDEA. The Court, therefore, grants in part and denies in part the Motion for Preliminary Injunction and TRO.

## FINDINGS OF FACT

"A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.). Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must [] state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2). "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only). See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).

The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d at 1188. Thus, while the Court does the best it can to make good findings from the record that it has and in the short time that it has to make findings, these findings of fact are relevant

only to the extent of a TRO, and do not bind the Court at trial.  Accordingly, the Court finds as follows:

1.      Plaintiffs Clarissa and Robert Hernandez are the parents of four children, ages eight to fifteen, in Lea County, New Mexico.  See Plaintiff's Original Complaint and Request for Temporary Restraining Order ¶ 1, at 2, filed September 16, 2020 (Doc. 1)("Complaint"); Declaration of Clarissa Hernandez in Support of Applications for a Temporary Restraining Order ¶¶ 1-9, at 1-2 (executed August 18, 2020), filed September 21, 2020 (Doc. 6-2).

2.      Plaintiff Shannon Woodworth is the parent of a school-aged child with special needs.  See Complaint ¶ 2, at 2.

3.      Woodworth's child has "an individual education program (IEP)"[1] and "has not been provided with many" of her IEP services "since school was shut down."  Declaration of Shannon Woodworth in Support of Applications for a Temporary Restraining Order ¶¶ 5-6, at 2 (executed September 18, 2020), filed September 21, 2020 (Doc. 6-3)("Woodworth Decl.").

4.      Woodworth's daughter has "regress[ed]" since schools closed for in person instruction and "is now failing in her courses."  Woodworth Decl. ¶ 13, at 2-3.

5.      Plaintiff David Gallegos is an elected representative in the New Mexico House of Representatives and is an elected member of the Board of Education for Eunice Public Schools. See  Complaint  ¶  3,  at  2;  Representative David M. Gallegos,  New  Mexico  Legislature, https://nmlegis.gov/Members/Legislator?SponCode=HGADV (last visited Sept. 21, 2020).

---

[1] "The term 'individualized education program' or 'IEP' means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with" 20 U.S.C. § 1414(d).  20 U.S.C. § 1401(14).

6.      Defendant Michelle Lujan Grisham is the Governor of New Mexico.   <u>See</u> Complaint ¶ 4, at 2; <u>Michelle Lujan Grisham</u>, Office of the Governor, https://www.governor.state.nm.us/our-leadership/governor/ (last visited Sept. 21, 2020).

7.      Defendant Ryan Stewart is the Secretary of Education for the State of New Mexico. <u>See</u> Complaint ¶ 5, at 2; <u>Ryan Stewart</u>, Office of the Governor, https://www.governor.state.nm.us/our-leadership/public-education-department/ (last visited Sept. 21, 2020).

8.      Defendant Kathyleen M. Kunkel is the Secretary for the New Mexico Department of Health.   <u>See</u> Complaint ¶ 6, at 2; <u>Office of the Secretary</u>, New Mexico Department of Health, https://www.nmhealth.org/about/asd/ots/ (last visited Oct. 10, 2020).

9.      The coronavirus disease 2019 ("COVID-19") is a pandemic that has spread around the world, within the United States of America, and in New Mexico.  <u>See</u> <u>Coronavirus disease 2019 (COVID-19)</u>, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last visited Oct. 12, 2020)("Mayo Clinic").

10.     As of February 11, 2020, there were twelve confirmed COVID-19 cases in the United States.  <u>See</u> <u>Previous U.S. COVID-19 Case Data</u>, Centers for Disease Control and Prevention (CDC), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/previouscases.html (last visited Sept. 29, 2020); <u>Cases in the U.S.</u>, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Sept. 27, 2020).

11.     As of October 10, 2020, there have been 7,525,920 cases of COVID-19 in the United States, and 211,311 deaths.  See WHO Coronavirus Disease (COVID-19) Dashboard, World Health Organization, https://covid19.who.int/ (last visited Oct. 10, 2020).

12.     As of October 10, 2020, New Mexico has had 32,722 cases and 907 deaths.  See 2019 Novel Coronavirus Disease (COVID-19), New Mexico Department of Health (DOH), https://cv.nmhealth.org/ (last visited Oct. 10, 2020).

13.     COVID-19 is a contagious disease that is spread through respiratory droplets that are released when infected individuals cough, sneeze, or talk.  See Mayo Clinic.

14.     Risk factors for COVID-19 are close contact --  typically defined as within six feet -- with someone who has COVID-19, or when a person infected with COVID-19 coughs or sneezes on others.  See Mayo Clinic; COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus and COVID-19, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

15.     Common signs and symptoms can include fever, cough, and tiredness.  See Mayo Clinic.

16.     Other symptoms can include a loss of taste or smell, shortness of breath or difficulty breathing, muscle aches, chills, sore throat, runny nose, headache, and chest pain.  See Mayo Clinic.

17.     Although COVID-19 may cause only mild symptoms for some people, for others, COVID-19 can cause severe complications, including pneumonia in both lungs, organ failure, and death.  See COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New

<u>Coronavirus and COVID-19</u>, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

18.     COVID-19 symptoms can persist for months.  <u>See</u> <u>COVID-19 (coronavirus): Long-term effects</u>, the Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351#:~:text=COVID%2D19%20symptoms%20can,within%20a%20few%20weeks (last visited Oct. 12, 2020).

19.     COVID-19 can damage the lungs, heart, and brain, which increases the risk of long-term health problems.  <u>See</u> <u>COVID-19 (Coronavirus): Long-Term Effects</u>, the Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351#:~:text=COVID%2D19%20symptoms%20can,within%20a%20few%20weeks (last visited Oct. 12, 2020).

20.      Signs and symptoms of COVID-19 typically appear two to fourteen days after exposure.  <u>See</u> Mayo Clinic.

21.     The time after exposure and before the appearance of symptoms is called the incubation period.  <u>See</u> Mayo Clinic.

22.     Many COVID-19 cases result in mild symptoms or no symptoms.  <u>See</u> Nathan W. Furukawa et al., <u>Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic</u>, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article ("Furukawa COVID-19 Transmission Paper").

23.     When cases are symptomatic, the average time from exposure to symptom onset is five to six days, with symptoms appearing as long as thirteen days after infection.  See Furukawa COVID-19 Transmission Paper.

24.     Individuals who have been infected, therefore, usually do not know that they are infected for at least several days, and they may never know, if they remain asymptomatic.  See Furukawa COVID-19 Transmission Paper.

25.     Because many people who have COVID-19 do not know they have been infected, healthcare officials recommend that all people limit person-to-person contact, stay six feet apart, wash hands frequently, wear masks, cover coughs and sneezes, and avoid large gatherings.  See How to Protect Yourself & Others, The Centers for Disease Control and Protection, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html  (last  visited Oct. 12, 2020); Furukawa COVID-19 Transmission Paper.

26.     The risk of transmission is heightened in indoor environments, where infectious droplets may linger for longer periods of time.  See Nathan W. Furukawa et al., Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

27.     People with certain underlying medical conditions -- comorbidities -- are at increased risk for severe illness, hospitalization, and death from COVID-19.  See People with Certain  Medical  Conditions,  The  Centers  for  Disease  Control  and  Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 12, 2020); Adekunleee Sanyaolu, et al., Comorbidity and its

- 8 -

Impact on Patients with COVID-19, SN Compr. Clin. Med. (Jun. 25, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7314621/.

28. Some of these comorbidities include cancer, chronic kidney disease, chronic obstructive pulmonary disease, heart conditions -- such as heart failure, coronary artery disease, or cardiomyopathy -- immunocompromised state, sickle cell disease, smoking, and type 2 diabetes mellitus. See People with Certain Medical Conditions, The Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 12, 2020).

29. As of October 9, 2020, the Centers for Disease Control and Prevention (the "CDC") reported that of the 200,499 recorded deaths because of COVID-19, 90,820 of these deaths were associated with patients who also had pneumonia. See Provisional Death Counts for Coronavirus Disease 2019, The Centers for Disease Control and Prevention (COVID-19) https://www.cdc.gov/nchs/nvss/vsrr/COVID19/index.htm (updated Oct. 9, 2020).

30. In New Mexico, a child first tested positive for COVID-19 on March 15, 2020. See Declaration of David R. Scrase ¶ 5, at 2, filed September 28, 2020 (Doc. 14-1)("Scrase Decl.").

31. New Mexico has tracked the percentage of new cases of COVID-19 by age since March, 2020. See New Mexico COVID-19 Cases Update October 5th, 2020 at 5, New Mexico Department of Health, https://cv.nmhealth.org/wp-content/uploads/2020/10/State-Report-05OCT2020.pdf (last visited October 10, 2020)("NM COVID-19 Case Report").

32. New Mexico's data shows that children, ages five to seventeen years old, make up approximately ten percent of COVID-19 cases:



Figure 1: <u>Percentage of New Cases Each Week by Age</u>.

Source: NM COVID-19 Case Report at 5.



Figure 2: <u>Case Rate Per 100,000 Population by Age</u>.

Source: NM COVID-19 Case Report at 5.

33.     Children who recover from COVID-19 may experience complications like cardiac lesions.  See Scrase Decl. ¶ 16, at 9; Mubbasheer Ahmed et al., Multisystem Inflammatory Syndrome     In     Children:     A     Systematic     Review,     The     Lancet, https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(20)30271-6/fulltext     (last visited October 10, 2020).

34.     Although children are less susceptible to COVID-19 and typically become less ill, studies show that children are a source of transmission, and children, therefore, present a risk of spreading COVID-19 to parents, teachers, and school staff.[2]   See Scrase Decl. ¶ 16, at 9;

_____

[2]The parties dispute to what extent, if at all, children spread COVID-19 to their parents and others with whom they come in contact.  Compare Motion (arguing that "the casual link between denying an in-person education and the spread of COVID-19 is attenuated at best, numerous public health experts have gone on record with their opinions that denying in-person school presents little to no advantage in stopping the spread of the disease, making the decision to deny the children their equal education and/or a FAPE arbitrary and capricious"), with Defendants' Joint Response to Plaintiffs Verified Emergency Motion for Temporary Restraining [Sic] Order, Preliminary Injunction And Permanent Injunctive Relief, filed September 28, 2020 (Doc. 14)("Joint Response")("New Mexico's nationally recognized testing program demonstrates that from the first week of testing children have carried a significant disease burden."). The Court finds, based on the available scientific evidence, that children can spread COVID-19, and therefore pose a risk to parents, teachers, and school staff.  The Court, in coming to this finding, relies primarily on numerous studies the Defendants cite, see Scrase Decl. ¶ 17, at 10-17, which document the prevalence and spread of COVID-19 in children.
        The Court finds that the declarations which the Plaintiffs cite, and the studies which those declarations rely upon, see e.g., Declaration of Dr. Jayanta Bhattacharya in Support of Application for Temporary Restraining Order, filed September 17, 2020 (Doc. 4-3)(originally filed in Brach et al., v. Newsom et al, Case 2:20-cv-06472-SVW-AFM (C.D. Cal.)), filed on September 16, 2020 (Doc. 28-3))("Bhattacharya Decl."), although persuasive, indicate only that children pose a potentially reduced risk of spreading COVID-19 compared with adults, not that children pose no risk of spreading COVID-19 to others or cannot contract COVID-19. Furthermore, the two studies that the Plaintiffs rely upon were conducted in April, 2020 in Europe, see Daniel F. Gudbjartsson, Agnar Helgason, et al., Spread of SARS-CoV-2 in the Icelandic Population, The New England Journal of Medicine, https://www.nejm.org/doi/full/10.1056/NEJMoa2006100 (June 11, 2020);

Arnaud Fontanet, Rebecca Grant, et al., <u>SARS-CoV-2 Infection in Primary Schools in Northern France: A Retrospective Cohort Study in an Area of High Transmission</u>, Institut Pasteur, https://www.pasteur.fr/fr/file/35404/download (June 23, 2020), and, at that time, a Bloomberg School of Public Health at Johns Hopkins University report on COVID-19 stated that "it is still not known what role children play in the transmission of SARSCoV-2. For other viral illnesses, like influenza, children are drivers of transmission. Early and prolonged school closures have been shown to reduce overall community transmission of influenza." Catlin Rivers et al., <u>Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors</u>, Bloomberg School of Public Health at Johns Hopkins University at 13 (April 17, 2020), https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopeningguidance-governors.pdf ("John Hopkins Report"). Because of the rapidly emerging research on COVID-19, and the role children and schools play in COVID-19's spread, the Court puts more emphasis on studies conducted after COVID-19's initial spread and puts less weight on these earlier studies.

The studies and reports that the Plaintiffs cite confirm that children can get COVID-19, and that children can spread it to others; the issue then is to what extent children in school act as "super spreaders" -- whether they have a propensity to infect a larger than average number of people. Early COVID-19 studies in Europe indicated that children pose a reduced risk of contracting and spreading the disease. The Plaintiffs cite a study conducted in Iceland in April, 2020, and published in the New England Journal of Medicine, <u>see</u> Motion ¶ 9, at 6-7, which finds:

> Of the 564 children under the age of 10 years in the targeted testing group, 38 (6.7%) tested positive, in contrast to positive test results in 1183 of 8635 persons who were 10 years of age or older (13.7%). In analyses involving participants up to 20 years of age, we observed a gradual increase with older age in the percentage who tested positive . . . .
> In the population-screening group, the difference was even more marked: none of the 848 children under the age of 10 years tested positive, as compared with 100 of 12,232 persons (0.8%; 95% CI, 0.7 to 1.0) 10 years of age or older.

Daniel F. Gudbjartsson, Agnar Helgason, et al., <u>Spread of SARS-CoV-2 in the Icelandic Population</u>, The New England Journal of Medicine, https://www.nejm.org/doi/full/10.1056/NEJMoa2006100 (June 11, 2020). In April, 2020, one of the study's authors stated that, based on the data from the Icelandic study conducted in April, 2020, "even if children do get infected, they are less likely to transmit the disease to others than adults. We have not found a single instance of a child infecting parents." Roger Highfield, <u>Coronavirus: Hunting Down COVID-10</u>, Science Museum Group, <u>https://www.sciencemuseumgroup.org.uk/blog/hunting-down-covid-19/</u> (April 27, 2020). The Court finds, however, that subsequent studies, discussed infra, do show that children can and do spread COVID-19 to their parents.

The Plaintiffs cite another study conducted in France in April, 2020, <u>see</u> Motion ¶ 9, at 6-7, which concludes that parents are the main source of infections in school-age-children, but

children are not the source of infections to their parents, other students, teachers, or staff at schools. See Arnaud Fontanet, Rebecca Grant, et al., <u>SARS-CoV-2 Infection in Primary Schools in Northern France: A Retrospective Cohort Study in an Area of High Transmission</u>, Institut Pasteur, https://www.pasteur.fr/fr/file/35404/download (June 23, 2020).

In their Response to Defendants' Motion to Dismiss Governor Lujan Grisham, Secretary Kunkel, And Secretary Stewart at 2, filed October 12, 2020 (Doc. 25)("Response to Motions to Dismiss"), the Plaintiffs cite a recent article in the Atlantic, noting:

> Our data on almost 200,000 kids in 47 states from the last two weeks of September revealed an infection rate of 0.13 percent among students and 0.24 percent among staff. That's about 1.3 infections over two weeks in a school of 1,000 kids, or 2.2 infections over two weeks in a group of 1,000 staff. Even in high-risk areas of the country, the student rates were well under half a percent. . . .

> These numbers are not zero, which for some people means the numbers are not good enough. But zero was never a realistic expectation. We know that children can get COVID-19, even if they do tend to have less serious cases. Even if there were no spread in schools, we'd see some cases, because students and teachers can contract the disease off campus. But the numbers are small--smaller than what many had forecasted.

Emily Oster, <u>Schools Aren't Super-Spreaders</u>, The Atlantic (Oct. 9, 2020), https://www.theatlantic.com/ideas/archive/2020/10/schools-arent-superspreaders/616669/. Although this article, <u>Schools Aren't Super-Spreaders</u>, indicates that children pose a very low risk, the Court notes the study is still ongoing and its early phases. The Court finds the studies and the article the Plaintiffs cite are persuasive; however, the Court finds that the studies do not foreclose the risk associated with allowing children to attend school.  Furthermore, when examining the data and studies cited by the Defendants, the Court emphasizes that the research on COVID-19 and children is still an emerging, fast changing discipline and there are many warning signs indicating caution.

The Defendants cite a study conducted in South Korea, between January and March, that concludes that, of 5,706 infected people and based on 59,073 traced contacts, children under 10 years old transmitted COVID-19 less often to adults, but children between the ages of 10 and 19 years old spread COVID-19 to the same extent that adults do.  See Young Joon Park, et al., <u>Contact Tracing during Coronavirus Disease Outbreak</u>, South Korea, 2020, 26 Emerging Infectious Diseases 10 (July 26, 2020), https://wwwnc.cdc.gov/eid/article/26/10/20-1315_article. Households with the older children had the highest rate of spread of COVID-19 to other household members -- 18.6% compared to the overall average of 11.8%.  See Young Joon Park, et al., <u>Contact Tracing during Coronavirus Disease Outbreak</u>, South Korea, 2020, 26 Emerging Infectious Diseases 10 (July 26, 2020), https://wwwnc.cdc.gov/eid/article/26/10/20-1315_article.  The study recommends that, "[i]n the current mitigation strategy that includes physical distancing, optimizing the likelihood of reducing individual, family, and community disease is important.

- 13 -

Implementation of public health recommendations, including hand and respiratory hygiene, should be encouraged to reduce transmission of SARS-CoV-2 within affected households." Young Joon Park, et al., Contact Tracing during Coronavirus Disease Outbreak, South Korea, 2020, 26 Emerging Infectious Diseases 10 (July 26, 2020), https://wwwnc.cdc.gov/eid/article/26/10/20-1315_article.

An article based on data taken from COVID-19 in Korea notes that, although children are less susceptible to COVID-19 and become less ill, "it is reasonable to expect that children are a source of transmission in the community, despite their mild symptoms." Young June Choe & Eun Hwa Choi, Are We Ready For Coronavirus Disease 2019 Arriving At Schools?, J Korean Med Sci. 35:e127 (March 17, 2020), https://jkms.org/DOIx.php?id=10.3346/jkms.2020.35.e127. The article continues:

> It is challenging to make guidance on school closure because its impact on the COVID-19 outbreak remains unpredictable. It is further complicated by the data suggesting children are less susceptible to this novel virus and less ill. Strategies to mitigate the COVID-19 epidemic are rooted in the pandemic influenza preparedness plan. Nonpharmaceutical interventions provide time for mitigation in the case of pandemic influenza. Historical findings demonstrated a strong association between early school closure and mitigation of the 1918-1919 influenza pandemic in the United States. Yet, a few observational studies and mathematical models have shown varied conclusions about the effects of reactive school closures on the course of influenza outbreaks. Models have generally predicted a reduction in the peak incidence of 20%-60%, but these predictions depend on the model's assumptions, and some studies have predicted no reduction in the attack rates. Nonetheless, COVID-19 is not influenza, as it exhibits different viral kinetics, transmission dynamics, and clinical outcomes.

> From the early epidemiological reports on COVID-19, we see a low frequency of cases and less severity among children. As of March 15, 2020, among 8,162 confirmed COVID-19 patients in Korea, 83 (1.0%) were aged 0-9 years and 427 (5.2%) were aged 10-19 years. Adults with COVID-19 efficiently transmit the virus during the asymptomatic or pre-symptomatic phase. A recent study on close contacts in China shows similar infection rates among children and adults. In such context, it is reasonable to expect that children are a source of transmission in the community, despite their mild symptoms. As outbreaks are occurring in places where people interact with each other closely, transmission between children is likely to occur when schools open, thus triggering a second wave in the community. Opening of schools is also expected to increase contact rates in the community, decreasing the effectiveness of social distancing, which is the mainstay of the current mitigation strategy.

Before ending school closures, schools should prepare for the possible occurrence of COVID-19 on campus.  The level of action and quarantine in the case of a school-outbreak will be significant and will require the closure of the affected school.  Standardized measures that can be applied to affected schools should be in place, such as detailed guidance for school closure, disinfection, and contact management.

At this moment, we do not have strong evidence to guide decisions on durations of school closures and how various durations will effect public health.  A few days of closure is reasonable in response to school-based cases of COVID-19 for decontamination and contact tracing; while medium to longer lengths of closure (4-8 weeks) may be considered as part of a broader community mitigation strategy.  Extending school closure will likely support the overall effectiveness of social distancing and thus aid in lowering the peak of the epidemic curve.  The policy should be balanced between public health benefits and the significant societal consequences.

Young June Choe & Eun Hwa Choi, Are We Ready For Coronavirus Disease 2019 Arriving At Schools?, J Korean Med Sci. 35:e127 (March 17, 2020), https://jkms.org/DOIx.php?id=10.3346/jkms.2020.35.e127.

The Defendants also cite a summary of articles and reports:

There's evidence as well that children, including those without symptoms, are as likely to be infectious.  Researchers in Berlin tested more than 3,700 COVID-19 patients, including 127 individuals under 20 years old.  The study found that compared to adults, kids carried the same viral load, a signal of infectiousness.

Some reports place children at the center of spreader events.  In Israel, the number of new cases has risen from fewer than 50 per day two months ago, before schools reopened, to more than 1,500 per day now.  Those numbers followed school outbreaks that infected at least 1,335 students and 691 staff.  An overnight camp for 13-to-18-year-olds in Missouri closed after 82 children and staff became infected.

Yang Yang, a biostatistician at the University of Florida's College of Public Health, is completing a study based on nearly 20,000 households.  He says his preliminary results reveal that children do infect adults, especially in the same households.  "Our analysis is that children are a little bit more infectious than adults with in-house transmission," he says, but that may just be because they are tended to by parents or grandparents in homes.

- 15 -

Jeffrey Shaman, an infectious disease expert at Columbia University's Mailman School of Public Health who has been a leading COVID-19 researcher, says it's impossible to get a clear picture of the effects of COVID on kids right now. Shaman and his team spent two years running the Virome of Manhattan, a surveillance project similar to HEROS, which tracked infections and transmission of flu, cold viruses and the coronaviruses that cause the common cold.  They found viruses moving from schools and daycare facilities, from children to parents, something any parent who sends their children to daycare or pre-kindergarten for the first time recognizes.  However, the studies to date about COVID-19 and children have been too small or too compromised by factors such as school closings, lack of testing or much smaller community caseloads than the United States.

"The question is, what happens when the children get it? Are they effectively dead ends?" he says.  "Or are they capable of communicating the virus and spreading it to other people? And I think the evidence is not conclusive. We don't know enough to know that children to some degree are less capable of transmitting this virus."

Derek Cummings, an emerging pathogens expert at the University of Florida, says he's not convinced by the evidence that children are less likely to transmit the disease.  His work with the endemic coronaviruses, relatives of SARS-CoV-2, shows that children are infected with their first coronavirus by three and get all four of the common coronaviruses by 20.  "Every other coronavirus infects kids and transmits among kids," he adds, "so why would we assume this one doesn't?"

Hartert says that the research indicating children may not as often transmit the virus would, once again, make SARS-CoV-2 an outlier.  She noted that studies show children are shedding a similar amount of COVID-19 virus as adults, which would suggest they were equally capable of transmittal.  "So there are a lot of things that would make it surprising if we find out that children are less likely to transmit the virus," she adds.

Shaman says he understands the need to get children back to school, but it's hard to gauge the risk given the current state of knowledge and information slanted by governments looking to reopen schools.  "We don't have a policy model and an experience model that allows us to understand what will be appropriate," he adds. "We're dealing with a novel coronavirus.  We don't fully understand how children are involved in the transmission cycle."

- 16 -

Mubbasheer Ahmed et al., <u>Multisystem Inflammatory Syndrome In Children: A Systematic Review</u>, The Lancet, https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(20)30271-6/fulltext (last visited October 10, 2020).

---

      Hartert, a former high school teacher, said that schools need to reopen for a number of reasons, including mitigating the inequities of staying at home for low-income students who need support for things like meals and after-school care.  But in her opinion, reopening should only happen in states and communities where the virus is under control.  (Other countries have reopened their schools, but only after the virus had been subdued and often with limited class sizes.)

      "There aren't many other countries that have opened schools while rates of the virus are increasing exponentially," she says.  "If you live in a region where there's more spread of the virus, it's a lot more likely that you have an outbreak from a teacher, parent, or child who brings the virus to school."

      Mitigation strategies like masks, social distancing and ventilation need to be in place as well.  "We're going to have to weigh the risks and benefits with the amount of data that we have at the point which we have to make decisions about opening schools," she says.  "We've got to get our kids back to school and we've got to open daycares for essential workers. I think everyone wants to do that. But it's not as easy as just mandating that it happen.

Jim Morrison, <u>What Scientists Know About How Children Spread COVID-19</u>, SmithsonianMag.Com (July 23, 2020), https://www.smithsonianmag.com/science-nature/what-scientists-know-about-how-children-spread-covid-19-180975396/.

     As is evident from the studies and articles cited above and the other studies cited in the Scrase Decl. ¶ 17, at 10-17, there is no clear scientific consensus on the risk of allowing children to attend school.  It is also evident, however, that the contention in the Plaintiffs' declarations that "[t]he overwhelming weight of scientific data suggests that the risk of transmission of the virus from younger people aged 20 and below to older people is small or negligible" is not correct. Bhattacharya Decl. ¶ 22, at 9.  The risk is not negligible.  There is a risk associated with children attending schools and spreading COVID-19 to parents, teachers, and school staff.  The Court, for this TRO, need not find how much risk is too much risk.

35.     On March 11, 2020, Governor Grisham declared a public health emergency under the Public Health Emergency Response Act, NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015)(the "PHERA"), and invoked the All Hazards Emergency Management Act, NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007)(the AHEMA), by directing all cabinets, departments, and agencies to comply with the directives of the declaration and the further instructions of the New Mexico Department of Health (the "NM Health Department").   See Updated: Governor, Department of Health announce first positive COVID-19 cases in New Mexico, Press Releases, Office of the Governor (March 11, 2020), https://www.governor.state.nm.us/2020/03/11/updated-governor-department-of-health-announce-first-positive-covid-19-cases-in-new-mexico/ (last visited Oct. 12, 2020)("Emergency Declaration").

36.     Secretary Kunkel subsequently entered a series of public health orders ("PHOs") encouraging New Mexicans to stay in their homes as much as possible and to practice precautions when entering public spaces as well as restricting mass gatherings and business operations.   See e.g., Kathyleen M Kunkel, Public Health Emergency Order Limiting Mass Gatherings and Implementing Other Restrictions Due to COVID-19, New Mexico Department of Health (March 16, 2020), www.governor.state.nm.us%2Fwp-content%2Fuploads%2F2020%2F03%2FAMENDED-PUBLIC-HEALTH-ORDER.pdf.   See also Chris McKee, Supreme Court Rules Governor Has Authority To Restrict, Ban Indoor Dining (Aug. 26, 2020), https://www.krqe.com/health/coronavirus-new-mexico/supreme-court-to-hold-hearing-on-public-health-order-business-restrictions/ (reporting that "[t]he New Mexico Supreme

Court ruled . . . that the state does have the power to enact a Public Health Order and restrict or close indoor dining at restaurants").

37.     After declaring a public health emergency, Governor Grisham ordered all public schools to close from March 16, 2020 to April 6, 2020.  See Governor Michelle Lujan Grisham, Executive Order 2020-005 (March 13, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/03/Executive-Order-2020-005.pdf.

38.     On March 26, 2020, Governor Lujan Grisham ordered all public schools to close for the remainder of the 2019 to 2020 school year because of the increase in COVID-19 cases.  See Governor Michelle Lujan Grisham, Executive Order 2020-012 (March 26, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/03/MLG_EO_2020_012.pdf.

39.     The New Mexico Public Education Department (the "PED") is a constitutionally-created entity authorized to "have control, management and direction of all public schools."  N.M. Const. Art. XII, § 6.  See N.M.S.A. 1978 § 22-2-1(A).

40.     The PED collaborates with the NM Health Deptment regarding decisions about the return of students to school.  See Affidavit of Ryan Stewart ¶¶ 2-4, at 1-2 (executed September 28, 2020), filed September 28, 2020 (Doc. 14-2)("Stewart Aff.").

41.     New Mexico employed Los Alamos National Labs ("LANL") to develop an ongoing epidemiological modeling for weekly updates on the virus trajectory in New Mexico.  See Stewart Aff. ¶ 5, at 2.

42.     LANL provided epidemiological modeling that suggested that New Mexico would experience a steep and sustained increase in positive COVID-19 cases if schools returned to in-

person learning without enhanced safety protocols and limitations on the number of students present in school buildings.  See Stewart Aff. ¶ 5, at 2.

43.     On April 1, 2020, the PED published a document addressing frequently asked questions related to providing Free and Appropriate Education ("FAPE") during school closures. See Providing a Free Appropriate Public Education (FAPE) through a Distance Learning Platform during a Closure to Normal School Operations due to the Coronavirus (COVID-19) Pandemic 2020, New Mexico Public Education Department, https://webnew.ped.state.nm.us/bureaus/safe-healthy-schools/covid-19-coronavirus/_ (Apr. 1, 2020)("PED Guidance for Providing FAPE During COVID-19").

44.     In the PED Guidance for Providing FAPE During COVID-19, the PED notes:

[a]t this time, [April 1, 2020] there is a statewide Stay at Home Order issued by the Governor and Department of Health that is effective until April 10, 2020.  As long as that, or any subsequent Stay at Home Order, is in place, Schools should not provide face-to-face special education services."
PED Guidance for Providing FAPE During COVID-19 at 2.

45.     In its FAPE guidance document, the PED states:

Initially, the US Department of Education issued guidance stating that if Schools do not provide any educational services to the general student population during the school closure, then it would not be required to provide services to students with disabilities during the school closure.  However, on March 21, 2020, new federal guidance was issued and emphasized that "schools should not opt to close or decline to provide distance instruction, at the expense of the students, to address matters pertaining to services for students with disabilities" and stated that "to be clear: ensuring compliance with the Individuals with Disabilities Education Act 1990 (IDEA), Section 504, the Americans with Disabilities Act of 1990 (ADA) should not prevent any school from offering educational programs through distance instruction."

If a School continues to provide educational opportunities to the general student population during a school closure, then it must ensure that students with disabilities also have equal access to the same opportunities, including the provision

- 20 -

of FAPE.  Schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's Individualized Education Plan (IEP) developed under IDEA.

With the extended school closure to the end of this school year, the PED is requiring Schools to provide Continuous Learning to students, to submit assurances about the provision of such learning, and to submit and obtain approval by the PED of a Continuous Learning Plan.  Special Education is an included requirement of the Continuous Learning Plan.

Schools are required by the PED to develop and implement Continuous Learning Plans and provide general education services to the general population and are required to ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE. Schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's IEP developed under IDEA.

PED Guidance for Providing FAPE During COVID-19 at 1.

46.     The PED Guidance for Providing FAPE During COVID-19 provides some information about dispute resolution options for parents such as hearings and mediations, available under IDEA, and the New Mexico rules for education:[3]

---

[3]The Complaint alleges that:

No post-deprivation due process will be provided to the children, parents, teachers or administrators of the affected counties to address the propriety of depriving the school children of the equal education protected by the New Mexico Constitution pursuant to the plan of the State of New Mexico from her Governor.

. . .

However, under the current COVID mandates in effect from the Governor and the Secretary of Health[,] not even the state educational agency (SEA, in this instance the NM PED) under IDEA could fashion a remedy that provides that children with special needs, in the affected counties, can be provided the opportunity for the requisite full benefits of a free and appropriate education in an integrated, least restrictive educational environment. Thus, it is impossible and

- 21 -

**44. What Dispute Resolution options are available for Schools and parents to resolve disagreements over IDEA services?**

The full range of Dispute Resolutions required by the IDEA remains available. This includes Mediation, Facilitated IEP meetings, State Complaints and Due Process Hearings. The PED Special Education Division Alternative Dispute Resolution staff are available to answer any questions.

**45. If a School or parent files a due process hearing request, will the due process hearing take place during the school closure?**

Parents and Schools will continue to be able to file special education due process hearing requests with the PED.  The PED requires that Schools have an administrator assigned to receive these complaints through electronic transmission during school closure.  The parties to a due process complaint should address any requests for extensions of time to the PED appointed Due Process Hearing Officer.  However, as long as a Stay at Home Order remains in effect, mediations, Facilitated IEP Meetings, State Complaints, or due process hearings will take place by telephone, videoconferencing or any other way that ensures effective communication.

**46. If a state complaint is filed, will it be investigated during the school closure?**

PED will continue to accept State Level Complaints under the IDEA and state special education rules.  The PED requires that Schools have an administrator assigned to receive these complaints through electronic transmission during school closure. The parties to a State Complaint should request an extension of time for exceptional circumstances if COVID-19 will prevent them from responding to the complaint or participating in the investigation of a particular complaint.

PED Guidance for Providing FAPE During COVID-19 at 10.

---

therefore completely futile for parents of these children to avail themselves of administrative process that barred by the operation of the PHA, PHERA and Emergency Powers Act orders issued under the color of law by the Governor and her Secretary of Health. And not even the SEA has the authority grant the wholesale remedy required to ensure that a FAPE is provided to these children in order to avoid violating the IDEA.

Complaint ¶ 13, at 4.  The Court addresses these arguments and allegations in the Analysis § V.

47.     In March, 2020, Secretary Kunkel issued PHOs prohibiting most public and private gatherings of any significant size and limiting business operations.  See Governor: K-12 school closings must continue to prevent potential spread of COVID-19, Office of the Governor (March 27, 2020), https://www.governor.state.nm.us/2020/03/27/governor-k-12-school-closings-must-continue-to-prevent-potential-spread-of-covid-19/.

48.     These PHO's restrictions have varied over the past few months based on COVID-19's severity.  See Governor Announces Limited Reopening for Dine-In Restaurants, Indoor Malls, Gyms, Salons and More, NMDOH (May 28, 2020), https://cv.nmhealth.org/2020/05/28/governor-announces-limited-reopening-for-dine-in-restaurants-indoor-malls-gyms-salons-and-more/; Public Health Order, NMDOH (June 1, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/06/060120-PHO.pdf.

49.     In May and June 2020, the PHOs eased some restrictions as COVID-19's transmission rate fell and testing capacity increased.  See Governor Announces Limited Reopening for Dine-In Restaurants, Indoor Malls, Gyms, Salons and More, NMDOH (May 28, 2020), https://cv.nmhealth.org/2020/05/28/governor-announces-limited-reopening-for-dine-in-restaurants-indoor-malls-gyms-salons-and-more/; Public Health Order, NMDOH (June 1, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/06/060120-PHO.pdf.

50.     On July 13, 2020, Secretary Kunkel tightened restrictions in response to "spikes" in COVID-19 cases in New Mexico and neighboring states.  See Public Health Order, at 1-2, New Mexico Department of Health (July 13, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/07/7.13.20-PHO-1.pdf; Coronavirus in New Mexico, Albuquerque Journal, https://www.abqjournal.com/coronavirus  (last visited Sept. 28, 2020).

51.     On August 28, 2020, Secretary Kunkel issued a PHO that eased some restrictions as the virus became more contained.  See Public Health Order at 1-2, New Mexico Department of Health (Aug. 28, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/08/082820-PHO.pdf.

52.     In late June 2020, the PED issued its official reentry guidance for the 2020 to 2021 school year.  See New Mexico Public Education Department Reentry Guidance at 1, New Mexico Public Education Department, https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/ (last visited Oct. 10, 2020)("Reentry Guidance"); Stewart Aff., Ex. 28, at 56 (Doc. 14-3).

53.     The PED, in the Reentry Guidance, structured reentry as a phased approach to school reentry.  See Reentry Guidance at 4.

54.     The Reentry Guidance provides that "[t]he state's goal is to move all schools into a full school schedule as soon as it can be safely accomplished."   Reentry Guidance at 4.

55.     The Reentry Guidance sets out eight minimum requirements for reentry at public schools.  See Reentry Guidance at 5.

56.     Under the Reentry Guidance, "[e]ach school district and charter school shall follow guidelines for reentry based on the public health conditions."  Reentry Guidance at 9.

57.     Under the Reentry Guidance, public schools may operate in three reentry categories: (i) remote, (ii) hybrid, and (iii) full reentry.  See Reentry Guidance at 9.

58.     For schools in the "remote" category, they may "[i]f feasible, . . . remain open for a limited set of students and staff in order to continue in-person educational services for students in PreK-3rd grade and students with special needs at a maximum 5:1 student to teacher ratio."  Reentry Guidance at 10.

- 24 -

59.     The hybrid category allows in-person learning where students can be spaced six feet apart or at fifty percent  of classroom capacity.  See Reentry Guidance at 9.

60.     The full reentry category allows in-person learning for every student five days per week.  See Reentry Guidance at 9-10.

61.     The Reentry Guidance states it will provide "Real Time Support" to students as well as "[u]se social emotional programs, groups, and individualized supports developed in the 'brick and mortar' setting to engage students and connect them to tools and resources for remote learning."  Reentry Guidance at 8.

62.     New Mexico uses "gating criteria" when determining when and whether to re-open New Mexico schools.  Scrase Decl. ¶ 7-8, at 4-5.

63.     The gating criteria include: (i) transmission of COVID-19, measured by the rate of spread and New Mexico daily cases;[4] (ii) testing capacity measured by the number of COVID-19 test per day and COVID-19 test positivity rate;[5] (iii) contract tracing and isolation capacity;[6] and (iv) statewide healthcare system capacity, measured by adult intensive care unit beds and seven-day supply of personal protective equipment across the primary hospitals.  See Scrase Decl. ¶ 7-8, at 4-5; Scrase Decl. ¶ 7, at 5 (figure 4); Stewart Aff. ¶¶ 6, 19, 38, at 3, 6, 11;  Public Health Gating

---

[4]The New Mexico Daily Cases is the measurement of how many cases the State or county has adjusted per capita on an average over seven days.  See Scrase Decl. ¶ 8(a), at 5-6.

[5]Test positivity rate is a seven-day rolling average of the number of confirmed cases (not positive cases) divided by the total number of tests.  See Scrase Decl. ¶ 8(b), at 6.

[6]Isolation capacity is the time from a COVID-19 positive test result to case isolation.  See Scrase Decl. ¶¶ 7-8, at 5-6.

Criteria for Reopening New Mexico, New Mexico Dept. of Health https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/ (last visited Oct. 10, 2020).

| Category | Measure | Target | Current Status | Status Updated Each: |
|---|---|---|---|---|
| **Public Health Gating Criteria for Reopening NM** | | | | |
| *Click here to view the NM Current Case Outlook* | | | | |
| Spread of COVID-19 | 1. Rate of spread (10-day rolling average) | 1.05 or less | 1.26 | Mon, Wed, Fri |
| Spread of COVID-19 | 2. NM daily cases (7-day rolling average) | 168 | 233 | Mon, Wed, Fri |
| Testing Capacity (general and vulnerable populations)* | 3. Number of COVID-19 tests per day (7-day rolling average) | 5,000 | 6,379 | Mon, Wed, Fri |
| Testing Capacity (general and vulnerable populations)* | 4. COVID-19 test positivity rate (7-day rolling average) | 5.00% or less | 4.8% | Mon, Wed, Fri |
| Contact Tracing and Isolation Capacity | 5. Time from COVID-19 positive test result to case isolation | 24 hours or less | 19 hours | Tues |
| Contact Tracing and Isolation Capacity | 6. Time from COVID-19 positive test result to quarantine of case contacts | 36 hours or less | 29 hours | Tues |
| Statewide Healthcare System Capacity | 7. Adult ICU beds occupied across 7 NM Hub Hospitals** | less than 439 | 242 | Tues |
| Statewide Healthcare System Capacity | 8. 7-day supply of personal protective equipment (PPE) across 7 NM Hub Hospitals** | 7-day supply in at least 6 out of 7 Hub Hospitals | 7 out of 7 hospitals | Tues |

Figure 3: Public Health Gating Criteria for Reopening New Mexico.

Source: Public Health Gating Criteria for Reopening New Mexico, New Mexico Dept. of Health https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/ (last visited Oct. 10, 2020

64.     New Mexico uses this gating criteria to issue PHOs when determining the category of reentry for schools in each county.  See Scrase Decl. ¶ 7-8, at 4-5; Scrase Decl. ¶ 7, at 5 (figure 4); Stewart Aff. ¶¶ 6, 19, 38, at 3, 6, 11;  Public Health Gating Criteria for Reopening New Mexico,

New Mexico Dept. of Health https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/ (last visited Oct. 10, 2020).

65.     The New Mexico Daily Cases is the measurement of how many cases the State or County has adjusted per capita on an average over seven days.  <u>See</u> Scrase Decl. ¶ 8(a), at 5-6.

66.     The New Mexico Daily Cases measurement is reflected in the different colors on the New Mexico map of counties. <u>See</u> Scrase Decl. ¶ 11, at 8 (figures 5, 6).



**RED:** Average Daily Cases 8 or more per 100,000 and Test Positivity 5% or greater

**ORANGE:** Average Daily Cases 8 or more per 100,000 and Test Positivity under 5%

**YELLOW:** Average Daily Cases under 8 per 100,000 and Test Positivity 5% or greater

**GREEN:** Average Daily Cases under 8 per 100,000 and Test Positivity under 5%

Figure 4: <u>Map of Average COVID-19 from 9/15/2020 to 9/28/2020 In New Mexico Counties</u>.

Source: Map of Average COVID-19 from 9/15/2020 to 9/28/2020 In New Mexico Counties, New Mexico Dept. of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Oct. 10, 2020).

67.    The "green level" for counties on the map is under eighty cases per one million per day or eight cases per 100,000 per day over a fourteen-day rolling average. See Scrase Decl. ¶ 8, at 5; Our Criteria & Sources, COVID Exit Strategy, https://www.covidexitstrategy.org/definitions-and-criteria (last visited Oct. 10, 2020)(defining metrics for phased reopening).

68.    The COVID-19 test positivity rate provides information about the effectiveness of testing results in the state or county. If the test positivity rate is above five percent, the consensus is that are there is not enough testing and cases are being missed as a result. See Scrase Decl. ¶ 8, at 5; Our Criteria & Sources, COVID Exit Strategy, https://www.covidexitstrategy.org/definitions-and-criteria (last visited Oct. 10, 2020)(defining metrics for phased reopening).

69.    New Mexico's target is at five percent or less for the whole State, and individual Counties as well. See Scrase Decl. ¶ 8, at 5; Our Criteria & Sources, COVID Exit Strategy, https://www.covidexitstrategy.org/definitions-and-criteria (last visited Oct. 10, 2020)(defining metrics for phased reopening).

70.    On July 15, 2020, Secretary of Human Services, Dr. David Scrase, stated:

One of the nuances that we're learning from doing the reading is that what actually increases spread is not the kids going to school . . . [.] It's that the parents are now free with their kids in school to go out and about, have more contacts, go to stores, you know go back to work for example in person, rather than working from home.

Gabrielle Burkhart, <u>New Mexico Health Officials, Educators Discussing APS Re-Entry Plan</u>,

KRQE,                    https://www.krqe.com/news/education/new-mexico-health-officials-educators-

struggling-to-determine-school-re-entry-plans/ (Jul. 15, 2020, updated: July 17, 2020).

71.     On August 3, 2020, the PED released a Reentry Guidance Addendum, which notes

that, for schools operating remotely, small group instruction is allowed in a ratio of five students

to one teacher for (i) pre-kindergarten to third grade; (ii) special education children of all ages; and

(iii) students needing additional support of all ages.  <u>See</u> Reentry Guidance Addendum A at 1,

Reentry District and School Guidance, https://webnew.ped.state.nm.us/reentry-district-and-

school-guidance/  (August 3, 2020).

72.     The Reentry Guidance Addendum also notes that "[s]tudents needing additional

support shall be determined locally and can include students at risk of dropping out, students least

able to participate successfully in remote learning, students with unstable home conditions, and

other locally determined support criteria."  Reentry Guidance Addendum A at 1.

73.     On August 28, 2020, Governor Lujan Grisham posted a Twitter thread discussing

school reopening:





Michelle  Lujan  Grisham  (@GovMLG),  Twitter  (Aug.  28,  2020,  8:55  AM),
https://twitter.com/GovMLG/status/1299359982417137665.

74.  On September 3, 2020, Secretary Stewart clarified the PED's goal with the hybrid

reentry system:

> PED is not requiring any district or charter school to open for in-person
> learning.  PED stands ready to assist every district, charter and school in the state
> in meeting the strict safety requirements and preparation efforts if those local
> entities decide they want to move into the hybrid model.  In addition to having an
> approved reentry plan, each school district and charter school needs to provide
> assurance that they can effectively implement COVID Safe Practices.  To that end,
> PED along with the State Fire Marshal's Office, National Guard and local fire are
> available to provide on-site guidance and support to ensure that schools are
> implementing COVID Safe Practices properly so that educators and students are as
> safe as possible.

Schools In 25 Counties May Launch Hybrid Model Sept. 8, The State of New Mexico,
https://www.newmexico.gov/2020/09/03/schools-in-25-counties-may-launch-hybrid-model-sept-
8/  (September 3, 2020).

75.  Beginning on September 8, 2020, PED  allowed schools to begin the hybrid reentry

category if the County in which the school is located has average daily cases less than eight cases

per 100,000 per day and test positivity under  five percent.  See Scrase Decl. ¶¶ 8-9, at 5-6; Stewart

Aff. ¶ 38, at 11.

76.  A school that meets the PED's gating criteria must also have a PED-approved

reentry plan, and the superintendent or charter leader must sign and return an assurance to abide

by safety protocols that the PED Reentry Guidance outlines.  See Stewart Aff. ¶ 38, at 11.

77.     These standards issued by the PED are applied uniformly across New Mexico.  See Stewart Aff. ¶ 19, at 6.

78.     During the 2020 to 2021 school year, the PED has not allowed some counties in New Mexico with higher incidence of COVID-19 to begin hybrid reentry.  Scrase Decl. ¶ 11 figure 6, at 8.   See also  Map of Average COVID-19 from 9/15/2020 to 9/28/2020 In New Mexico Counties,  New Mexico Dept. of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Oct. 10, 2020).

79.     For instance, during September 2 through September 15, 2020, several Counties did not meet the reentry criteria:



COVID-19 Average Daily Case Rates by Test Positivity,
New Mexico Counties, September 2 - September 15, 2020

COVID-19 Average Daily Case Rates by Test Positivity,
New Mexico Counties, September 2 - September 15, 2020

| County | Average Daily Case Rates per 100,000 | Test Positivity |
|---|---|---|
| Chaves | 26.0 | 8.6% |
| Eddy | 16.3 | 8.3% |
| Lea | 13.1 | 8.1% |
| Luna | 18.0 | 7.8% |
| Catron | 12.2 | 6.6% |
| Roosevelt | 12.5 | 6.5% |
| Quay | 6.0 | 5.4% |
| Curry | 7.7 | 3.9% |
| Dona Ana | 5.4 | 3.4% |
| McKinley | 6.3 | 2.8% |
| De Baca | 4.0 | 2.3% |
| Mora | 1.6 | 2.3% |
| Santa Fe | 4.4 | 2.2% |
| San Juan | 2.1 | 1.6% |
| Lincoln | 2.2 | 1.6% |
| Rio Arriba | 2.9 | 1.5% |
| Colfax | 2.9 | 1.4% |
| Bernalillo | 2.6 | 1.3% |
| Sandoval | 2.2 | 1.3% |
| Otero | 1.9 | 1.3% |
| Grant | 4.1 | 1.2% |
| Valencia | 1.9 | 1.2% |
| Taos | 2.2 | 1.2% |
| San Miguel | 2.3 | 1.0% |
| Los Alamos | 0.8 | 0.6% |
| Cibola | 1.3 | 0.5% |
| Socorro | 0.8 | 0.5% |
| Sierra | 0.6 | 0.3% |
| Hidalgo | 0.0 | 0.0% |
| Union | 0.0 | 0.0% |
| Guadalupe | 0.0 | 0.0% |
| Harding | 0.0 | 0.0% |
| Torrance | 0.0 | 0.0% |

- 33 -

Figure 5: COVID-19 Average Daily Case Rates Test Positivity, New Mexico Counties

September 2 - September 15, 2020.

Source: Scrase Decl. ¶ 11 figure 6, at 8.   See also Map of Average COVID-19 from 9/15/2020 to 9/28/2020 In New Mexico Counties, New Mexico Dept. of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Oct. 10, 2020).

80.    Some schools, such as those in the City of Albuquerque, New Mexico, decided to delay reopening even though they met the reentry criteria.  See Scrase Decl. ¶ 12, at 9 (noting that "in the city of Albuquerque, which as of [the week of September 28, 2020] in Bernalillo County has only 2.6 cases per 100,000 and a test passivity of 1.3%, the decision was made to delay reopening of schools until 2021").

81.    The PED regularly assesses and publishes whether schools are in reentry compliance according to the gating criteria.  See School Reentry Status, New Mexico Department of Health,  https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/  (last visited October 12, 2020).



**School Reentry Status**
*Listed by District*
<u>Updated</u>: Thursday, October 1, 2020

The following is a comprehensive list of public schools – listed alphabetically by their district – that reflects their current reentry model. Some counties listed in the "red" were previously "green," allowing their districts to be eligible for reentry. A dip from green to red on the health map does not necessarily indicate an immediate school closure. Public Schools in New Mexico may be eligible to bring Elementary students back for in-person learning, if they meet the reentry requirements. Middle and High School students are not currently allowed to attend in-person learning (with the exception of special education small groups).

| DISTRICT | SCHOOL NAME | Reentry Model* | COUNTY* |
|---|---|---|---|
| ABQ SCHOOL OF EXCELLENCE | ABQ SCHOOL OF EXCELLENCE | REMOTE | BERNALILLO |
| ABQ SIGN LANGUAGE ACADEMY | ABQ SIGN LANGUAGE ACADEMY | Small Groups | BERNALILLO |
| ALAMOGORDO | ACADEMY DEL SOL ALT. | REMOTE | OTERO |
| ALAMOGORDO | ALAMOGORDO HIGH | REMOTE | OTERO |
| ALAMOGORDO | BUENA VISTA ELEMENTARY | REMOTE | OTERO |
| ALAMOGORDO | CHAPARRAL MIDDLE | REMOTE | OTERO |
| ALAMOGORDO | DESERT STAR ELEMENTARY | REMOTE | OTERO |
| ALAMOGORDO | HIGH ROLLS MOUNTAIN PARK ELEMENTARY | REMOTE | OTERO |
| ALAMOGORDO | HOLLOMAN ELEMENTARY | REMOTE | OTERO |
| ALAMOGORDO | HOLLOMAN MIDDLE | REMOTE | OTERO |
| ALAMOGORDO | LA LUZ ELEMENTARY | REMOTE | OTERO |
| ALAMOGORDO | MOUNTAIN VIEW MIDDLE | REMOTE | OTERO |
| ALAMOGORDO | NORTH ELEMENTARY | REMOTE | OTERO |
| ALAMOGORDO | SIERRA ELEMENTARY | REMOTE | OTERO |
| ALAMOGORDO | SUNSET HILLS ELEMENTARY | REMOTE | OTERO |
| ALAMOGORDO | YUCCA ELEMENTARY | REMOTE | OTERO |
| ALBUQUERQUE | A. MONTOYA ELEMENTARY | Small Groups | BERNALILLO |
| ALBUQUERQUE | ABQ CHARTER ACADEMY | Small Groups | BERNALILLO |
| ALBUQUERQUE | ACE LEADERSHIP HIGH SCHOOL | Small Groups | BERNALILLO |
| ALBUQUERQUE | ADOBE ACRES ELEMENTARY | Small Groups | BERNALILLO |
| ALBUQUERQUE | ALAMEDA ELEMENTARY | Small Groups | BERNALILLO |
| ALBUQUERQUE | ALAMOSA ELEMENTARY | Small Groups | BERNALILLO |
| ALBUQUERQUE | ALBUQUERQUE HIGH | Small Groups | BERNALILLO |
| ALBUQUERQUE | ALICE KING COMMUNITY SCHOOL | Small Groups | BERNALILLO |

*data subject to change

**Remote:** Schools are operating in a distance-learning stance. Students and staff are not expected to come into the building (unless staff is performing an essential, in-person duty).
**Small Groups:** Schools are primarily operating in a distance-learning stance. The school is remote, but bringing in either K-3rd graders or Special Education students (of all ages) for small group instruction, adhering to the 5:1 student-to-staff ration and maintaining social distancing.
**Hybrid:** Schools are operating at 50% capacity, alternating student cohorts so that all students have access to in-person learning, if they so choose. Families who select online-only options may continue their child's distance learning during the hybrid stance.
**Full:** Some schools – those considered "micro-districts" and approved by PED – may have transitioned to full, in-person learning. This assumes they can maintain small group ratios as well as social distancing, while maximizing in-person learning.

Figure 6: <u>School Reentry Status as of October 1, 2020</u>

Source:   <u>School   Reentry   Status</u>,   New   Mexico   Department   of   Health,   https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/   (last   visited   October   12, 2020).

82.     The PED has issued many supplementary guidance documents, which offer resources for improved educational services during remote learning.  See COVID-19 (CORONAVIRUS), New Mexico Public Education Department, https://webnew.ped.state.nm.us/bureaus/safe-healthy-schools/covid-19-coronavirus/ (last visited Oct. 12, 2020).

83.     PED has issued guidance related to how school districts can provide special needs students with a FAPE, see PED Guidance for Providing FAPE During COVID-19 at 1, as well as some resources for social-emotional supports for students during this time to address concerns about the impact of the Coronavirus on students' mental health, see Behavioral Health/Social and Emotional Learning (SEL), New Mexico Dept. of Health, https://webnew.ped.state.nm.us/bureaus/safe-healthy-schools/behavioral-health/ (last visited Oct. 12, 2020).

84.     New Mexico has some of the lowest rates of broadband access in the nation.  New Mexico ranks 48th nationally with respect to households with broadband internet.  See COVID-19: Internet Access and the Impact on Tribal Communities in New Mexico at 2, filed September 28, 2020 (Doc. 11-2)("COVID-19: Internet Access").

85.     Approximately twenty six percent of households in New Mexico do not have broadband.[7]  See COVID-19: Internet Access at 2.  Further, nine percent of New Mexicans cannot

_____

[7]The State of New Mexico estimates thirteen to twenty percent of "locations" in New Mexico -- defined as homes and businesses -- do not have broadband access.  See State of New Mexico Broadband Strategic Plan and Rural Broadband Assessment at 9, filed September 28, 2020 (Doc. 11-3)("State Broadband Plan").

purchase broadband because they live in an area without broadband capacity.  See COVID-19:

Internet Access at 2.  The State of New Mexico has noted a need for "broadband capital subsidy"

in rural areas to address the "broadband gap."  State of New Mexico Broadband Strategic Plan and

Rural Broadband Assessment at 11, filed September 28, 2020 (Doc. 11-3)("State Broadband

Plan").

86.     Bringing broadband to all rural New Mexico would cost between $2 billion and $5

billion dollars.  See State Broadband Plan at 14.  The State's Broadband plan notes that "[m]uch

as broadband has proven critical to continued economic and educational life in the early months

of the pandemic -- through work from home, home-based business, and distance learning -- it is

likely to be a necessary element of Covid-19 recovery."  State Broadband Plan at 19.  The State

also acknowledged a need for federal funding to "close the 'homework gap'  -- the struggle of

some students to learn effectively when they do not have internet at home."  State Broadband Plan

at 21.[8]

---

[8]The Plaintiffs allege that the lack of broadband internet in New Mexico will "adversely affect[]" the "right" of children in rural areas and on tribal lands "to a fair and equal education."  Supplemental Information per September 24, 2020 Minute Order at 5, filed September 28, 2020 (Doc. 11)("Supplemental Information").  The Plaintiffs also argue that preventing children from attending school in person equates "an outright denial of education because . . . there are households that lack access to the broadband internet coverage necessary for remote learning."  Plaintiffs' Reply in Support of Motion for TRO and PI, filed September 29, 2020 (Doc. 15)(citing Gabriel R. Sanchez et al., COVID-19: Internet Access and the Impact on Tribal Communities in New Mexico (2020), filed September 28, 2020 (Doc. 11-2) and State of New Mexico Broadband Strategic Plan and Rural Broadband Assessment, CTC Technology & Energy (June 2020), filed September 28, 2020 (Doc. 11-3)).

The Plaintiffs, however, do not seek to certify a class of students who lack broadband internet.  See Supplemental Information at 4-5.  At the hearing held on September 30, 2020, see Clerk's Minutes at 1, filed September 30, 2020 (Doc. 18), the Court then asked whether any of the Plaintiffs lacked internet access and the Plaintiffs responded that they all have internet access, but that they can "find a good number of students, both disabled students and non-disabled students,

87.     Eighty percent of individuals living on tribal lands in New Mexico do not have internet services.  See COVID-19: Internet Access at 4.  Reasons for this lack of internet access include: (i) inability to afford the cost of internet services; (ii) location of homes in areas of reservations that prohibit digging; (iii) structures of adobe homes do not allow for Wi-Fi.  See COVID-19: Internet Access at 4.  Even in Bernalillo County, Native Americans are less likely to have internet access.  See COVID-19: Internet Access at 4.  Parents in tribal communities "are struggling to keep their children engaged in their K-12 education without a computer at home or reliable Wi-Fi."  COVID-19: Internet Access at 4.

88.     Before the pandemic, "significant disparities in educational outcomes" existed between Native American students and White and Hispanic students.  COVID-19: Internet Access at 5.  "The impact of school closures and the lack of access to online educational resources have the potential to widen the gap between Native American students and their counterparts and to exacerbate educational disparities."  COVID-19: Internet Access at 5.

89.     After school closures in March 2020, the PED found over 23,000 Native American students in New Mexico public schools lacked broadband devices or capabilities.  See COVID-19: Internet Access at 7.  The amount of Native American students without access to broadband in New Mexico is likely higher, however, because the PED's assessment excluded students in

_____

with parents that live in homes that don't have internet access especially when we start looking up on the Navajo reservation."  See Transcript of Hearing at 43:7-19 (taken September 30, 2020)(Court, Dunn).  Because there is no plaintiff who lacks internet and because the Plaintiffs do not seek to certify a class that includes students who lack internet, the Court will not address this issue for the purposes of this TRO.

Albuquerque, Rio Rancho, Santa Fe, and Bureau of Indian Education and tribally operated schools.  See COVID-19: Internet Access at 7-8.

90.      Some school districts, including Albuquerque Public Schools, have loaned devices to students without computers at home.  See COVID-19: Internet Access at 8.  Other school districts in rural areas lack the resources to provide devices, exacerbating the technology access gaps in these areas.  See COVID-19: Internet Access at 8-9.

91.      For some students, remote learning is not an effective model for learning.  See Catlin Rivers et al., Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors, Bloomberg School of Public Health at Johns Hopkins University at 1 (Apr.     17,     2020),     https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopeningguidance-governors.pdf  ("John Hopkins Report").

92.       Often online education for school age choildren is not a substitute for in-person learning and socialization in a school setting.  See John Hopkins Report at 1.[9]

_____

[9]The John Hopkins Report continues:

The Children are less vulnerable to severe illness from COVID-19 than adults.  A recent report found that fewer than 2% of cases of COVID-19 in the United States were diagnosed in children, and of those (for whom data were available), between 5.7% and 20% required hospitalization.  Most children requiring hospitalization were under 1 year of age.  These considerations favor the reopening of schools and childcare facilities.

. . .

[I]t is still not known what role children play in the transmission of [COVID-19].  For other viral illnesses, like influenza, children are drivers of transmission.  Early and prolonged school closures have been shown to reduce overall community transmission of influenza.  There has been some evidence that COVID-19 produces more mild illness in children and therefore it may be less

93.     Long-term shutdowns will likely lead to increased education disparities and other consequences for many children.  See John Hopkins Report at 1.

94.     ████████████████████████████████████

████████████  ████████████████████████████  ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

95.     School closures "can lead to severe learning loss, and the need for in-person instruction is particularly important for students with heightened behavioral needs."  Centers for

---

likely to be detected than in adults.  However, without more conclusive evidence, it is difficult to quantify the role of children in propagating COVID-19 to other students, their family members, teachers, and school staff.  Furthermore, schools and childcare facilities are staffed by adults, some of whom may be at risk of severe illness.

John Hopkins Report at 13.  The John Hopkins Report concludes the section on children and schools by stating that more information and research is needed "to better understand the role of children in transmission;" likewise, "studies reconstructing transmission chains are needed, as are studies seeking to correlate viral load to infectiousness.  Governors should work with their state public health departments to make this research a priority."  John Hopkins Report at 13

Disease Control and Prevention, <u>The Importance of Re-opening America's Schools this Fall</u>,

COVID-19 (July 23, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/schools-

childcare/reopening-schools.html.

96.     Keeping schools closed can pose a risk to children's health and safety.  <u>See</u>

Declaration of Dr. Mark McDonald in Support of Application for Temporary Restraining Order

(executed July 23, 2020), filed September 17, 2020 (Doc. 4-12)(originally filed in <u>Brach et al., v.

Newsom et al</u>, Case 2:20-cv-06472-SVW-AFM (C.D. Cal.)), filed on September 16, 2020 (Doc.

28-8))("McDonald Decl.").[10]

97.     The United States Department of Education ("US DOE") has provided guidance on

how school reentry can comport with the IDEA.  <u>See</u> U.S. Department of Education,

<u>Implementation of IDEA Part B Provision of Services in the COVID-19 Environment</u>, Office of

---

[10]In his declaration, Dr. McDonald states that:

> Keeping schools closed contributes to a substantial known risk to children's health and safety.  Psychological, social, and emotional development requires children to both spend time away from parents and with their peers, in structured settings, such as school.  Robbing them of this critical experience places them at high risk of stunted growth and developmental arrest.  In addition, extended periods of confinement provoke numerous mental and emotional illnesses such as depression, anxiety, phobias, self-harming behaviors and suicide.  In vulnerable populations, physical and sexual abuse at home will worsen.  I have seen a substantial increase in illness among existing pediatric patients in my clinical practice, all of whom have been confined at home for over three months.  For patients with cognitive developmental delays like autism, most have regressed in years, and many have become violent toward themselves and their parents.  No child in my practice has maintained or improved in his emotional condition since school closures began in March 2020.

McDonald Decl. ¶ 7, at 3.

Special          Education          Programs          (Sept.          28,          2020),

https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/qa-provision-of-services-idea-part-

b-09-28-2020.pdf ("September IDEA Guidance").

98.     The US DOE "reminds SEAs [State of New Mexico Educational Agencies][11] and

LEAs [Local Education Agencies][12] that **no matter what primary instructional delivery**

**approach is chosen, SEAs, LEAs, and individualized education program (IEP) Teams**

**remain responsible for ensuring that a free appropriate public education (FAPE) is**

**provided to all children with disabilities.**"   September IDEA Guidance at 2 (emphasis in

original).

99.     The US DOE further advises that where

---

[11]The relevant regulations under Title 34 of the Code of Federal Regulations  defines "State educational agency or SEA" as

> the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law.

34 C.F.R. § 300.41.

[12]The relevant regulations under Title 34 of the Code of Federal Regulations defines "Local educational agency or LEA" as

> a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.

34 C.F.R. § 300.28(a).

State and local decisions require schools to limit or not provide in-person instruction due to health and safety concerns, SEAs, LEAs, and IEP Teams are not relieved of their obligation to provide FAPE to each child with a disability under IDEA. As conditions continue to change throughout the country, some of the special education and related services included in a child's IEP may need to be provided in a different manner; however, all children with disabilities must continue to receive FAPE and must have the "chance to meet challenging objectives." Therefore, IEP Teams should identify how the special education and related services included in a child's IEP will be provided and should consider a variety of instructional methods and settings.

September IDEA Guidance at 3-4 (quoting Endrew F. v. Douglas Cty. Sch. Dist., 137 S. Ct. 988, 1000 (2017)).

**PROCEDURAL BACKGROUND**

1.      On September 16, 2020, the Plaintiffs filed the Complaint.  See Complaint at 1.  In the Complaint, the Plaintiffs allege claims for: (i) violation of the right to equal education without due process of law, under Article XII § 1 of the New Mexico Constitution and the Fourteenth Amendment of the United States Constitution, see Complaint at 11; (ii) denial of equal protection under Article II § 18 of the New Mexico Constitution and the Fourteenth Amendment of the United States Constitution, see Complaint at 12; and (iii) failure to provide a free and appropriate public education under 20 U.S.C. § 1401(8), see Complaint at 13.  The Plaintiffs request that the Court "certify the classes," Complaint ¶ A, at 14, and declare that: (i) "Defendants have unlawfully denied" Plaintiffs "a free and uniform public education without providing them due process of law," Complaint ¶ B, at 15; (ii) "Defendants have unlawfully denied" Plaintiffs "equal protection of the law without reasonable justification for doing so in an arbitrary and capricious manner," Complaint ¶ C, at 16; and (iv) "the actions of the Defendants have denied students of a due and owing" free and public education "in violation" of the Individuals with Disabilities Act, Complaint

¶ D, at 15.  Plaintiffs also ask the Court to both preliminarily and permanently enjoin "Defendants from prohibiting in-person instruction without providing equal and acceptable alternatives that provide a uniform educational system that also meets critical socialization requirements." Complaint ¶ E-F, at 15.

> ### 1.      The Motion.

1.      On September 21, 2020, the Plaintiffs filed the Motion, which requests that the Court grant a TRO, a preliminary injunction, and permanent injunctive relief.

2.      The Plaintiffs argue that Defendants' ban on in-person instruction at public schools in certain counties in New Mexico violates the Fourteenth Amendment's Due Process and Equal Protection Clauses.  See Motion at 9.

3.      Further, Plaintiffs contend that Defendants' actions "undoubtedly infringe[] the fundamental or quasi-fundamental right to a basic education." Motion at 11-2 (citing Plyer v. Dole, 457 U.S. 202 (1982)).

4.      Plaintiffs also allege that the Defendant has also violated Plaintiffs' procedural due process rights by depriving them of "in person learning and therefore a uniform education without requiring any heightened showing . . . ."  Motion at 12-13, (citing Matthews v. Eldridge, 424 U.S. 319, 334 (1976)).

5.      The Plaintiffs argue that Defendant Governor Lujan Grisham's school reentry plan violates the equal protection clause, even under rational basis review.  The Plaintiffs argue that the state's denial of in-person learning to students in certain counties is not rationally related to the state's interest in combating COVID-19.  See Motion at 15 (citing City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976)).  Without citing any authority, Plaintiffs maintain that "children are not

at risk of being sickened or killed by COVID-19" and "do not play a significant role in transmitting the virus to adults."  Complaint at 16.

6.      Next, Plaintiffs contend that the Defendants' actions have violated the federal Individuals with Disabilities Act ("IDEA").   The Plaintiffs assert that, under IDEA, states receiving federal funding must provide eligible children with a "free appropriate public education" ("FAPE").  Complaint at 16-17 (citing Endrew F. v. Douglas Cty. School Dist., 137 S. Ct. 988, 993 (2017)).  See 20 U.S.C. § 1412(a)(1)(2018).  Plaintiffs argue that, to meet IDEA's requirement for schools to provide "special education" and "related services," "school districts must be able to provide at least some in-person services."  Complaint at 17-18.  The Plaintiffs contend that children without special needs should "more than likely" also be present to allow for "appropriate socialization" for special needs children.   Complaint at 18.   Finally, Plaintiff contends that the schools "material[ly] fail[]" to implement special needs children's individualized education programs ("IEPs") without in person learning.  Complaint at 18  (citing Van Duyn ex. Rel. Van Duyn v. Baker Sch. Dist., 502 F.3d 811, 811 (9th Cir. 2007).

7.      Plaintiffs maintain that without in-person learning, in addition to educational deprivation, special needs children will suffer collateral harms including "abuse, depression, suicide, and hunger."  Complaint at 18.  They avow that because Plaintiffs' constitutional rights are implicated, they would undergo irreparable injury absent an injunction.  See Complaint at 18-19.  Additionally, Plaintiffs contends that the balance of harm weighs in Plaintiffs' favor.  See Complaint at 19.  Finally, the Plaintiffs maintain that granting a preliminary injunction is in the public interest to prevent violations of Plaintiffs' constitutional rights.  See Complaint at 21.

8.     The Plaintiffs request a TRO to "prohibit[] the Defendants from denying in person learning."  Complaint at 20.

   **2.     <u>The Minute Order</u>.**

9.     On September 24, 2020, the Court issued a Minute Order requesting additional information from the Plaintiffs.  Minute Order, filed September 24, 2020 (Doc. 8)("Minute Order").

10.    The Court asked the Plaintiffs to provide the following information:

> (i) provide documentation and explanation of Plaintiff Woodworth's daughter's special needs and how those special needs fall under the protections of the Individuals with Disabilities Act (IDEA); (ii) provide the Court with a copy of Plaintiff Woodworth's daughter's Individual Education Plan (IEP) under IDEA before the Reentry Guidance, and any subsequent modifications to her IEP after the Reentry Guidance; (iii) provide information and documentation regarding how schooling at home does not adhere to Plaintiff Woodworth's daughters IEP; (iv) provide additional detail about what injuries Plaintiff Hernandez' children have suffered as a result of the Reentry Guidance; (v) provide additional detail about what injury Plaintiff Gallegos has suffered as a result of the Reentry Guidance, and what threat of irreparable injury he faces as a result of the Reentry Guidance; (vi) provide any available expert documentation about the harm caused by New Mexico's Reentry Guidance, because the reports Plaintiffs have thus far provided all refer to California; (vii) provide additional detail about why administrative remedies under IDEA would be futile, and which, if any, of the exceptions to IDEAs exhaustion requirement Plaintiffs allege would apply; (viii) specify whether the Plaintiffs intend to certify three subclasses pursuant to Federal Rule of Civil Procedure 23(c)(5); and (iv) provide additional information whether children in affected counties have had consistent internet access to allow them to complete online coursework.

Minute Order.

3. **The Plaintiffs' Supplemental Information.**

11.     The Plaintiffs filed Supplemental Information per September 24, 2020 Minute Order on September 28, 2020.  See Supplemental Information per September 24, 2020 Minute Order, filed September 28, 2020 (Doc. 11)("Supplemental Information").

12.     In the Supplemental Information, the Plaintiffs filed additional documentation, including Woodworth's daughter's IEP, and advised the Court that she "is afforded the protections of the IDEA as a student that has a learning disability . . . that is profoundly affected by being denied in-person education."  Supplemental Information at 2.

13.     The Plaintiffs also included additional information regarding harms to Hernandez' children.  Supplemental Information at 2.

14.     The Plaintiffs clarified that they intend to seek certification of three sub-classes under rule 23(c)(5) of the Federal Rules of Civil Procedure.  See Supplemental Information at 4; Fed. R. Civ. P. 23(c)(5).

15.     The Plaintiffs also allege that Gallegos is experiencing irreparable harm, because of his "loss of the Constitutional protections of Due Process without any legitimate rational basis for denying him a fair opportunity to be heard . . . ."  Supplemental Information at 3.

16.     The Supplemental Information reaffirmed the Plaintiffs' assertion that administrative remedies under the IDEA would be futile.  Plaintiffs allege that school districts cannot offer any in-person learning "without violating the Governor's and the Public Education Department's mandates."  Supplemental Information at 3.

17.     The Plaintiffs maintain that many students lack broadband internet access across

New Mexico. The Plaintiffs cite a study, COVID-19: Internet Access and the Impact on Tribal

Communities in New Mexico, which states:

> New Mexico has some of the lowest rates of broadband access in the nation.
> According to 2016 data from the U.S. Census Bureau, New Mexico ranked 48th
> nationally in the percentage of households with broadband internet subscriptions.
> That data suggests that approximately 26% of the state's population lacks
> broadband connections. More importantly, 9% of the state's population does not
> have the ability to purchase a high-speed internet connection due to a lack of
> broadband capacity where they live.

COVID-19: Internet Access and the Impact on Tribal Communities in New Mexico, filed

September 28, 2020 (Doc. 11-2).  The Plaintiffs, therefore, allege that the lack of broadband

in New Mexico will "adversely affect[]" the "right" of children in rural areas and on tribal

lands "to a fair and equal education."  Supplemental Information at 5.

### 4.     **The Joint Response.**

18.     On September 28, 2020, the Defendants filed the Defendants' Joint Response to

Plaintiffs' Verified Emergency Motion for Temporary Restraining Order, Preliminary Injunction

and Permanent Injunctive Relief (Doc. 14)("Joint Response").

19.     First, the Defendants argue that sovereign immunity bars the Plaintiffs' claims

against New Mexico.  See Joint Response at 13. The Defendants contend that, under Twombly v.

Iqbal, 556 U.S. 662, 678 (2009), the Plaintiffs' Complaint does not support a cause of action

against New Mexico.  Joint Response at 14.  See Twombly v. Iqbal, 556 U.S. at 678.  Further, the

Defendants allege that, even if the Plaintiffs' Complaint does state a claim against New Mexico,

sovereign immunity bars that claim.  See Joint Response at 14.  The Defendants argue that the Ex

Parte Young exception to sovereign immunity does not apply to Plaintiffs' claims against the state.

- 48 -

See Ex Parte Young, 209 U.S. 123 (1905); Joint Response at 14. The Joint Response states that § 1983 actions cannot be brought against New Mexico, because the statute does not allow actions against a state. See Joint Response at 14-15. Moreover, Defendants maintain that, under the Eleventh Amendment of the United States Constitution, Plaintiffs may not bring state constitutional claims against New Mexico.[13] See Joint Response at 15. Further, Defendants contend that supplemental jurisdiction under 28 U.S.C. § 1367 would not allow Plaintiffs to bring state constitutional claims.[14] See Joint Response at 15-16. Finally, the Defendants assert that even if the Court finds it has supplemental jurisdiction over the state constitutional claims, the Court should decline jurisdiction because "interpretation of New Mexico's Constitution and its right to education as applied to in-person versus online learning is a quintessential novel or complex issue of state law that should be left to state courts and a 'compelling reason for declining jurisdiction.'" Joint Response at 17. See 28 U.S.C. § 1367(c).

20. Next, the Defendants argue that the Court should not provisionally certify the Plaintiffs' proposed classes. See Joint Response at 17. The Defendants contend that the IDEA Plaintiffs have failed to exhaust their administrative remedies under the IDEA. See Joint Response at 18. Next, the Defendants assert that the Plaintiffs fail to satisfy the commonality and typicality requirements in rule 23(a) of the Federal Rules of Civil Procedure, because "the individual

---

[13]The Court notes that the Plaintiffs voluntarily dismissed all claims against the State of New Mexico on October 12, 2020. See Notice of Voluntary Dismissal as to State of New Mexico, filed October 12, 2020 (Doc. 26).

[14]At the hearing, the Plaintiffs conceded that they were "not asserting a state law cause of action here." Tr. at 25:2-5 (Court).

circumstances of every member of the proposed class and subclasses are different" under the "student's individual education program, in addition to their family situations and personal health status[.]" Joint Response at 18.  Moreover, the Defendants argue that the proposed classes include up to 60,000 individuals with "different desires for or against in-person learning, and their interests thus cannot be represented by the representatives proffered here as required by rule 23(a)(4)." Joint Response at 18.

21.    Third, the Defendants maintain that the Plaintiffs have failed to meet the necessary standard for a TRO or preliminary injunction.  See Joint Response at 23.  The Plaintiffs note that, where the government is the opposing party, the third and fourth factors for obtaining preliminary injunctive relief -- that the balance of equities tip in the movant's favor, and that the injunction is in the public interest -- merge.  Joint Response at 23 (citing Aposhian v. Barr, 958 F.3d 1295, 1298 (10th Cir. 2020)).  Further, the Defendants argue that the Plaintiffs' requested injunction is a "disfavored injunction," because it would provide the Plaintiffs "all the relief that [they] could recover at the conclusion of a full trial on the merits."  Joint Response at 23-24 (citing Schrier v. Univ. of Colorado, 427 F.35 1252, 1258-59 (10th Cir. 2005)).  They contend that, because the Plaintiffs' relief falls in this disfavored category, the Plaintiffs must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of the harm." Joint Response at 24 (citing O Centro Espirita Beneficente Uniao o Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004)).

22.    Next, the Defendants assert that the Court should be especially deferential to the state's response to the COVID-19 pandemic.  See Joint Response at 24.  They contend that, because state officials have "undertaken to act in an area fraught with medical and scientific

uncertainties," the Court must give the Defendants "especially broad" latitude.  Joint Response at

25 (quoting <u>South Bay United Pentecostal Church v. Newsom</u>, 140 S. Ct. 1613 (2020)(Roberts,

C.J., concurring)).  The Defendants also note that "numerous courts" have "refrained from issuing

TROs and preliminary injunctions that invalidate emergency orders issued in response to the

COVID-19 pandemic."  Joint Response at 25 n.28.  The Defendants note that they did not "seek a

blank check from the Court to disregard the Constitution," but conclude that the Court should

provide Defendants broad latitude, because the  Court is not "'an unelected federal judiciary.'"

Joint Response at 25-26 (internal citations omitted).

   23.  The Defendants allege that strict scrutiny should not apply to the Plaintiffs' equal

protection claims, because education is not a fundamental right.[15]  <u>See</u> Joint Response at 26.

Moreover, the Defendants contend that persons in certain counties are not a suspect class for equal

protection purposes.  <u>See</u> Joint Response at 26 (quoting <u>Palisade Fruitlands v. Todd</u>, 279 F.3d

1204, 1210 (10th Cir. 2002)).  The Defendants argue that, because the Defendants' policies do not

implicate a suspect class, their policies must burden the exercise of a fundamental right to require

strict scrutiny.  <u>See</u> Joint Response at 27-28.  The Defendants note that the Supreme Court of the

United States of America has never held that education is a fundamental right.  <u>See</u> Joint Response

at 27.  The Defendants refuted the Plaintiffs' argument that the Court should recognize education

as a fundamental right, because the right is "deeply rooted in this Nation's history and tradition."

Joint Response at 28 (internal citations omitted).  The Defendants note that public schools were

---

[15]The Court notes that this part of the Defendants' analysis conflates substantive due process and equal protection.  <u>See</u> Joint Response at 26-28.  Plaintiffs may make a substantive due process claim where they have been deprived of a fundamental right. Members of a suspect class may make an equal protection claim if a state policy singles them out.

almost non-existent when the Constitution was ratified, and that state-run school systems did not arise in the United States until around 1830. See Joint Response at 28. The Defendants also contend that the Supreme Court typically has only recognized "negative rights (i.e. the right to be free from restraint or barrier)." Joint Response at 28 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195-96 (1989)). They allege that the Supreme Court also has rejected Plaintiffs' argument that children have a right to learn writing skills to allow them access to the justice system. See Joint Response at 29. Further, the Defendants contend that, although the New Mexico Constitution provides a right to education, "state constitutional rights cannot be used as a basis for applying strict scrutiny under the Federal Equal Protection clause." Joint Response at 27 n.30.

24.     The Defendants argue that the Court should not apply the heightened scrutiny which the Supreme Court applied in Plyler v. Doe, 458 U.S. 311 (1982). Joint Response at 29-30. They allege that, in Kadrmas v. Dickinson Public Schools, 487 U.S. 450 (1988), the Supreme Court refused to apply heightened scrutiny to a challenge to a school bus service user fee, because it would not "promot[e] the creation and perpetuation of a subclass of illiterates." Joint Response at 30 (quoting Kadrmas, 487 U.S. at 459). The Defendants contend that their school policy does not target a disfavored group of children like the legislation in Plyler v. Dole, which applied to undocumented children. Joint Response at 30. Instead, they argue that the Reentry Guidance applies "across the board" to children in affected counties. Joint Response at 30. The Defendants argue that the Court therefore should apply rational basis review, as the Supreme Court did in Papasan v. Allain, 478 U.S. 265 (1986). See Joint Response at 30-31. Moreover, the Defendants note that the Plaintiffs have not alleged that children "are not being taught to read or write or that

Defendants are failing to provide them with any instruction," but rather that "virtual learning is not as *effective* as in-person learning."   Joint Response at 31 (emphasis in original).   The Defendants also argue that the Plaintiffs' allegations about lack of internet in rural counties are not sound, because internet has expanded in New Mexico, and even students with limited internet access "may take advantage of internet accessible areas created in school parking lots and school buses."   Joint Response at 31 n.31.   Regardless, the Defendants argue that the Plaintiffs' claims "do not rise to the level of a total and permanent deprivation of any education involved in Plyler." Joint Response at 31-32.

25.   Further, the Defendants contend that, even if Plyler v. Dole's heightened scrutiny applies here, the Court should uphold the Reentry Guidance, because the policy "may fairly be viewed as furthering a substantial interest of the state."   Joint Response at 32 (quoting Plyler v. Dole, 457 U.S. at 217-18).   Defendants note that the Court has acknowledged that "'combatting local outbreaks of the coronavirus amidst a global pandemic' is a compelling governmental interest."   Joint Response at 32 (citing Legacy Church, Inc. v. Kunkel, No. CV 20-0327 JB\SCY, 2020 WL 3963764 (D.N.M. July 13, 2020)(Browning, J.)).   The Defendants note that the State's interest in combatting COVID-19 is as compelling now as it was when the Court decided Legacy Church, Inc. v. Kunkel, particularly because of elevated case rates and flu season.   See Joint Response at 33.   Moreover, the Defendants allege that the Reentry Guidance does not discriminate against children like the law in Plyer v. Dole did, but "simply seeks to protect children" in places with higher incidence of COVID-19.   Joint Response at 33.   The Defendants contend that they rely on objective indicia, including a "mountain of evidence," to determine whether and when to re-open schools.   Joint Response at 34.   Citing studies that "suggest that children aged $\geq 10$ years can

efficiently transmit SARS-CoV-2," the Defendants refute the Plaintiffs' contention that "children do not play a significant role in transmitting the virus to adults . . . ."  Joint Response at 34. Accordingly, the Defendants conclude that their Reentry Guidance "'may fairly be viewed' as furthering the State's compelling interest in fighting an unprecedented pandemic.'"   Joint Response at 35 (citing Plyler v. Dole, 457 U.S. at 217-18).

26.     Next, the Defendants address the Plaintiff's procedural due process claims.  See Joint Response at 36.  The Defendants argue that, although the New Mexico Constitution provides for a right to education, it "does not guarantee that every aspect of education is a protected right." Joint Response at 36.   The Defendants contend that online instruction is "sufficient for the education" of school children.  Joint Response at 36-37 (quoting Norton v. Bd. Of Ed. Of Sch. Dist. No. 16, Hobbs Mun Sch., 1976-NMSC-045, 89 N.M. 470, 553 P.2d 1277 (1980)). Defendants acknowledge that children have a property interest in their public education.  Joint Response at 37-38 (citing Goss v. Lopez, 419 U.S. 565, 574 (1975)).   Nonetheless, the Defendants argue that, unless a student is "completely excluded" from his or her education, the student has not been deprived of his or her protectable property interest.  Joint Response at 38.  Accordingly, the Defendants contend that, because New Mexico students receive remote instruction, they are not totally without an education, and, therefore the State has not deprived the students of their property interest in their education.  See Joint Response at 39.  Moreover, the Defendants note that there is an exception to procedural due process violations when "the underlying governmental action affects a general class of persons."  Joint Response at 39.  The Defendants allow that this exception usually applies to laws that state legislatures or Congress pass.  See Joint Response at 39. Nevertheless, they contend that the exception should apply to their Reentry Guidance, because

courts "focus on whether the action applies to a larger segment of the population rather than a limited number of individuals."  Joint Response at 38-39.  Further, the Defendants argue that, even if their actions are not legislative in nature, the Plaintiffs are not entitled to due process, because states may "depriv[e] property to protect the public health and safety."  Joint Response at 40.  Last, Defendants argue that the Plaintiffs are unlikely to succeed on their procedural due process claims because they have not exhausted their administrative remedies under the IDEA.  Joint Response at 41.

27.    Next, the Defendants address the Plaintiffs' IDEA claims.  See Joint Response at 42.  The Defendants maintain that local school districts are responsible for providing special education to students with disabilities.  See Joint Response at 43.  Because the IDEA requires individualized determinations, the Defendants contend that, "[g]iven the diversity of potential needs of each qualifying student . . . it is incorrect to assume that every student with disabilities will receive a benefit from in-person international with students . . . ."  Joint Response at 44-45.  The Defendants note that the IDEA itself does not require that children receive in-person social interaction.  Joint Response at 45.  The Defendants also cite United States Department of Education guidance, and conclude that, under this guidance, "there can be no violation of the [least restrictive environment] provision if students with disabilities participate in remote instruction like students without disabilities."  Joint Response at 46.  Further, the Defendants contend that under United States Department of Education guidance, "there must be some flexibility as to students' FAPE due to the exceptional and ever-changing environment of the pandemic."  Joint Response at 46.  Still, the Defendants acknowledge that not all students with disabilities will succeed in a remote learning environment.  Joint Response at 47.  They, therefore, point note their reentry guidance

allows schools to provide in-person learning to special needs children "pursuant to their IEPs during remote instruction."  Joint Response at 47 (citing Ex. B at 50-57).  The guidance allows school districts to choose whether to provide in person learning to students with disabilities in small groups.  See Joint Response at 47.

28.    Next, the Defendants contend that the Court may not review the Plaintiffs' IDEA claims, because the Plaintiffs have not exhausted administrative procedures under the IDEA.  See Joint Response at 48.  They allege that the Plaintiffs must file complaints with their local education agency ("LEA") or state education agency ("SEA") to satisfy the exhaustion requirement.  See Joint Response at 48.  Thereafter, the Defendants argue, the Plaintiffs may file a claim in state or federal court.  See Joint Response at 48-49.  Moreover, the Defendants argue that the Plaintiffs could obtain the relief which they seek through the administrative process because school districts are authorized to provide in person education to special needs students.  See Joint Response at 49.  Further, the Defendants assert that the Plaintiffs do not qualify for the systemic failure exception to the IDEA's exhaustion requirement, because they do not contend that New Mexico's entire special education program is ineffective.  See Joint Response at 49-50.  The Defendants reiterate that exhaustion would not be futile, because hearing officers would be able to authorize in person learning for disabled students.  See Joint Response at 50-51.

29.    Next, the Defendants assert that the Plaintiffs have not demonstrated that they will suffer irreparable harm as a result of the Defendants' Reentry Guidance.  See Joint Response at 52.  They argue that the Plaintiffs' claims regarding harms from remote learning are unfounded and speculative.  See Joint Response at 52.  Further, they argue that what harms the Plaintiffs allege are not attributable directly to remote learning.  See Joint Response at 53.  The Defendants

allege that lack of socialization will not "permanently impact the remainder of a child's life." Joint Response at 53.  Additionally, Defendants maintain that Gallegos has not suffered any cognizable injury under any law.  See Joint Response at 53. The Defendants also argue that the public interest in social distancing during a pandemic counsels against granting the Plaintiffs' request for relief. See Joint Response at 53.  The Defendants conclude that "the strong public interest in continuing to prevent the spread of COVID-19 outweighs the injunctive relief Plaintiffs seek." Joint Response at 55.

**5.    The Reply.**

30.    On September 29, 2020, the Plaintiffs filed their Reply in Support of Motion for TRO and PI, filed September 29, 2020 (Doc. 15)("Reply").   The Plaintiffs argue that the Defendants cannot satisfy even rational basis to support treating children differently based on in what county they live.  See Reply at 1.  The Plaintiffs argue that Governor Lujan Grisham's school reentry plan is irrational, because there is "no evidence that [COVID-19] is still a threat."  Reply a 2.  The Plaintiffs contend that COVID-19 "poses little to no graver threat on a statistical basis than a variety of other diseases or causes of injury, illness or death," and, therefore, "cannot justify the deprivations of liberty even when weighed against a rational basis standard." Reply at 2.  The Plaintiffs argue that, in some cases, preventing children from attending school in person equates "an outright denial of education because . . . there are households that lack access to the broadband internet coverage necessary for remote learning."  Reply at 1 (citing Gabriel R. Sanchez et al., COVID-19: Internet Access and the Impact on Tribal Communities in New Mexico (2020), filed September 28, 2020 (Doc. 11-2) and State of New Mexico Broadband Strategic Plan and Rural

Broadband Assessment, CTC Technology & Energy (June 2020), filed September 28, 2020 (Doc. 11-3)).

31.     The Plaintiffs assert that "the rational basis test requires only that the governmental action 'bear[] a rational relationship to some legitimate end.'"  Reply at 2 (quoting Romer v. Evans, 517 U.S. 620, 631 (1996)).  The Plaintiffs next cite a case from the United States Court of Appeals for the Third Circuit for the proposition that government actions that are "irrational, arbitrary or capricious do not bear a rational relationship to any end."  Reply at 2 (citing Cty. Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 169 (3d. Cir. 2006)).

32.     The Plaintiffs contend that "simple statistics" demonstrate the Defendants' actions are irrational and "detached . . . from reality;" maintaining, that because "children pose an extremely low risk of creating additional spread" of COVID-19 and are unlikely to suffer harm themselves, the Governor Lujan Grisham's actions are "outright nuts" and "can't possibly pass the smell test."  Reply at 3.  Quoting the Center for Disease Control (the "CDC"), the Plaintiffs contend the highest hospitalization rate is for "people 65 years and older (472.3 per 100,000) and 50-64 years (261.5 per 100,000)."   Reply at 3 (quoting COVIDView Weekly Summary, Centers for Disease    Control    and    Prevention,    https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (Updated Sept. 25, 2020)). The Plaintiffs argue the initial reasoning for the public health mandates -- flattening the curve -- no longer applies and that it appears that the Defendants' new goal is to "prevent anyone from even getting the disease."  Reply at 3.  The Plaintiffs contend only 28,985 people in New Mexico have tested positive for COVID-19 and that only 873 people have died, and that these numbers are not much worse than other causes of death in New Mexico.  See Reply at 3-4 (citing deaths for automobile accidents, influenza and

- 58 -

pneumonia, and homicides and statistics for violent crime).  Similarly, the Plaintiffs allege that the United States has reported more than 7,000,000 COVID-19 cases and 204,598 deaths as of September 29, 2020, which, when compared to the total population for the United States, "means 0.1% of the United States population has perished from COVID-19."  Reply at 4 (citing COVIDView Weekly Summary, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (updated Sept. 25, 2020)).[16]

33.    Next, the Plaintiffs press their argument that "the Defendants can produce no correlation . . . that public schools in the affected counties are any more dangerous for students, teachers or the public at large than public schools in other counties, or daycare centers in the same affected counties."  Reply at 5.  The Plaintiffs quote Catlin Rivers et al., Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors, Bloomberg School of Public Health at Johns Hopkins University at 1 (April 17, 2020), https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopeningguidance-governors.pdf ("John Hopkins Report"), for the proposition that "Online education from K-12 is not a substitute for in-person learning and socialization in a school setting. Long-term shutdowns will likely lead to education gaps and other consequences for many

---

[16]The Plaintiffs do not cite the number of people who have been exposed to COVID-19, theoretically or otherwise.  Without this metric, comparing the total number of deaths because of COVID-19 to the total population of either New Mexico or the United States is without much meaning, because not every person in New Mexico or the United States has been exposed to COVID-19.

children."  Reply at 5.  The Plaintiffs further quote the John Hopkins Report to support their

contention that school age children are not at risk of harm because of COVID-19:

> Children are less vulnerable to severe illness from COVID-19 than adults.
> A recent report found that fewer than 2% of cases of COVID-19 in the United States
> were diagnosed in children, and of those (for whom data were available), between
> 5.7% and 20% required hospitalization.  Most children requiring hospitalization
> were under 1 year of age.  These considerations favor the reopening of schools and
> childcare facilities.

Reply at 6 (quoting the John Hopkins Report at 13).[17]

34.    Based on these statistics, the Plaintiffs conclude that the real risk of harm is not

COVID-19, but forcing children to stay at home, meaning that Governor Lujan Grisham's school

reentry plan is "appropriate[ly] . . . likened to the [sic] those of the gestapo."  Reply at 6.  The

Plaintiffs point to a suicide that occurred in Hobbs, New Mexico, alleging that the "young

---

[17]The next paragraph of the John Hopkins Report states that there are countervailing factors
that "weigh against reopening":

> [I]t is still not known what role children play in the transmission of
> SARSCoV-2.  For other viral illnesses, like influenza, children are drivers of
> transmission.  Early and prolonged school closures have been shown to reduce
> overall community transmission of influenza.  There has been some evidence that
> COVID-19 produces more mild illness in children and therefore it may be less
> likely to be detected than in adults.  However, without more conclusive evidence,
> it is difficult to quantify the role of children in propagating COVID-19 to other
> students, their family members, teachers, and school staff.  Furthermore, schools
> and childcare facilities are staffed by adults, some of whom may be at risk of severe
> illness.

John Hopkins Report at 13.  The John Hopkins Report concludes the section on children and
schools by stating that more information and research is needed "to better understand the role of
children in transmission;" likewise, "studies reconstructing transmission chains are needed, as are
studies seeking to correlate viral load to infectiousness.  Governors should work with their state
public health departments to make this research a priority."  John Hopkins Report at 13.  This
report was published in April 2020, and the Plaintiffs do not provide updated statistics or research.

gentleman . . . unquestionably lost his life due to the emotional toil that depriving him of the social interaction of school, lays at the feet of an administration that is completely calloused to the collateral damage of their actions have and continue to cause."  Reply at 6.  The Plaintiffs argue Governor Lujan Grisham's school reentry plan irrationally discriminates against certain counties, allowing some counties to implement risk mitigation safety measures "on public schools that are allowed to open in place, but makes no effort to explain persuasively why this regimen would be insufficient in the public schools in counties with higher per capita positive testing while being acceptable in public schools in other counties with a fractionally lower occurrence . . . ."  Reply at 7.

### 6.    The Hearing.

35.    The Court held a hearing on September 30, 2020.  See Clerk's Minutes at 1, filed September 30, 2020 (Doc. 18).  At the start of the hearing, the Court stated it was primarily interested in the Plaintiffs' IDEA claim, because, with regards to the Plaintiffs' constitutional claims, the rational basis test, if it applies, favors the Defendants' actions.  See Transcript of Hearing at 6:3-12 (taken September 30, 2020)(Court)("Tr.").[18]  The Court also stated that it was inclined to certify a class of the special needs children or parents, because some of the Plaintiffs likely had standing, but that it was not certain of that inclination, but it may have to evaluate the merits of each child's claim separately, because the children's situations vary.  See Tr. at 6:20-24

---

[18]The Court's citations to the transcripts of the hearing in this Memorandum Opinion and Order refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

(Court).  The Court then asked the Plaintiffs' counsel to proceed with their arguments.  See Tr. at 7:7-19 (Court).

### a.      Equal Protection.

36.      The Plaintiffs started the hearing by arguing that intermediate scrutiny should apply to their constitutional claims, because education is considered a fundamental right or a quasi-fundamental right.  See Tr. at 8:2-9:7 (Dunn).  The Plaintiffs explained that, when looking at the Fourteenth Amendment to the Constitution of the United States of America with an originalist perspective in conjunction with many State constitutions, which generally include a right to a "free and uniform public education," it is clear that education is a fundamental right.   Tr. at 8:2-9:7 (Dunn).  Next, the Plaintiffs argued that school age children do not pose a health risk, arguing instead that Governor Lujan Grisham's actions instead are meant to keep parents inside with their children.  See Tr. at 10:3-18 (Dunn).  The Court then asked the Plaintiffs to clarify what the right was, because, if only rational basis applies, not some higher level of scrutiny, then much of the Plaintiffs' discussion of the Governor's rationale is not productive.  See Tr. at 10:19-11:7 (Court). The Court asked the Plaintiffs what their best case is to support the argument that education is a quasi-fundamental right.  See Tr. at 11:11-13 (Court).  The Plaintiffs responded by citing Plyler v. Doe and Washington v. Glucksberg.  See Tr. at 11:14-12:8 (Dunn).  The Plaintiffs argued that under Washington v. Glucksberg, a court looks to "right[s] that [are] implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed," meaning that, in regards to education, "[i]t's impossible to be part of a function[ing] government and a functioning society . . . without the ability to read and writ[e] and a basic education is necessary to be an informed citizen."   Tr. at 11:24-12:17 (Dunn).  The Plaintiffs agreed with the Court,

- 62 -

however, that education is not subject to strict scrutiny, because it is not a fundamental right for purposes of their equal protection or due process claims.  See Tr. at 12:22-13:3 (Court, Dunn).

37.     Next, the Plaintiffs stated that some of the counties in New Mexico are still under the severest restrictions prohibiting in person learning, while others are allowed to have some in-person learning.  See Tr. at 14:18-15:6 (Dunn).   The Plaintiffs maintained that Governor Lujan Grisham's rationale differentiating between counties is arbitrary and capricious, because there is no good reason to rely on per capita positive test data to shut down some counties, but not others. See Tr. at 15:1-6 (Dunn).   The Plaintiffs argued that "there is really no rational relationship between the number of positive test cases and a risk to students and teachers . . . ."  Tr. at 15:13-15 (Dunn).   The Plaintiffs maintained that the risk of death and hospitalization in New Mexico as an adult is very low, even with comorbidities,[19] meaning that there is no rational basis for the Governor's actions. See Tr. at 16:22-17:6 (Dunn).   The Plaintiffs argued that it "is irrational to take what was an emergency situation back in March," 2020, where the stated goal was "flattening curve so we didn't overwhelm the health care resources" and now, months later, use those arguments to shut down schools when the mortality rate is so low.  Tr. at 18:2-12 (Dunn).   The Plaintiffs argued that the Court should look at the Governor's actions more closely than just through an "extremely deferential . . . lens . . . .   [T]he Court has to be more careful [now] that

---

[19]The CDC and other organizations track whether COVID-19 is the only mentioned cause of death, or whether there are other "health conditions and contributing conditions mentioned in conjunction with death involving coronavirus disease (COVID-10)."  Provisional Death Counts for Coronavirus Disease 2019 (COVID-19),  Comorbidities, The Center for Disease Control and Prevention                      (Oct.                      7,                      2020), https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#Comorbidities. The CDC and other health organizations define these additional conditions or causes as "comorbidities."  See id.

we're months -- not just weeks, but months -- after the emergency."  Tr. at 19:2-5 (Dunn).  The

Plaintiffs concluded their opening remarks by asking "the Court to take a hard look at what the

State is calling rational basis."  Tr. at 19:18-25 (Dunn).

38.     The Plaintiffs also noted that they do not have any witnesses for the current hearing.

See Tr. at 20:16-21:2 (Dunn).  The Court clarified that it would allow the parties to call witness if

they wanted them for this hearing, and the Plaintiffs responded they did not have any witnesses

for the TRO hearing.   See Tr. at 21:2-22:2 (Court, Dunn).

39.     In response, the Governor and the Secretaries pointed to Jacobson v. Massachusetts,

197 U.S. 11  (1905), for the proposition that New Mexico has the authority  to impose quarantine

laws to protect the public from infectious diseases.  See Tr. at 23:3-9 (Garcia).  The Governor and

the Secretaries also stated the federal courts should be cautious about "imposing their opinions

about the propriety of . . . decisions made by the elected officials with respect to public health

during this time of the COVID-19 pandemic."  Tr. at 23:13-16 (Garcia).  The Governor and the

Secretaries argued that this case is much simpler than what the Court had recently faced in Legacy

Church, Inc. v. Kunkel, No. CIV 20-0327 JB\SCY, 2020 WL 1905586 (D.N.M. Apr. 17,

2020)(Browning, J.).  See Tr. at 24:6-18 (Garcia).

40.     The Court asked the Governor and the Secretaries what their position is on whether

education is a quasi-fundamental right as it applies to any student in the State as well as students

with disabilities.  See Tr. at 24:19-25:11 (Court).  The Governor and the Secretaries responded that

education is not a fundamental right, that there certainly is no fundamental right to in-person

education and that, here, there is not a complete absence of education, because students are still

engaging in online classes.  See Tr. at 25:12-25 (Garcia); Tr. at 27:12-18 (Garcia).  The Governor

and the Secretaries explained that the Center for Disease Control and Prevention recommends five different levels of reintroduction for schools based on the risk of transmission of COVID-19 in schools.  See Tr. at 26:12-25 (Garcia).  The Governor and the Secretaries also noted that New Mexico is not precluding in-person learning for students with disabilities because, the Public Education Department allows in-person learning for groups of five students or less.  See Tr. at 27:19-28:1 (Garcia).  The Governor and the Secretaries contended that if

> the plaintiff in this case isn't getting [in-person] learning, that is something that needs to be resolved with the school district.  The public education department isn't precluding the student [with disabilities] from getting in-person learning. . . . [I]t's actually the school district or the school that has made the decision not to allow for in-person learning, [not the State.]

Tr. at 28:1-11 (Garcia).  The Governor and the Secretaries concluded by arguing that most of the Plaintiffs do not have standing and that the one student who might have standing has not exhausted her administrative remedies.  See Tr. at 29:21-30-14 (Garcia).

41.     Next, New Mexico stated that it plans to address primarily sovereign immunity and class certification issues.  See Tr. at 30:25-31:4 (Sydow).  New Mexico echoed the Governor and the Secretaries that the Plaintiffs are not being denied a right education, because the issue here is the distinction between in-person education and distanced learning and not between a complete lack of  education and some education. See Tr. at 32:1-18 (Sydow).

42.     The Court then asked if New Mexico agrees with the Plaintiffs "that there is a quasi-fundamental right for disabled children to receive certain services from the state?  And then is there a quasi-fundamental right of all children to receive education?"  Tr. at 34:1-18 (Court).  New Mexico responded that it did not

think it's clearly established that there is a fundamental right to receive services that would encompass in-person versus online schooling as part of a right for people with disabilities. . . .  [E]ven if there is a quasi-fundamental right to education, which . . . the Supreme Court has not clearly established, it does not encompass a right to in-person education as opposed to online education.

Tr. at 35:22-36:1 (Sydow).

43.     In response, the Plaintiffs argued that many rural communities do not have access to broadband internet services, meaning that distance learning means a complete denial of one's right to education.  See Tr. at 37:19-38:14 (Dunn).  The Plaintiffs argued that they have provided "evidence that virtual learning significantly impairs if not outright effectively denies and precludes students from receiving a basic minimum education at all levels."  Tr. at 38:17-20 (Dunn).  The Plaintiffs argued, that because many schools could practice safe social distancing while teaching in-person, the Governor's actions are not sufficiently tailored.  See Tr. at 39:7-40:7 (Dunn).  The Plaintiffs stated that the remedy which they are seeking is not to force all children back to school, but rather to allow some children to return to school for in-person classes if their parents want that result and to allow others to continue with online education.  See Tr. at 41:21-43:6 (Dunn).

44.     The Court then asked whether any of the Plaintiffs do not have internet access and the Plaintiffs responded that they all have internet access, but that they can "find a good number of students, both disabled students and non-disabled students, with parents that live in homes that don't have internet access especially when we start looking up on the Navajo reservation."  Tr. at 43:7-19 (Court, Dunn).  The Court next asked the Plaintiffs to clarify whether the potential class encompasses only the counties currently with restrictions or all children in all the counties in New Mexico, to which the Plaintiffs responded that the "putative class could be any parent in the state

that's in any county that may or has been affected by" New Mexico's actions.  Tr. at 45:11-23 (Court, Dunn).

### b.   Procedural Due Process.

45.   The Court then asked the Plaintiffs to move on to their due process claims.  See Tr. at 49:12-14 (Court).   The Plaintiffs argued that there has been "no meaningful opportunity, no notice and opportunity to be heard on this subject by the school districts and by the parents."  See Tr. at 49:20-21 (Dunn).  The Plaintiffs argued that there is no process for the public to have input on the Governor's actions other than an election in a couple of years.  See Tr. at 50:2-18 (Dunn).

46.   In response, the Governor and the Secretaries argued that the Plaintiffs had not identified any property or liberty interest at stake that would give rise to a procedural due process challenge.  See Tr. at 54:11-55:2 (Garcia).   The Court noted that, if education is a quasi-fundamental right, it would be afforded some protections, to which the Governor and the Secretaries agreed, but responded that there is no right to have "some sort of administrative process prior to issuance of these public health orders."  Tr. at 55:3-19 (Court, Garcia).  The Governor and the Secretaries stated that they do not understand what relief the Plaintiffs are requesting.  See Tr. at 56:25-57:16 (Garcia).

47.   The Court then asked the Plaintiffs whether the State has a compelling interest in reducing and eliminating COVID-19.  See Tr. at 57:20-58:1 (Court).  The Plaintiffs answered that there is no compelling interest, because there no longer is an emergency.  See Tr. at 59:215-25 (Dunn).  The Plaintiffs stated that "[t]here is still take public health crisis going on but it's not an emergency."  Tr. at 71:11-13 (Dunn).  The Governor and the Secretaries responded that "the cases are legion across the country that hold that" New Mexico has a compelling interest in combating

COVID-19 and protecting its citizens.  Tr. at 59:215-25 (Garcia).  New Mexico added that it "do[es]n't know of any authority that allows for procedural due process challenges based on legislative action requiring some sort of post legislative administrative individualized process." Tr. at 61:23-62:3 (Sydow).  New Mexico added that it has a compelling interest, because

> facts on the ground are sobering and worth noting: we've already lost more than 200,000 Americans to this illness; it is one of the leading causes of death in the country; it has killed far more people than things like violent crime, like traffic accidents, and as the science shows, I know [the Plaintiffs have] argued that there aren't risks to young children . . . but I think developing science [already] shows . . . there are risks of long-term health consequences simply beyond death that include children and obviously children can transmit diseases to their families and their communities.

Tr. at 62:4-18 (Sydow).  The Court then asked New Mexico what it thought about one of the Plaintiffs' affidavits from California that assert that children do not spread COVID-19 and that the scientific literature indicates that for younger children, risk of health and transmission is very low. See Tr. at 62:19-63:2 (Court); Tr. at 63:20-64:2 (Court).  New Mexico responded that, although it might be true that younger children have a lower risk of transmission than older children, the risk to children and the risk of transmission by children is "certainly not nonexistent."  Tr. at 64:3-12 (Sydow).  The Court stated that a "blanket order for elementary children" to stay home might not pass scrutiny more exacting than rational basis.  Tr. at 64:13-19 (Court).  The Court explained that it "tend[ed] to think the tie goes to the Governor on the literature if it's rational basis.  But if we start crawling up that scrutiny line, I don't know, it seems to me the evidence is sort of overwhelmingly against doing these things for school age children."  Tr. at 65:10-15 (Court).  New Mexico stated that it disagreed with the Court about what the evidence shows and stated that it deferrs to the Governor on the medical literature for specifics.  See Tr. at 65:16-66:4 (Sydow).

48.     The Plaintiffs next reiterated that the Government's actions to

> mitigate[e] risk are no [longer] rationally related to that objective [of reducing
> COVID-19].  We can all die at any time. . . .  The Government simply cannot take
> this position that they are going to keep everybody from getting the disease and that
> be a rational basis [for the Governor's actions].  It is just not.  We are all going to
> get COVID-19 from one thing or another. . . . [The] risk of death or even of long-
> term ailment and hospitalization is just not that high in this situation . . . [meaning
> the Governor cannot] den[y] in-person learning to the students of New Mexico.

Tr. at 71:11-72:17 (Dunn).

### c.     Substantive Due Process.

49.     Next, the Court asked what standard it should apply to the substantive due process

claim.  See Tr. at 72:22-73:5 (Court).   The Plaintiffs stated that they "hadn't really thought

[through] that question," but that it was related to interference with engaging in ones chose

profession and that they did not "think that it quite gets to the level of needing to be shock the

conscience," but they

> think it does shock the conscience that the Government, in this instance, is so
> callous . . . [about] the risks associated to students in requiring them to remain at
> home when it comes to terms of exposing them to abuse, to neglect and not being
> able to obtain food, to potential risks for suicide and other types of harm, physical
> harm[.] [They] think that . . . the Government is so callous to those negative
> collateral side effects [of its actions], [that it] should shock the conscience of the
> Court.

Tr. at 73:15-74:13 (Dunn).

50.     The Governor and the Secretaries responded that shock the conscience is the correct

legal standard for substantive due process claims, and that it requires the Plaintiffs to show that

the government's actions are manifestly unjust.  See Tr. at 75:1-6 (Garcia). The Governor and the

Secretaries argued that "there is nothing in the complaint that we are depriving people from earning

a living," and that the Complaint alleges only a denial of in-person learning.  Tr. at 75:9-76:6

- 69 -

(Garcia).   The Governor and the Secretaries argued that the Plaintiffs' contention that there is no emergency goes against the CDC guidance, and the submitted affidavits from the New Mexico Secretary of Education and a medical doctor.   See Tr. at 76:15-77:6 (Garcia).   The Governor and the Secretaries contended that the Court should show deference to state officials on public health emergency claims.   See Tr. at 77:7-12 (Garcia).   The Governor and the Secretaries argued that there is no harm, because children can socialize outside of class, and that there is no evidence in the record that demonstrates immediate and irreparable harm to justify a TRO.   See Tr. at 77:13-20 (Garcia).

51.     The Plaintiffs responded that the record shows irreparable harm, and that the Court should "correlate[e] what's going on with students in New Mexico and students in California" based on the submitted affidavits.   Tr. at 84:14-16 (Dunn).   The California "teacher said that virtual learning wasn't working, it was failing the students.   There was no chance of it working." Tr. at 84:22-24 (Dunn).   The Plaintiffs quoted one of the submitted affidavits for the proposition that "[k]eeping schools closed contributes to a substantial known risk to children's health and safety.   Psychological, social, and emotion development requires children to both spend time away from parents and with their peers in structured settings such as school."   Tr. at 85:10-15 (Dunn)(quoting Declaration of Mark McDonald, M.D. in Support of Application for Temporary Restraining Order (filed in Brach et al., v. Newsom et al, Case 2:20-cv-06472-SVW-AFM (C.D. Cal.)), filed on September 16, 2020 (Doc. 1-12).

### d.     The IDEA and Exhaustion.

52.     Next, the Plaintiffs argued that, under the IDEA, Governor Lujan Grisham's actions are undermining the "educational need for the . . . students" with educational needs to "hav[e]

other children present." Tr. at 88:5-6 (Dunn).  The Court asked what the Plaintiffs thought about the Governor and the Secretaries' contention that each school district can allow students with special educational needs to come to school for in-person learning.  See Tr. at 88:13-18 (Court). The Plaintiffs responded that they thought the order allowing school districts to open up schools for students with special needs is unclear and that school districts "feel they are prohibited from the order by doing that because of the mass gathering  requirements and some of the other things that are in place they feel like there may be a problem with being able to do that." Tr. at 89:15-19 (Dunn).  The Plaintiffs reiterated that they thought the Governor's actions prevents schools from opening up for students with special needs.  See Tr. at 91:20-24 (Dunn).   The Court stated that how the school districts feel about the Governor's orders is irrelevant; what matters is what the orders actually allow and prohibit.  See Tr. at 91:25-92:1 (Court).  The Plaintiffs responded that it is "incumbent upon the Court look at the . . . things that are protected by the IDEA and the compare them against what's in the order."  Tr. at 92:2-5 (Dunn).

53.     Next, the Plaintiffs addressed exhaustion of administrative remedies.  See Tr. at 92:18-25 (Dunn).   The Plaintiffs argued that in United States Court of Appeals for the Ninth Circuit, "exhaustion under the IDEA was not required where [i] it would be futile to use due process procedures.  [ii] The agency has adopted a policy or pursued a practice of general applicability that is contrary to the law.  [iii] And is it probable that adequate relief can be obtained by pursuing administrative remedies; i.e., the hearing officer lacks authority."  Tr. at 93:23-94:4 (Dunn)(citing Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1303 (9th Cir. 1992)).   The Plaintiffs argued that all three conditions were present.  See Tr. at 94:4-19 (Dunn).

54.     The Governor and the Secretaries responded, stating that

> as Your Honor has recognized the school districts district is actually the proper
> defendant in this case.  They are authorized to provide in-person in instruction
> which is the basis for the plaintiff's claim and they're the ones that are not doing
> so, and that's exactly the kind of issue that the exhaustion requirement is intended
> to address.  Exhaustion isn't going to address claims, grievances against the
> governor's orders [or] the Department of Health public health order . . . .  Again the
> grievance here is that the LEA is not doing what it's permitted to do under the
> applicable public education department guidelines.

Tr. at 95:12-25 (Garcia).  The Governor and the Secretaries also stated the Governor's public

health order does place mass gathering restrictions on schools.  See Tr. at 97:1-20 (Garcia).  The

Governor and the Secretaries argued that the "[s]tudents here . . . can get virtual and distance

learning and for children with special needs they can get in-person learning," these choices are

"dealt with at the school district level.  Not at the Governor level not they Department of Health

level and not at the Department of education level."  Tr. at 98:6-11 (Garcia).

> ### e.    Class Certification.

55.    Next, the Court asked the parties to address class certification.  See Tr. at 102:18-

23 (Court).  New Mexico stated that for the Plaintiffs to obtain a TRO they need to secure class

certification.  See Tr. at 104:19-25 (Sydow).  New Mexico argued that, for the first potential class

-- the parents of children with special needs -- there are issues related to the exhaustion requirement

and with numerosity, and that the students with special needs have different requirements for relief.

See Tr. at 104:25-106:7 (Sydow).   The Court asked if class certification is possible if the

complaints by the students with special needs are common among the potential class.  See Tr. at

106:8-23 (Court).  New Mexico answered, arguing that

> some students with disabilities are going to have heart conditions and other students
> with disabilities will have emotional disabilities, and those students are very
> differently situated in terms of both their needs in an IEP and their appropriate
> needs considering the public health risks that are out there.  . . . [T]hose kinds of

>differences bar class certification for almost any IDEA claim that you could conceive.  But yes if the Plaintiffs could show an IDEA claim that was based on the lack of in-person socialization with non-disabled students, and . . . that was a violation of a FAPE for every disabled students, then maybe they could meet those commonality requirements of class certification.

Tr. at 107:12-108:1 (Sydow).  New Mexico argued that, even if the students with disabilities satisfy commonality, they still must prove that they do not have to exhaust administrative remedies.  See Tr. at 108:13-23 (Sydow).  New Mexico agreed with the Court that there is no Plaintiff who represents rural students without access to broadband internet.  See Tr. at 110:2-10 (Court, Sydow).

56.     New Mexico next argued that many of the parents of the children with disabilities want different outcomes, some want in-person classes, and some want online classes, meaning that a potential class of all parents would not work.  See Tr. at 113:9-24 (Sydow).  New Mexico argued "there is no showing that even the majority of the parents throughout the state want to send their students to  school in person, particularly where they are high levels of the virus circulating.  . . . [T]here is no showing that the named plaintiffs' claims are typical and meet that requirement under Rule 23(a)(3)."  Tr. at 115:18-23 (Sydow).  New Mexico argued that the Court should not certify a class, because the class counsel and the class claims will cause harm to some of the class members because of increased exposure to the virus.  See Tr. at 115:23-116:14 (Sydow).

57.     The Governor and the Secretaries stated that they support New Mexico's arguments on class certification and added that the incorrect Defendants were named, because schools have been afforded discretion whether to hold in-person classes, meaning the relief the Plaintiffs seek is not feasible.  See Tr. at 116:24-117:12 (Garcia).

58.     The Plaintiffs responded, contending that "the relief [they] sought is not to require students and parents that don't want to go back to in-person learning to be required to do."   Tr. at 118:8-11 (Dunn).  The Plaintiffs clarified:

> What we're asking for is an order from this Court enjoining them from prohibiting the districts from making the determination [whether] to open or not, and allowing the districts to do that.  And none of the districts . . . are . . . talking about requiring all students to come back and doing away with virtual learning; that's just simply not the relief that was requested here.  It should be up to the students, the parents, and the school districts to decide how they want to do that.  And if they don't want their children to go back to public school, they're not going to be required to do so.

Tr. at 118:11-25 (Dunn).  The Plaintiffs argued that there is typicality among the parents with access to internet and those without, and if typicality was an issue, the Court can certify a sub-class.  See Tr. at 120:17-22 (Dunn).

### f.     Sovereign Immunity.

59.     Next, New Mexico argued that sovereign immunity bars two claims.  See Tr. at 123:7-12 (Sydow).  First, New Mexico argued that claims that name New Mexico as a separate entity are barred, but here, even though the Complaint names New Mexico as a Defendant, the Complaint does not make any specific allegations against it.  See Tr. at 123:14-22 (Sydow).  New Mexico explained that § 1983 claims cannot be brought against New Mexico, because it is not a person for § 1983 purposes.  See Tr. at 123:22-124:3 (Sydow).  Second, New Mexico argued that a party cannot bring state constitutional claims against New Mexico in federal court.  See Tr. at 124:11-25 (Sydow).  New Mexico noted that it did not think the Plaintiffs were raising any state constitutional claims in the Complaint, see Tr. at 124:11-25 (Sydow),  and the Court agreed that

the Plaintiffs had conceded that they were "not  asserting a state law cause of action here,"  Tr. at 25:2-5 (Court).

60.    Next, the Court asked if a party has a cause of action against New Mexico under the IDEA.  See Tr. at 130:6-17 (Court).  New Mexico stated that it does not believe that there is a possible cause of action under the IDEA, but stated that it would brief that issue in a motion to dismiss as well as whether a party can name New Mexico as a proper defendant for injunctive relief for constitutional violations under the doctrine that Ex Parte Young, 209 U.S. 123 (1908) articulates.  See Tr. at 130:18-131:12 (Court, Sydow).  The Court stated that it understood the IDEA to allow parties to sue New Mexico, because the United States Congress has abrogated the States' immunity under the Eleventh Amendment.  See Tr. at 132:5-17 (Court).  The Governor and the Secretaries stated that they do not know whether the IDEA waives New Mexico's immunity, but they do not think that the complaint properly includes New Mexico as a Defendant. See Tr. at 132:23-133:2 (Garcia).

61.    The Plaintiffs responded that a regulation pursuant to the IDEA provides for waiver of sovereign immunity.  See Tr. at 133:5-12 (Dunn).  New Mexico responded that it is not a proper Defendant, because, under Ex Parte Young, 209 U.S. 123 (1908), a state official must be sued in his or her official capacity and that it would have to look to see if the IDEA waives state immunity. See Tr. at 133:20-134:23 (Sydow).

**7.    The Governor and the Secretaries' Motion to Dismiss.**

62.    On October 5, 2020, the Governor and the Secretaries filed a Motion to Dismiss Governor Lujan Grisham, Secretary Kunkel, and Secretary Stewart, filed October 5, 2010 (Doc. 22)("Governor and Secretaries' Motion to Dismiss").  In the Motion to Dismiss, the Governor and

the Secretaries argue that the Court should dismiss the claims against them under rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  See Governor and Secretaries' Motion to Dismiss at 1.  The Governor and the Secretaries argue that the Plaintiffs' Amended Complaint fails Article III standing regarding the Governor, Secretary Kunkel, and Secretary Stewart, and that the Amended Complaint fails to state a § 1983 claim against the Governor and Secretary Kunkel for which relief may be granted.  See Governor and Secretaries' Motion to Dismiss at 2.

63.    The Governor and the Secretaries argue that federal courts have limited jurisdiction, and if a court lacks jurisdiction, it must dismiss the case.  See Governor and Secretaries' Motion to Dismiss at 7-8 (citing Montoya v. Chao, 296 F.3d 952, 955 (10th Cir. 2002); Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)).  The Governor and the Secretaries argue the Court should dismiss the case for lack of subject-matter jurisdiction under rule 12(b)(1).  See Governor and Secretaries' Motion to Dismiss at 7-8 (citing Fed. R. Civ. P. 12(b)(1)). The Governor and the Secretaries contend that courts use a rule 12(b)(6) standard to evaluate rule 12(b)(1) motions.  See Governor and Secretaries' Motion to Dismiss at 8 (citing Muscogee Nation v. Okla. Tax Comm'n, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010)).

64.    The Governor and the Secretaries contend that on March 26, 2020, the Governor ordered the closure of all public schools for the remainder of the 2019-2020 school, and that "[t]he Governor has not issued any executive order affecting public schools since the March 26 order." See Governor and Secretaries' Motion to Dismiss at 3.  The Governor and the Secretaries contend that for the 2020-2021 school, all orders related to keeping schools closed are issued by the Public Education Department ("PED"), which is "is a constitutionally created entity generally authorized to 'have control, management and direction of all public schools.'" Governor and Secretaries'

Motion to Dismiss at 4 (quoting NMSA 1978, § 22-2-1(A)(2004); citing N.M. Const. Art. XII, Sec. 6(A) N.M. Const. Art. XII, Sec. 6(D); NMSA 1978, § 22-2-1(A)(2004); NMSA 1978, § 22-2-2 (2004); and NMSA 1978, § 22-2-8 (2003)).  The Governor and the Secretaries further content that in June 2020, the PED issued an official reentry for the 2020-2021 school year.  See Governor and Secretaries' Motion to Dismiss at 5 (citing New Mexico Public Education Department Reentry Guidance, New Mexico Public Education Department (June 29, 2020)(updated July 15, 2020)(Doc. 22-1)).

65.    Based, on this factual predicate, the Governor and the Secretaries argue that the Plaintiffs cannot show standing, meaning the Court does not have jurisdiction over the Governor, Secretary Kunkel, and Secretary Stewart.   See Governor and Secretaries' Motion to Dismiss at 10.  The Governor and the Secretaries argue that "a plaintiff must show that: (1) she has suffered an injury in fact . . . (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested." Governor and Secretaries' Motion to Dismiss at 10 (quoting Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004)).  First, the Governor and the Secretaries argue the that Plaintiffs fail to demonstrate that their injuries are fairly traceable to the Governor and Secretary Kunkel, see Governor and Secretaries' Motion to Dismiss at 11-15, and, second, that Plaintiffs fail to demonstrate their injury will be redressed by a favorable decision by the Court, see Governor and Secretaries' Motion to Dismiss at 15-17.

66.    The Governor and the Secretaries quote a recent Tenth Circuit case for the proposition that: "To satisfy the traceability requirement, the defendant's conduct must have caused the injury."  Governor and Secretaries' Motion to Dismiss at 11 (quoting Aptive Envtl.,

LLC v. Town of Castle Rock, 959 F.3d 961, 977 (10th Cir. 2020)).   The Governor and the

Secretaries argue that

> Plaintiffs' alleged injuries from the temporary suspension of in-person learning in
> schools cannot be fairly traced to the Governor or Secretary Kunkel. . . . Indeed,
> Plaintiffs' Amended Complaint is devoid of any allegations that the Governor
> issued an executive order or that Secretary Kunkel enacted a public health order
> regarding public schools or the temporary suspension of in-person learning for the
> 2020-2021 school year.

See Governor and Secretaries' Motion to Dismiss at 12.   The Governor and the Secretaries further

argue that reentry guidance is under the purview of  the PED, which under New Mexico law has

the authority to issue the Reentry Guidance: "The PED is vested with the powers and duties to

related to the control, management, and direction of all public schools in this state."  Governor and

Secretaries' Motion to Dismiss at 13 (citing N.M.S.A. 1978, § 22-2-1(A); N.M. Const. Art. XII,

Sec. 6(A); N.M. Const. Art. XII, Sec. 6(D)).  The Governor and the Secretaries contend the reentry

guidance was issued by the PED.  See Governor and Secretaries' Motion to Dismiss at 13 (citing

New Mexico Public Education Department Reentry Guidance, New Mexico Public Education

Department (June 29, 2020)(updated July 15, 2020)).

      67.    The Governor and the Secretaries also argue that the Plaintiffs fail to show how the

Governor and Secretary Kunkel caused the allege injuries; the Governor and the Secretaries argue

that the Plaintiffs fail to point to any action by the Governor and Secretary Kunkel that prohibits

in-person learning at public schools.  See Governor and Secretaries' Motion to Dismiss at 14.  The

Governor and Secretaries contend the decision for which students receive in-person learning are

the local school districts, not the Governor or Secretary Kunkel, and "[t]herefore, it is the

independent action of the school districts, who are not parties to this case, that are causing Plaintiffs' alleged injuries." Governor and Secretaries' Motion to Dismiss at 14.

68.     Second, the Governor and the Secretaries argue that the Plaintiffs lack standing to sue the Governor, Secretary Kunkel, and Secretary Stewart because the Plaintiffs fail to establish redressability. See Governor and Secretaries' Motion to Dismiss at 14. The Governor and the Secretaries contend that to establish redressability, a "plaintiff must also establish it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Governor and Secretaries' Motion to Dismiss at 14 (quoting Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir. 1996)). The Governor and the Secretaries argue that the relief requested by the Plaintiffs, an injunction entered against the Governor and Secretary Kunkel regarding in-person learning, will not enable students to go back to in-person classes, because "it is the PED that issued the Reentry Guidance pursuant to its powers and duties related to the control, management, and direction of all public schools in this state." Governor and Secretaries' Motion to Dismiss at 15.

69.     The Governor and the Secretaries argue that even if Secretary Stewart, as Secretary of Education for the Public Education Department, is enjoined, there is no guarantee that the "requested injunction will likely lead to in-person learning because local school districts have the discretion regarding how to operate." Governor and Secretaries' Motion to Dismiss at 16. The Governor and the Secretaries contend that many school districts have decided to continue remote learning even when they meet the PED's reentry requirements "in order to prioritize the safety of their students." Governor and Secretaries' Motion to Dismiss at 16. The Governor and the Secretaries, argue, therefore, that the "Plaintiffs must include all superintendents as defendants in

this case to obtain the requested relief."  Governor and Secretaries' Motion to Dismiss at 16.  The Governor and the Secretaries argue, therefore, that Plaintiffs have failed to demonstrate redressability.  See Governor and Secretaries' Motion to Dismiss at 16.

70.     Last, the Governor and the Secretaries argue that the Plaintiffs' claims under § 1983 "must allege that each Defendant was a cause of promulgating the purportedly unlawful Reentry Guidance," and the Amended Complaint lacks sufficient specific allegations demonstrating that the Governor or Secretary Kunkel were involved in issuing the PED's Reentry Guidance. Governor and Secretaries' Motion to Dismiss at 18.  The Governor and the Secretaries contend that "Plaintiffs' legal conclusion that the Governor and Secretary Kunkel issued the Reentry Guidance is false," because of the language of the Reentry Guidance and New Mexico law. Governor and Secretaries' Motion to Dismiss at 20 (citing New Mexico Public Education Department Reentry Guidance, New Mexico Public Education Department (June 29, 2020)(updated July 15, 2020)); N.M. Const. Art. XII, Sec. 6; §§ 22-2-1(A), 22-2-2, 22-2-8; Ellenberg v. N.M. Military Inst., 478 F.3d 1262, 1270 (10th Cir. 2007)).

71.     The Governor and the Secretaries conclude that the Court should dismiss the Governor, Secretary Kunkel, and Secretary Stewart from this action for lack of standing, or that the Court should dismiss the Governor and Secretary Kunkel because the Plaintiffs fail to demonstrate the causation as required by § 1983.  See Governor and Secretaries' Motion to Dismiss at 20-21.

### 8.     **The State of New Mexico's Motion to Dismiss.**

72.     New Mexico filed its Motion to Dismiss on October 5, 2020 (Doc. 23)("State of New Mexico's Motion to Dismiss").  New Mexico argues that the Amended Complaint does not

identify any basis for a claim against New Mexico as a separate legal entity, meaning New Mexico should be dismissed under rule 12(b)(6).  See State of New Mexico's Motion to Dismiss at 1-2 (citing Fed. R. Civ. P. 12(b)(6)). In the alternative, New Mexico argues that all claims should be dismissed against it for lack of jurisdiction.  See State of New Mexico's Motion to Dismiss at 2. New Mexico contends that

> [a]lthough Plaintiffs list New Mexico as a Defendant in the caption, they do not offer any basis for a claim or relief against the State as a sovereign entity.  In fact, it is unclear whether the State is intended to be a separate Defendant, apart from the individual Defendants, at all.  The State is not listed among the Defendants in the "Parties and Jurisdiction" section of the complaint.  Furthermore, the complaint repeatedly alleges that it is specifically challenging the actions of the individual Defendants while not mentioning the State.

State of New Mexico's Motion to Dismiss at 3.

73.     Next, New Mexico argues has Eleventh Amendment Sovereign Immunity from any claim under 42 U.S.C. § 1983. and therefore, any such claims should be dismissed under rule 12(b)(1) of the Federal Rules of Civil Procedure.  See State of New Mexico's Motion to Dismiss at 3.  New Mexico argues that because it has sovereign immunity, it is "immune from suits brought in federal court by their own citizens, by citizens of other states, by foreign sovereigns and by Indian tribes."  State of New Mexico's Motion to Dismiss at 6 (quoting Chamber of Commerce of U.S. v. Edmondson, 594 F.3d 742, 760 (10th Cir. 2010)).  New Mexico argues there are three exceptions to sovereign immunity, but that none apply.  State of New Mexico's Motion to Dismiss at 6.

74.     New Mexico argues that abrogation for sovereign immunity under § 1983 by the United States Congress does not allow a party to bring a claim against the State as a separate entity because "neither a State nor its officials acting in their official capacities are 'persons' under §

1983."  State of New Mexico's Motion to Dismiss at 6.  (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  New Mexico also argues the exception to sovereign immunity recognized in Ex Parte Young, 209 U.S. 123 (1908), does not apply because Ex Parte Young must be brought against state officials, not the State.  See State of New Mexico's Motion to Dismiss at 7.

75.     New Mexico also noted while it did not seek to dismiss the "Plaintiffs' IDEA claim on sovereign immunity grounds, the State expressly preserves this defense."  State of New Mexico's Motion to Dismiss at 2 n.1.  New Mexico states that "[i]f the case is not dismissed, the State intends to raise additional defenses by motion under the Rules of Civil Procedure."  State of New Mexico's Motion to Dismiss at 2 n.1.

### 9.      The Court's Order to Respond to the Motions to Dismiss and the Response.

76.     On October 10, 2020, the Court ordered the Plaintiffs to respond to both Motions to Dismiss by noon on October 12, 2020.  See Minute Order, filed October 10, 2020 (Doc 24)(text only entry).  On October 12, 2020, the Plaintiffs filed their Response to Defendants' Motion to Dismiss Governor Lujan Grisham, Secretary Kunkel, And Secretary Stewart, filed October 12, 2020 (Doc. 25)("Response to MTDs").  The Plaintiffs acknowledge that the Governor's "Executive Order of March 26, 2020 closing schools [is] no[t] current[ly] [in] effect," but argue instead that "it is implausible after months of press conferences where the school re-entry plan is touted as the Governor's that Secretary Stewart's actions were not done in compliance and collaboration with Secretary Kunkel's orders and with direct input from the Governor."  Response to MTDs at 1-2 (footnote omitted).  The Plaintiffs argue that the Court should not treat the Governor, the Secretary of Health and the Secretary of Education separately for purposes of the

Motions to Dismiss, because they "are all working together to combat what they all claim is still a public health emergency."   Response to MTDs at 1.

77.   The Plaintiffs argue that the Court does not lack subject matter jurisdiction, because Plaintiffs have demonstrated the required elements of standing in their claims against all Defendants.   See Response to MTDs at 3 (citing Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004)).   The Plaintiffs argue that the "Plaintiffs' injures are fairly traceable to Governor Lujan Grisham and Secretary Kunkel," because "all three of these of these actors working together issue the Governor's plan which encompasses Secretary Stewart's 'reentry guidance['] that has caused the students to be deprived of their education."  Response to MTDs at 4.   The Plaintiffs argue that Governor Lujan Grisham created the reentry guidance because she has "portrayed the actions publicly as her 'school re-entry plan' and touted that all of her public officials, including not only Secretary Kunkel and Secretary Stewart but also Secretary Scrase, worked out this plan to ensure the safety of students during the pandemic."   Response to MTDs at 4.   The Plaintiffs conclude:

> It is in reality quite frivolous to waste this Court's time quibbling about who's plan it really is that is causing the deprivation of at least a quasi-fundamental liberty and denying students with special needs of their federally protected FAPE when the Governor has publicly touted that it is her plan carried out in accordance with the orders of her Secretary of Health and pursuant to the guidance issued by her Secretary of Education.
>
> Moreover, it is laughable to try to shift the burden of redressability to the Districts who have been explicitly clear in public and as alleged in the complaint that, but for the prohibitions of  Defendants they would make both in-person and virtual school available to the students, thus alleviating any Constitutional injury.

Response to MTDs at 4-5.

## 10.   The Plaintiffs' Notice Voluntarily Dismissing the State of New Mexico.

80.     On October 12, 2020, the Plaintiffs filed a Stipulation of Voluntary Rule 41 Dismissal of The State Of New Mexico, filed October 12, 2020 (Doc. 26).  The Plaintiffs stated that they were "voluntarily dismiss[ing] the State of New Mexico from this matter" pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  Stipulation of Voluntary Rule 41 Dismissal of The State Of New Mexico at 1.

## LAW REGARDING ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Supreme Court has construed Eleventh Amendment immunity to prohibit federal courts from entertaining suits against States that their own citizens or citizens of another State without their consent.  See Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990).  State agencies and State officials likewise enjoy immunity as "an arm of the state."  Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 280-81 (1977).

Exceptions to a State's Eleventh Amendment immunity are few.  See, e.g., Ex Parte Young, 209 U.S. at 159-60 ("If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.  The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.").  A State may, however, voluntarily waive its immunity.  See Edelman v. Jordan, 415 U.S. 651, 673 (1974).  Congress may also abrogate Eleventh Amendment

immunity pursuant to Section 5 of the Fourteenth Amendment to the Constitution of the United States, where the statute explicitly manifests Congress' intent to do so.  See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976).  Congress did not, however, abrogate Eleventh Amendment immunity when enacting 42 U.S.C. § 1983.  See Quern v. Jordan, 440 U.S. 332, 340 (1979).  Consequently, Eleventh Amendment immunity extends to defendants under that statute, and claims against the state pursuant to § 1983 in the federal courts are barred as a matter of law.

Although not properly characterized as an exception to a State's Eleventh Amendment immunity, the doctrine that the Supreme Court announced in Ex Parte Young, 209 U.S. at 128, allows for suits against state officials under certain circumstances.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d 602, 607-08 (10th Cir. 1998)("The Ex parte Young doctrine is not actually an exception to Eleventh Amendment state immunity because it applies only when the lawsuit involves an action against state officials, not against the state.").  In Ex Parte Young, the Supreme Court held that the Eleventh Amendment bar generally does not apply in federal court to state officials defending against suit which seeks only prospective relief from violations of federal law.  See Ex Parte Young, 209 U.S. at 28.  The Ex Parte Young doctrine allows suit to proceed against defendant state officials if the following requirements are met: (i) the plaintiffs are suing state officials rather the state itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the state treasury; and (iv) the suit does not implicate special sovereignty interests.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 609.

**LAW REGARDING THE IDEA**

The IDEA provides a comprehensive scheme to ensure provision of special education to students with disabilities. IDEA's overarching purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A).

The IDEA regulations provide that in making changes to a child's IEP after the annual IEP Team meeting, the parent and the public agency may agree not to convene an IEP Team meeting for the purpose of making those changes, and instead, may develop a written document to amend or modify the child's current IEP.  See 34 C.F.R. § 300.324(a)(4)(i).  An amendment to an IEP cannot take the place of an annual IEP Team meeting.

If a state agency makes changes to the child's IEP through a written document, the public agency must ensure that the child's IEP Team is informed of those changes.  Upon request, a parent must be provided with a revised copy of the IEP with the changes incorporated. See 34 C.F.R. § 300.324(a)(6).

## 1.    Policy Underlying the IDEA.

The IDEA embodies "a strong federal policy to provide an appropriate education for every [disabled] child."  Kruelle v. New Castle Cty. Sch. Dist., 642 F.2d 687, 690 (3d Cir. 1981).  The United States Court of Appeals for the Third Circuit in Kruelle v. New Castle County School District cites various passages of legislative history in explaining that Congress passed the IDEA to further three interrelated purposes.  See 642 F.2d at 690.  First, Congress sought to secure by legislation the right to a publicly-supported equal educational opportunity which it perceived to be

mandated by <u>Brown v. Board of Education</u>, and explicitly guaranteed with respect to the handicapped by two seminal federal cases, <u>Pennsylvania Association for Retarded Children v. Pennsylvania</u> and <u>Mills v. Board of Education</u>.  <u>Kruelle v. New Castle County Sch. Dist.</u>, 642 F.2d at 690-91 (citing S.Rep. No. 168, 94th Congress, 1st Sess. 6, reprinted in U.S.Code Cong. & Ad. News 1425, 1430)(footnotes omitted).  Second, "Congress intended the provision of education services to increase the personal independence and enhance the productive capacities of handicapped citizens."  <u>Kruelle v. New Castle County Sch. Dist.</u>, 642 F.2d at 691 (citation and footnote omitted). Third, Congress "acknowledged the need for an expanded federal fiscal role to aid state compliance with the court decisions and to assure protection for the rights of handicapped children." 642 F.2d at 691. According to the Third Circuit in <u>Kruelle v. New Castle County School District</u>, Congress employed a cost-benefit philosophy: "[i]nstead of saddling the public agencies and taxpayers with the enormous expenditures necessary to maintain the handicapped as lifelong dependents in a minimally acceptable institutionalized existence, Congress reasoned that the early injection of federal money and provision of educational services would remove this burden by creating productive citizens." 642 F.2d at 691 (citing S.Rep. No. 168, 94th Congress, 1st Sess., reprinted in U.S. Code Cong. & Ad. News, 1425, 1434).

2.    **The IDEA's Basic Structure.**

The IDEA is, on its surface, a funding statute.  The Supreme Court of the United States has pointed out, however, that the IDEA "confers upon disabled students an enforceable substantive right to public education in participating States." <u>Honig v. Doe</u>, 484 U.S. 305, 310 (1988). The Office of Special Education Programming of the United States Department of Education administers the IDEA.  <u>See</u> 20 U.S.C. §§ 1406, 1417. States decide whether to participate in the

IDEA and accept the funds that it provides.  At present, all states participate. New Mexico was the

last state to accept federal funding under the IDEA.  See Bd. of Educ. of Hendrick Hudson Cent.

Sch. Dist. v. Rowley, 458 U.S. 176, 18384 (1982).  The IDEA defines the term "free appropriate

public education":

> The terms "free and appropriate public education" means special education and
> related services that--
> (A) have been provided at public expense, under public supervision and direction,
> and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary, or secondary school education in
> the State involved; and
> (D) are provided in conformity with the individualized education programs required
> under section 1414(d) of [IDEA].

20 U.S.C. § 1401(8).

The IDEA confers an "enforceable substantive right to public education." Honig v. Doe,

484 U.S. at 310 (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at

176 n.1).  Through the IDEA, Congress chose a highly detailed procedural scheme to ensure that

children with disabilities receive the special education and related services they need.  See Bd. of

Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 205-06. The Honorable

Christina Armijo, United States District Judge for the District of New Mexico, has recognized that

the IDEA scheme of ensuring that all children with disabilities receive a FAPE involves parents,

schools, and states:

> The IDEA additionally envisions a collaborative effort by which parents, educators, state
> and others work together not just to create a personalized [individual education plan
> ("IEP") ] through which the individual child will receive the free appropriate public
> education to which he or she is entitled, but also to effect systemic change.

Sanders v. Santa Fe Pub. Schs., 383 F. Supp. 2d 1305, 1310 (D.N.M. 2004)(Armijo, J.)(citing 20 U.S.C. § 1414(d)(1)-(4))).

"Each 'State Educational Agency' ('SEA') must enact procedures and policies to implement the IDEA, and ensure both state and local compliance with the Act. 'Local Education Agencies' ('LEAs') are given primary responsibility for overseeing the actual provision of special education services to disabled children." Ellenberg, 478 F.3d at 1269 (citing 20 U.S.C § 1412(a)(11); 1413(a)(1); Gadsby v. Grasmick, 109 F.3d 940, 942-43 (4th Cir. 1997)). "SEAs ensure LEA compliance through the power of the purse: Federal IDEA funds are distributed to the SEA, and those funds may not be forwarded to LEAs within the state unless they demonstrate compliance with the IDEA to the satisfaction of the SEA." Ellenberg, 478 F.3d at 1269 (citing § 1413(a), (d)). If an LEA is "unable to establish and maintain programs of free appropriate public education in compliance with IDEA," the SEA must provide special education and related services directly to disabled children. Ellenberg, 478 F.3d at 1269 (citing 20 U.S.C. § 1413(h)(1))

### 3.    Standard of Review for IDEA Administrative Decisions.

A United States district court undertakes a "modified de novo" review of the underlying IDEA administrative decisions. Erickson v. Albuquerque Pub. Schs., 199 F.3d 1116, 1120 (10th Cir. 1999). The district court must "independently review the evidence contained in the administrative record, accept and review additional evidence if necessary, and make a decision based on a preponderance of the evidence, while giving 'due weight' to the administrative proceedings below." Murray v. Montrose County Sch. Dist. RE-1J, 51 F.3d 921, 927 (10th Cir. 1995). The district court reviewing the final state administrative IDEA decision reviews questions of law de novo. See O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233, 144 F.3d 692, 698

(10th Cir. 1998). "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005).

### 4.    Supplementation of the Administrative Record.

The IDEA provides that the need for additional evidence is within the court's discretion. The IDEA apparently requires, however, an evidentiary hearing to determine what evidence the court should consider adding to the record.  See 20 U.S.C. § 1415(i)(2)(C)(ii)(stating that the court "shall hear additional evidence at the request of a party").  In light of this mandatory language, the Court observes that there is some tension between 20 U .S.C. § 1415(i)(2)(C)(ii) and the exhaustion requirement under the IDEA, which requires parties to present arguments and evidence for administrative review before presenting them to a federal court. The Court believes, however, that the tension is resolved through the "modified de novo review" of a plaintiffs' IDEA claims. Murray v. Montrose County Sch. Dist. RE-IJ, 51 F.3d at 927 (explaining that "[t]he district court must therefore independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving 'due weight' to the administrative proceedings below").

### 5.    Enforcing Administrative Orders Under the IDEA's Stay-Put Provision.

IDEA's stay-put provision, 20 U.S.C. § 1415(j), provides, in pertinent part:

[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).  The statutory stay-put provision thus seeks to maintain the status quo during the administrative and judicial proceedings that IDEA provides.  "The purpose of the stay-put

provision is to prevent school districts from 'effecting unilateral change in a child's educational program' during the pendency of IDEA proceedings." Erickson v. Albuquerque Pub. Schs., 199 F.3d at 1121 (quoting Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 83 (3d Cir. 1996)).

The Tenth Circuit has recognized that IDEA's stay-put "has been construed to impose 'an automatic statutory injunction' requiring that the child's then-current educational placement be maintained . . . ." Miller v. Albuquerque Pub. Schs., 565 F.3d 1232, 1252 n.13 (10th Cir. 2009). In Laster v. District of Columbia, 394 F. Supp. 2d 60 (D.D.C. 2005)(Urbina, J.), the United States District Court for the District of Columbia stated:

> A parent can invoke the stay put provision when the school system proposes "a fundamental change in, or elimination of, a basic element of the [then-current educational placement]." Lunceford v. Dist. of Columbia Bd. of Educ., 745 F.2d 1577, 1582 (D.C. Cir. 1984). A parent moving for a stay put injunction "must identify, at a minimum, a fundamental change in, or elimination of a basic element of the education program in order for the change to qualify as a change in educational placement." Id.

Laster v. District of Columbia, 394 F. Supp at 64. IDEA's stay-put provision becomes applicable only when a change in a child's placement is proposed. See Moss v. Smith, 794 F. Supp. 11, 14 (D.D.C. 1992). See DeLeon v. Susquehanna Cmty. Sch. Dist., 747 F.2d 149, 152 (3d Cir. 1984)(stating that the threshold question is whether there is a proposed change in "educational placement").

Once a change in educational placement has been proposed, IDEA's stay-put provision operates as a substitute for traditional preliminary injunction analysis. In Casey K. ex rel. Norman K. v. St. Anne Community High School District No. 302, 400 F.3d 508 (7th Cir. 2005), the United States Court of Appeals for the Seventh Circuit, in an opinion authored by the Honorable Richard A. Posner, United States Circuit Judge, stated: "The stay-put provision has been interpreted as

imposing an automatic statutory injunction . . . like the automatic stay in bankruptcy." Casey K. ex rel. Norman K. v. St. Anne Community High School District No. 302, 400 F.3d. at 511 (citing Honig v. Doe, 484 U.S. at 326-27).

"The law is clear that an administrative decision in favor of the parents is equivalent to an agreement between the state agency and the parents and, therefore, represents the child's current education placement for purposes of IDEA's 'stay-put' provision." Bd. of Educ. of Albuquerque Pub. Schs. v. Miller, No. CIV.05-487 MCA/LFG, 2005 WL 6168485, at *4 (D.N.M. July 22, 2005)(Armijo, J.)(citing 34 C.F.R. § 300.514(c)); Sch. Comm. of Town of Burlington v. Mass. Dep't of Educ., 471 U.S. 359, 373 (1985); Bd. of Educ. v. Schutz, 290 F.3d 476, 482-84 (2d Cir. 2002); Ga. State Dep't of Educ. v. Derrick C., 314 F.3d 545, 552 (11th Cir. 2002); Susquenita Sch. Dist. v. Raelee S., 96 F.3d at 83-84; Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings, 903 F.2d 635, 641 (9th Cir. 1990); Bd. of Educ. of Pine Plains Cent. Sch. Dist. v. Engwiller, 170 F. Supp. 2d 410, 413-14 (S.D.N.Y.2002)).  Judge Armijo explained in Miller v. Board of Education of the Albuquerque Public Schools:

> The Court also must keep in mind that this case presents an unusual situation where the Plaintiffs are appealing from an administrative proceeding at which they prevailed and received some form of equitable relief as to most of the substantive issues . . . . [T]he IDEA does not give Plaintiffs the right to bring a civil action for judicial review of the administrative proceedings conducted pursuant to that statute unless and until they are "aggrieved" by the result of those proceedings. See 20 U.S.C. § 1415(i)(2)(A); Robinson v. Pinderhughes, 810 F.2d 1270, 1275 (4th Cir. 1987). It follows that there is no basis for the Court to review evidentiary rulings with respect to those issues on which the AAO found in Plaintiffs' favor and awarded adequate relief.
> . . . .
> That a student is aggrieved by a school district's failure to comply with an administrative tribunal's decision in favor of the student is a separate and distinct claim that may rest on an entirely different legal theory than the relatively

straightforward IDEA . . . . <u>See</u>, <u>e.g.</u>, <u>Robinson</u>, 810 F.2d at 1274-75 (concluding that such non-compliance can be addressed under 42 U.S.C. § 1983).

2006 WL 2786759 at *14, 16.

**<u>LAW REGARDING STANDING</u>**

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.  First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies.  Second, standing has a prudential component. <u>See</u> <u>Habecker v. Town of Estes Park, Colo.</u>, 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff. <u>See</u>, <u>e.g.</u>, <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 104 (1998).  The plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing." <u>FW/PBS v. City of Dallas</u>, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record." <u>Renne v. Geary</u>, 501 U.S. 312, 316 (1991)(quoting <u>Bender v. Williamsport Area Sch. Dist.</u>, 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record." <u>Phelps v. Hamilton</u>, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting <u>FW/PBS v. City of Dallas</u>, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

1.     **<u>Article III Standing.</u>**

- 93 -

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies." San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc). See U.S. Const. art. III, § 2. "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" Wyoming ex rel. Crank v. United States, 539 F.3d at 1241 (quoting Massachusetts v. EPA, 549 U.S. at 539 (internal quotation marks omitted). "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing." San Juan Cty., Utah v. United States, 503 F.3d at 1171. To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)). In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law. 484 F.3d at 1285. The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in <u>Nova Health Systems v. Gandy</u>, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law. <u>See</u> 416 F.3d at 1154. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions. 416 F.3d at 1155. Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing. <u>See</u> 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct that the statute prohibits. <u>See</u> <u>Winsness v. Yocom</u>, 433 F.3d 727, 732 (10th Cir. 2006). "This does not necessarily mean that a statute must be enforced against the plaintiff before he can sue." <u>Winsness v. Yocom</u>, 433 F.3d at 732 (quoting <u>Ward v. Utah</u>, 321 F.3d 1263, 1267 (10th Cir. 2003)). Where a plaintiff can show a "credible threat of prosecution," they can sue for prospective relief against enforcement. <u>Winsness v. Yocom</u>, 433 F.3d at 732 (quoting <u>Ward v. Utah</u>, 321 F.3d at 1267). Thus, to satisfy Article III, the "plaintiff's expressive activities must be inhibited by an objectively justified fear of real

- 95 -

consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement." Winsness v. Yocom, 433 F.3d at 732 (internal quotations omitted). See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights").

### 2.    **Prudential Standing.**

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).  Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted).  Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing.  The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l v. Static Control Components, 572 U.S. 118, 127 (2014).  Statutory standing "extends only to plaintiffs

- 96 -

whose interests fall within the zone of interests protected by the law invoked." <u>Lexmark Int'l v. Static Control Components</u>, 572 U.S. at 127.  Notably, the Supreme Court stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S. at 130 (quoting <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 225 (2012)). Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S. at 130 (internal quotation marks and citations omitted).  This "lenient approach" preserves the APA's flexible judicial-review provisions. <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S. at 130.

## <u>LAW REGARDING FEDERAL-QUESTION JURISDICTION</u>

Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction. <u>See</u> <u>Basso v. Utah Power & Light Co.</u>, 495 F.2d 906, 909 (10th Cir. 1974); <u>Chavez v. Kincaid</u>, 15 F. Supp. 2d at 1119.  A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  There is a federal question if the case arises under the Constitution, laws, or treatises of the United States. <u>See</u> 28 U.S.C. § 1331.  Whether a case arises under a federal law is determined by the "wellpleaded complaint rule," <u>Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.</u>, 463 U.S. 1, 9 (1983), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," <u>Caterpillar, Inc. v. Williams</u>, 482 U.S. 386, 392 (1987)(citing <u>Gully v. First Nat'l Bank</u>, 299 U.S. 109, 112-13 (1936)).  This

determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 10 (citing Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)). The Supreme Court has further limited subject-matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action. See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 25-26. The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813 (1986). See Sandoval v. New Mexico Tech. Grp., L.L.C., 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("*Merrell Dow* is the controlling law when invoking subject matter jurisdiction" when a right under state law turns on construing federal law). District courts must exercise "prudence and restraint" when determining whether a federal question is presented by a state cause of action because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810.

In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)). If the resolution turns on a substantial question of federal law, the federal question must also be "contested." Grable & Sons

Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005).  Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."  542 U.S. at 313.  Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts.  542 U.S. at 313.  See Darr v. N.M. Dep't of Game & Fish, 403 F. Supp. 3d 967, 1012 (D.N.M. 2019)(Browning, J.)(explaining that, to establish federal-question jurisdiction, "the federal question must also be 'actually disputed,' and its necessary to the case's resolution" (quoting Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314)); Bonadeo v. Lujan, 2009 WL 1324119, at *7-9.

## LAW REGARDING YOUNGER ABSTENTION

Under the abstention doctrine that the Supreme Court articulated in Younger, 401 U.S. 37, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief.  Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)).  Younger abstention is not a doctrine only belonging to courts of equity, although the doctrine arose from parties seeking equitable relief from state court proceedings in federal court.  The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' [r]ather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief."  Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir.

1996)(quoting <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 716-17 (1996)).  This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs." <u>J.B. ex rel. Hart v. Valdez</u>, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting <u>Seneca-Cayuga Tribe v. Oklahoma</u>, 874 F.2d 709, 711 (10th Cir. 1989)).

For <u>Younger</u> abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.  <u>See J.B. ex rel. Hart v. Valdez</u>, 186 F.3d at 1291 (citing <u>Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423, 432 (1982)("<u>Middlesex</u>")); <u>Sw. Air Ambulance, Inc. v. City of Las Cruces</u>, 268 F.3d 1162, 1177-78 (10th Cir. 2001).  When all of the elements mandating abstention clearly exist in the record, courts may and should address application of the <u>Younger</u> abstention doctrine <u>sua sponte</u>.  <u>See Bellotti v. Baird</u>, 428 U.S. 132, 143 n.10 (1976)(stating that "abstention may be raised by the court <u>sua sponte</u>"); <u>Morrow v. Winslow</u>, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying <u>Younger</u> abstention doctrine sua sponte, and holding that parties need not raise the <u>Younger</u> abstention doctrine to preserve its applicability).

"<u>Younger</u> abstention is not discretionary once the [three] conditions are met, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims." <u>Seneca-Cayuga Tribe v. Oklahoma</u>, 874 F.2d 709, 711 (10th Cir. 1989)(citation omitted).  <u>See Taylor v. Jaquez</u>, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the <u>Younger</u> doctrine is absolute . . . when a case meets the <u>Younger</u> criteria,' there is no discretion for the district court to exercise.")  When the <u>Younger</u> abstention

- 100 -

elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation.  Deakins v. Monaghan, 484 U.S. 198, 202 (1988).  For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action.  See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended).  See also Younger, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a state court can address a plaintiff's causes of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the state court proceeding.  In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights.  See 242 F. App'x at 613.  The parent had requested a federal district court to issue an order regarding his parental rights and rights to child support payments, and to award the parent monetary damages recompensing him for his past child support payments.  See 242 F. App'x at 611.  Additionally, the parent alleged that the Colorado state trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court

seeking money damages from the state court officials adjudicating his state custody case.  242 F. App'x at 613.  The Tenth Circuit ruled that the district court was right to abstain from hearing the parent's case under Younger.  See Wideman v. Colorado, 242 F. App'x at 614.  The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614.  Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigant any federal constitutional issues that may arise . . . in the Colorado state proceedings."  242 F. App'x at 614.  Thus, where the Younger abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing.

## LAW REGARDING 42 U.S.C. § 1983 CLAIMS

§ 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  § 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute.  See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186,

1197 (10th Cir. 1998))).  § 1983 authorizes an injured person to assert a claim for relief against a

person who, acting under color of state law, violated the claimant's federally protected rights.  To

state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation

of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color

of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal
> Constitution or created by federal statute or regulation, (2) proximately caused
> (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance,
> regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M.

2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-

0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court clarified that, in alleging a § 1983 action against a government agent

in his or her individual capacity, "a plaintiff must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal,

556 U.S. at 676.  Consequently, there is no respondeat superior liability under § 1983.  See

Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens*[20] and

§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's

---

[20]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388
(1971)("Bivens"), the Supreme Court of the United States held that a violation of the Fourth
Amendment of the Constitution of the United States "by a federal agent acting under color of his
authority gives rise to a cause of action for damages consequent upon his unconstitutional
conduct."  403 U.S. at 389.  Thus, in a Bivens action, a plaintiff may seek damages when a federal
officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See
Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions
are the "federal analog" to § 1983 actions).

own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-

supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit has noted, however, that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'"  Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING 42 U.S.C. § 1988

§ 1983 "and its fee-shifting provision, 42 U.S.C. § 1988, seek to encourage attorneys to litigate civil rights violations."  Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL

2383667, at *13 (D.N.M. June 13, 2012)(Browning, J.).  Section 1988(b) provides: "[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  "[T]here are two elements in deciding whether to award attorney's fees.  First, the party seeking fees must qualify as a 'prevailing party.'  Second, the fee itself must be 'reasonable.'"  Phelps v. Hamilton, 120 F.3d 1126, 1129 (10th Cir. 1997)(quoting 42 U.S.C. § 1988(b)).

For the purpose of determining attorney's fees, a court may determine that plaintiffs are "prevailing parties . . . if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  Hensley v. Eckerhart, 461 U.S. at 433 (internal quotation marks omitted)(citation omitted).  In Farrar v. Hobby, 506 U.S. 103 (1992), the Supreme Court later elaborated on this description:

> Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.  The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement.  Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement.  Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff.  Only under these circumstances can civil rights litigation effect the material alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party.  In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

506 U.S. at 111 (citations omitted)(internal quotation marks omitted)(alterations omitted).  The Supreme Court has stated that "this is a generous formulation that brings the plaintiff only across the statutory threshold."  Hensley v. Eckerhart, 461 U.S. at 433.  See Copar Pumice Co., Inc. v. Morris, 2012 WL 2383667, at *19 (concluding that Copar Pumice qualified as a prevailing party under the "generous formulation" that the Supreme Court set in Hensley v. Eckerhart).  The district

court must then determine what fee is "reasonable."  Hensley v. Eckerhart, 461 U.S. at 433; Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d 1188, 1210 (D.N.M. 2011)(Browning, J.)("Once a court determines that a party is a prevailing party, it must then determine what amount of reasonable attorney's fees should be awarded.").

"To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate."  Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)(citing Blum v. Stenson, 465 U.S. at 888; Hensley v. Eckerhart, 461 U.S. at 433).  This lodestar figure "provides an objective basis on which to make an initial estimate of the value" of an attorney's services. Hensley v. Eckerhart, 461 U.S. at 433.  While the Court "agrees that attorneys' fees should be adequate to attract competent counsel," they should "not be so large that it is a windfall for attorneys -- who should not be encouraged to grow fat off of lackluster cases, or pester the court with trifles in the hopes of capturing large attorneys' fees from dubious claims."  Obenauf v. Frontier Financial Group, Inc., 785 F. Supp. 2d at 1214.  The prevailing party requesting an award of its fees must submit evidence to support its claim of time spent and rates claimed.  See Hensley v. Eckerhart, 461 U.S. at 434.  If the evidence is inadequate, the district court may reduce the fee award accordingly.  See Hensley v. Eckerhart, 461 U.S. at 434. See also Ysasi v. Brown, 2015 WL 403930, at *14 (reducing the plaintiffs' counsel's requested fees because the time records were of poor quality, lacked detail, and were general in their wording).

A district court may also adjust the lodestar to reflect a plaintiff's overall success level. See Jane L. v. Bangerter, 61 F.3d at 1511 (citing Hensley v. Eckerhart, 461 U.S. at 435-36).  "In making such adjustments, however, Hensley requires that lower courts make qualitative

comparisons among substantive claims before adjusting the lodestar either for excellent results or limited success." Jane L. v. Bangerter, 61 F.3d at 1511. The district court must consider the relationship between the fees awarded and the degree of success obtained and must make a qualitative assessment to determine when limited results will nonetheless justify full recovery or to what extent a plaintiff's "limited success" should reduce the lodestar. Jane L. v. Bangerter, 61 F.3d at 1511. "There is no precise rule or formula" for making such determinations. Hensley v. Eckerhart, 461 U.S. at 436. In Hensley v. Eckerhart, the Supreme Court explained the rationale behind this approach:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

461 U.S. at 435.

Furthermore, when a plaintiff brings related claims, failure on some claims should not preclude full recovery if the plaintiff achieves success on a significant, interrelated claim. See Hensley v. Eckerhart, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."); Jane L. v. Bangerter, 61 F.3d at 1512. Claims are related when they are either based on "a common core of facts" or based on "related legal theories." Hensley v. Eckerhart, 461 U.S. at 435. In both cases, the district court should refrain from reducing the amount of the prevailing party's attorney's fee award. See Jane L. v. Bangerter, 61 F.3d at 1512. The Tenth Circuit has "refused to permit the reduction of an attorneys fee request if successful and unsuccessful claims are based on a common core of facts." Jane L. v. Bangerter,

61 F.3d at 1512 (internal quotation marks omitted)(quoting Tidwell v. Fort Howard Corp., 989 F.2d 406, 412-13 (10th Cir. 1993)(holding that the trial court abused its discretion in reducing attorney's fees for a plaintiff who prevailed under some provisions of the Equal Pay Act, but failed on her Title VII and state law claims)). The Tenth Circuit has also recognized that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." Jane L. v. Bangerter, 61 F.3d at 1512 (quoting Hensley v. Eckerhart, 461 U.S. at 435).

## LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER

The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order. See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004). The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days. See Fed. R. Civ. P. 65(b)(1)-(2). In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted. Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)). See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181. The Supreme Court and the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve

the power to render a meaningful decision on the merits.'")(quoting <u>Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.</u>, 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a TRO under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order. Fed. R. Civ. P. 65(b). "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise." <u>Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.</u>, 320 F.3d 1081, 1105 (10th Cir. 2003)(citing <u>Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.</u>, 805 F.2d at 355). A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008)("<u>Winter</u>")(citing <u>Munaf v. Geren</u>, 553 U.S. 674, 689-90 (2008)); <u>Amoco Prod. Co. v. Gambell</u>, 480 U.S. 531, 542 (1987); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. <u>Diné Citizens Against Ruining Our Env't v. Jewell</u>, 839 F.3d 1276 (10th Cir. 2016)("<u>Diné</u>"). In <u>Diné</u>, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in <u>Winter v. Natural Resources Defense Council</u>," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm."

Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22).  The Tenth Circuit concluded that, although the standard overruled in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor.  Diné, 839 F.3d at 1282.  Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States and its officers and agencies are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable.").  See also Flood v. ClearOne Comm'ns, 618 F.3 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security,'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d at 1215 (quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Court has written several times on the topic of TROs and preliminary injunctions.  In O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M. 2017), the Court issued a preliminary injunction requiring the United States Citizen and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist religious

organization ("UDV").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1269.  The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1263-64.  USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program.  See 286 F. Supp. 3d at 1264.  UDV theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be compensated.  See 286 F. Supp. 3d at 1264.  The Court reasoned, accordingly, that DHS had substantially burdened the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money.  See 286 F. Supp. 3d at 1264.  The minister also met a preliminary injunction's other three prongs, so the Court granted the relief requested.  See 286 F. Supp. 3d at 1265-66.  The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation.  See Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200.  It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies" including "cupping and shaking girls' breasts" were unreasonably and unconstitutionally intrusive, even if those type of searches were likely effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighed the damage of the TRO; and (iv) the TRO was not adverse to the public, because it would protect other students' constitutional

rights who attended prom and graduation.  Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1194-98.  The Court denied a request for injunctive relief in Salazar v. San Juan County Detention Center, No. CIV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016)(Browning, J.), after concluding that, although the defendants faced irreparable harm, the balance of equities favored them, and an injunction was not adverse to the public interest, the plaintiffs were unlikely to succeed on the merits.  See Salazar v. San Juan Cty. Detention Ctr., 2016 WL 335447, at *43-52.

## LAW REGARDING PRELIMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."  Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."  Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter, 555 U.S. at 19 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in

- 113 -

his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))). The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972). "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282. "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'" Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963) ). "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'" Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395). In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal

quotation marks omitted)(quoting <u>O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 975 (10th Cir. 2004), <u>aff'd and remanded sub nom.</u> <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418 (2006)("<u>O Centro II</u>")). <u>Accord</u> <u>Westar Energy, Inc. v. Lake</u>, 552 F.3d 1215, 1224 (10th Cir. 2009). Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" <u>Schrier v. Univ. of Colorado</u>, 427 F.3d at 1261 (all alterations but first in <u>Schrier v. Univ. of Colo.</u>)(quoting <u>O Centro [II]</u> . . . , 389 F.3d at 979). The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, <u>i.e.</u>, that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

<u>Salazar v. San Juan Cty. Det. Ctr.</u>, 2016 WL 335447, at *40. When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." <u>SCFC ILC, Inc. v. Visa USA, Inc.</u>, 936 F.2d 1096, 1100 (10th Cir. 1991), <u>overruled on other grounds by</u> <u>O Centro II</u>, 389 F.3d at 975). "The meaning of this category is self-evident." <u>Salazar v. San Juan Cty. Det. Ctr.</u>, 2016 WL 335447, at *41. With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." <u>Salt Lake Tribune Publ'g Co. v. AT & T Corp.</u>,

320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]" United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING EQUAL PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'" Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). "The Clause 'creates no substantive rights. Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly.'" Teigen v. Renfrow, 511 F.3d 1072, 1083 (10th Cir. 2007)(unpublished)(quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).

Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated

differently from similarly situated individuals who are not in that class.  See <u>SECSYS, LLC v. Vigil</u>, 666 F.3d 678, 688 (10th Cir. 2012).  The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons."  <u>SECSYS, LLC v. Vigil</u>, 666 F.3d at 685 (quoting <u>Pers. Adm'r of Mass. v. Feeney</u>, 442 U.S. at 279).  In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action."  <u>SECSYS, LLC v. Vigil</u>, 666 F.3d at 685.

A state actor can generally be subject to liability only for its own conduct under 42 U.S.C. § 1983.  See <u>Robbins v. Oklahoma</u>, 519 F.3d at 1251 (citing <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 197 (1989)).  At least in the Tenth Circuit, however, under some circumstances, harassment by a third-party can subject a supervisor or municipality to liability for violation of the equal-protection clause -- not for the harasser's conduct, per se, but for failure to take adequate steps to stop it.  See <u>Murrell v. Sch. Dist. No. 1</u>, 186 F.3d 1238, 1249-51 (10th Cir. 1999).  The plaintiff "must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority."  <u>Murrell v. Sch. Dist. No. 1</u>, 186 F.3d at 1249 (citations omitted).  The failure to prevent discrimination before it occurs is not actionable.  <u>Murrell v. Sch. Dist. No. 1</u>, 186 F.3d at 1250 n.7.

**<u>LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS</u>**

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause

encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"   Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).  The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S.

at 571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.  Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is

flexible and calls for such procedural protections as the particular situation demands." <u>Mathews</u>

<u>v. Eldridge</u>, 424 U.S. at 334.  The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

<u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542, 545(footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process."  <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, [529] . . . (2004)(quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 335.  A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" <u>Id.</u> (quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 335. . . .).

<u>United States v. Abuhamra</u>, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the

procedures already guaranteed, and whether additional procedural safeguards would prove

valuable; and (iii) the government's interest and the burdens that additional procedures might

impose.  <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. at 335.  For example, "[w]here . . . the state must act

quickly, a meaningful postdeprivation hearing is adequate."  <u>Clark v. City of Draper</u>, 168 F.3d

- 121 -

at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times.  See A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngeres, the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, Camuglia v. City of Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 197).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

1.     **Exceptions to the General Rule.**

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115,

1135 (D.N.M. 2012)(Browning, J.)(citing <u>Johnson ex rel. Estate of Cano v. Holmes</u>, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.       Special-Relationship Exception.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due process clause is the special-relationship doctrine. A plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  <u>See Liebson v. N.M. Corr. Dep't</u>, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)."  <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572 (10th Cir. 1995).

### 3.       Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  <u>Uhlrig v. Harder</u>, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  <u>Currier v. Doran</u>, 242 F.3d at 923.  <u>See Estate of B.I.C. v. Gillen</u>, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."  <u>Uhlrig v. Harder</u>, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"  <u>Estate of B.I.C. v. Gillen</u>, 702 F.3d at 1187 (quoting <u>Gray v. Univ. Colo. Hosp. Auth.</u>,

672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, the plaintiff must show that his

or her danger-creation claim for due process violations meets a six-part test: (i) the state and

individual actors must have created the danger or increased plaintiff's vulnerability to the danger

in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii)

the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and

proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted

recklessly in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227

(D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511

F.3d 1114, 1126 (10th Cir. 2008)).

    In determining whether the danger-creation exception applies, the Tenth Circuit has

focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v.

City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk

of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City &

Cty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present

where the defendant "is aware of a known or obvious risk" creating a high probability that serious

harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable

disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496 (citations

omitted).

### 4.    **Conduct that Shocks the Conscience**.

    A government actor's official conduct intended to injure in a way that cannot reasonably

be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento

v. Lewis, 523 U.S. at 849("[C]onduct intended to injure in some way unjustifiable by any

- 125 -

government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge."  Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections,

alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience."  265 F.3d at 1134.  The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is not enough to satisfy the danger-creation theory's conscience shocking standard."  265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process rights when they did not take sufficient action to prevent a student at the school from "racking"[21] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the Defendants indicated to the sixth graders that it had policies in

---

[21]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

place to punish individuals that assaulted other students but did not, in fact, have such policies.

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1074-75.

## ANALYSIS

District courts, including the Court, appellate courts, and the Supreme Court have looked to Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11 (1905)("Jacobson") when deciding suits seeking injunctive relief against government action during the COVID-19 pandemic. See, e.g., S. Bay United Pentecostal Church v Newsom, 140 S. Ct. 1613 (2020)(Roberts, CJ., concurring in denial of application for injunctive relief); In re Abbott, 956 F.3d 696, 704 (5th Cir. 2020); Elim Romanian Pentecostal Church v. Pritzker, 962 F.3d 341, 347 (7th Cir. 2020); Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d 1100, 1160 (D.N.M. Apr. 17, 2020)(Browning, J.); Prof'l Beauty Fed'n of California v. Newsom, No. 2:20-CV-04275-RGK-AS, 2020 WL 3056126, at *5 (C.D. Cal. June 8, 2020)(Klausner, J.); J.H. by & through N.H. v. Edwards, No. CV 20-293-JWD-EWD, 2020 WL 3448087, at *48 (M.D. La. June 24, 2020)(deGravelles, J.); On Fire Christian Ctr., Inc. v. Fischer, 453 F. Supp. 3d 901, 912 (W.D. Ky. 2020)(explaining that although constitutional law does not "remain rigidly fixed in the time of a national emergency . . . . even under Jacobson, constitutional rights still exist")(Walker, J.).  But see Gomez v. Trump, No. 20-

CV-01419, 2020 WL 5367010 (D.D.C. Sept. 4, 2020)(Mehta, J.)(declining to apply Jacobson to a federal government action).  The Court concludes that "Jacobson instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency."  In re Abbot, 956 F.3d at 786 (emphasis in original).  See also Lindsay F. Wiley & Stephen I. Vladeck, Coronavirus, Civil Liberties, and the Courts: The Case Against "Suspending" Judicial Review, 133 Harv. L. Rev. F. 179, 191 (2020).

To be sure, the law permits permit greater intrusions into civil liberties in times of greater communal need.  Nevertheless, even during a public health crisis, the Court may not "distort the Constitution to approve all that the" State deems necessary.  Korematsu v. United States, 323 U.S. 214, 244 (1944)(Jackson, J., dissenting), abrogated by Trump v. Hawaii, 138 S. Ct. 2392 (2018).  Thus, where the State has enacted emergency public health measures, the Court will not uphold policies which (i) have "no real or substantial relation" to the State's public health objectives; or (ii) are "a plain, palpable invasion of rights secured by the fundamental law."  Jacobson, 197 U.S. at 31.  See Robinson v. Attorney Gen., 957 F.3d 1171, 1182 (11th Cir. 2020)(concluding that a state had "impinge[d] the right to an abortion in a 'plain and palpable' fashion under Jacobson").  Where the State's policies go "far beyond what [is] reasonably required for the safety of the public," the Court is "authorize[d] or compel[led] . . . to interfere . . . ."  Jacobson, 197 U.S. at 28.  Accordingly, the Court concludes that rational basis review is the appropriate standard for Plaintiffs constitutional claims, to ensure that the Defendants' policies are "rationally related to a legitimate state interest."  City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976).  See League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer, 814 F. App'x 125, 127-28 (6th Cir. 2020)(applying Jacobson and concluding that a Governor's order must satisfy rational basis review

upon stipulation of the parties); <u>Peterson ex rel. K.P. v. Kunkel</u>, No. 1:20-CV-00898-WJ-CG, 2020 WL 5878407, at *6 (D.N.M. Oct. 2, 2020)(Johnson, C.J.)(applying rational basis review to an equal protection claim seeking injunctive relief to enjoin limitations on private schools imposed during the COVID-19 pandemic).

I.      **THE PLAINTIFFS HAVE SHOWN THAT THEY LIKELY HAVE STANDING TO BRING CLAIMS AGAINST SECRETARY STEWART, BUT THE PLAINTIFFS HAVE FAILED TO SHOW THAT THEY ARE LIKELY TO ESTABLISH STANDING TO SUE GOVERNOR LUJAN GRISHAM AND SECRETARY KUNKEL.**

In addition to showing that there is an injury-in-fact to establish Article III standing, the Plaintiffs must show that there is a causal relationship between the injury and the challenged conduct; and that there is a likelihood that the injury can be redressed.  See <u>Protocols, LLC v. Leavitt</u>, 549 F.3d 1294, 1298 (10th Cir. 2008).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  <u>Phelps v. Hamilton</u>, 122 F.3d 1309, 1326 (10th Cir. 1997). "[A] a plaintiff must demonstrate standing for each claim he seeks to press." <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 352 (2006).  The PED issued the official reentry guidance for the 2020 to 2021 school year in June 2020, and the PED, based on its reentry criteria, determines whether a school must operate remotely or is allowed to operate as a hybrid or full entry. <u>See</u> Reentry Guidance at 1, 9. The Plaintiffs, however, do not allege sufficient facts to tie Governor Lujan Grisham or Secretary Kunkel to the Reentry Guidance or to current school closures.  Therefore, because the PED controls the reentry process, the Plaintiffs have shown that they will likely establish standing to sue Secretary Steward, but not to sue Governor Lujan Grisham and Secretary Kunkel.

A.    BECAUSE THE PED ISSUED THE REENTRY GUIDANCE AND
CONTROLS THE REENTRY PROCESS, THE PLAINTIFFS LIKELY
HAVE STANDING TO SUE SECRETARY STEWART.

The Governor and the Secretaries argue that the Plaintiffs lack standing to bring claims

against Secretary Stewart, because the Plaintiffs cannot show that a preliminary or permanent

injunction enjoining Secretary Stewart would guarantee that in-person schooling would resume,

"because local school districts have the discretion regarding how to operate." See Governor and

Secretaries' Motion to Dismiss at 16.  The Governor and the Secretaries admit, however, that the

Reentry Guidance, which was issued by the PED, controls the reentry process and Secretary

Stewart has the power to alter it, see Governor and Secretaries' Motion to Dismiss at 13; N.M.S.A.

1978 §§ 22-2-1, 22-2-2, 22-2-8, therefore, the Plaintiffs likely have standing to bring claims

against Secretary Stewart.

To establish redressability, "a plaintiff must . . . establish it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision."  Comm. to Save the Rio

Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir. 1996).  A plaintiff seeking injunctive relief satisfies

the redressability requirement "by alleging a continuing violation or the imminence of a future

violation of an applicable statute or standard."  NRDC v. Sw. Marine, 236 F.3d 985, 995 (9th Cir.

2000).  For purposes of a standing analysis, however, the Court assumes that the alleged legal

violations have occurred and asks whether a favorable decision in the case will redress the injury

that the plaintiffs have alleged.  See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452.

To satisfy redressability, the plaintiffs need to show only "the likelihood (as opposed to speculation

[or certainty]) that the injury will be redressed by a favorable decision."  Sw. Ctr. for Biological

Diversity v. Clark, 90 F. Supp. 2d 1300, 1310 (D.N.M. 1999)(Mecham, Senior Judge).  Where the

plaintiff has established that the challenged action causes him or her an ongoing injury in fact, then an order invalidating and enjoining further engagement in the challenged action will redress the injury.  See Friends of the Earth, Inc. v. Laidlaw Env. Services (TOC), Inc., 528 U.S. 167, 185-186 (2000).

The Governor and the Secretaries agree that "New Mexico law explicitly authorizes the PED to issue the Reentry Guidance.  The PED is vested with the powers and duties related to the control, management, and direction of all public schools in this state.  The PED determines the policies for the operation of all public schools."  Governor and Secretaries' Motion to Dismiss at 13 (citations omitted).  The Governor's and the Secretaries' acknowledgment that the PED and Secretary Stewart "control, manage[], and direct[] . . . all public schools" and the reentry process, see Governor and Secretaries' Motion to Dismiss at 15, means that it is "likely . . . that the [Plaintiffs alleged] injury will be redressed by a favorable decision."  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452. The Governor and the Secretaries argue that "school districts may decide to delay in-person learning and continue to use remote instruction" pursuant to their own discretion under the Reentry Guidance.  See Governor and Secretaries' Motion to Dismiss at 16.  However, because the PED and Secretary Stewart issued -- and can, and have, amended -- the Reentry Guidance, which currently gives schools the discretion to hold in-person instruction if they meet the reentry criteria or for schools operating remotely, allows small group instruction for (i) pre-kindergarten through third grade; (ii) special education of all ages; and (iii) students needing additional support of all ages, see Reentry Guidance Addendum A at 1, the Governor and the Secretaries have not shown that an injunction will not lead to a change in how the schools operate. The Defendants' citation to Bronson v. Swensen, 500 F.3d 1099, 1111 (10th Cir. 2007)("The

redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute."), is distinguishable, because, here, by their own admission, the PED and Secretary Stewart have the power to control and direct whether schools follow the reentry policy and change that policy, if need be.  The Plaintiffs have shown, therefore, that a preliminary or permanent injunction enjoining Secretary Stewart will likely redress their alleged injuries.[22]

### B.   THE PLAINTIFFS LIKELY LACK STANDING TO SUE THE GOVERNOR LUJAN GRISHAM AND SECRETARY KUNKEL.

The Plaintiffs' argument that the Governor and the Secretaries' actions are so intertwined that all three parties are inseparable for a standing analysis under Article III lacks merit.  See Response to MTDs at 2.  It is well- established that "a plaintiff must demonstrate standing for each claim he seeks to press," DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006), and, similarly, that the plaintiff must demonstrate standing against each defendant, see Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 65-66 (2d Cir. 2012)(concluding that "a plaintiff's injury resulting from the conduct of one defendant should have any bearing on her Article III standing to sue other defendants"); Reniger v. Hyundai Motor Am., 122 F. Supp. 3d 888, 895 (N.D. Cal. 2015)("[W]here there are multiple defendants and multiple claims, there must exist at least one

---

[22]The Governor and the Secretaries contend that the "Plaintiffs must include all superintendents as defendants in this case to obtain the requested relief."  Governor and Secretaries' Motion to Dismiss at 16. The Governor and the Secretaries fail to develop this argument, which is properly brought under rule 12(b)(7) of the Federal Rules of Civil Procedure, for failure to join a required party under rule 19, and plaintiffs asserting claims under the IDEA against a state department of education may bring claims solely against the department, see Winkelman v. Ohio Dept. of Educ., 616 F. Supp. 2d 714, 717-718 (N.D. Ohio 2008)(finding that joinder of the school district was not required in bringing claims under the IDEA against a state department of education).

named plaintiff with Article III standing as to each defendant and each claim.").  The Plaintiffs argue that "it is implausible . . . that that Secretary Stewart's actions were not done in compliance and collaboration with Secretary Kunkel's orders and with direct input from the Governor," Response to MTDs at 2, however, the Plaintiffs do not point to any executive order from Governor Lujan Grisham or a PHO issued by Secretary Kunkel that has shut down any school for the 2020 to 2021 school year or otherwise caused the Plaintiffs' alleged injuries.  Because the Plaintiffs have failed to allege sufficient factual allegations to show both causation and redressability regarding Governor Lujan Grisham and Secretary Kunkel, they likely lack standing to bring claims against Governor Lujan Grisham or Secretary Kunkel.

"The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." Ecological Rights Found. v. Pacific Lumber, 230 F.3d 1141, 1151 (9th Cir. 2000)(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  See Bronson v. Swensen, 500 F.3d 1099, 1109 (10th Cir. 2007)("The principle of causation for constitutional standing requires a plaintiff's injury to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.")(internal quotation marks and citations omitted). "To satisfy the traceability requirement, the defendant's conduct must have caused the injury." Aptive Envtl., LLC v. Town of Castle Rock, 959 F.3d 961, 977 (10th Cir. 2020)(internal quotation marks and citations omitted).  "Although a defendant's alleged misconduct need not be the proximate cause of a plaintiff's harm, Article III does at least require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." Bronson v. Swensen, 500

F.3d at 1109 (internal quotations marks and citation omitted).  The Tenth Circuit has distinguished

between the injury-in-fact requirement and the causation requirement:

> Whether an increased risk will or will not occur due to the agency action determines whether a plaintiff has suffered injury in fact, not causation . . . .  [T]he risk must be actual, threatened or imminent. However, once the plaintiff has established the likelihood of the increased risk for purposes of injury in fact, to establish causation . . . the plaintiff need only trace the risk of harm to the agency's alleged failure to follow the [law].

Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 451-52 (10th Cir. 1996).  The relevant

showing for purposes of Article III standing, is injury to the plaintiff.  See Friends of the Earth,

Inc. v. Laidlaw Env. Services (TOC), Inc., 528 U.S. 167, 181 (2000).

The Plaintiffs make no factual allegations specific to Secretary Kunkel in their Amended

Complaint linking her to the Reentry Guidance or school closures, and therefore, have no claim

that the injury they suffer is "fairly traceable to the challenged action of the defendant." Bronson

v. Swensen, 500 F.3d at 1109.  The Plaintiffs only lump Secretary Kunkel together with Governor

Lujan Grisham and Secretary Stewart into general, conclusory allegations, maintaining that their

"Amended Complaint actually alleges . . . that it is all three of these of these actors working

together [to] issue the Governor's plan which encompasses Secretary Stewart's 'reentry guidance

that has caused the students to be deprived of their education,'" Response to MTDs at 4, and the

"Secretary of Health[]" under her "authorities under the Public Health Act and the authorities

vested in her Secretary of Education issued [the Reentry Guidance.]"  Amended Complaint ¶ 10,

at 3. Such allegations fail to establish Article III standing, instead the alleged injuries are clearly

"the result of the independent action of some third party." Bronson v. Swensen, 500 F.3d at 1109.

For similar reasons, the Plaintiffs fail to establish standing against Governor Lujan Grisham.  The Plaintiffs allege that "the Governor acting through her executive orders . . . close[d] certain counties['] schools to in-person learning," but point to no such executive orders.  Amended Complaint ¶ 21, at 6.  See Response to MTDs at 1 (admitting that Governor Lujan Grisham's "Executive Order of March 26, 2020 closing schools being" has "no current effect and impact" and listing no other applicable executive order).  Instead, the Plaintiffs ask the Court to not "silo[]" the allegations against each Defendant, but rather treat Governor Lujan Grisham as working in concert with Secretary Stewart, because "the Governor herself has portrayed the actions publicly as her 'school re-entry plan' and touted that all of her public officials, including not only Secretary Kunkel and Secretary Stewart, but also Secretary Scrase, orked out this plan to ensure the safety of students during the pandemic."  Response to MTDs at 2, 4. In making this argument, the Plaintiffs cite to numerous press conferences and news clips where Governor Lujan Grisham discusses the status of school reopening.  See Exhibit 1, filed October 12, 2020 (Doc 25-1).  However, press conferences are not executive orders, meaning Plaintiffs' argument is not a legal one.  Indeed, in the press conferences and Twitter updates, Governor Lujan Grisham emphasizes that the PED, not  the  Governor, is taking action to facilitate safe school reentry.  See e.g., Michelle Lujan      Grisham      (@GovMLG),     Twitter      (Aug.     28,      2020,     8:55     AM), https://twitter.com/GovMLG/status/1299359982417137665     ("[PED]     has     established     strict requirements for school districts that want to engage in a hybrid model of in-person and remote learning . . . .").  The Plaintiffs point to no legal authority turning press conferences and Twitter updates into binding executive orders causing school closures.  See Response to MTDs at 2, 4-5.  And, the Court is "not bound to accept legal conclusions couched as factual allegations." United

States ex rel. Hanlon v. Columbine Mgmt. Servs., 676 Fed. App'x 787, 790 (10th Cir. 2017).  See

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)("To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief this plausible on its

face.")(internal quotation marks and citation omitted); McIntyre v. Kelly, No. 18-2617-DDC-

GEB, 2020 U.S. Dist. LEXIS 97225, at *10 (D. Kan. June 3, 2020)(Crabtree, J.)(rejecting

allegations in a complaint alleging that the "Governor . . . 'has the authority' to issue certain

executive orders, and 'is responsible' for appointing agency secretaries," because "these are 'bare

legal assertions' stated 'without any supporting factual allegations . . . .'" (citing Peterson v.

Martinez, 707 F.3d 1197, 1206 (10th Cir. 2013)).  Therefore, without factual allegations linking

Governor Lujan Grisham to current school closures, the Plaintiffs fail to establish standing's core

causation requirement.

Last, the Plaintiffs fail to establish redressability -- standing's third prong -- regarding

Governor Lujan Grisham and Secretary Kunkel.  To establish redressability, "a plaintiff must . . .

establish it is likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision."  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452.  A plaintiff seeking

injunctive relief satisfies the redressability requirement "by alleging a continuing violation or the

imminence of a future violation of an applicable statute or standard."  NRDC v. Sw. Marine, 236

F.3d at 995.  The Plaintiffs point to no state law or constitutional provision giving the Secretary of

the Department of Health power or control over the school reentry process.  See Amended

Complaint ¶ 21, at 6-7; Response to MTDs at 4-5.  Without specific factual allegations and without

some legal basis, the Plaintiffs are unlikely to show that their alleged "injur[ies] will be redressed

by a favorable decision" from this Court.  Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at

452.   Likewise, the Plaintiffs fail to demonstrate that Governor Lujan Grisham has control over the reentry process, where the PED, not the Governor, is authorized to issue the Reentry Guidance. See N.M.S.A. 1978, § 22-2-1(A); 22-2-2; 22-2-8; N.M. Const. Art. XII, Sec. 6(A).   Without citation to applicable legal authority, the Plaintiffs likely cannot show that they can establish redressability regarding Governor Lujan Grisham.

## II.   GALLEGOS AND HERNANDEZ LIKELY LACK STANDING UNDER THE IDEA.

Generally, only disabled children and their parents have standing to bring suit under the IDEA.   See Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 531 (2007)(explaining that both disabled children and disabled children's parents are "aggrieved parties" under the IDEA); Ryan v. Shawnee Mission U.S.D. 512, 416 F. Supp. 2d 1090, 1098 (D. Kan. 2006)(Lungstrum, J.)(finding that a plaintiff who did not allege that she was a disabled child or a parent of a disabled child was not entitled to relief under the IDEA, "because the IDEA does not provide her with a private right of action).   An organization may have representational standing under the IDEA when its members would have standing to bring suit individually under the IDEA; i.e., where its members are parents of disabled children.   See New Jersey Prot. & Advocacy, Inc. v. New Jersey Dep't of Educ., 563 F. Supp. 2d 474, 483 (D.N.J. 2008)(Cooper. J.). Accordingly, the Court concludes that the IDEA does not provide a private right of action to school boards or school board members.   See Fairfield-Suisun Unified School Dist. v. California Dept. of Educ., 780 F.3d 968, 971 (9th Cir. 2015)(finding that the IDEA creates no express or implied right of action for a school district to sue a State agency); Lawrence Tp. Bd. of Educ. v. New Jersey, 417 F.3d 368, 371 (3d Cir. 2005)(holding that a school district had no right of action under the

IDEA because statutory "language strongly suggests that Congress intended to provide a private right of action only to disabled children and their parents"); County of Westchester v. New York, 286 F.3d 150 (2d Cir. 2002)(holding that counties lack a private right of action under IDEA). Similarly, teachers lack standing to enforce the IDEA.  See Jones v. Camden City Bd. of Educ., 499 Fed. App'x 127 (3d Cir. 2012)(explaining that teachers lack standing under the IDEA); Collins v. City of New York, 156 F. Supp. 3d 448 (S.D.N.Y. 2016)(Caproni, J.)(concluding that there is no standing for teachers under the IDEA).  Accordingly, as a school board member, Gallegos lacks standing under the IDEA.  Likewise, because Hernandez is not a disabled child's parent, she also lacks standing under the IDEA.  Finally, as the parent of a disabled child, Woodworth satisfies standing requirements under the IDEA.

### III.   NEW MEXICO LIKELY HAS SOVEREIGN IMMUNITY WITH RESPECT TO THE PLAINTIFFS' § 1983 CLAIMS, BUT LIKELY LACKS SOVEREIGN IMMUNITY WITH RESPECT TO WOODWORTH'S IDEA CLAIMS.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const., amend. XI.   The Eleventh Amendment acts as a "jurisdictional bar that precludes unconsented suits in a federal court against a state . . . ."  Peterson v. Martinez, 707 F.3d 1197, 1205 (10th Cir. 2013).  Nonetheless, the Eleventh Amendment is subject to three exceptions: (1) abrogation by Congress, (2) waiver by state consent to suit; and (3) suits against individual state

- 139 -

officials for prospective relief to remedy an ongoing violation of federal law.[23]   See Muscogee (Creek) Nation v. Pruitt, 669 F.3d 1159, 1166 (10th Cir. 2012).

The Plaintiffs lack a cause of action under § 1983 against New Mexico.[24]  "§ 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989).  Justice White concluded that "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity."  Will, 491 U.S. at 66.  Justice Ginsburg subsequently clarified that "§ 1983 actions do not lie against a State."  Arizonans for Official English v. Arizona, 520 U.S. 43, 69 (1997)(citing Will, 491 U.S. at 71).  The Supreme Court explained that even absent Eleventh Amendment immunity, "which the State could waive," plaintiffs may not sue a state under § 1983 because "§

---

[23]The Eleventh Amendment does not bar claims against Governor Lujan Grisham, Secretary Kunkel, and Secretary Stewart are not barred by the Eleventh Amendment, pursuant to the third exception Ex parte Young explains.  See 209 U.S. 123 (1908).

[24]It is not clear based on the Complaint whether the Plaintiffs intend to bring § 1983 claims against New Mexico. Plaintiffs

> bring this action pursuant 42 U.S.C.A. § 1983 to stop Michelle Lujan Grisham, individually, acting in her capacity as the Governor of New Mexico, Ryan Stewart, individually, acting in his capacity as the Secretary of the State of New Mexico Department of Education, Kathyleen M. Kunkel, individually, acting in her capacity as the Secretary of the State of New Mexico Department of Health ("Defendants"), from denying the children of Southeast and Southern New Mexico an equal, Free and Appropriate Public Education ("FAPE") pursuant to the Fourteenth Amendment to the United States Constitution, N.M. Const. art. XII, § 1 and the Individuals with Disabilities Education Act ("IDEA").

Complaint at 1-2.  Although this portion of the Complaint does not mention New Mexico, the Court assumes that the Plaintiffs intend to include New Mexico as a Defendant.

1983 creates no remedy against a State." Arizonans, 520 U.S. at 70.  Here, New Mexico has asserted its sovereign immunity.  See Joint Response at 13-17.  Further, even if New Mexico had waived its sovereign immunity, the Plaintiffs would lack a remedy against New Mexico under § 1983.  See Arizonans, 520 U.S. at 70.  Similarly, the Plaintiffs' claims under the New Mexico Constitution are improper, because New Mexico has not waived sovereign immunity with respect to those claims.[25]  See Joint Response at 13-17.  The Court therefore concludes that the Plaintiffs' § 1983 claims and New Mexico Constitution claims against New Mexico are barred.

Nevertheless, the Eleventh Amendment permits Plaintiffs' IDEA claims against New Mexico.  New Mexico may not assert an Eleventh Amendment defense where Congress has abrogated its immunity.  See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996).  Congress abrogated state sovereign immunity under the IDEA. In a section entitled "Abrogation of State Sovereign Immunity," the IDEA provides that states "shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court."  20 U.S.C. § 1403(a).  A state waives its sovereign immunity when it accepts federal funds under the IDEA. See Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 280 (5th Cir. 2005)(holding that the IDEA "conditions a state's receipt of federal IDEA funds on its consent to suit under that Act").  New Mexico "has chosen to accept IDEA funds, and has adopted rules to comply with IDEA's requirements accordingly."  Ellenberg v. New Mexico Military Inst., 478 F.3d 1262, 1270 (10th Cir. 2007).  Moreover, states may be held responsible for failing to provide services to disabled

---

[25]As discussed above, claims under the New Mexico Constitution against the other defendants would be proper under Ex parte Young, 209 U.S. 123 (1908).  The Plaintiffs, however, conceded their state law claims at the hearing.  See Tr. at 25:2-5 (Court).

children.  Chavez ex rel. M.C. v. New Mexico Pub. Educ. Dep't, 621 F.3d 1275, 1280 (10th Cir.

2010).  Accordingly, the Plaintiffs' IDEA claims against New Mexico are proper, because New

Mexico has waived sovereign immunity under the IDEA.

## IV.  THE COURT CONCLUDES THAT IT IS NOT LIKELY TO CERTIFY THE PLAINTIFFS' CLASS OF PARENTS OF SPECIAL NEEDS CHILDREN UNDER THE IDEA, BECAUSE THE PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY ARE LIKELY TO DEMONSTRATE COMMONALITY AND TYPICALITY SUCCESSFULLY ON THE MERITS.

The Court concludes that it is not likely to certify the Plaintiffs first and third classes,

because these Plaintiffs likely lack standing.  See Section II. The Court also concludes that the

Court likely will not certify the Plaintiffs' second class (the "IDEA Parent Class").  See Walmart

Stores, Inc. v. Dukes, 564 U.S. 338 (2011)("Walmart"). This class includes "the parents of the

New Mexico school children who are or will be subject to the denial of a FAPE in violation of the

IDEA without any administrative remedy that would not be futile . . . ."  Complaint ¶ 32, at 8.

Woodworth has not established that she is likely to successfully demonstrate rule 23(a) of the

Federal Rules of Civil Procedure's commonality and typicality requirements.  See Fed. R. Civ. P.

23(a).

### A.   THE IDEA PARENT CLASS IS SO NUMEROUS THAT JOINDER OF ALL MEMBERS IS IMPRACTICABLE.

The Court concludes that joinder of all members of the IDEA Parent Class is impracticable.

The Plaintiffs estimate, and the Defendants do not dispute, that "thousands" of parents are in the

class, which includes all parents of special needs children in affected New Mexico counties.

Complaint ¶ 35, at 9.  "The Tenth Circuit has stated that there is 'no set formula' to determine

whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the

district court's discretion." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978)). The Court previously has found that a class may satisfy the numerosity requirement where it "would not necessarily be impossible, but rather impracticable for the Plaintiffs to use joinders . . . ." Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 687 (D.N.M. 2016)(Browning, J.)(concluding that a class of 230 satisfied the numerosity requirement). Further, a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.)(citation omitted). Here, there are thousands of putative class members spread across New Mexico, and a "common sense assumption" indicates that joinder would be virtually impossible. See Neiberger v. Hawkins, 208 F.R.D. at 313; Complaint ¶ 35, at 9. Accordingly, joinder of all members would be impracticable for rule 23(a)(1)'s purposes, and the numerosity requirement is satisfied. See Fed. R. Civ. P. 23(a)(1).

### B.   WOODWORTH HAS NOT DEMONSTRATED THAT SHE IS LIKELY TO SUCCEED ON THE MERITS IN SHOWING THAT THERE ARE QUESTIONS OF LAW OR FACT COMMON TO THE IDEA PARENT CLASS.

Rule 23(a)(2) requires that "the class members 'have suffered the same injury.'" Walmart, 564 U.S. at 349-50 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982)). See Fed. R. Civ. P. 23(a)(2). In an IDEA class action, plaintiffs may satisfy commonality by identifying a uniformly applied, official policy or practice that drives the alleged violation. See Parent/Prof'l Advocacy League v. City of Springfield, Massachusetts, 934 F.3d 13, 29 (1st Cir. 2019). Here, Plaintiffs allege that the Defendants have applied a uniform Reentry Guidance in affected counties

- 143 -

that prohibits all children of the IDEA Parent Class from attending school in person.  See Complaint ¶¶ 36-39, at 9.  They contend that the Defendants have engaged in "a large-scale violation[] of the [IDEA's] terms."  Mark C. Weber, Idea Class Actions After Wal-Mart v. Dukes, 45 U. Tol. L. Rev. 471, 473 (2014).  Yet, on its face, the Reentry Guidance does not prohibit in person education for special needs students; schools in the remote category may "remain open for a limited set of students and staff in order to continue in-person educational services for students in PreK-3rd grade and students with special needs at a maximum 5:1 student to teacher ratio." Reentry Guidance at 10.  Some students in the putative class, therefore, may have been provided with in person instruction in accordance with their IEPs.  The Court therefore concludes that the Woodworth has not successfully shown that she is likely to demonstrate successfully on the merits that the IDEA Parent Class members have suffered the same injury, in accordance with  rule 23(a)(2).  See Fed. R. Civ. P. 23(a)(2).

### C.   WOODWORTH HAS NOT ESTABLISHED THAT SHE IS LIKELY TO DEMONSTRATE SUCCESSFULLY ON THE MERITS THAT HER CLAIMS ARE TYPICAL OF THE ABSENT CLASS MEMBERS' CLAIMS.

The Court determines that Woodworth's claims likely will not satisfy Rule 23(a)(3)'s requirement that a class representative's claims "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement ensures that absent Class members are adequately represented by evaluating whether the class representative's interests are sufficiently aligned with the class's interest."  In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1235 (D.N.M. 2012)(Browning, J.).  Here, Woodworth alleges that, like the IDEA Parent Class members, her special needs child suffered an irreparable injury under the IDEA as a result of the

Defendants' Reentry Guidance.  <u>See</u> Woodworth Decl. at 2-3.  Special needs children in affected regions of New Mexico are no doubt experiencing differing difficulties as a result of the Reentry Guidance.  Moreover, each member of the class "need not be in a situation identical to that of the named plaintiff."  <u>Milonas v. Williams</u>, 691 F.2d 931, 938 (10th Cir. 1982).  Woodworth alleges that she shares common questions of law and fact with other members of the IDEA Parent Class; namely, whether the Defendants' Reentry Guidance "subject[s] her child to the denial of a FAPE in violation of the IDEA without any administrative remedy . . . ."  Complaint ¶ 32, at 8.  Although, as discussed *infra*, Woodworth has demonstrated a likelihood of success on the merits that her daughter's IEP is inadequate under the IDEA, she has not demonstrated that other children are experiencing similar problems with their IEPs.  The Court has only received one IEP as evidence thus far -- Woodworth's daughter's.[26]  There is insufficient evidence, therefore, to demonstrate

---

[26]The Court notes that Woodworth's daughter's IEP contains the following ███████ ███████████████████████

that Woodworth is likely to succeed on the merits in demonstrating that the infirmities in this IEP persist across the putative class.  See Winter, 555 U.S. at 20.  Accordingly, the Court concludes that Woodworth has not demonstrated that she is likely to prevail in showing that her claims or defenses "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

### D.      THE NAMED REPRESENTATIVES WILL LIKELY PROTECT FAIRLY AND ADEQUATELY THE INTERESTS OF THE IDEA PARENT CLASS.

Rule 23(a)(4) instructs courts to ensure that "the representative parties will fairly and adequately protect the interests of the class" before certifying a class.  Fed. R. Civ. P. 23(a)(4).  "This requirement protects the due-process interests of unnamed proposed class members -- whom any judgment binds."  Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 691 (D.N.M. 2016)(Browning, J.).  The Court considers two questions relevant to the adequacy of representation inquiry: (i) whether Woodworth and her counsel have any conflicts with other proposed class members; and (ii) whether the Woodworth and her counsel will vigorously prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).  Here, there is no reason to believe that Woodworth or the class counsel have any conflict of interest with the IDEA Parent class.  On the second question, the Court may consider "the experience and competence of the attorney representing the class."  Zuniga v. Bernalillo Cty., 319 F.R.D. 640, 665 (D.N.M. 2016)(Browning, J.). The Plaintiffs contend, and the Defendants do not contest, that

---

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ Nonetheless, with only one IEP to evaluate, the Court cannot conclude that this problem likely exists in all putative class members' IEPs.

class counsel "have extensive experience litigating complex civil rights matters in federal court and detailed knowledge of New Mexico's law and other relevant issues."  Complaint ¶ 47, at 10. Woodworth and class counsel thus likely would satisfy both elements of the adequacy of representation inquiry in accordance with Rule 23(a)(4).  See Fed. R. Civ. P. 23(a)(4).

### E.  THE IDEA PARENT CLASS LIKELY DOES NOT SATISFY RULE 23(B)(2)'S REQUIREMENTS.

Rule 23(b)(2) of the Federal Rule of Civil Procedure permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Here, the Plaintiffs maintain that the "Defendants have acted on grounds that apply generally to the classes -- namely the Governor's school reentry plan that denies students from 10 counties the equal opportunity for an equal education and denies students with special needs critical components of a FAPE ensured by the IDEA."  Complaint ¶ 50, at 11. The Plaintiffs further contend that "[c]lass status is particularly appropriate because there is an acute risk that any individual class member's claim for declaratory and injunctive relief will become moot before the litigation is finally resolved."  Complaint ¶ 52, at 11.  Nonetheless, as the Court explained above, Woodworth has failed to identify a uniformly applicable policy that prevents in person learning for her child.

"The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today."  Abraham v. WPX Energy Prod., LLC, 322 F.R.D. 592, 621 n.10 (D.N.M. 2017)(Browning, J.).  The Tenth Circuit has held that rule 23(b)(2) consists of two requirements: (i) the "plaintiffs must demonstrate defendants' actions or inactions are based on

grounds generally applicable to all class members;" and (ii) the "plaintiffs must also establish the injunctive relief they have requested is appropriate for the class as a whole." DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010). In other words, a district court must be able to "conceive of an injunction that would satisfy [rule 65(d)'s] requirements." Monreal v. Potter, 367 F.3d 1224, 1236 (10th Cir. 2004). Here, because Woodworth has not identified a uniformly applicable policy that prohibits class members from attending school in person, the Court cannot "conceive of an injunction" that would apply generally to the class. Monreal, 367 F.3d at 1236.

## V.     THE COURT CONCLUDES THAT THE PLAINTIFFS' SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION CLAIMS ARE UNLIKELY TO SUCCEED ON THE MERITS BECAUSE THE REENTRY GUIDANCE IS RATIONALLY RELATED TO A LEGITIMATE STATE INTEREST.

The Plaintiffs' constitutional claims are unlikely to succeed on the merits, and therefore the Court does not grant the TRO on this basis. Rational basis review applies to the Plaintiffs' equal protection claims, because Plaintiffs have not demonstrated that the Defendants have a discriminatory purpose. See Washington v. Davis, 426 U.S. 229, 241 (1976). Likewise, rational basis review applies to the Plaintiffs' substantive due process claims, because the Plaintiffs have not demonstrated a likelihood of success on the merits that remote instruction does not satisfy the state's duty to provide public education. See Martinez v. State, No. D-101-CV-2014-00793, 2018 WL 9489382, at *199 (N.M. Dist. Dec. 20, 2018). Accordingly, because the Defendants' Reentry Guidance is rationally related to a legitimate state interest, the Plaintiffs' constitutional claims are unlikely to succeed on the merits. See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976).

### A.     THE PLAINTIFFS' EQUAL PROTECTION CLAIMS ARE LIKELY TO FAIL BECAUSE THE PLAINTIFFS HAVE NOT DEMONSTRATED THAT A DISCRIMINATORY PURPOSE MOTIVATED THE DEFENDANTS' REENTRY GUIDANCE.

"A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race." Washington v. Davis, 426 U.S. 229, 241 (1976)(citing Yick Wo v. Hopkins, 118 U.S. 356 (1880)).  Nevertheless, when a statute appears facially neutral, plaintiffs must make out a "prima facie case of discriminatory purpose." Washington v. Davis, 426 U.S. at 241.  See Wayte v. United States, 470 U.S. 598, 610 (1985)(concluding that, even if a government's policy has a discriminatory effect on vocal non-registrants for the Selected Service, plaintiffs must show that the government intended that discriminatory effect).  The Supreme Court has extended these requirements beyond race-based equal protection challenges to legislation. See, e.g., Romer v. Evans, 517 U.S. 620 (1996)(invalidating a state constitutional amendment impacting sexual minorities, because its "sheer breadth" was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects").

Here, Plaintiffs do not allege that a discriminatory purpose or animus towards children with special needs motivated Defendants' Reentry Guidance.  See Washington v. Davis, 426 U.S. at 241.  First, the Defendants' Reentry Guidance is facially neutral; it does not single out special needs children.  Next, unlike the state constitutional amendment in Romer v. Evans, which solely impacted sexual minorities, the Defendants' Reentry Guidance does not solely impact children with special needs.  See Romer v. Evans, 517 U.S. at 632.  Rather, the Reentry Guidance requires all children in counties with higher rates of COVID-19 to stay home from school.  Jessica Garate et al., School Districts Learn Whether They Are Eligible to Return to School or Not, KQRE (Sept. 3, 2020), https://www.krqe.com/news/education/ped-cabinet-sec-ryan-stewart-to-host-webinar-

on-school-re-entry/ ("Garate").   Nor is there any evidence that Defendants possess a "bare . . . desire to harm" special needs children.  Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973).  The Plaintiffs have not attempted to make a prima facie showing of discriminatory purpose or animus; therefore, Plaintiffs' classification-based equal protection claim necessarily fails.

    **B.**    **THE COURT CONCLUDES THAT THE PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS ARE NOT LIKELY TO SUCCEED BECAUSE THE DEFENDANTS HAVE NOT DENIED ADEQUATE PUBLIC EDUCATION TO THE PLAINTIFFS.**

The Supreme Court has stopped short of finding a fundamental right to education under the Fourteenth Amendment. See Plyler v. Dole, 457 U.S. 202, 223 (1982); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 37 (1973).  Still, "education is perhaps the most important function of state and local governments."  Brown v. Bd. of Ed. of Topeka, 347 U.S. 483, 493, (1954).  The Supreme Court has acknowledged that denying children a basic education denies "them the ability to live within the structure of our civic institutions . . . ."  Plyler v. Dole, 457 U.S. at 223 (1982).  Moreover, the New Mexico Constitution mandates that "[a] uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained."  N.M. Const. art. XII, § 1.  The Tenth Circuit has concluded that "New Mexico's constitution gives each child the right to a free public education."  Ellenberg v. New Mexico Military Inst., 478 F.3d 1262, 1270 (10th Cir. 2007)(citing N.M. Const. art. XII, § 1; NMSA 1978 § 22-1-4.3).

New Mexico closed all public schools on March 26, 2020 in response to COVID-19.  See Executive Order 2020-012, Order Directing the Closure of All Public Schools for the Remainder of the 2019-2020 Academic Year, State of New Mexico (March 26, 2020).  On September 3, 2020,

Secretary Stewart announced that the PED would allow some school districts to return for in-person classes.  Garate.  In the announcement, Secretary Stewart notes his "goal to keep schools open" for in-person learning.  Garate.  First, school districts must have eight or fewer positive daily cases per 100,000 people to host in-person classes.  See Garate; COVID-19 in New Mexico, New Mexico Department of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Sept. 22, 2020)(school districts in the map's green zones may return to in0person learning).  Additionally, the PED must approve each school district's reentry plan before each district may begin in-person learning.  See Garate.  If the PED approves a school district's reentry plan, individual school boards will then decide whether to re-open schools in that district.  See Cedar Attanasio, In-person Learning for Some Younger Students in New Mexico, Associated Press (Sept. 3, 2020), https://apnews.com/4ddfdb135842505b0020a80ccdd07688 ("Attanasio").  Albuquerque, the state's largest district, will remain closed to in person learning until January 2021 although its COVID-19 case numbers satisfy the PED's requirements for re-opening.  See Attanasio. In counties that remain closed, students are attending online classes.  See Attanasio.

When a state requires a student to enroll in online courses rather than attend classes in person, the state has not violated automatically its duty to provide sufficient, free public schools.  See Vidovic v. Mentor City Sch. Dist., 921 F. Supp. 2d 775, 793 (N.D. Ohio 2013)(Nugent, J.).  The Honorable Judge Donald C. Nugent, United States District Judge for the Northern District of Ohio, indicated that school-aged children do not have a "right to a choice of how [their] education is delivered."  Vidovic v. Mentor City Sch. Dist., 921 F. Supp. 2d at 793.  The State's provision of remote education, therefore, is not a per se breach of its duty to provide children with a free education, and Plaintiffs cite no contrary authority. Remote instruction may violate still the State's

duty where they comprise "inadequate services, programs, [or] resources."  Martinez v. State, No.

D-101-CV-2014-00793, 2018 WL 9489382, at *199 (N.M. Dist. Dec. 20, 2018).  The current

factual record does not provide the Court with a basis to conclude that Plaintiffs are likely to

successfully demonstrate on the merits that the existing remote instruction is inadequate.

### C.    THE DEFENDANTS' REENTRY GUIDANCE IS RATIONALLY RELATED TO A LEGITIMATE STATE INTEREST.

Because the Reentry Guidance affects neither a suspect class[27] nor a fundamental right,[28]

the Court will evaluate the policy under rational basis review to determine whether the policy is

"rationally related to a legitimate state interest."  City of New Orleans v. Dukes, 427 U.S. 297, 303

(1976).  A State policy "need not be in every respect logically consistent with its aims to be

constitutional.  It is enough that there is an evil at hand for correction, and that it might be thought

---

[27]The Court acknowledges that there is some debate whether classifications based on disability require courts to apply "rational basis with bite."  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 460 n.4 (1985)(Marshall, J., concurring in part and dissenting in part)(noting that the "rational basis" review decisions upon which the majority relied were in fact "intermediate review decisions masquerading in rational-basis language")("Cleburne").  See Michael E. Waterstone, Disability Constitutional Law, 63 Emory L.J. 527 (2014); Kenji Yoshino, The New Equal Protection, 124 Harv. L. Rev. 747 (2011)(discussing courts' varying standards of review for classifications affecting sexual orientation or disability).  As Justice Marshall noted in his concurrence in Cleburne, Courts often purport to apply rational basis review in such cases, while actually applying a heightened standard of review.  See, e.g., Copelin-Brown v. New Mexico State Pers. Office, 399 F.3d 1248, 1254 (10th Cir. 2005)(striking down a regulation based on disability while purporting to apply rational basis review because the regulation's "distinction between disabled and non-disabled persons" was "arbitrary and irrational").  Here, because the Reentry Guidance does not contain a classification based on disability, the Court need not decide which standard of review would apply.

[28]As discussed above, although the Supreme Court has not recognized a fundamental right to education, it has emphasized that providing education is a very important state function. See Plyler v. Dole, 457 U.S. at 223.

that the particular legislative measure was a rational way to correct it." Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 487-88 (1955).

Here, the Defendants maintain that school closures prevent COVID-19's spread. See Joint Response at 7-11. They allege that the risk of spreading COVID-19 is higher in counties where cases exceed eight per 100,000. See Joint Response at 10-11. Further, the Defendants have a legitimate interest in "the protection and preservation of human life . . . ." Cruzan v. Dir. Missouri Dep't of Health, 497 U.S. 261 (1990). As of September 23, 2020, COVID-19 has sickened 27,790 people and killed 854 people in New Mexico. COVID-19 in New Mexico, New Mexico Department of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Sept. 22, 2020). According to the United States Center for Disease Control and Prevention ("CDC"), "the more closely a person interacts with others and the longer that interaction, the higher the risk of COVID-19 spread." How COVID-19 Spreads, Centers for Disease Control and Prevention https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html (last visited Sept. 23, 2020). In-person schooling involves daily, prolonged interactions between large groups of people, and school closures have been shown to reduce transmission of communicable diseases. See Catlin Rivers et al., Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors, Bloomberg School of Public Health at Johns Hopkins University at 13 (Apr. 17, 2020), https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopeningguidance-governors.pdf ("John Hopkins Report"). The Defendants' Reentry Guidance thus rationally relates to its legitimate purpose of protecting the health and lives of its citizens by preventing the spread of COVID-19.

## VI.    THE COURT CONCLUDES THAT THE PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIMS ARE UNLIKELY TO SUCCEED ON THE MERITS BECAUSE THE DEFENDANTS' REENTRY GUIDANCE IS QUASI-LEGISLATIVE IN NATURE.

The Plaintiffs have a "legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause . . . ." Goss v. Lopez, 419 U.S. 565, 574 (1975).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).    The Defendants argue that, although children do possess a property right in their public education, they have not been deprived of this property interest because remote and hybrid learning are "sufficient for the[ir] education."  Joint Response at 36-37 (quoting Norton v. Bd. Of Ed. Of Sch. Dist. No. 16, Hobbs Mun Sch., 89 N.M. 470 (1980)).  Where a child is expelled or denied enrollment in school without adequate procedural safeguards, the child's procedural due process rights have been violated.  See Goss, 419 U.S. at 575; Alonso as Next Friend of I.A. v. Sch. Bd. of Collier Cty., Fla., No. 216CV379FTM38MRM, 2018 WL 5304813, at *15 (M.D. Fla. Aug. 8, 2018)(certifying class action where students were denied enrollment at a school without any due process).  See also Chavez v. Bd. of Educ. of Tularosa Mun. Sch., No. CIV 05-380 JB/RLP, 2006 WL 4060667, at *5 (D.N.M. Oct. 4, 2006)(Browning, J.)(explaining that "[i]f the Plaintiffs had alleged that [defendant] affirmatively acted to exclude [the child] from school, such as by suspension or expulsion," the affirmative exclusion could give rise to procedural due process violations).  By

contrast, where a student is denied one of the "innumerable separate components of the educational process, such as participation in athletics and membership in school clubs," that student has not been denied "a property interest subject to constitutional protection."   Seamons v. Snow, 84 F.3d 1226, 1235 (10th Cir. 1996).  See also Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1257 (10th Cir. 2008)(explaining that where a student had been put in time out, "any loss of a property right is de minimis and not subject to procedural protections").  Where a student has been temporarily suspended from school, for example, an informal discussion between the student and school principal satisfies procedural due process requirements.  See  Keough v. Tate Cty. Bd. of Educ., 748 F.2d 1077, 1080 (5th Cir. 1984)(concluding that an "informal give-and-take. . .allows the student an opportunity to state his case as he sees it").  Here, by contrast, total deprivation of in-person learning for an indefinite period of time amounts to more than a "de minimis" taking.  See Couture, 535 F.3d at 1257.

Although access to an in-person education has more than a de minimis effect on a student's property interest in his or her education, individualized hearings would be inappropriate here. "To determine what process is due, courts must balance: (1) the private interests that will be affected by the official action; (2) the risk of erroneous deprivation; and (3) the burden on the government from additional procedural requirements." Couture, 535 F.3d at 1258 (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). Here, the Plaintiffs allege, and the Defendants do not refute, that the Defendants did not provide students with the opportunity for a hearing.  See Motion at 12-13; Joint Response at 35-39.  The Court agrees with the Plaintiffs that the interests in an in-person education, affected by the Defendants' Reentry Guidance, are significant. Nonetheless, "summary administrative action may be justified in emergency situations."  Hodel v. Va. Surface Mining &

Reclamation Ass'n, Inc., 452 U.S. 264, 300 (1981).   Additionally, there is no risk of "erroneous deprivation" in this case.  Cf. Harjo v. City of Albuquerque, 307 F. Supp. 3d 1163, 1211 (D.N.M. 2018)(Browning, J.)(discussing a risk of erroneous deprivation where an ordinance required defendants to prove their innocence), modified on reconsideration, 326 F. Supp. 3d 1145 (D.N.M. 2018). Further, the grant of an individualized hearing to every student in New Mexico would impose a significant burden on the government, and "where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption."  Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 445 (1915).

Moreover, the Defendants' Reentry Guidance is "quasi-legislative in nature," and Plaintiffs therefore are likely not entitled to additional due process.  Onyx Properties LLC v. Bd. of Cty. Commissioners of Elbert Cty., No. 10-CV-01482-LTB-KLM, 2015 WL 1361393, at *6 (D. Colo. Mar. 24, 2015)("Onyx I"), aff'd, 838 F.3d 1039 (10th Cir. 2016).  "When the action has a limited focus (only a few people or properties are affected) and is based on grounds that are individually assessed, it may be more adjudicative than legislative and therefore subject to traditional procedural requirements of notice and hearing."  Onyx Properties LLC v. Bd. of Cty. Commissioners of Elbert Cty., 838 F.3d 1039, 1046 (10th Cir. 2016)("Onyx II").  By contrast, "governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient."  Halverson v. Skagit Cty., 42 F.3d 1257, 1261 (9th Cir. 1994).  Here, the Defendants' school closure policies affect the entirety of New Mexico, and, accordingly are not subject to the traditional notice and hearing requirements.  See Joint Response at 8-12.  Although the policies may impact different students in different ways,

they are generally applicable.  See Onyx II, 838 F.3d at 1046.  Further, the Tenth Circuit has held that there must be an "element of deliberateness in directing the misconduct toward the plaintiff before the Due Process Clause is implicated." Archuleta, 897 F.2d at 498.   The Defendants' policies are based on objective criteria, not directed at individual students.  Finally, the Defendants made the relevant policies available to the public, providing sufficient "general notice. . .by law." Halverson, 42 F.3d at 1261.  Based on the foregoing, the Plaintiffs' procedural due process allegation is unlikely to succeed on the merits, and the Court therefore declines to grant a preliminary injunction on this basis.

Nonetheless, Defendants argue that unless a student is "completely excluded" from his or her education, the student has not been deprived of his or her protectable property interest.  Joint Response at 38.   Accordingly, Defendants contend that because New Mexico students receive remote instruction, they are not totally without an education, and therefore have not been deprived of their property interest in their education.  See Joint Response at 39.  Moreover, Defendants point out that there is an exception to procedural due process violations when "the underlying governmental action affects a general class of persons."  Joint Response at 39.  Defendants allow that this exception usually applies to laws passed by state legislatures or Congress.  See Joint Response at 39.  Nevertheless, they contend that the exception should apply to their Reentry Guidance because courts "focus on whether the action applies to a larger segment of the population rather than a limited number of individuals."  Joint Response at 38-39.  Further, Defendants argue that even if its actions are not legislative in nature, Plaintiffs are not entitled to due process because states may "depriv[e] property to protect the public health and safety." Joint Response at 40.  Last, Defendants argue that Plaintiffs are unlikely to succeed on their procedural due process claims

because they have not exhausted their administrative remedies under the IDEA.  Joint Response

at 41.

## VII.   WOODWORTH NEED NOT EXHAUST HER ADMINISTRATIVE REMEDIES UNDER THE IDEA BECAUSE HER SUIT LIKELY PRESENTS A PURELY LEGAL QUESTION.

Under the IDEA, judicial review is typically unavailable until the plaintiffs exhaust the

statute's administrative remedies.  See Honig v. Doe, 484 U.S. 305, 327 (1988).  Nonetheless,

"parents may bypass the administrative process where exhaustion would be futile or inadequate."

Honig v. Doe, 484 U.S. at 327.  See Assoc. for Cmty Living v. Romer, 992 F.2d 1040, 1044 (10th

Cir. 1993).  Another exception to IDEA's exhaustion requirement exists where a suit presents a

purely legal question.  See Lester H. by Octavia P. v. Gilhool, 916 F.2d 865, 869-70 (3d Cir. 1990).

Some Courts of Appeals also have recognized an "emergency situation exception" when

exhaustion "would work 'severe or irreparable harm' upon a litigant."[29]   Kominos by Kominos v.

Upper Saddle River Bd. of Educ., 13 F.3d 775, 778-79 (3d Cir. 1994)(Trump, J.)(citing

Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1097 (1st Cir. 1989))("Kominos"). To

meet the threshold that the United States Courts of Appeals for the First and Third Circuits have

required for the emergency situation exception, the plaintiffs must do more than allege irreversible

_____

[29]The Court notes that the Tenth Circuit has not addressed whether the emergency situation exception is a valid exception to the IDEA's exhaustion requirement.  See generally Lewis M. Wasserman, Delineating Administrative Exhaustion Requirements and Establishing Federal Courts' Jurisdiction Under the Individuals with Disabilities Education Act: Lessons from the Case Law and Proposals for Congressional Action, 29 J. Nat'l Ass'n Admin. L. Judiciary 349 (2009). The Court finds that this exception is valid under the IDEA's text, legislative history, and purpose. Exhaustion is inappropriate where a child is likely to suffer an irreversible harm, such as irremediable intellectual regression.  See Kominos, 13 F.3d at 779.

harm; they must "provide affidavits from competent professionals along with other hard evidence that the child faces irreversible damage if the relief is not granted." Kominos, 13 F.3d at 779 (finding that "regression" did not per se constitute irreparable harm sufficient to satisfy the emergency situation exception). Additionally, the plaintiffs need not exhaust their IDEA administrative remedies when the gravamen of their suit is something other than denial of a FAPE. See Fry v. Napoleon Cmty. Schs., 137 S. Ct. 743, 748 (2017). These exceptions frequently overlap, and courts may find that exhaustion is futile because of one or more of the other exceptions. See Cave v. East Meadow Union Free Sch. Dist., 514 F.3d 240, 249 (2d Cir. 2008)(combining the exceptions)(internal quotations omitted); Bray v. Hobart City Sch. Corp., 818 F. Supp. 1226, 1233 (N.D. Ind. 1993)(Rodovich, M.J.)(holding that exhaustion would be futile, because the state administrative code did not prove an adequate remedy to the systemic IDEA violations).

When, a plaintiff alleges that a state "agency has adopted a policy or pursued a practice of general applicability that is contrary to the law," administrative remedies may be futile. Assoc. for Cmty. Living in Colorado v. Romer, 992 F.2d 1040, 1044 (10th Cir. 1993). See Complaint ¶ 71, at 14. On its face, Plaintiffs' Complaint appears to identify a policy of general applicability. See Complaint ¶ 71, at 14. See also Supplemental Information at 3. Plaintiffs also must "still show that the policy is contrary to law and that the underlying purposes of exhaustion would not be served." Assoc. for Cmty. Living in Colorado v. Romer, 992 F.2d at 1044. Nonetheless, as described above, Defendants' Reentry Guidance does not prohibit in person education for special needs children. Woodworth therefore has not identified "a practice of general applicability" that justifies eschewing administrative remedies. Still, Woodworth's IEP contains "purely legal"

errors.   Ass'n for Cmty. Living in Colorado v. Romer, 992 F.2d 1040, 1044 (10th Cir. 1993)(recognizing an exception to the IDEA's exhaustion requirement where a Plaintiff presents a "purely legal" question).   See See Komninos, 13 F.3d at 778 (explaining that an exception to exhaustion "exists where the issue presented is a purely legal question"); Lester ex rel. Octavia P. v. Gilhool, 916 F.2d 865, 899-72 (3d Cir. 1990), cert. denied, 499 U.S. 923 (1991)(concluding that exhaustion would be futile where the court considered "whether Congress empowered the courts to grant a compensatory remedy" under the IDEA because this was "a pure question of law"); Christopher W. v. Portsmouth Sch. Committee, 877 F.2d 1089, 1099 (1st Cir. 1989); T.R. v. Sch. Dist. of Philadelphia, 223 F. Supp. 3d 321, 328 (E.D. Pa. 2016)(Goldberg, J.); J.Q. v. Washington Tp. Sch. Dist., 92 F. Supp. 3d 241, 252 (D.N.J. 2015)(Simandle, J.)(recognizing the pure legal question exception to exhaustion, but holding that it did not apply); K.S. ex rel. C.S. v. R.I. Bd. of Educ., 44 F. Supp. 3d 193, 197 (D.R.I. 2014)(Smith, C.J.)(holding that exhaustion was unnecessary because the case involved a "purely legal question of statutory interpretation" of whether enforcement of a state law violated the IDEA); Doe v. Town of Framingham, 965 F. Supp. 226, 229 (D. Mass. 1997)(O'Toole, J.)(concluding that administrative exhaustion was unnecessary because the propriety of excluding the plaintiff from public school after expelling him without a hearing was a "pure matter of law"); Christen G. v. Lower Merion Sch. Dist., 919 F. Supp. 793, 820-21  (E.D. Pa. 1996)(Broderick, J.)(holding that an IDEA tuition reimbursement dispute involving the First Amendment presented a legal question, and therefore administrative exhaustion would be futile).   Woodworth's daughter's IEP misinterprets "state health regulations" as forbidding in person instruction, when in fact, State Reentry Guidance permits in person instruction for special needs students.  Moreover, the IEP prioritizes the LEA's apparent preference

for fully remote instruction over creating a program that will enable Woodworth's daughter to make academic progress.  See Endrew F., 137 S. Ct. at 999. Administrative exhaustion therefore would likely be futile and consequently is probably unnecessary.

## VIII.  WOODWORTH IS ENTITLED TO A TEMPORARY RESTRAINING ORDER UNDER THE IDEA BECAUSE HER IEP LIKELY VIOLATES THE IDEA.

Woodworth is (i) likely to suffer irreparable injury unless the TRO issues; (ii) the threatened injury outweighs whatever damage the proposed injunction may cause the Defendants; (iii) the injunction, if issued, would not be adverse to the public interest; and (iv) there is a substantial likelihood of success on the merits.  See Fed. R. Civ. P. 65.  Further, regardless of the individual school districts' actions, the State ultimately is responsible for ensuring that all children with disabilities receive a FAPE.  See Ellenberg, 478 F.3d at 1269 (citing 20 U.S.C § 1412(a)(11); 1413(a)(1))("Each 'State Educational Agency' ('SEA') must enact procedures and policies to implement the IDEA, and ensure both state and local compliance with the Act."). Moreover, courts are entitled to fashion relief for IDEA violations to address deficiencies.  See e.g., Emma C. v. Eastin, 673 Fed. App'x 637, 639-40 (9th Cir. 2016)(affirming the district court's jurisdiction under a Consent Decree to order California to develop and implement a statewide plan to satisfy the IDEA's monitoring requirements); D.L. v. District of Columbia, 860 F.3d 713, 719 (D.C. Cir. 2017)(upholding, in an IDEA class action, the district court's "programmatic" injunction requiring the District of Columbia to "set compliance benchmarks," and show "annual improvement in the numbers of children identified as needing, evaluated for, and offered special education and related services"); Morgan Hill Concerned Parents Assoc. v. California Dept. of Educ., No. 2:11-cv-3471-KJM-AC, 2013 WL 1326301 at *8 (E.D. Cal. Mar. 29, 2013)(Mueller, J.)("[T]he injury is

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

        ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████  ███████████████████████████████████

████████████████████████████████████████  ██████████████  ██████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████  As the CDC has noted, school closures "can lead

to severe learning loss, and the need for in-person instruction is particularly important for students with heightened behavioral needs."  Centers for Disease Control and Prevention, The Importance of Re-opening America's Schools this Fall, COVID-19 (July 23, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/reopening-schools.html.  "Severe learning loss," like the loss Woodworth's daughter has experienced, is an irreparable harm under the IDEA, which requires schools provide a FAPE which "enable[s]" a child to "progress."  Endrew F., 137 S. Ct. at 999.

Next, the threatened injuries to Woodworth's daughter  -- severe learning loss -- outweigh possible damage to the Defendants.  The Defendants acknowledge that school districts may provide special needs children within in person instruction on a small group basis.  See Reentry Guidance at 10. It will not damage Woodworth's LEA to correctly apply the Reentry Guidance, as well as the Endrew F. standards. Moreover, 34 C.F.R. § 300.324(a)(4) and N.M. Admin. Code 6.31.2 provide a streamlined IEP amendment process, and do not require the LEA to "redraft[] the entire IEP." 34 C.F.R. § 300.324(a)(4).  Because the threatened injuries to Woodworth's daughter are severe, and the possible damage to the Defendants is minimal, the Court concludes this element has been met.

Third, a TRO requiring the Secretary Stewart to ensure that the LEA to provides Woodworth's daughter with a FAPE under the IDEA would not be adverse to the public interest. The Court acknowledges COVID-19 pandemic's seriousness.  See Legacy Church, Inc. v. Kunkel, No. CV 20-0327 JB\SCY, 2020 WL 3963764 (D.N.M. July 13, 2020).  Nonetheless, the Court concludes that children likely have a lower risk of spreading and contracting COVID-19 than adults.  See Bhattacharya Decl.  Further, the Court is not instructing the Defendants to fully re-

open schools, which could increase the risk of COVID-19 transmission.  Instead, the Court concludes that, in spite of the ongoing pandemic, Secretary Stewart must provide Woodworth's daughter with a "free and appropriate public education" as the IDEA requires.[30]  This might include in person instruction provided in small groups, with appropriate precautions including social distancing.  In such circumstances, the educational benefit to the child would outweigh the relatively low risk of contagion.

Finally, Woodworth's IDEA claim is likely to succeed on the merits.  A FAPE under the IDEA includes both "special education" and "related services." 20 U.S.C. § 1401(9).  "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child . . . to benefit from" that instruction. 20 U.S.C. §§ 1401(26), (29).  New Mexico therefore must provide each disabled child with such special education and related services "in conformity with the [child's] individualized education program" or IEP.  A child has received a FAPE if "the child's IEP sets out an educational program that is 'reasonably calculated to enable the child to receive educational benefits.'" Endrew F., 137 S. Ct. at 995-96 (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 207 (1982)("Rowley")).  "For children receiving instruction in the regular classroom, this would generally require an IEP 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" Endrew F., 137 S.

---

[30]The United States Department of Education "reminds SEAs and LEAs that **no matter what primary instructional delivery approach is chosen, SEAs, LEAs, and individualized education program (IEP) Teams remain responsible for ensuring that a free appropriate public education (FAPE) is provided to all children with disabilities.**"  September IDEA Guidance at 2 (emphasis in original).

Ct. at 995-96.  ██████████████████████████████████████

████████████████████   ██████████████████████   Unlike  the  plaintiff  in  <u>Rowley</u>,

Woodworth's daughter is not making "excellent" progress ████████████████████████

█████████████████████, unlike the plaintiff in <u>Rowley</u>, Woodworth's daughter does not have

access to a "substantial suite of specialized instruction and services," while she learns remotely;

her ████████████████████████████████████████████████████████████████████

████████████████. Moreover, the IEP declined to provide Woodworth's daughter with any in

person services due to a misinterpretation of "state health regulations."  J.W. Records at 37.  Given

her lack of progress under remote instruction, it is likely that Woodworth's daughter's IEP is not

"reasonably calculated to ensure she receive educational benefits."  <u>Endrew F.</u>, 137 S. Ct. at 999

("A school must offer an IEP reasonably calculated to enable a child to make progress appropriate

in light of the child's circumstances.").  Her "IEP must aim to enable the child to make progress."

<u>Endrew F.</u>, 137 S. Ct. at 999.  Here, because Woodworth's daughter is not progressing under

remote instruction, it is likely that she could demonstrate on the merits that she is not receiving a

FAPE in violation of the IDEA.

     **IT IS ORDERED** that: (i) the Plaintiffs' Verified Emergency Motion for a Temporary

Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief, filed September 21,

2020 (Doc. 6), is granted in part, and denied in part; and (ii) Defendant Secretary Ryan Stewart

must  direct  Woodworth's  daughter's  Local  Education  Agency  to  amend  her  Individualized

Education Program to ensure that the IEP is "reasonably calculated to ensure the child[] receive[s]

educational  benefits,"  pursuant  to  <u>Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1</u>,

137 S. Ct. 988, 999 (2017), and so that Woodworth's daughter receives a free and appropriate

public education under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et. seq.

Accordingly, Secretary Stewart must instruct the LEA to amend Woodworth's daughter's current

IEP -- which allows Woodworth's daughter to █████████████████████████

████████████████ and denies her requests for in person instruction because of its

incorrect interpretation of "state health regulations," -- pursuant to 34 C.F.R. § 300.324(a)(4), as

well as N.M. Admin. Code 6.31.2, so that the amended IEP is "reasonably calculated to enable

[Woodworth's daughter] to make progress" Endrew F., 137 S. Ct. at 999 in her classes, regardless

of the LEA's preference for remote instruction.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

A. Blair Dunn
Jared R. Vander Dussen
Western Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Matthew L. Garcia
  Chief General Counsel to Governor Michelle Lujan Grisham
Kyle P. Duffy
  Associate General Counsel to Governor Michelle Lujan Grisham

Maria S. Dudley
  Associate General Counsel to Governor Michelle Lujan Grisham
Office of the Governor
Santa Fe, New Mexico

     *Attorneys for Defendants Governor Michelle Lujan Grisham, Secretary Ryan Stewart, and Secretary Kathyleen M. Kunkel*

Hector Balderas
  Attorney General for the State of New Mexico
Erin Elizabeth Lecocq
Nicholas M. Sydow
  Civil Appellate Chief
New Mexico Office of the Attorney General
Santa Fe, New Mexico

     *Attorneys for the State of New Mexico*