IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CLARISSA HERNANDEZ;
ROBERT HERNANDEZ;
SHANNON WOODWORTH and
DAVID GALLEGOS,

        Plaintiffs,

vs.                            No. CIV 20-0942 JB\GBW

MICHELLE LUJAN
GRISHAM; RYAN
STEWART; KATHYLEEN
M. KUNKEL and the
STATE OF NEW MEXICO,

        Defendants.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Dismiss Governor Grisham, Secretary Kunkel, and Secretary Stewart, filed October 5, 2010 (Doc. 22)("Governor and Secretaries' MTD"); and (ii) the State of New Mexico's Motion to Dismiss, filed October 5, 2020 (Doc. 23)("New Mexico's MTD"). The Court held a hearing on October 19, 2020. See Clerk's Minutes at 1, filed October 20, 2020 (Doc. 37). The primary issues are: (i) whether the Plaintiffs -- Clarissa Hernandez, Robert Hernandez, Shannon Woodworth, and David Gallegos -- have standing under Article III of the Constitution of the United States of America to sue New Mexico Governor Michelle Lujan Grisham; (ii) whether the Plaintiffs have Article III standing to sue Secretary for the New Mexico Department of Health Kathyleen M. Kunkel; (iii) whether the Plaintiffs have Article III standing to sue New Mexico Secretary of Education Ryan

---

[1]This version of the Court's Memorandum Opinion and Order is not filed under seal because all references to documents filed under seal, which contain sensitive information, have been omitted.

Stewart; (iv) whether the Plaintiffs have stated a claim for which relief can be granted under 42 U.S.C. § 1983 against Governor Grisham; and (v) whether the Plaintiffs have stated a claim for which relief can be granted under § 1983 against Secretary Kunkel.  The Court concludes that that the Plaintiffs lack standing as to Secretary Kunkel,[2] but have standing to sue Governor Grisham and Secretary Stewart.  The Court also concludes that the Plaintiffs have stated a claim for which relief can be granted under § 1983 against Governor Grisham.  Accordingly, the Court grants the Governor and Secretaries' MTD with respect to Secretary Kunkel, but denies the Governor and Secretaries' MTD with respect to Governor Grisham and Secretary Stewart.  The Court also grants New Mexico's MTD, because the Plaintiffs voluntarily dismissed New Mexico.  See Stipulation of Voluntary Rule 41 Dismissal of the State of New Mexico, filed October 12, 2020 (Doc. 26)(voluntarily dismissing New Mexico "with prejudice as to Counts I and II of the Amended Complaint (ECF No. 4) and without prejudice as to Count III").

## FACTUAL BACKGROUND

The Governor and Secretaries have filed a motion to dismiss under rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  See Governor and Secretaries' MTD at 1.  Rule 12(b)(1) motions to dismiss "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).  On a facial attack, the Court must consider the complaint's allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180.  By contrast, on a factual attack, the Court may refer to evidence outside the pleadings.  See Holt v. United States, 46 F.3d 1000, 1003 (10th Cir.

---

[2]On October 23, 2020, the Plaintiffs voluntarily dismissed Secretary Kunkel.  See Stipulation of Voluntary Rule 41 Dismissal of Kathleen M. Kunkel, filed October 23, 2020 (Doc. 39)(voluntarily dismissing Secretary Kunkel with prejudice).

1995)(citations omitted); World Fuel Servs., Inc. v. Nambe Pueblo Dev. Corp., 362 F. Supp. 3d 1021, 1086-87 (D.N.M. 2019)(Browning, J.).  Further, in a factual rule 12(b)(1) motion, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  Here, the Governor and Secretaries have launched a factual attack under rule 12(b)(1). See Governor and Secretaries' MTD at 1-6.  The Court, accordingly, will consider facts outside the pleadings for the purposes of the rule 12(b)(1) portion of the Governor and Secretaries' MTD.

By contrast, for the rule 12(b)(6) portion of the Governor and Secretaries' MTD, the Court may consider the "sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The Court may also consider: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007);  see Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the Court could consider notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . .

an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."). Consequently, the Court will provide a bifurcated facts section in this opinion. The first subsection will summarize the facts for purposes of rule 12(b)(6), while the second subsection will summarize the facts for purposes of rule 12(b)(1).

1.      **Rule 12(b)(6) Factual Background.**

The Court takes its facts, for the rule 12(b)(6) portion of the MTDs, from the Amended Complaint, filed September 17, 2020 (Doc. 4)("Am. Compl.").[3] The Court provides these facts for background. It does not adopt them as the truth, and it recognizes that these facts are largely the Plaintiffs' version of events.

This matter arises from claims for: (i) violation of the right to equal education without due process of law, under Article XII § 1 of the New Mexico Constitution and the Fourteenth Amendment of the United States Constitution, see Amended Complaint at 11; (ii) denial of equal protection under Article II § 18 of the New Mexico Constitution and the Fourteenth Amendment of the United States Constitution, see Amended Complaint at 12; and (iii) failure to provide a free and appropriate public education under 20 U.S.C. § 1401(8), see Amended Complaint at 13. The Plaintiffs also request that the Court "certify the classes," Amended Complaint ¶ A, at 14, and declare that: (i) the "Defendants have unlawfully denied" the Plaintiffs "a free and uniform public education without providing them due process of law," Amended Complaint ¶ B, at 15; (ii) "Defendants have unlawfully denied" the Plaintiffs "equal protection of the law without reasonable justification for doing so in an arbitrary and capricious manner," Amended Complaint ¶ C, at 16;

---

[3]The Plaintiffs amended the Complaint to correct the caption. See Amended Complaint at n.1, filed September 17, 2020 (Doc. 4)("Amended Complaint")(changing Plaintiffs' names from Clarissa and Robert Sanchez to Clarissa and Robert Hernandez); Complaint, filed September 16, 2020 (Doc. 1).

and (iv) "the actions of the Defendants have denied students of a due and owing" free and public education "in violation" of the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 et seq., Amended Complaint ¶ D, at 15.  The Plaintiffs also ask the Court to enjoin both preliminarily and permanently "Defendants from prohibiting in-person instruction without providing equal and acceptable alternatives that provide a uniform educational system that also meets critical socialization requirements."  Amended Complaint ¶ E-F, at 15.

### 2.   Rule 12(b)(1) Factual Background.

1.      Plaintiffs Clarissa and Robert Hernandez are the parents of four children, ages eight to fifteen, in Lea County, New Mexico.  See Am. Compl. ¶ 1, at 2; Declaration of Clarissa Hernandez in Support of Applications for a Temporary Restraining Order ¶¶ 1-9, at 1-2 (executed August 18, 2020), filed September 21, 2020 (Doc. 6-2)("Hernandez Decl.".

2.      Plaintiff Shannon Woodworth is the parent of a school-aged child with special needs.  See Am. Compl. ¶ 2, at 2.

3.      Woodworth's child has "an individual education program (IEP)"[4] and "has not been provided with many" of her IEP services "since school was shut down."  Declaration of Shannon Woodworth in Support of Applications for a Temporary Restraining Order ¶¶ 5-6, at 2 (executed September 18, 2020), filed September 21, 2020 (Doc. 6-3)("Woodworth Decl.").

4.      Woodworth's daughter has "regress[ed]" since schools closed for in person instruction and "is now failing in her courses."  Woodworth Decl. ¶ 13, at 2-3.

5.      Plaintiff David Gallegos is an elected representative in the New Mexico House of Representatives and is an elected member of the Board of Education for Eunice Public Schools.

---

[4]"The term 'individualized education program' or 'IEP' means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with" 20 U.S.C. § 1414(d).  20 U.S.C. § 1401(14).

See Am. Compl. ¶ 3, at 2; <u>Representative David M. Gallegos</u>, New Mexico Legislature, https://nmlegis.gov/Members/Legislator?SponCode=HGADV (last visited Sept. 21, 2020).

6.      Defendant Michelle Lujan Grisham is the Governor of New Mexico.  <u>See</u> Am. Compl. ¶ 4, at 2; <u>Michelle Lujan Grisham</u>, Office of the Governor, https://www.governor.state.nm.us/our-leadership/governor/ (last visited Sept. 21, 2020).

7.      Defendant Ryan Stewart is the Secretary of Education for the State of New Mexico. <u>See</u> Am. Compl. ¶ 5, at 2; <u>Ryan Stewart</u>, Office of the Governor, https://www.governor.state.nm.us/our-leadership/public-education-department/ (last visited Sept. 21, 2020).

8.      Defendant Kathyleen M. Kunkel is the Secretary for the New Mexico Department of Health.  <u>See</u> Am. Compl. ¶ 6, at 2; <u>Office of the Secretary</u>, New Mexico Department of Health, https://www.nmhealth.org/about/asd/ots/ (last visited Oct. 10, 2020).

### 1.      **The COVID-19 Pandemic.**

1.      The coronavirus disease 2019 ("COVID-19") is a pandemic that has spread around the world, within the United States of America, and in New Mexico.  <u>See Coronavirus disease 2019 (COVID-19)</u>, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last visited Oct. 12, 2020)("Mayo Clinic").

2.      By February 11, 2020, there were twelve confirmed COVID-19 cases in the United States.  <u>See Previous U.S. COVID-19 Case Data</u>, Centers for Disease Control and Prevention (CDC), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/previouscases.html (last visited Sept. 29, 2020); <u>Cases in the U.S.</u>, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Sept. 27, 2020).

3.      As of November 3, 2020, there have been 9,108,353 cases of COVID-19 in the United States, and 229,442 deaths.  See WHO Coronavirus Disease (COVID-19) Dashboard, World Health Organization, https://covid19.who.int/ (last visited Nov. 3, 2020).

4.      As of October 10, 2020, New Mexico has had 48,104 cases and 1,036 deaths.  See 2019 Novel Coronavirus Disease (COVID-19), New Mexico Department of Health (DOH), https://cv.nmhealth.org/ (last visited Oct. 10, 2020).

5.      COVID-19 is a contagious disease that is spread through respiratory droplets that are released when infected individuals cough, sneeze, or talk.  See Mayo Clinic.

6.      Risk factors for COVID-19 are close contact -- typically defined as within six feet -- with someone who has COVID-19, or when a person infected with COVID-19 coughs or sneezes on others.  See Mayo Clinic; COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus and COVID-19, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

7.      Common signs and symptoms of COVID-19 can include fever, cough, and tiredness.  See Mayo Clinic.

8.      Other symptoms can include a loss of taste or smell, shortness of breath or difficulty breathing, muscle aches, chills, sore throat, runny nose, headache, and chest pain.  See Mayo Clinic.

9.      Although COVID-19 may cause only mild symptoms for some people, for others, COVID-19 can cause severe complications, including pneumonia in both lungs, organ failure, and death.  See COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus and COVID-19, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

- 7 -

10.     COVID-19 symptoms can persist for months.  See COVID-19 (coronavirus): Long-term effects, the Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351#:~:text=COVID%2D19%20symptoms%20can,within%20a%20few%20weeks    (last visited Oct. 12, 2020).

11.     COVID-19 can damage the lungs, heart, and brain, which increases the risk of long-term health problems.  See COVID-19 (Coronavirus): Long-Term Effects, the Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351#:~:text=COVID%2D19%20symptoms%20can,within%20a%20few%20weeks    (last visited Oct. 12, 2020).

12.      Signs and symptoms of COVID-19 typically appear two to fourteen days after exposure.  See Mayo Clinic.

13.     The time after exposure and before the appearance of symptoms is called the incubation period.  See Mayo Clinic.

14.     Many COVID-19 cases result in mild symptoms or no symptoms.  See Nathan W. Furukawa et al., Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article ("Furukawa COVID-19 Transmission Paper").

15.     When cases are symptomatic, the average time from exposure to symptom onset is five to six days, with symptoms appearing as long as thirteen days after infection.  See Furukawa COVID-19 Transmission Paper.

16.     Individuals who have been infected, therefore, usually do not know that they are infected for at least several days, and they may never know, if they remain asymptomatic.  See Furukawa COVID-19 Transmission Paper.

17.     Because many people who have COVID-19 do not know they have been infected, healthcare officials recommend that all people limit person-to-person contact, stay six feet apart, wash hands frequently, wear masks, cover coughs and sneezes, and avoid large gatherings.  See How to Protect Yourself & Others, The Centers for Disease Control and Protection, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html  (last visited Oct. 12, 2020); Furukawa COVID-19 Transmission Paper.

18.     The risk of transmission is heightened in indoor environments, where infectious droplets may linger for longer periods of time.  See Nathan W. Furukawa et al., Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

19.     People with certain underlying medical conditions -- comorbidities -- are at increased risk for severe illness, hospitalization, and death from COVID-19.  See People with Certain Medical Conditions, The Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 12, 2020); Adekunleee Sanyaolu, et al., Comorbidity and its Impact on Patients with COVID-19, SN Compr. Clin. Med. (Jun. 25, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7314621/.

20.     Some of these comorbidities include cancer, chronic kidney disease, chronic obstructive pulmonary disease, heart conditions -- such as heart failure, coronary artery disease, or

cardiomyopathy -- immunocompromised state, sickle cell disease, smoking, and type 2 diabetes mellitus.  See People with Certain Medical Conditions, The Centers for Disease Control and Prevention,   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 12, 2020).

21.    As of November 3, 2020, the Centers for Disease Control and Prevention (the "CDC") reported that of the 216,459 recorded deaths because of COVID-19, 98,472 of these deaths were associated with patients who also had pneumonia.  See Provisional Death Counts for Coronavirus Disease 2019, The Centers for Disease Control and Prevention (COVID-19) https://www.cdc.gov/nchs/nvss/vsrr/COVID19/index.htm (updated Nov. 3, 2020).

22.    In New Mexico, a child first tested positive for COVID-19 on March 15, 2020.  See Declaration of David R. Scrase ¶ 5, at 2, filed September 28, 2020 (Doc. 14-1)("Scrase Decl.").

23.    New Mexico has tracked the percentage of new cases of COVID-19 by age since March, 2020.  See New Mexico COVID-19 Cases Update October 5th, 2020 at 5, New Mexico Department of Health, https://cv.nmhealth.org/wp-content/uploads/2020/10/State-Report-05OCT2020.pdf (last visited Oct. 10, 2020)("NM COVID-19 Case Report").

24.    New Mexico's data shows that children, ages five to seventeen years old, make up approximately ten percent of COVID-19 cases.  See NM COVID-19 Case Report at 5.

25.    Children who recover from COVID-19 may experience complications like cardiac lesions.  See Scrase Decl. ¶ 16, at 9; Mubbasheer Ahmed et al., Multisystem Inflammatory Syndrome In Children: A Systematic Review, The Lancet, https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(20)30271-6/fulltext   (last visited October 10, 2020).

26.     Although children are less susceptible to COVID-19 and typically become less ill, studies show that children are a source of transmission, and children, therefore, present a risk of spreading COVID-19 to parents, teachers, and school staff.   See Scrase Decl. ¶ 16, at 9; Mubbasheer Ahmed et al., Multisystem Inflammatory Syndrome In Children: A Systematic Review, The Lancet, https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(20)30271-6/fulltext (last visited October 10, 2020).

### 2.     New Mexico's COVID-19 Response.

1.     On March 11, 2020, Governor Grisham declared a public health emergency under the Public Health Emergency Response Act, NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015)(the "PHERA"), and invoked the All Hazards Emergency Management Act, NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007)(the AHEMA), by directing all cabinets, departments, and agencies to comply with the directives of the declaration and the further instructions of the New Mexico Department of Health (the "NM Health Department").   See Updated: Governor, Department of Health announce first positive COVID-19 cases in New Mexico, Press Releases, Office of the Governor (March 11, 2020), https://www.governor.state.nm.us/2020/03/11/updated-governor-department-of-health-announce-first-positive-covid-19-cases-in-new-mexico/ (last visited Oct. 12, 2020)("Emergency Declaration").

2.     Secretary Kunkel subsequently entered a series of public health orders ("PHOs") encouraging New Mexicans to stay in their homes as much as possible and to practice precautions when entering public spaces as well as restricting mass gatherings and business operations.   See e.g., Kathyleen M Kunkel, Public Health Emergency Order Limiting Mass Gatherings and Implementing Other Restrictions Due to COVID-19, New Mexico Department of Health (March

16,                         2020),                         www.governor.state.nm.us%2Fwp-

content%2Fuploads%2F2020%2F03%2FAMENDED-PUBLIC-HEALTH-ORDER.pdf.       See

also Chris McKee, Supreme Court Rules Governor Has Authority To Restrict, Ban Indoor Dining

(Aug. 26, 2020), https://www.krqe.com/health/coronavirus-new-mexico/supreme-court-to-hold-

hearing-on-public-health-order-business-restrictions/ (reporting that "[t]he New Mexico Supreme

Court ruled . . . that the state does have the power to enact a Public Health Order and restrict or

close indoor dining at restaurants").

3.     After declaring a public health emergency, Governor Grisham ordered all public

schools to close from March 16, 2020 to April 6, 2020.  See Governor Michelle Lujan Grisham,

Executive   Order   2020-005   (March   13,   2020),   https://www.governor.state.nm.us/wp-

content/uploads/2020/03/Executive-Order-2020-005.pdf.

4.      On March 26, 2020, Governor Grisham ordered all public schools to close for the

remainder of the 2019 to 2020 school year because of the increase in COVID-19 cases.  See

Governor   Michelle   Lujan   Grisham,   Executive   Order   2020-012   (March   26,   2020),

https://www.governor.state.nm.us/wp-content/uploads/2020/03/MLG_EO_2020_012.pdf.

5.     The New Mexico Public Education Department (the "PED") is a constitutionally-

created entity authorized to "have control, management and direction of all public schools."  N.M.

Const. Art. XII, § 6.  See N.M.S.A. 1978 § 22-2-1(A).

6.     The PED collaborates with the NM Health Department regarding decisions about

the return of students to school.  See Affidavit of Ryan Stewart ¶¶ 2-4, at 1-2 (executed September

28, 2020), filed September 28, 2020 (Doc. 14-2)("Stewart Aff.").

7.     New Mexico employed Los Alamos National Labs ("LANL") to develop an ongoing epidemiological modeling for weekly updates on the virus trajectory in New Mexico.  See Stewart Aff. ¶ 5, at 2.

8.     New Mexico would experience an increase in positive COVID-19 cases if schools return to in-person learning without enhanced safety protocols and limitations on the number of students present in school buildings.  See Stewart Aff. ¶ 5, at 2; id. at 22.

9.     New Mexico would not experience a significant rise in cases if schools implement the "hybrid" learning precautions.  See Stewart Aff. at 22-23.

10.     On April 1, 2020, the PED published a document addressing frequently asked questions related to providing Free and Appropriate Education ("FAPE") during school closures.  See Providing a Free Appropriate Public Education (FAPE) through a Distance Learning Platform during a Closure to Normal School Operations due to the Coronavirus (COVID-19) Pandemic 2020, New Mexico Public Education Department, https://webnew.ped.state.nm.us/bureaus/safe-healthy-schools/covid-19-coronavirus/  (Apr. 1, 2020)("PED Guidance for Providing FAPE During COVID-19").

11.     In the PED Guidance for Providing FAPE During COVID-19, the PED notes:

> At this time, [April 1, 2020] there is a statewide Stay at Home Order issued by the Governor and Department of Health that is effective until April 10, 2020. As long as that, or any subsequent Stay at Home Order, is in place, Schools should not provide face-to-face special education services.

PED Guidance for Providing FAPE During COVID-19 at 2.

12.     In its FAPE guidance document, the PED states:

> Initially, the US Department of Education issued guidance stating that if Schools do not provide any educational services to the general student population during the school closure, then it would not be required to provide services to students with disabilities during the school closure.  However, on March 21, 2020, new federal guidance was issued and emphasized that "schools should not opt to

- 13 -

close or decline to provide distance instruction, at the expense of the students, to address matters pertaining to services for students with disabilities" and stated that "to be clear: ensuring compliance with the Individuals with Disabilities Education Act 1990 (IDEA), Section 504, the Americans with Disabilities Act of 1990 (ADA) should not prevent any school from offering educational programs through distance instruction."

If a School continues to provide educational opportunities to the general student population during a school closure, then it must ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE. Schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's Individualized Education Plan (IEP) developed under IDEA.

With the extended school closure to the end of this school year, the PED is requiring Schools to provide Continuous Learning to students, to submit assurances about the provision of such learning, and to submit and obtain approval by the PED of a Continuous Learning Plan. Special Education is an included requirement of the Continuous Learning Plan.

Schools are required by the PED to develop and implement Continuous Learning Plans and provide general education services to the general population and are required to ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE. Schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's IEP developed under IDEA.

PED Guidance for Providing FAPE During COVID-19 at 1.

13.    The PED Guidance for Providing FAPE During COVID-19 provides some information about dispute resolution options for parents such as hearings and mediations, available under IDEA, and the New Mexico rules for education:

**What Dispute Resolution options are available for Schools and parents to resolve disagreements over IDEA services?**

The full range of Dispute Resolutions required by the IDEA remains available. This includes Mediation, Facilitated IEP meetings, State Complaints and Due Process Hearings. The PED Special Education Division Alternative Dispute Resolution staff are available to answer any questions . . . .

**If a School or parent files a due process hearing request, will the due process hearing take place during the school closure?**

Parents and Schools will continue to be able to file special education due process hearing requests with the PED. The PED requires that Schools have an administrator assigned to receive these complaints through electronic transmission during school closure. The parties to a due process complaint should address any requests for extensions of time to the PED appointed Due Process Hearing Officer. However, as long as a Stay at Home Order remains in effect, mediations, Facilitated IEP Meetings, State Complaints, or due process hearings will take place by telephone, videoconferencing or any other way that ensures effective communication . . . .

**If a state complaint is filed, will it be investigated during the school closure?**

PED will continue to accept State Level Complaints under the IDEA and state special education rules. The PED requires that Schools have an administrator assigned to receive these complaints through electronic transmission during school closure. The parties to a State Complaint should request an extension of time for exceptional circumstances if COVID-19 will prevent them from responding to the complaint or participating in the investigation of a particular complaint.

PED Guidance for Providing FAPE During COVID-19 at 10 (emphasis in original).

14.     In March, 2020, Secretary Kunkel issued PHOs prohibiting most public and private gatherings of any significant size and limiting business operations. See Governor: K-12 school closings must continue to prevent potential spread of COVID-19, Office of the Governor (March 27, 2020), https://www.governor.state.nm.us/2020/03/27/governor-k-12-school-closings-must-continue-to-prevent-potential-spread-of-covid-19/.

15.     In May and June 2020, the PHOs eased some restrictions as COVID-19's transmission rate fell and testing capacity increased. See Governor Announces Limited Reopening for Dine-In Restaurants, Indoor Malls, Gyms, Salons and More, NMDOH (May 28, 2020), https://cv.nmhealth.org/2020/05/28/governor-announces-limited-reopening-for-dine-in-restaurants-indoor-malls-gyms-salons-and-more/; Public Health Order, NMDOH (June 1, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/06/060120-PHO.pdf.

16.     On July 13, 2020, Secretary Kunkel tightened restrictions in response to "spikes" in COVID-19 cases in New Mexico and neighboring states.  See Public Health Order, at 1-2, New Mexico Department of Health (July 13, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/07/7.13.20-PHO-1.pdf; Coronavirus in New Mexico, Albuquerque Journal, https://www.abqjournal.com/coronavirus (last visited Sept. 28, 2020).

17.     On August 28, 2020, Secretary Kunkel issued a PHO that eased some restrictions as the virus became more contained.  See Public Health Order at 1-2, New Mexico Department of Health (Aug. 28, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/08/082820-PHO.pdf.

18.     On June 25, 2020, Governor Grisham held a press conference to provide an update on New Mexico's efforts to combat COVID-19.  See Plaintiffs' Compilation of Press Releases, Press Conferences, News Articles, and Social Media Posts at 1, filed October 12, 2020 (Doc. 25-1)("Plaintiffs' Compilation"); Gov. Lujan Grisham 6/25 Press Conference, Youtube (June 25, 2020), https://www.youtube.com/watch?v=Xp8hgX2nPAw ("Gov. Grisham June 25 Press Conf.").

19.     Governor Grisham discussed her concerns about reopening schools, explaining that "we are the fourth state in the country to have the highest median age of educators; knowing age is a factor for COVID-19 and the risks is another issue . . . we want to make sure that people are safe."  Gov. Grisham June 25 Press Conf. at 49:36-49:45.  See Plaintiffs' Compilation at 1.

20.     Governor Grisham continued, "the hybrid model is challenging for parents to navigate," but noted that "we are going to do everything in our power to minimize how difficult the navigation is and are clear that we don't have enough childcare options in the current context of the state."  Gov. Grisham June 25 Press Conf. at 49:50-50:16.  See Plaintiffs' Compilation at 1.

21.     Governor Grisham affirmed that "our goal is to not to have a hybrid model and our goal is not to have parents and educators and school districts and all our public education workers challenged by these difficulties." Gov. Grisham June 25 Press Conf. at 51:25-51:33.  See Plaintiffs' Compilation at 1.

22.     Governor Grisham maintained that "our goal is to full time in the classroom education as quick as we can" depending on "how well we do with our COVID safe practices and how effective we are at maintaining and reducing the rate of spread of COVID in New Mexico." Gov. Grisham June 25 Press Conf. at 51:34-52:12.  See Plaintiffs' Compilation at 1.

23.     Governor Grisham noted that "New Mexico is a multi-generational living arrangement state, so the opportunity for kids to take this virus and spread it in high risk areas is way too high for our comfort" particularly because "our educators are older and in higher risk groups."  Gov. Grisham June 25 Press Conf. at 58:37-59:12.  See Plaintiffs' Compilation at 1.

24.     Governor Grisham noted that "if we have an outbreak at a school . . . it's possible we would close a school until it's cleaned, everyone's tested and we're clear; it's possible that we isolate the virus, we do surveillance testing . . . but we allow the school to be open."  Gov. Grisham June 25 Press Conf. at 1:01:00-1:02:00.  See Plaintiffs' Compilation at 1.

25.     On August 27, 2020, Governor Grisham "and state health and education officials . . . provided a public update on the state's COVID-19 response and recovery efforts" including "New Mexico's preparation for a limited re-entry to in-person learning next month." Governor Announces Revised Emergency Public Health Order, Office of the Governor: Michelle Lujan Grisham (Aug. 27, 2020), https://www.governor.state.nm.us/2020/08/27/governor-announces-revised-emergency-public-health-order/ ("Aug. 27 Press Release").  See Plaintiffs' Compilation at 1.

26.     PED has worked "alongside school districts and charter schools statewide to ensure comprehensive COVID-19 safety and response protocols are established before any district or charter can be approved to begin limited in-person learning for K-5 age groups after Labor Day."  Aug. 27 Press Release.  See Plaintiffs' Compilation at 1.

27.     Governor Grisham made the following Facebook post on August 28, 2020:

> We have to deliver the education New Mexico kids deserve during this pandemic.  But we can only get back into classrooms if and when every single precaution for kids, educators, and families is in place.
>
> The health of our families and school communities is non-negotiable.
>
> . . .
>
> I am optimistic that we can be in a place next week to begin formally approving the reentry proposals that meet those requirements.
>
> We can do this right.  But we will only do it safely.
>
> The state will not force any school district to bring students back for in-person learning.  But the state will require districts that do want to return to be in compliance with strict protocols to keep educators and students safe.  Beyond doubt.
>
> New Mexico has the opportunity to show the U.S. what a safe and effective learning environment look like during COVID-19.  We can be leaders without sacrificing an inch of our public health focus.  And I think we will be.

Governor Michelle Lujan Grisham, Facebook (Aug. 28, 2020), https://www.facebook.com/pg/GovMLG/posts/?ref=page_internal.  See Plaintiffs' Compilation at 2.

**3.     The PED's Reentry Guidance.**

1.     In late June 2020, the PED issued its official reentry guidance for the 2020 to 2021 school year.  See New Mexico Public Education Department Reentry Guidance at 1, New Mexico

Public Education Department, https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/ (last visited Oct. 10, 2020)("Reentry Guidance"); Stewart Aff. at 56.

2.    The PED, in the Reentry Guidance, structured school reentry in phases.   <u>See</u> Reentry Guidance at 4.

3.    The Reentry Guidance provides that "[t]he state's goal is to move all schools into a full school schedule as soon as it can be safely accomplished."   Reentry Guidance at 4.

4.    The Reentry Guidance sets out eight minimum requirements for reentry at public schools.  <u>See</u> Reentry Guidance at 5.

5.    Under the Reentry Guidance, "[e]ach school district and charter school shall follow guidelines for reentry based on the public health conditions."  Reentry Guidance at 9.

6.    Under the Reentry Guidance, public schools may operate in three reentry categories: (i) remote, (ii) hybrid, and (iii) full reentry.  <u>See</u> Reentry Guidance at 9.

7.    Schools in the remote category, may, "[i]f feasible, . . . remain open for a limited set of students and staff in order to continue in-person educational services for students in PreK-3rd grade and students with special needs at a maximum 5:1 student to teacher ratio."  Reentry Guidance at 10.

8.    The hybrid category allows in-person learning where students can be spaced six feet apart or at fifty percent of classroom capacity.  <u>See</u> Reentry Guidance at 9.

9.    The full reentry category allows in-person learning for every student five days per week.  <u>See</u> Reentry Guidance at 9-10.

10.    The Reentry Guidance states PED will provide "Real Time Support" to students as well as "[u]se social emotional programs, groups, and individualized supports developed in the

'brick and mortar' setting to engage students and connect them to tools and resources for remote learning."  Reentry Guidance at 8 (no citation for quotation).

11.     New Mexico uses "gating criteria" when determining when and whether to re-open New Mexico schools.  Scrase Decl. ¶ 7-8, at 4-5.

12.     The gating criteria include: (i) transmission of COVID-19, measured by the rate of spread and New Mexico daily cases;[5] (ii) testing capacity measured by the number of COVID-19 test per day and COVID-19 test positivity rate; (iii) contract tracing and isolation capacity; and (iv) statewide healthcare system capacity, measured by adult intensive care unit beds and seven-day supply of personal protective equipment across the primary hospitals.  See Scrase Decl. ¶ 7-8, at 4-5; Stewart Aff. ¶¶ 6, 19, 38, at 3, 6, 11;  Public Health Gating Criteria for Reopening New Mexico, New Mexico Dept. of Health, https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/ (last visited Oct. 10, 2020); Public Health Gating Criteria for Reopening New Mexico, New Mexico Dept. of Health, https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/ (last visited Oct. 10, 2020).

---

[5]The Department of Health defines "rate of spread" as:

Also known as the effective reproduction number, rate of spread is one measure of COVID-19 viral spread in a community. The rate of spread illustrates the mean number of secondary COVID-19 cases produced by one COVID-19 case.

NM evaluates the rate of spread regularly to understand how well the state's organizational and individual social distancing measures are working to diminish transmission of the virus. Specifically, the rate of spread is calculated in two formats: 1) a statewide rate of spread; and, 2) regional rates of spreads. Understanding how the rate of spread varies and evolves regionally is critical in responding to community-specific needs and challenges.

Spread of COVID-19, New Mexico Dept. of Health, https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/rate-of-spread/ (last visited Nov. 4, 2020). The New Mexico Daily Cases is the measurement of how many cases the State or County has adjusted per capita on an average over seven days.  See Scrase Decl. ¶ 8(a), at 5-6.

13.     New Mexico uses this gating criteria to issue PHOs when determining the category of reentry for schools in each county.  See Scrase Decl. ¶ 7-8, at 4-5; Stewart Aff. ¶¶ 6, 19, 38, at 3, 6, 11; Public Health Gating Criteria for Reopening New Mexico, New Mexico Dept. of Health https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/ (last visited Oct. 10, 2020).

14.     The New Mexico Daily Cases measurement is reflected in the different colors on the New Mexico map of Counties. See Scrase Decl. ¶ 11, at 8; Map of Average COVID-19 from 10/13/2020 to 10/26/2020 In New Mexico Counties, New Mexico Dept. of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Nov. 4, 2020).

15.     The "green level" for Counties on the map is under eighty cases per one million per day or eight cases per 100,000 per day over a fourteen-day rolling average.  Scrase Decl. ¶ 8, at 5. See Our Criteria & Sources, COVID Exit Strategy, https://www.covidexitstrategy.org/definitions-and-criteria (last visited Oct. 10, 2020)(defining metrics for phased reopening).

16.     The COVID-19 test positivity rate provides information about the effectiveness of testing results in the state or county.  See Scrase Decl. ¶ 8, at 5.

17.     If the test positivity rate is above five percent, there is not enough testing and cases are being missed as a result.  See Scrase Decl. ¶ 8, at 5; Our Criteria & Sources, COVID Exit Strategy,   https://www.covidexitstrategy.org/definitions-and-criteria   (last   visited   Oct.   10, 2020)(defining metrics for phased reopening).

18.     New Mexico's target is at five percent or less for the whole State, and for individual Counties as well.  See Scrase Decl. ¶ 8, at 5; Our Criteria & Sources, COVID Exit Strategy, https://www.covidexitstrategy.org/definitions-and-criteria   (last   visited   Oct.   10, 2020)(defining metrics for phased reopening).

19.     On July 15, 2020, Secretary of Human Services, Dr. David Scrase, stated:

> One of the nuances that we're learning from doing the reading is that what actually increases spread is not the kids going to school . . . [.] It's that the parents are now free with their kids in school to go out and about, have more contacts, go to stores, you know go back to work for example in person, rather than working from home.

Gabrielle Burkhart, New Mexico Health Officials, Educators Discussing APS Re-Entry Plan, KRQE, https://www.krqe.com/news/education/new-mexico-health-officials-educators-struggling-to-determine-school-re-entry-plans/ (Jul. 15, 2020, updated: July 17, 2020).

20.     On August 3, 2020, the PED released a Reentry Guidance Addendum, which notes that, for schools operating remotely, small group instruction is allowed in a ratio of five students to one teacher for (i) pre-kindergarten to third grade; (ii) special education children of all ages; and (iii) students needing additional support of all ages.  See Reentry Guidance Addendum A at 1, Reentry District and School Guidance, https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/ (August 3, 2020)("Reentry Guidance Addendum").

21.     The Reentry Guidance Addendum also notes that "[s]tudents needing additional support shall be determined locally and can include students at risk of dropping out, students least able to participate successfully in remote learning, students with unstable home conditions, and other locally determined support criteria."  Reentry Guidance Addendum A at 1.

22.     On August 28, 2020, Governor Grisham posted a Twitter thread discussing school reopening.  See Michelle Lujan Grisham (@GovMLG), Twitter (Aug. 28, 2020, 8:55 AM), https://twitter.com/GovMLG/status/1299359982417137665.

23.     On September 3, 2020, Secretary Stewart clarified the PED's goal with the hybrid reentry system:

> PED is not requiring any district or charter school to open for in-person learning.  PED stands ready to assist every district, charter and school in the state in meeting the strict safety requirements and preparation efforts if those local

entities decide they want to move into the hybrid model.  In addition to having an approved reentry plan, each school district and charter school needs to provide assurance that they can effectively implement COVID Safe Practices.  To that end, PED along with the State Fire Marshal's Office, National Guard and local fire are available to provide on-site guidance and support to ensure that schools are implementing COVID Safe Practices properly so that educators and students are as safe as possible.

See Schools In 25 Counties May Launch Hybrid Model Sept. 8, The State of New Mexico, https://www.newmexico.gov/2020/09/03/schools-in-25-Counties-may-launch-hybrid-model-sept-8/ (September 3, 2020).

24.     Beginning on September 8, 2020, PED allowed schools to begin the hybrid reentry category if the County in which the school is located has average daily cases less than eight cases per 100,000 per day and test positivity under five percent.  See Scrase Decl. ¶¶ 8-9, at 5-6; Stewart Aff. ¶ 38, at 11.

25.     A school that meets the PED's gating criteria also must have a PED-approved reentry plan, and the superintendent or charter leader must sign and return an assurance to abide by safety protocols that the PED Reentry Guidance outlines.  See Stewart Aff. ¶ 38, at 11.

26.     These standards issued by the PED are applied uniformly across New Mexico.  See Stewart Aff. ¶ 19, at 6.

27.     During the 2020 to 2021 school year, the PED has not allowed some Counties in New Mexico with higher incidence of COVID-19 to begin hybrid reentry.  See Scrase Decl. ¶ 11. See also Map of Average COVID-19 from 9/15/2020 to 9/28/2020 In New Mexico Counties, New Mexico Dept. of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Nov. 4, 2020).

28.     For instance, during September 2 through September 15, 2020, several Counties did not meet the reentry criteria. See Scrase Decl. ¶ 11 figure 6, at 8.   See also Map of Average

COVID-19 from 9/15/2020 to 9/28/2020 In New Mexico Counties, New Mexico Dept. of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Nov. 4, 2020).

29.     Some schools, such as those in the City of Albuquerque, New Mexico, have decided to delay reopening even though they met the reentry criteria.  See Scrase Decl. ¶ 12, at 9 (noting that, "in the city of Albuquerque, which as of [the week of September 28, 2020] in Bernalillo County has only 2.6 cases per 100,000 and a test passivity of 1.3%, the decision was made to delay reopening of schools until 2021").

30.     The PED regularly assesses and publishes whether schools are in reentry compliance according to the gating criteria.  See School Reentry Status, New Mexico Department of Health, https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/ (last visited October 12, 2020).   See School Reentry Status, New Mexico Department of Health, https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/ (last visited October 12, 2020).

31.     The PED has issued many supplementary guidance documents, which offer resources for improved educational services during remote learning.   See COVID-19 (CORONAVIRUS),       New       Mexico       Public       Education       Department, https://webnew.ped.state.nm.us/bureaus/safe-healthy-schools/covid-19-coronavirus/ (last visited Oct. 12, 2020).

32.     PED has issued guidance related to how school districts can provide special needs students with a FAPE, see PED Guidance for Providing FAPE During COVID-19 at 1, and has provided some resources for social-emotional supports for students during this time to address concerns about the impact of the Coronavirus on students' mental health, see Behavioral Health/Social   and   Emotional   Learning   (SEL),   New   Mexico   Dept.   of   Health,

https://webnew.ped.state.nm.us/bureaus/safe-healthy-schools/behavioral-health/ (last visited Oct. 12, 2020).

4.      **Internet Access in New Mexico.**

1.      New Mexico has some of the lowest rates of broadband access in the nation.  See COVID-19: Internet Access and the Impact on Tribal Communities in New Mexico at 2, filed September 28, 2020 (Doc. 11-2)("COVID-19: Internet Access").

2.      New Mexico ranks 48th nationally with respect to households with broadband internet.  See COVID-19: Internet Access at 2.

3.      Approximately twenty six percent of households in New Mexico do not have broadband.  See COVID-19: Internet Access at 2.

4.      Further, nine percent of New Mexicans cannot purchase broadband, because they live in an area without broadband capacity.  See COVID-19: Internet Access at 2.

5.      The State of New Mexico has noted a need for "broadband capital subsidy" in rural areas to address the "broadband gap."  State of New Mexico Broadband Strategic Plan and Rural Broadband Assessment at 11, filed September 28, 2020 (Doc. 11-3)("State Broadband Plan").

6.      Bringing broadband to all rural New Mexico will cost between two billion and five billion dollars.  See State Broadband Plan at 14.

7.      "Much as broadband has proven critical to continued economic and educational life in the early months of the pandemic -- through work from home, home-based business, and distance learning -- it is likely to be a necessary element of Covid-19 recovery."  State Broadband Plan at 19.

8.     The State has a need for federal funding to "close the 'homework gap' -- the struggle of some students to learn effectively when they do not have internet at home."  State Broadband Plan at 21 (no citation for quotation).

9.     Eighty percent of individuals living on Tribal lands in New Mexico do not have internet services.  See COVID-19: Internet Access at 4.

10.     Reasons for this lack of internet access include: (i) inability to afford the cost of internet services; (ii) location of homes in areas of reservations that prohibit digging; (iii) structures of adobe homes do not allow for Wi-Fi.  See COVID-19: Internet Access at 4.

11.     Even in Bernalillo County, New Mexico, where Albuquerque is located, Native Americans are less likely to have internet access.  See COVID-19: Internet Access at 4.

12.     Parents in Tribal communities "are struggling to keep their children engaged in their K-12 education without a computer at home or reliable Wi-Fi."  COVID-19: Internet Access at 4.

13.     Before the pandemic, "significant disparities in educational outcomes" existed among American Indian students and White and Hispanic students.  COVID-19: Internet Access at 5.

14.     "The impact of school closures and the lack of access to online educational resources have the potential to widen the gap between Native American students and their counterparts and to exacerbate educational disparities."  COVID-19: Internet Access at 5.

15.     After school closures in March 2020, the PED found over 23,000 American Indian students in New Mexico public schools lacked broadband devices or capabilities.  See COVID-19: Internet Access at 7.

16.     The amount of American Indian students without access to broadband in New Mexico is higher, however, than the PED estimates because the PED's assessment excludes students in Albuquerque, Rio Rancho, and Santa Fe, New Mexico, and Bureau of Indian Education and Tribally operated schools.  See COVID-19: Internet Access at 7-8.

17.     Some school districts, including Albuquerque Public Schools, have loaned devices to students without computers at home.  See COVID-19: Internet Access at 8.

18.     Other school districts in rural areas in New Mexico lack the resources to provide devices; exacerbating the technology access gaps in these areas.  See COVID-19: Internet Access at 8-9.

19.     For some students, remote learning is not an effective model for learning.  See Catlin Rivers et al., Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors, Bloomberg School of Public Health at Johns Hopkins University at 1 (Apr. 17, 2020)   https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200417-reopeningguidance-governors.pdf ("John Hopkins Report").

20.      Often online education for school age children is not a substitute for in-person learning and socialization in a school setting.  See John Hopkins Report at 1.

21.     Long-term school shutdowns will likely lead to increased education disparities and other consequences for many children.  See John Hopkins Report at 1.

**5.     The Impact of School Closures on Children.**

1.     ███████████████████████████████████████████

███████████████████████████████████████

2.     ███████████████████████████████████████████

███████████

3.   ████████████████████████████████████████████

████████████████████████████████████

4.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

5.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

6.   ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

7.     School closures "can lead to severe learning loss, and the need for in-person instruction is particularly important for students with heightened behavioral needs."  Centers for Disease Control and Prevention, The Importance of Re-opening America's Schools this Fall, COVID-19 (July 23, 2020) https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/reopening-schools.html.

8.     Keeping schools closed poses a risk to children's health and safety.  See Declaration of Dr. Mark McDonald in Support of Application for Temporary Restraining Order (executed July 23, 2020), filed September 17, 2020 (Doc. 4-12)(originally filed in Brach et al., v. Newsom et al, Case 2:20-cv-06472-SVW-AFM (C.D. Cal.)), filed on September 16, 2020 (Doc. 28-8))("McDonald Decl.").

9.     The United States Department of Education ("US DOE") has provided guidance on how school reentry can comport with the IDEA.   See U.S. Department of Education,

Implementation of IDEA Part B Provision of Services in the COVID-19 Environment, Office of Special Education Programs (Sept. 28, 2020), https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/qa-provision-of-services-idea-part-b-09-28-2020.pdf ("September IDEA Guidance").

10.    The US DOE "reminds SEAs [State of New Mexico Educational Agencies] and LEAs [Local Education Agencies] that **no matter what primary instructional delivery approach is chosen, SEAs, LEAs, and individualized education program (IEP) Teams remain responsible for ensuring that a free appropriate public education (FAPE) is provided to all children with disabilities.**" September IDEA Guidance at 2 (bold in original).

11.    Where "State and local decisions require schools to limit or not provide in-person instruction due to health and safety concerns, SEAs, LEAs, and IEP Teams are not relieved of their obligation to provide FAPE to each child with a disability under IDEA." September IDEA Guidance at 3.

12.    "As conditions continue to change throughout the country, some of the special education and related services included in a child's IEP may need to be provided in a different manner; however, all children with disabilities must continue to receive FAPE and must have the 'chance to meet challenging objectives.'" September IDEA Guidance at 3-4 (quoting Endrew F. v. Douglas Cty. Sch. Dist., 137 S. Ct. 988, 1000 (2017)).

13.    "Therefore, IEP Teams should identify how the special education and related services included in a child's IEP will be provided" during the COVID-19 pandemic "and should consider a variety of instructional methods and settings." September IDEA Guidance at 4 (quoting Endrew F. v. Douglas Cty. Sch. Dist., 137 S. Ct. 988, 1000 (2017)).

## PROCEDURAL BACKGROUND

1.     **The Governor and the Secretaries' Motion to Dismiss**.

On October 5, 2020, the Governor and the Secretaries filed the Governor and Secretaries' MTD.  See Governor and Secretaries' MTD at 1.  In the MTD, the Governor and the Secretaries argue that the Court should dismiss the claims against them under rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  See Governor and Secretaries' MTD at 1.  The Governor and the Secretaries argue that the Plaintiffs' Amended Complaint fails to satisfy Article III standing regarding the Governor, Secretary Kunkel, and Secretary Stewart, and that the Amended Complaint fails to state a § 1983 claim against the Governor and Secretary Kunkel for which relief may be granted.  See Governor and Secretaries' MTD at 2.

The Governor and the Secretaries argue that federal courts have limited jurisdiction and that, if a court lacks jurisdiction, it must dismiss the case.  See Governor and Secretaries' MTD at 7-8 (citing Montoya v. Chao, 296 F.3d 952, 955 (10th Cir. 2002); Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)).  The Governor and the Secretaries argue that the Court should dismiss the case for lack of subject-matter jurisdiction under rule 12(b)(1).  See Governor and Secretaries' MTD at 7-8 (citing Fed. R. Civ. P. 12(b)(1)).  The Governor and the Secretaries contend that courts use a rule 12(b)(6) standard to evaluate rule 12(b)(1) motions.  See Governor and Secretaries' MTD at 8 (citing Muscogee Nation v. Okla. Tax Comm'n, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010)).

Next, the Governor and the Secretaries note that, on March 26, 2020, the Governor ordered the closure of all public schools for the remainder of the 2019-2020 school year, but maintain that "[t]he Governor has not issued any executive order affecting public schools since the March 26 order."  Governor and Secretaries' MTD at 3.  The Governor and the Secretaries contend that for

the 2020-2021 school year, the PED issues all orders related to keeping schools closed, and that the PED "is a constitutionally created entity generally authorized to 'have control, management and direction of all public schools.'"  Governor and Secretaries' MTD at 4 (quoting NMSA 1978, § 22-2-1(A)(2004); citing N.M. Const. Art. XII, §§ 6(A), 6(D); NMSA 1978, §§ 22-2-1(A), 22-2-2 (2004); and NMSA 1978, § 22-2-8 (2003)).  The Governor and the Secretaries further note that, in June, 2020, the PED issued official Reentry Guidance for the 2020-2021 school year.[6]  See Governor and Secretaries' MTD at 5 (citing New Mexico Public Education Department Reentry Guidance, New Mexico Public Education Department (June 29, 2020)(updated July 15, 2020)(Doc. 22-1)("Reentry Guidance")).

Based on this factual predicate, the Governor and the Secretaries argue that the Plaintiffs cannot show standing, and that thus the Court does not have jurisdiction over the Governor, Secretary Kunkel, and Secretary Stewart.    See Governor and Secretaries' MTD at 10.  The Governor and the Secretaries argue that "'a plaintiff must show that: (1) she has suffered an injury in fact . . . (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested.'" Governor and Secretaries' MTD at 10 (quoting Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004)).  First, the Governor and the Secretaries argue that the Plaintiffs fail to demonstrate that their injuries are fairly traceable to the Governor and Secretary Kunkel. See Governor and Secretaries' MTD at 11-15. Second, the Governor and Secretaries argue that Plaintiffs fail to demonstrate a favorable decision will redress their injuries.  See Governor and Secretaries' MTD at 15-17.

---

[6]The Reentry Guidance provides schools with guidelines on how to operate, as well as re-opening qualifications, during the COVID-19 pandemic.

The Governor and the Secretaries quote a recent case from the United States Court of Appeals for the Tenth Circuit for the proposition that, "'[t]o satisfy the traceability requirement, the defendant's conduct must have caused the injury.'"  Governor and Secretaries' MTD at 11 (quoting Aptive Envtl., LLC v. Town of Castle Rock, 959 F.3d 961, 977 (10th Cir. 2020)).  The Governor and the Secretaries argue that the

> Plaintiffs' alleged injuries from the temporary suspension of in-person learning in schools cannot be fairly traced to the Governor or Secretary Kunkel. . . . Indeed, Plaintiffs' Amended Complaint is devoid of any allegations that the Governor issued an executive order or that Secretary Kunkel enacted a public health order regarding public schools or the temporary suspension of in-person learning for the 2020-2021 school year.

See Governor and Secretaries' MTD at 12.  The Governor and the Secretaries further argue that Reentry Guidance is under the PED's purview, and that, under New Mexico law, the PED has the authority to issue the Reentry Guidance: "The PED is vested with the powers and duties to related to the control, management, and direction of all public schools in this state."  Governor and Secretaries' MTD at 13 (citing N.M.S.A. 1978, § 22-2-1(A); N.M. Const. Art. XII, §§ 6(A), 6(D)).  The Governor and the Secretaries contend that the PED issued the Reentry Guidance.  See Governor and Secretaries' MTD at 13 (citing Reentry Guidance).

The Governor and the Secretaries also argue that the Plaintiffs fail to show how the Governor and Secretary Kunkel caused their alleged injuries.  See Governor and Secretaries' MTD at 14.  The Governor and the Secretaries argue that the Plaintiffs fail to point to the Governor and Secretary Kunkel's action that prohibits in-person learning at public schools.  See Governor and Secretaries' MTD at 14.  The  Governor and Secretaries contend that local school districts decide which students receive in-person learning, rather than the Governor or Secretary Kunkel, and that "[t]herefore, it is the independent action of the school districts, who are not parties to this case, that are causing Plaintiffs' alleged injuries."  Governor and Secretaries' MTD at 14.

Next, the Governor and the Secretaries argue that the Plaintiffs lack standing to sue the Governor, Secretary Kunkel, and Secretary Stewart, because the Plaintiffs fail to establish redressability.  See Governor and Secretaries' MTD at 14.   The Governor and the Secretaries contend that, to establish redressability, a "'plaintiff must also establish it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"   Governor and Secretaries' MTD at 14 (quoting Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir. 1996)).  The Governor and the Secretaries argue that the relief which the Plaintiffs request -- an injunction entered against the Governor and Secretary Kunkel regarding in-person learning -- will not enable students to go back to in-person classes, because "it is the PED that issued the Reentry Guidance pursuant to its powers and duties related to the control, management, and direction of all public schools in this state."  Governor and Secretaries' MTD at 15.

The Governor and the Secretaries argue that even if Secretary Stewart, as PED Secretary, is enjoined, there is no guarantee that the "requested injunction will likely lead to in-person learning because local school districts have the discretion regarding how to operate."  Governor and Secretaries' MTD at 16.  The Governor and the Secretaries contend that many school districts have decided to continue remote learning even when they meet the PED's reentry requirements "in order to prioritize the safety of their students."  Governor and Secretaries' MTD at 16.  The Governor and the Secretaries, argue, therefore, that the "Plaintiffs must include all superintendents as defendants in this case to obtain the requested relief."  Governor and Secretaries' MTD at 16. Consequently, the Governor and the Secretaries allege that the Plaintiffs have failed to demonstrate redressability.  See Governor and Secretaries' MTD at 16.

Last, the Governor and the Secretaries argue that the Plaintiffs' claims under § 1983 "must allege that each Defendant was a cause of promulgating the purportedly unlawful Reentry

Guidance," and that the Amended Complaint lacks sufficient specific allegations demonstrating that the Governor or Secretary Kunkel were involved in issuing the PED's Reentry Guidance. Governor and Secretaries' MTD at 18.  The Governor and the Secretaries insist that the "Plaintiffs' legal conclusion that the Governor and Secretary Kunkel issued the Reentry Guidance is false," because of the language of the Reentry Guidance and New Mexico law.  Governor and Secretaries' MTD at 20 (citing New Mexico Public Education Department Reentry Guidance, New Mexico Public Education Department (June 29, 2020)(updated July 15, 2020)); N.M. Const. Art. XII, Sec. 6; §§ 22-2-1(A), 22-2-2, 22-2-8; Ellenberg v. N.M. Military Inst., 478 F.3d 1262, 1270 (10th Cir. 2007)).

The Governor and the Secretaries conclude that the Court should dismiss the Governor, Secretary Kunkel, and Secretary Stewart from this action for lack of standing, or that the Court should dismiss the Governor and Secretary Kunkel, because the Plaintiffs fail to demonstrate the causation that § 1983 requires.  See Governor and Secretaries' MTD at 20-21.

## 2.    The NM MTD.

New Mexico filed its Motion to Dismiss on October 5, 2020 (Doc. 23)("NM MTD").  New Mexico argues that the Amended Complaint does not identify any basis for a claim against New Mexico as a separate legal entity, meaning New Mexico should be dismissed under rule 12(b)(6). See NM MTD at 1-2 (citing Fed. R. Civ. P. 12(b)(6)). In the alternative, New Mexico argues that all claims should be dismissed against it for lack of jurisdiction.  See NM MTD at 2.  New Mexico contends:

> Although Plaintiffs list New Mexico as a Defendant in the caption, they do not offer any basis for a claim or relief against the State as a sovereign entity.  In fact, it is unclear whether the State is intended to be a separate Defendant, apart from the individual Defendants, at all.  The State is not listed among the Defendants in the "Parties and Jurisdiction" section of the complaint.  Furthermore, the

complaint repeatedly alleges that it is specifically challenging the actions of the
individual Defendants while not mentioning the State.

NM MTD at 3.

Next, New Mexico argues that it has Eleventh Amendment sovereign immunity from any

claim under 42 U.S.C. § 1983, and therefore, any such claims should be dismissed under rule

12(b)(1).  See NM MTD at 3.  New Mexico contends that, because it has sovereign immunity, it

is "'immune from suits brought in federal court by its own citizens, by citizens of other states, by

foreign sovereigns and by Indian tribes.'"  NM MTD at 6 (quoting Chamber of Commerce of U.S.

v. Edmondson, 594 F.3d 742, 760 (10th Cir. 2010)).  New Mexico continues that there are three

exceptions to sovereign immunity, but that none apply.  See NM MTD at 6.

New Mexico also notes that, although it did not seek to dismiss the "Plaintiffs' IDEA claim

on sovereign immunity grounds, the State expressly preserves this defense."  NM MTD at 2 n.1.

New Mexico states that, "[i]f the case is not dismissed, the State intends to raise additional defenses

by motion under the Rules of Civil Procedure."  NM MTD at 2 n.1.

New Mexico argues that congressional abrogation of sovereign immunity under § 1983

does not allow a party to bring a claim against the State as a separate entity, because "neither a

State nor its officials acting in their official capacities are 'persons' under § 1983."  NM MTD at

6 (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  New Mexico also that

argues the exception to sovereign immunity Ex Parte Young, 209 U.S. 123 (1908), recognizes does

not apply, because claims Ex Parte Young must be brought against state officials, not the State.

See NM MTD at 7.

**3.      The Court's Order to Respond to the Motions to Dismiss and the Response.**

On October 10, 2020, the Court ordered the Plaintiffs to respond to both Motions to

Dismiss by noon on October 12, 2020.  See Minute Order, filed October 10, 2020 (Doc. 24)(text

only entry).   On October 12, 2020, the Plaintiffs filed their Response to Defendants' Motion to Dismiss Governor Grisham, Secretary Kunkel, and Secretary Stewart, filed October 12, 2020 (Doc. 25)("Response to MTDs").   The Plaintiffs acknowledge that the Governor's "Executive Order of March 26, 2020 closing schools [is] no[t] current[ly] [in] effect," but argue instead that "it is implausible after months of press conferences where the school re-entry plan is touted as the Governor's that Secretary Stewart's actions were not done in compliance and collaboration with Secretary Kunkel's orders and with direct input from the Governor."   Response to MTDs at 1-2 (footnote omitted).   The Plaintiffs argue that the Court should not treat the Governor, the Secretary of Health and the Secretary of Education separately for purposes of the Motions to Dismiss, because they "are all working together to combat what they all claim is still a public health emergency."   Response to MTDs at 1.

The Plaintiffs argue that the Court does not lack subject matter jurisdiction, because the Plaintiffs have demonstrated the required elements of standing in their claims against all of the Defendants.   See Response to MTDs at 3 (citing Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004)).   The Plaintiffs argue that the "Plaintiffs' injures are fairly traceable to Governor Grisham and Secretary Kunkel," because "all three of these of these actors working together issue the Governor's plan which encompasses Secretary Stewart's 'reentry guidance['] that has caused the students to be deprived of their education."   Response to MTDs at 4 (quotation marks in original but not attributed to any source).   The Plaintiffs insist that Governor Grisham creates the Reentry Guidance, because she has "portrayed the actions publicly as her 'school re-entry plan' and touted that all of her public officials, including not only Secretary Kunkel and Secretary Stewart but also Secretary [for Health and Human Services Dr. David]   Scrase, worked out this

plan to ensure the safety of students during the pandemic."  Response to MTDs at 4.  The Plaintiffs

conclude:

> It is in reality quite frivolous to waste this Court's time quibbling about who's plan it really is that is causing the deprivation of at least a quasi-fundamental liberty and denying students with special needs of their federally protected FAPE when the Governor has publicly touted that it is her plan carried out in accordance with the orders of her Secretary of Health and pursuant to the guidance issued by her Secretary of Education.
>
> Moreover, it is laughable to try to shift the burden of redressability to the Districts who have been explicitly clear in public and as alleged in the complaint that, but for the prohibitions of Defendants they would make both in-person and virtual school available to the students, thus alleviating any Constitutional injury.

Response to MTDs at 4-5.

### 4.    The Plaintiffs' Notice Voluntarily Dismissing the State of New Mexico.

On October 12, 2020, the Plaintiffs filed a Stipulation of Voluntary Rule 41 Dismissal of

The State Of New Mexico, filed October 12, 2020 (Doc. 26).  The Plaintiffs stated that they were

"voluntarily dismiss[ing] the State of New Mexico from this matter" pursuant to Federal Rule of

Civil Procedure 41(a)(1)(A)(ii).  Stipulation of Voluntary Rule 41 Dismissal of The State Of New

Mexico at 1.  The Plaintiffs did not describe why they had dismissed New Mexico.  See Stipulation

of Voluntary Rule 41 Dismissal of The State Of New Mexico at 1.

### 5.    The Defendants' Reply in Support of Motion to Dismiss Governor Grisham, Secretary Kunkel, and Secretary Stewart.

On October 15, 2020, the Defendants filed a Reply in Support of the Governor and

Secretaries' MTD.  See Reply in Support of Motion to Dismiss Governor Grisham, Secretary

Kunkel, and Secretary Stewart, filed October 15, 2020 (Doc. 34)("Reply").  The Defendants insist

that the Plaintiffs' Amended Complaint does not contain allegations "sufficient to establish the

requirements for Article III standing and their § 1983 claim."  Reply at 2.  The Defendants also

note that the Response to MTDs does not cite the Amended Complaint to support its arguments. See Reply at 2 (citing Amended Complaint).

First, the Defendants contend that the Plaintiffs lack Article III standing for their claims against Governor Grisham, Secretary Kunkel, and Secretary Stewart.  See Reply at 2-3.  The Defendants argue that rule 12(b)(6) applies, and that the Amended Complaint itself must state sufficient allegations to establish Article III standing.  See Reply at 3 (citing Muscogee Nation v. Okla. Tax Comm'n, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).  The Defendants aver that the Court "cannot review matters outside the complaint."  Reply at 3 (quoting Carter v. Daniels, 91 F. App'x 83, 85 (10th Cir. 2004)).  Consequently, the Defendants insist that the Court should not consider the additional facts in the Response to MTDs.  See Reply at 3.  The Defendants note that the Amended Complaint is "completely silent as to" these facts, "particularly that the Governor claims the PED Reentry Guidance is her school plan."  Reply at 4.  Further, the Defendants maintain that no authority establishes the Governor's social media posts or press conferences are "executive orders or any other type of law."  Reply at (citing MOO, 2020 WL 6063799, at *136).

Next, the Defendants urge that the Plaintiffs have confused well-pled facts with legal conclusions in their Amended Complaint.  See Reply at 4.   Further, the Defendants contend that the Amended Complaint fails to establish that the Plaintiffs' injuries are fairly traceable to the Governor and to Secretary Kunkel.  See Reply at 4 (citing Bronson v. Swensen, 500 F.3d 1099, 1109 (10th Cir. 2007)).  The Defendants continue that the Plaintiffs must show a "'substantial likelihood that the defendant's conduct caused plaintiff's injury in fact.'"  Reply at 5 (quoting Bronson v. Swensen, 500 F.3d at 1109).  Next, the Defendants aver that the Governor and Secretary Kunkel have not caused in-person learning to be suspended, and that Plaintiffs "provide no authority that Secretary Kunkel or the Governor are responsible for, or can control, the reentry

process for public schools." Reply at 5. Moreover, the Defendants note that Governor Grisham has not issued any executive orders related to school closures for the 2020-21 school year. See Reply at 5-6. The Defendants reiterate that the arguments just described also apply to the Plaintiffs' IDEA claims. See Reply at 6 (citing Nova Health Sys. v. Gandy, 416 F.3d 1149, 1157 (10th Cir. 2005). The Defendants insist that the "entit[ies] responsible for determining which" special needs students "can receive in-person learning are the local school districts -- not the Governor or Secretary Kunkel." Reply at 6.

Next, the Defendants argue that the relief sought against the Governor and the Secretaries cannot redress the Plaintiffs' injuries. See Reply at 6. To establish redressability, the Defendants maintain, the Plaintiffs "'must also establish it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Reply at 6 (quoting Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir. 1996)). The Defendants continue that, if the Court enters the Plaintiffs' requested injunction against the Governor and Secretary Kunkel, the injunction will not change anything, because the PED issues the Reentry Guidance. See Reply at 7. Regarding Secretary Stewart, the Defendants aver that "the requested injunction will not 'likely' reinstate in-person learning, because the Reentry Guidance gives school districts the discretion to continue remote learning even when permitted to advance to the hybrid model." Reply at 7. Further, the Defendants note that the Amended Complaint does not contain any "assertion that, but for the Reentry Guidance, local school districts in the Counties at issue would provide in-person learning to their students." Reply at 8. The Defendants contend that it is "pure speculation" whether school districts will allow in-person learning and that therefore the Plaintiffs lack standing. Reply at 8. Similarly, the Defendants argue that the Plaintiffs' "conclusory assertions

regarding the Governor and Secretary Kunkel's connection to the Reentry Guidance in the Amended Complaint are inadequate to establish causation pursuant to § 1983." Reply at 9.

The Defendants ask the Court to dismiss Governor Grisham, Secretary Kunkel, and Secretary Stewart for lack of standing. See Reply at 9. In the alternative, the Defendants ask the Court to dismiss Governor Grisham and Secretary Kunkel for "failure to demonstrate the requisite causation required for their claims." Reply at 9.

### 6.    The Memorandum Opinion and Order.

The Court issued a Memorandum Opinion and Order ("MOO") on October 14, 2020. See Hernandez v. Grisham, No. CIV 20-0942 JB\GBW, 2020 WL 6063799 (D.N.M. Oct. 14, 2020)(Browning, J.). The Court made the following conclusions:

> (i) the Plaintiffs have shown that they likely have standing to bring claims against Secretary Stewart, but have failed to demonstrate that they are likely to have standing to sue Governor Grisham and Secretary Kunkel because they have not successfully established the causation and redressability prongs of the standing inquiry with respect to these two defendants; (ii) only Woodworth likely has standing under the IDEA, because Hernandez and Gallegos are not parents of special needs children; (iii) New Mexico likely has sovereign immunity with respect to the Plaintiff's § 1983 claims because the statute does not allow plaintiffs to sue states directly for constitutional violations, but likely lacks sovereign immunity under the IDEA because Congress has abrogated state sovereign immunity under the IDEA; (iv) the Court likely will not certify Plaintiffs' proposed subclasses, because Plaintiffs have not established that they are likely to establish commonality and typicality successfully on the merits pursuant to rule 23(a) of the Federal Rules of Civil Procedure; (v) the Plaintiffs' substantive due process and equal protection claims are unlikely to succeed on the merits because the Reentry Guidance is rationally related to a legitimate state interest, and remote instruction does not per se violate a state's duty to provide adequate free public education; (vi) the Defendants have not violated the Plaintiffs' procedural due process rights because the re-entry guidance is quasi-legislative; (vii) Woodworth need not exhaust the available administrative remedies under the IDEA because the deficiencies in her IEP present a purely legal question; and (viii) a temporary restraining order is appropriate with respect to Woodworth alone because she is likely to succeed in demonstrating that her Individualized Education Plan ("IEP") violates the IDEA.

MOO, 2020 WL 6063799, at *1.  Consequently, the Court granted in part and denied in part the Plaintiffs' Motion for Preliminary Injunction and TRO.  MOO, 2020 WL 6063799, at *1.

### 7.    **The Hearing.**

The Court held a hearing on October 19, 2020.  See Clerk's Minutes at 1, filed October 20, 2020 (Doc. 37).  First, the Court advised the parties that it was concerned about dismissing Governor Grisham, because "the Governor is so involved in the policy-making for her cabinet people."  Tr. at 3:6-12 (Court).  The Court continued that it thought school closure "orders are probably coming out of the PED rather than coming through Secretary Kunkel."  Tr. at 3:15-17 (Court).  Nonetheless, the Court informed the parties that it "may" dismiss the Governor and Secretary Kunkel from the case.  Tr. at 4:21-25 (Court).  The Court also noted that it would be "concerned if Secretary Stewart put in place something that had no in-person component for" children with disabilities. Tr. at 5:14-19 (Court).  Such an action, the Court said, might merit class certification for children with disabilities.  See Tr. at 5:22-6:8 (Court).  The Court also noted that it thought "the Governor is probably going to fall by the wayside, unless we start picking up some class wide relief as to children with disabilities.  But maybe not on the grounds the Defendants are proposing."  Tr. at 7:20-24 (Court).

The Defendants noted that it appears that the case could involve ultimately a single plaintiff, and the Defendants thought "that's something that can probably be fixed with a phone call."  Tr. at 7:9-12 (Garcia).  The Defendants also advised the Court of logistical concerns about quarantine procedures for the upcoming preliminary injunction hearing.  See Tr. at 9:4-12 (Garcia). The Defendants then argued that the Plaintiffs' Amended Complaint fails to link Governor Grisham and Secretary Kunkel to the PED Reentry Guidance.  See Tr. at 10:1-6 (Garcia).

The Court asked the Defendants whether, if Governor Grisham asks Secretary Stewart to open schools, the schools would open. See Tr. at 10:7-11 (Court). The Defendants responded that they "would assume so." Tr. at 10:12 (Garcia). The Court asked whether, similarly, if Governor Grisham asked Secretary Stewart to close all schools, the schools would close. See Tr. at 10:13-17 (Court). The Defendants responded that "it's possible, I mean, those are hypotheticals." Tr. at 10:18-20 (Garcia). The Court noted that Governor Grisham appears to speak authoritatively about schools in press conferences and social media. See Tr. at 10:21-11:5 (Court).

Next, the Defendants informed the Court that Secretary Kunkel retired in September, 2020, and argued that her retirement further undermines the Plaintiffs redressability argument. See Tr. at 11:22-12:12 (Court, Garcia). The Defendants continued that "just because the Governor has a generalized duty to uphold the law doesn't mean you get to hook her in to ever lawsuit against a member of the executive branch." Tr. at 12:14-25 (Garcia)(citing McIntyre v. Kelly, No. 18-2617-DDC-GEB, 2020 U.S. Dist. LEXIS 97225, at *10 (D. Kan. June 3, 2020)(Crabtree, J.)). The Court agreed that respondeat superior does not apply to § 1983 claims, but noted that, if Governor Grisham is in the same room as the Secretary Stewart making policy, and if Governor Grisham appears to exercise a degree of control over the PED's Reentry Guidance, "then you begin to have a different situation." Tr. at 13:4-10 (Court). The Court also noted that it was not "wedded to the complaint" under rule 12(b)(1). Tr. at 13:13-20 (Court). The Defendants replied that they brought the MTD pursuant to both rule 12(b)(1) and rule 12(b)(6). See Tr. at 13:21-25 (Court).

The Defendants continued that, although Governor Grisham has the power to regulate for public health, her public health orders do not currently apply to schools. See Tr. at 14:1-15 (Garcia). The Court noted that, considering "practicalities, it looks like the Governor controls her people. Even if other people are signing the orders, she seems to be knee deep and maybe further

in all these decisions that are being made." Tr. at 14:16-21 (Court).  The Defendants acknowledged that Governor Grisham is "the boss." Tr. at 14:22 (Garcia).

Next, the Defendants advised the Court that special needs students can receive in-person learning in groups of five to one, and that "I wouldn't expect that to change going forward, even if there was a wider shut down of schools than there is currently." Tr. at 17:20-25 (Garcia).  The Court asked the Defendants about schools that are not providing special needs students with in-person learning: "It would seem . . . that we've got a situation where Secretary Stewart may be obligated to require that." Tr. at 18:1-5 (Court).  The Defendants agreed, but argued that the school districts should be joined as Defendants, because "there are some school districts that believe they do not have to comply with PED directives." Tr. at 18:6-19 (Garcia).  The Defendants continued that they would "get a letter out . . . that is in accordance with the Court's instruction on the TRO, so Secretary Stewart sends a letter to the schools saying you're entitled to do in-person learning at 5:1 ratios, please do it." Tr. at 19:8-15 (Garcia).  The Defendants also advised the Court that they are planning to file a subsequent motion to dismiss that will discuss the claims' substance.  See Tr. at 20:8-13 (Garcia).  The Court noted that it does not think the Plaintiffs have standing under the IDEA to sue Governor Grisham.  See Tr. at 21:2-9 (Court).  The Defendants responded that "I think we have enough here to dismiss everybody except Secretary Stewart . . . but even with him remaining we have this one individual parent with this one individual child, and the Secretary, which will of course give that directive, and then there isn't anything left after that." Tr. at 21:12-21 (Garcia).

The Plaintiffs responded that Secretary Kunkel does not provide "us any relief; at this point we wouldn't holler too loudly about her dismissal" and therefore conceded to Secretary Kunkel's dismissal.  Tr.  23:18-20 (Dunn).  The Court indicated that, to show causation regarding Secretary

Kunkel, the Plaintiffs will need to produce evidence of meeting minutes or something similar where Secretary Kunkel is involved directly in preparing the Reentry Guidance, because otherwise linking school directives to Secretary Kunkel would be speculative. See Tr. at 24:9-23 (Court). The Court advised the Plaintiffs that it did not see "constitutional claims here . . . . It looks like your best case is for the disabled children" under the IDEA. Tr. at 25:12-17 (Court). The Plaintiffs agreed. See Tr. at 25:18 (Dunn). The Plaintiffs continued that, at the preliminary injunction hearing, they intend to present evidence that would allow the Court to grant class-wide relief under the IDEA. See Tr. at 25:21-26:3 (Dunn). The Court explained:

> One of the things I struggled with is, while I was troubled by what's happening with the disabled children, I just simply couldn't figure out how to write the relief. And I can't really enter injunctive relief that's enforceable if I can't tell the Defendants what they have to do. Finally, I ended up thinking all I could do was for the individual Plaintiff.

Tr. at 26:4-12 (Court). The Plaintiffs explained that the current Reentry Guidance allows only special needs students to attend school in small groups with other special needs students, and emphasized that "socialization between special needs students and non-special needs students" is crucial. Tr. at 27:20-23 (Dunn). The Plaintiffs insisted that the Court should issue an order that would "allow in-person learning in sufficient numbers to allow students with special needs to also socialize with students with non-special needs and have them in the classrooms as well." Tr. at 27:25-28:4 (Dunn). The Court asked if there is evidence in the record about socialization between special needs and non-special needs students. See Tr. at 28:12-17 (Court). The Plaintiffs could not indicate where this evidence is in the current records, although they thought it might be in "Dr. Anna Walker's" declaration.[7] The Plaintiffs noted that there will be further evidence on this issue

---

[7]The Court has examined the Declaration of Anna Walker, filed September 17, 2020 (Doc 4-14)("Walker Decl."), who is a special education teacher and school administrator. The Walker

at the upcoming hearing.  See Tr. at 28:23-25.  The Court asked the Plaintiffs whether the IEPs

require this form of socialization, and the Plaintiffs advised the Court that some IEPs contain that

requirement, but that Woodworth's does not.  See Tr. at 29:1-18 (Court, Dunn).  Still, the Plaintiffs

argued that the socialization with non-special needs children aspect is "inherent in [Woodworth's]

IEP," and that the "IEP was crafted in a time where that wasn't an issue."[8]  Tr. at 30:9-14 (Dunn).

The Plaintiffs advised the Court that the only issue is "socialization between non-special needs

students and special needs students," and that every disabled child has an "IDEA right to have

socialization that includes nondisabled children."  Tr. at 31:15-32:9 (Dunn, Court).

Next, the Court asked the Plaintiffs to explain "why it is so important that these children

socialize with children without disabilities, because children with disabilities run the gamut.  There

could be one kid that's got one disability, another child with a different disability, but you could

still have a pretty diverse and robust classroom."  Tr. at 38:22-39:3 (Court).  The Plaintiffs argued

---

Decl. does not indicate a need for special needs students to interact with non-special needs
students.  See generally Walker Decl.  The Walker Decl. provides:

> When school campuses are closed and education is moved entirely online,
> many of the guarantees and key ten[et]s afforded to special needs children under
> the Individuals with Disabilities Education Act ("IDEA") collapse. The home is
> recognized as being the most restrictive setting in the continuum of special
> education placements, next to a residential treatment facility. The IDEA clearly
> states that students with disabilities have a right to be in the least restrictive setting.
> I know from first-hand experience that, even under the best of circumstances, it is
> challenging for schools to provide a free and appropriate education in the least
> restrictive environment.  At a minimum, waivers should be allowed for students
> with special needs to so that they can receive in-person instruction.

Walker Decl. ¶ 5, at 2.

[8]The Court notes that Addendum to Woodworth's IEP is dated September 10, 2020, after
the pandemic reached New Mexico in March, 2020.  See Woodworth Individualized Education
Plan at 37, filed under seal September 28, 2020 (Doc. 12).

that Woodworth's daughter, for example, needs to interact with children without disabilities for her "development as a student and then growing into an adult." Tr. at 39:16-40:7 (Dunn).

The Defendants argued that the Plaintiffs had not presented a clear class definition. <u>See</u> Tr. at 47:15-25 (Garcia). Further, the Defendants contended that the Plaintiffs are asking for an order that does not relate directly to Woodworth's daughter. <u>See</u> Tr. at 48:1-12 (Garcia). The Defendants continued that "the idea that every student's IEP is going to include this issue that there has to be socialization with students who are not on an IEP is wildly speculative." Tr. at 48:13-17 (Garcia). The Defendants also noted that they do not understand why the Plaintiffs' children cannot socialize after school. <u>See</u> Tr. at 49:6-14 (Garcia). The Defendants insisted:

> If the claims are going to change, and particularly if the factual predicate for the IDEA claim is going to change, then the Complaint has to be amended. I also think we need a class definition that is consistent and comports with the claims that are now being brought about for the first time today, so that we have a basis again to respond to that and challenge that.

Tr. at 48:18-25 (Garcia). The Defendants also averred that every superintendent in the State needs to be joined, "because they're the only people that can execute the kind of relief that the Plaintiffs are seeking." Tr. at 50:9-13 (Garcia). The Defendants noted that the IDEA does not apply to children without disabilities, the Court agreed, and the Defendants said that the Plaintiffs are trying to "force students who are not part of the IDEA and who do not have a disability to come to school." Tr. at 56:23-57:8 (Garcia, Court, Garcia). The Plaintiffs advised the Court that "because we've conceded today that Secretary Kunkel really doesn't provide us much . . . we'll remove her." Tr. at 59:8-12 (Dunn).

## <u>LAW REGARDING RULE 12(b)(1)</u>

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a

jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986); United States v. Nixon, 418 U.S. 683 (1974); Tafoya v. U.S. Dep't of Justice, Law Enf't Assistance Admin., 748 F.2d 1389, 1390 (10th Cir. 1984)).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").  Because "federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction." U.S. ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999).  Rule 12(b)(1) allows a party to raise, by motion, the defense of the court's "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1).

The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002). On a facial attack, a plaintiff enjoys safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897 (1981).  When the attack is factual, however,

> a district court may not presume the truthfulness of the complaint's factual allegations.  A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(citations omitted).  See World Fuel

Servs., Inc. v. Nambe Pueblo Dev. Corp., 362 F. Supp. 3d 1021, 1086-87 (D.N.M.

2019)(Browning, J.).   Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009

WL 1312856, at *8-9 (D.N.M. March 11, 2009)(Browning, J.), aff'd on other grounds by 634 F.3d

1170 (10th Cir. 2011).  The United States Court of Appeals for the Fifth Circuit has stated:

> "[T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P.
> 56.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -
> - its very power to hear the case -- there is substantial authority that the trial court
> is free to weigh the evidence and satisfy itself as to the existence of its power to
> hear the case.   In short, no presumptive truthfulness attaches to plaintiff's
> allegations, and the existence of disputed material facts will not preclude the trial
> court from evaluating for itself the merits of jurisdictional claims."

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav.

& Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the complaint's allegations

to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or

other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64

F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In

those instances, a court's reference to evidence outside the pleadings does not convert necessarily

the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003

(citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, the court

determines that jurisdictional issues a rule 12(b)(1) motion raises are intertwined with the case's

merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.  See Franklin Sav.

Corp. v. United States, 180 F.3d at 1129; Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir.

1997).  "When deciding whether jurisdiction is intertwined with the merits of a particular dispute,

'the underlying issue is whether resolution of the jurisdictional question requires resolution of an

aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).  "When subject-matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case, the jurisdictional claim and the merits are considered to be intertwined."  Garcia v. United States, No. CIV 08-0295 JB/WDS, 2009 WL 1300938, at *9 (D.N.M. March 30, 2009)(Browning, J.)(citing Wheeler v. Hurdman, 825 F.2d at 259; Holt v. United States, 46 F.3d at 1003).

### LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the Court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered[.]").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those

allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the Plaintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

        A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).  See Duncan v. Citibank (S.D.), N.A., No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements necessary to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate."  Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d at 1125.  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004) states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91

F. App'x at 85.[9]  There are three limited exceptions to this general principle: (i) documents that

the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S.

at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's

claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co.,

287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice,"

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc.

v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing

a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to

or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to

their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files

and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson,

211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d

946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion

with numerous documents, and the district court cited portions of those motions in granting the

---

[9]Carter v. Daniels is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.... However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004); Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005); and Hyberg v. Enslow, 801 F. App'x 647 (10th Cir. 2020), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

motion." 627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that,

even if "the district court did not err initially in reviewing the materials, the court improperly relied

on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for

summary judgment." 627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that,

"[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district

court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City,

153 F. App'x 529, 534 n.4 (10th Cir. 2005).  The Court has previously ruled that, when a plaintiff

references and summarizes the defendants' statements in a complaint, the Court cannot rely on

documents containing those statements that the defendants attach in their briefing.  See Mocek v.

City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14,

2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by

reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the

statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at

*50-51.  The Court also previously has ruled that, when determining whether to toll a statute of

limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may

not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was

aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v.

Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23,

2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not

fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on

the sufficiency of its contents alone, as the complaint did not incorporate the documents by

reference or refer to the documents.  See 2012 WL 3656500, at *22-23; Mocek v. City of

Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

Conversely, in a securities class action and as an exception to the general rule, the Court concluded that the Court may consider a defendant's operating certification, to which the plaintiffs referred in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.   See SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint, because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## ANALYSIS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim.   See Fed. R. Civ. P. 12(b)(1). Motions to dismiss for lack of standing are "properly brought pursuant to rule 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007). Rule 12(b)(1) motions to dismiss may be either a facial attack or a factual attack.   See Holt v. United States, 46 F.3d 1000, 1002-03 (10th Cir. 1995).

In addition to showing that there is an injury-in-fact to establish Article III standing, the Plaintiffs must show that (i) there is a causal relationship between the injury and the challenged conduct; and, (ii) there is a likelihood that the injury can be redressed.  See Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997).  "[A] a plaintiff must demonstrate standing for each claim he seeks to press."  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

The Plaintiffs' argument that the Governor and the Secretaries' actions are so intertwined that all three parties are inseparable for a standing analysis under Article III lacks merit.  See Response to MTDs at 2.  Nevertheless, it is well-established that "a plaintiff must demonstrate standing for each claim he seeks to press,"  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006), and, similarly, that the plaintiff must demonstrate standing against each defendant, see Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 65-66 (2d Cir. 2012)(concluding that a plaintiff failed to demonstrate that her "injury resulting from the conduct of one defendant should have any bearing on her Article III standing to sue other defendants"); Rolaff v. Farmers Ins. Co., Inc., No. CIV-19-0689-J, 2020 WL 4939172, at *4 (W.D. Okla. Mar. 19, 2020)(Jones, J.)(dismissing several defendants, because the "Plaintiffs have not standing to assert any claims against" these defendants); Reniger v. Hyundai Motor Am., 122 F. Supp. 3d 888, 895 (N.D. Cal. 2015)(Conti, J.)("[W]here there are multiple defendants and multiple claims, there must exist at least one named plaintiff with Article III standing as to each defendant and each claim."); Henry v. Circus Circus Casinos, Inc., 223 F.R.D. 541, 544 (D. Nev. 2004)(Pro, C.J.)("[T]o establish Article III standing in a class action, at least one named plaintiff must have standing in his own

right to assert a claim against each named defendant before he may purport to represent a class

claim against that defendant."); 7AA C. Wright & A Miller, Federal Practice & Procedure § 1785.1

(3d ed. Oct. 2020 Update)(Additional Certification Issues: Standing and Mootness).  See also

Blum v. Yaretsky, 457 U.S. 991, 999 (1982)("Nor does a plaintiff who has been subject to injurious

conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of

another kind, although similar, to which he has not been subject.").  Accordingly, the Court will

analyze individually the Plaintiffs' standing to sue Secretary Stewart and Governor Grisham.

The Court concludes that the PED controls the school reentry process, and therefore, the

Plaintiffs have established standing to sue Secretary Stewart and Governor Grisham.  The PED

issued the official Reentry Guidance for the 2020-2021 school year in June 2020.  See Reentry

Guidance at 1.  The PED, based on its reentry criteria, determines whether a school must operate

remotely or is allowed to operate under the hybrid or full entry models.  See Reentry Guidance at

9.  Similarly, the Plaintiffs have established standing to sue Governor Grisham.  The Court will

not address whether the Plaintiffs have standing to sue Secretary Kunkel, because the Plaintiffs

voluntarily dismissed Secretary Kunkel following the hearing.  See Stipulation of Voluntary Rule

41 Dismissal of Kathyleen M. Kunkel at 1, filed October 23, 2020 (Doc. 39); Tr. at 59:8-12 (Dunn).

Likewise, the Court will not discuss the Plaintiffs' standing to sue New Mexico, because the

Plaintiffs voluntarily dismissed New Mexico.  See Stipulation of Voluntary Rule 41 Dismissal of

the State of New Mexico, filed October 12, 2020 (Doc. 26).

I.    **THE PLAINTIFFS HAVE STANDING TO SUE GOVERNOR GRISHAM, BECAUSE THEY HAVE SUFFERED AN INJURY-IN-FACT, THERE IS A CAUSAL CONNECTION BETWEEN THE GOVERNOR AND THE INJURY, AND IT IS LIKELY THAT A FAVORABLE DECISION WOULD REDRESS THE PLAINTIFFS' INJURY.**

The Court concludes that the Plaintiffs have standing to sue Governor Grisham.  See Lujan,

504 U.S. at 561.  The Plaintiffs have alleged "concrete and particularized" injuries -- denial of

education and denial of a FAPE under the IDEA.  Summers v. Earth Island Inst., 555 U.S. 488,

493 (2009).  See Am. Compl. ¶ 32, at 8-9.  Further, Governor Grisham's heavy involvement in the

State's education policy before and during the pandemic, coupled with her constitutional duty to

"take care that the laws be faithfully executed," N.M. Const. Art. V, § 4, demonstrate that the

Plaintiffs' harm is fairly traceable to Governor Grisham, see Petrella v. Brownback, 697 F.3d 1285,

1294 (10th Cir. 2012); Tr. at 10:7-11 (Court, Garcia); id. at 14:22 (Garcia); Governor Michelle

Lujan          Grisham,          Facebook          (Aug.          28,          2020),

https://www.facebook.com/pg/GovMLG/posts/?ref=page_internal; Gov. Grisham June 25 Press

Conf.; Aug. 27 Press Release.    Moreover, a favorable decision as to Governor Grisham likely

would redress the Plaintiffs' injuries, because Governor Grisham has control over Secretary

Stewart and, therefore, may direct whether and to what extent schools provide in-person education.

See Lujan, 504 U.S. at 561; Petrella v. Brownback, 697 F.3d at 1295; Tr. at 10:7-11 (Court,

Garcia); id. at 14:22 (Garcia).  The Plaintiffs, therefore, have satisfied standing's three prongs --

injury, causation, and redressability.  Mahon v. Ticor Title Ins. Co., 683 F.3d at 65-66 (2d Cir.

2012).

A.    **THE PLAINTIFFS HAVE SUFFERED AN INJURY-IN-FACT, BECAUSE THEY HAVE ALLEGED A CONCRETE AND PARTICULARIZED INJURY THAT IS ACTUAL AND IMMINENT.**

To establish Article III standing, plaintiffs first must allege a "concrete and particularized"

injury, and the threat of injury "must be actual and imminent."  Summers v. Earth Island Inst., 555

U.S. at 493.  The Plaintiffs allege here that they "are or will be subject to the loss of the

constitutionally guaranteed equal education without due process," and that "children with special

needs . . . are or will be subject to the denial of a FAPE . . . without any administrative remedy that

would not be futile."  Am. Compl. ¶ 32, at 8-9.  The Plaintiffs further allege:

> Keeping schools closed contributes to a substantial known risk to children's health and safety. Psychological, social, and emotional development requires children to both spend time away from parents and with their peers, in structured settings, such as school. Robbing them of this critical experience places them at high risk of stunted growth and developmental arrest. In addition, extended periods of confinement provoke numerous mental and emotional illnesses such as depression, anxiety, phobias, self-harming behaviors and suicide. In vulnerable populations, physical and sexual abuse at home will worsen . . . . For patients with cognitive developmental delays like autism, most have regressed in years, and many have become violent toward themselves and their parents.

Am. Compl. ¶ 19, at 6 (citing McDonald Decl.). Moreover, the Defendants do not contend that the Plaintiffs have failed to show an injury in fact. See generally Governor and Secretaries' MTD; Reply. Consequently, the Court concludes that the Plaintiffs' allegations, taken as true, are "concrete and particularized" and "actual or imminent." Summers v. Earth Island Inst., 555 U.S. at 493; Lujan, 504 U.S. at 560; Petrella v. Brownback, 697 F.3d at 1293 (concluding that the plaintiffs had demonstrated an injury-in-fact where the plaintiffs alleged that legislation "caused increases in class size, the closure of three schools in the district, and the planned closure of a fourth"). Accordingly, the Plaintiffs have stated successfully an injury-in-fact for Article III standing purposes, which is sufficient to survive a motion to dismiss. See Lujan, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice.").[10]

---

[10]In the MOO, the Court concluded that the Plaintiffs would likely fail to establish standing as to Governor Grisham. See MOO, 2020 WL 6063799, at *57. The Court explained that, "without factual allegations linking Governor Lujan Grisham to current school closures, the Plaintiffs fail to establish standing's core causation requirement." MOO, 2020 WL 6063799, at *57. The Court also stated that "the Plaintiffs fail to demonstrate that Governor Lujan Grisham has control over the reentry process, where the PED, not the Governor, is authorized to issue the Reentry Guidance[]" and therefore "the Plaintiffs likely cannot show that they can establish redressability regarding Governor Lujan Grisham." MOO, 2020 WL 6063799, at *57.

The Court wrote this passage in the context of a TRO, which the Court had a very short time to write. Specifically, the Court had less than two days to review the Plaintiffs' Compilation,

**B.     THE PLAINTIFFS' INJURY IS FAIRLY TRACEABLE TO GOVERNOR GRISHAM, BECAUSE GOVERNOR GRISHAM HAS SUPREME EXECUTIVE POWER AND A DUTY TO TAKE CARE THAT NEW MEXICO'S LAWS ARE FAITHFULLY EXECUTED.**

"The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." Ecological Rights Found. v. Pacific Lumber, 230 F.3d 1141, 1151 (9th Cir. 2000)(citing Lujan, 504 U.S. at 560).  See Bronson v. Swensen, 500 F.3d 1099, 1109 (10th Cir. 2007)("The principle of causation for constitutional standing requires a plaintiff's injury to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.")(internal quotation marks and citations omitted).  "To satisfy the traceability requirement, the defendant's conduct must have caused the injury." Aptive Envtl., LLC v. Town of Castle Rock, 959 F.3d 961, 977 (10th Cir. 2020)(internal quotation marks and citations omitted). "Although a defendant's alleged misconduct need not be the proximate cause of a plaintiff's harm, Article III does at least require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." Bronson v. Swensen, 500 F.3d at 1109 (internal quotations marks and citation omitted).

Here, Secretary Stewart released the Reentry Guidance via the PED.  See New Mexico Public Education Department Reentry Guidance at 1, New Mexico Public Education Department, https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/   (last   visited   Oct.   10, 2020)("Reentry Guidance"); New Mexico PED Reentry Guidance at 56, filed September 28, 2020

---

which contains hours of video footage that the Plaintiffs allege link Governor Grisham to the school closures.  See Plaintiffs' Compilation at 1-2.  The Court has had time to review the relevant evidence more closely, and now comes to a different conclusion based on Governor Grisham's heavy involvement in the school reentry process, as well as applying the Tenth Circuit's conclusion that a governor's duty to enforce a state's laws is sufficient to satisfy the causation portion of the standing inquiry, see infra n.11.

(Doc. 14-3).   The Defendants, therefore, argue that, because the PED has issued the Reentry

Guidance pursuant to its statutory authority, Governor Grisham has not caused the Plaintiffs'

alleged injuries.   See Governor and Secretaries' MTD at 12.   Moreover, the Defendants argue that,

because the Reentry Guidance allows certain school districts to decide whether students receive

in-person learning,[11] "it is the independent action of the school districts, who are not parties to this

case, that are causing Plaintiffs' alleged injuries."   Governor and Secretaries' MTD at 14.   See

Stewart Aff. ¶ 37, at 10.   Yet, it cannot "be disputed that the Governor" has "responsibility for the

enforcement of the laws of the state."[12]   Petrella v. Brownback, 697 F.3d at 1294.   See N.M. Const.

---

[11]"All school boards and charter school governing councils have local autonomy to determine the school schedule, including the dates on which students return for in-person learning once public health conditions indicate it is safe enough do so."   Affidavit of Ryan Stewart ¶ 37, at 10, filed September 28, 2020 (Doc. 14-2)("Stewart Aff.").   Further, "[a]ny school board that so chooses can bring back all of its students with disabilities and many of its pre K-3 students."   Stewart Aff. ¶ 41, at 12.

[12]Courts of Appeals have split whether, absent a specific duty, plaintiffs may sue a governor because of his or her general duty to "take care that the laws be faithfully executed."   N.M. Const. Art. V, § 4.   See Ex parte Young, 209 U.S. 123, 157-60 (1908).   The United States Courts of Appeals for the Third and Fourth Circuits have held that "general authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law."   First West Corp. v. Sch. Dist. of Philadelphia, 6 F.3d 109, 113 (3d Cir. 1993).   See Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir. 1979)("The mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute.");   Waste Mgmt. Holdings, Inc. v. Gilmore III, 252 F.3d 316, 330 (4th Cir. 2001)(dismissing a governor as a defendant, because although the governor "is under a general duty to enforce the laws of Virginia . . . he lacks a specific duty to enforce the challenged statutes").   See also Women's Emergency Network v. Bush, 323 F.3d 937 (11th Cir. 2003)(explaining that a suit against a state officer is permissible only when the officer is responsible for a challenged action and has some connection to the unconstitutional act, and thus holding that where a governor's "only connection" to a challenged statute was "that he, along with six members of the cabinet" was responsible for enforcing it, the governor's "shared authority . . . is simply too attenuated to establish that he is responsible for" the challenged conduct).   By contrast, the Tenth Circuit and the United States Court of Appeals for the Sixth Circuit have concluded that a governor's responsibility to enforce a state's laws is sufficient to demonstrate causation for Article III standing purposes.   See Petrella v. Brownback, 697 F.3d 1285 (10th Cir. 2012);   Allied Artists Picture Corp. v. Rhodes, 679 F.2d 656, 665 n.5 (6th Cir.

Art. V, § 4 ("The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed."); MOO, 2020 WL 6063799, at *1 (concluding that the "Reentry Guidance is quasi-legislative"); Defendants' Joint Response to Plaintiffs' Verified Emergency Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunctive Relief at 40, filed September 28, 2020 (Doc. 14)("Joint Response")(arguing that the "Defendants' orders and the Reentry Guidelines are . . . legislative in nature, as they apply to every public school across the state").   Although the Governor and Secretaries contend that the Plaintiffs "cannot identify any specific action on" the Governor's part, see Governor and Secretaries' MTD at 12-14 -- like an executive order closing schools -- which has caused them harm, they need not identify a specific action because "[i]t cannot seriously be disputed that the proper vehicle for challenging the constitutionality" of a state policy "where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute." Petrella v. Brownback, 697 F.3d at 1293-94.

---

1982)(allowing a governor to "be sued for . . . declaratory and injunctive relief" where a statute involving "substantial public interest . . . places a significant obligation upon the Governor to use his general authority to see that state laws are enforced"); Doe v. Ohio, No. 2:91-CV-464, 2012 WL 12985973, at *8 (S.D. Ohio Feb. 16, 2012)(Watson, J.)(concluding that a "'substantial public interest'" is at stake in a case brought under the IDEA and § 1983, and therefore, the governor was a proper party (quoting Allied Artists Picture Corp. v. Rhodes, 679 F.2d at n.5)); Animal Legal Def. Fund v. Kelly, 434 F. Supp. 3d 974, 1002 (D. Kan. 2020)(Vratil, J.)(concluding that the plaintiffs had standing to challenge the constitutionality of a statute and affirming that "in suits for prospective relief under Kansas law, the Governor is a proper party."); Sportsmen's Wildlife Def. Fund v. United States Dep't of Interior, 949 F. Supp. 1510, 1515 (D. Colo 1996)(Babcock, J.)(concluding that, because the state constitution provided the governor with authority to faithfully execute the laws, the court had subject matter jurisdiction over a suit against the governor in his official capacity to enjoin construction of a state prison).  Even if the Court applied the Third and Fourth Circuits' approach, however, Governor Grisham's heavy involvement in the State's education policy before and during COVID-19 is sufficient to satisfy the standing inquiry.  See Tr. at 10:7-11 (Court, Garcia); id. at 14:22 (Garcia); Governor Michelle Lujan Grisham, Facebook (Aug. 28, 2020), https://www.facebook.com/pg/GovMLG/posts/?ref=page_internal;  Gov. Grisham June 25 Press Conf.; Aug. 27 Press Release.

Governor Grisham, "by virtue of [her] office, has some connection" with the Reentry Guidance.[13] Ex parte Young, 209 U.S. 123, 157 (1908).  See Peterson v. Martinez, 707 F.3d 1197, 1207 (10th Cir. 2013)("A defendant need not be identified in the challenged statute itself to fit within the Ex parte Young exception.").  Moreover, the Governor and Secretaries acknowledge that the PED "has continuously collaborated with the Office of the Governor . . . to evaluate science-based criteria for deciding, whether, when, and to what extent to reopen schools."  Stewart Aff. ¶ 2, at 1.  Governor Grisham herself has also indicated that she is heavily involved in the State's COVID-19 related education policy, noting that "we want to make sure that people are safe" before opening schools, Gov. Grisham June 25 Press Conf. at 49:36-49:45, and that "if we have an outbreak at a school . . . it's possible we would close a school until it's cleaned, everyone's tested and we're clear; it's possible that we isolate the virus, we do surveillance testing . . . but we allow the school to be open," id. at 1:01:00-1:02:00.  Governor Grisham has repeatedly noted that "we" or "us" are creating school reentry policy.  See Plaintiffs' Compilation at 1-2.  Thus, in addition to Governor Grisham's general duty to enforce State law and policy, the Court concludes she has been heavily involved in creating the Reentry Guidance and the State's COVID-19

---

[13]The Defendants cite McIntyre v. Kelly, No. 18-2617-DDC-GEB, 2020 U.S. Dist. LEXIS 97225, at *6-7 (D. Kan. June 3, 2020)(Crabtree, J.), for the proposition that "just because the Governor has a generalized duty to uphold the law doesn't mean you get to hook her in to ever lawsuit against a member of the executive branch." Tr. at 12:14-25 (Garcia).  See Governor and Secretaries' MTD at 12.  The Defendants are correct that McIntyre v. Kelly concludes that a governor's general duty to enforce the laws is not enough to satisfy the Ex Parte Young exception. See McIntyre v. Kelly, 2020 U.S. Dist. LEXIS 97225, at *6-7.  Nonetheless, the Court concludes that the Honorable Daniel D. Crabtree, United States District Judge of the Untied States District Court for the District of Kansas, in McIntyre v. Kelly, did not consider properly that the Tenth Circuit applies a different approach to suits against governors.  See Petrella v. Brownback, 697 F.3d at 1293-94.  In the Tenth Circuit, a governor has "some connection" to challenged state laws, because of his or her "office." Ex parte Young, 209 U.S. 123, 157 (1908).  Moreover, as the Court explained above, Governor Grisham is heavily involved in the challenged policies.

education policy.  Accordingly, the Plaintiffs have demonstrated successfully causation for Article III standing purposes.

### C.   A FAVORABLE DECISION WOULD REDRESS THE PLAINTIFFS' INJURY AS TO GOVERNOR GRISHAM, BECAUSE THE GOVERNOR CAN DIRECT THE PED TO AMEND THE REENTRY GUIDANCE.

The Plaintiffs establish redressability -- standing's third prong -- regarding Governor Grisham.  To establish redressability, "a plaintiff must . . . establish it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Lujan, 504 U.S. at 561; Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452.  A plaintiff seeking injunctive relief satisfies the redressability requirement "by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard."  NRDC v. Sw. Marine, 236 F.3d at 995. The Plaintiffs allege that Governor Grisham has injured public school students in New Mexico, because the Reentry Guidance prohibits certain school districts from providing in-person learning, in violation of § 1983.  See Am. Compl. ¶ 21, at 6-7.

A favorable decision on the merits would redress the Plaintiffs' injuries.  "Without prejudging the merits," the Plaintiffs "could get meaningful relief under a variety of scenarios." Petrella v. Brownback, 697 F.3d at 1294.  The Plaintiffs would prefer an order requiring all schools to provide in-person instruction.[14]  See Am. Compl. ¶¶ e, f, at 15.  The Court, however, need not grant this exact relief -- "[e]quitable relief can take many forms."  Petrella v. Brownback, 697 F.3d at 1295.  Moreover, the Amended Complaint seeks not only an order enjoining the Defendants "from prohibiting in-person instruction," but also "all such other and further relief as the Court deems just and proper."  Am. Compl. ¶ e-h, at 15.  As the Defendants admit, if Governor Grisham

---

[14]At the hearing, the Plaintiffs asked the Court to order the Defendants to "allow in-person learning in sufficient numbers to allow students with special needs to also socialize with students without special needs and have them in the classrooms as well."  Tr. at 27:24-28:4 (Dunn).

instructs Secretary Stewart to amend the Reentry Guidance to require schools to provide in-person instruction, he will do as she instructs.  See Tr. at 10:7-11 (Court, Garcia); id. at 14:22 (Garcia, Court)(acknowledging that Governor Grisham is "the boss" and is "knee deep" in school closure decisions).  See also Response to MTDs at 1 (admitting that Governor Grisham closed schools for the 2019-2020 school year with her "Executive Order of March 26, 2020").  Viewing Governor Grisham's powers and "control over her" cabinet members, Tr. at 10:7-11, in a pragmatic light, the Court concludes she has the ability to re-open schools for in-person instruction.

Further, Governor Grisham and Secretary Stewart have the ability to control the school districts, including via the Reentry Guidance.  See, e.g., Michelle Lujan Grisham (@GovMLG), Twitter (Aug. 28, 2020, 8:55 AM), https://twitter.com/GovMLG/status/1299359982417137665 ("[PED] has established strict requirements for school districts that want to engage in a hybrid model of in-person and remote learning . . . .");  NMSA 1978 § 22-21(A).  The Governor and Secretaries' argument that "the entities responsible for determining which students can receive in-person learning are the local school districts -- not the Governor," therefore, falls flat.  Reply at 6. The Defendants are correct that the "Reentry Guidance gives school districts the discretion to continue remote learning even when permitted to advance to the hybrid model."  Reply at 6.  The Governor, via the PED and Secretary Stewart, however, has the ability to amend the Reentry Guidance to limit school districts' discretion.  See Governor and Secretaries' MTD at 4.[15]  For

---

[15]The Governor and Secretaries' MTD provides:

> PED is a constitutionally created entity generally authorized to "have control, management and direction of all public schools."  NMSA 1978, § 22-2-1(A)(2004); see N.M. Const. Art. XII, Sec. 6(A)(creating PED, which "shall have such powers and duties as provided by law"); N.M. Const. Art. XII, Sec. 6(D)("The secretary of public education shall have administrative and regulatory powers and duties, including all functions relating to the distribution of school funds and

example, the Reentry Guidance could require, rather than allow, schools districts to provide in-person instruction if the school district meets the gating criteria.  Consequently, it is not "pure speculation" whether school districts will allow in-person learning if Governor Grisham and Secretary Stewart require them to do so -- Secretary Stewart has "control, management and direction of all public schools . . . ."  NMSA 1978 § 22-21(A); Reply at 8.  The Court concludes, therefore, that a favorable decision as to Governor Grisham would likely redress the Plaintiffs' injuries.  See Lujan, 504 U.S. at 561.

## II.    THE PLAINTIFFS DEMONSTRATE STANDING TO SUE SECRETARY STEWART, BECAUSE THE PED HAS ISSUED THE REENTRY GUIDANCE AND CONTROLS THE REENTRY PROCESS.

For similar reasons to those pertaining to Governor Grisham, described above, the Plaintiffs have established redressability -- and therefore standing -- as to Secretary Stewart.[16]  The Governor and  Secretaries argue that the Plaintiffs lack standing to bring claims against Secretary Stewart, because the Plaintiffs cannot show that a preliminary or permanent injunction enjoining Secretary Stewart would guarantee that in-person schooling would resume, "because local school

---

financial accounting for the public schools to be performed as provided by law."); NMSA 1978, § 22-2-1(A)(2004)("The secretary is the governing authority and shall have control, management and direction of all public schools, except as otherwise provided by law."); NMSA 1978, § 22-2-2 (2004)(providing that the PED shall "determine policy for the operation of all public schools . . . [and] supervise all schools and school officials coming under its jurisdiction"); NMSA 1978, § 22-2-8 (2003)(providing that the "[PED] shall prescribe standards for all public schools in the state" including standards for "organization and administration of education," "the physical condition of public school buildings and grounds," and "educational facilities of public schools").

Governor and Secretaries' MTD at 4-5.  The Defendants' own characterization of the PED's power indicates that it has statutory authority to control local school districts.  See Governor and Secretaries' MTD at 4-5.

[16]The Parties do not dispute causation or injury as to Secretary Stewart, and the Court has evaluated these elements in § 1, supra.  This section, therefore, will focus on redressability.

districts have the discretion regarding how to operate."  Governor and Secretaries' MTD at 16.
The Governor and the Secretaries admit, however, that the Reentry Guidance, which the PED has
issued, controls the reentry process and that Secretary Stewart has the power to alter it, see
Governor and Secretaries' MTD at 13; N.M.S.A. 1978 §§ 22-2-1, 22-2-2, 22-2-8; therefore, the
Plaintiffs have standing to bring claims against Secretary Stewart.

        The Governor and the Secretaries acknowledge that "New Mexico law explicitly authorizes
the PED to issue the Reentry Guidance.  The PED is vested with the powers and duties related to
the control, management, and direction of all public schools in this state.  The PED determines the
policies for the operation of all public schools."  Governor and Secretaries' MTD at 13 (citations
omitted).  The Governor's and the Secretaries' acknowledgment that the PED and Secretary
Stewart "control, manage[], and direct[] . . . all public schools" and the reentry process, Governor
and Secretaries' MTD at 15, means that the Plaintiffs' alleged "injury will be redressed by a
favorable decision," Comm. to Save the Rio Hondo v. Lucero, 102 F.3d at 452.  The Governor and
the Secretaries also argue that "school districts may decide to delay in-person learning and continue
to use remote instruction" pursuant to their discretion under the Reentry Guidance.  See Governor
and Secretaries' MTD at 16.  Secretary Stewart and the PED, however, have issued and amended
the Reentry Guidance.  See Governor and Secretaries' MTD at 16.  The Reentry Guidance
currently gives schools the discretion to hold in-person instruction if they meet the reentry criteria.
See Reentry Guidance Addendum A at 1; Governor and Secretaries' MTD at 16.  Schools that do
not meet the criteria must operate remotely, although the Reentry Guidance allows remote schools
to host small group in-person instruction for (i) pre-kindergarten through third grade; (ii) special
needs children of all ages; and (iii) students needing additional support of all ages. See Reentry
Guidance Addendum A at 1. The Governor and Secretaries cite Bronson v. Swensen, 500 F.3d

1099, 1111 (10th Cir. 2007)("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute."), but that case is distinguishable, because, here, by their own admission, Secretary Stewart and the PED have the power to direct schools to provide instruction in-person or remotely.  See N.M.S.A. 1978 §§ 22-2-1, 22-2-2, 22-2-8.   The Plaintiffs have shown, therefore, that a preliminary or permanent injunction enjoining Secretary Stewart would likely redress[17] their alleged injuries. [18]

### III.   THE PLAINTIFFS HAVE STATEDSTATED A § 1983 CLAIM AGAINST GOVERNOR GRISHAM UPON WHICH RELIEF CAN BE GRANTED, BECAUSE THE AMENDED COMPLAINT CONTAINS SUFFICIENT FACTUAL ALLEGATIONS TO PLEAD A § 1983 VIOLATION.

[17]Secretary Stewart's power over the school districts is further evidenced by his October 23, 2020 letter to T.J. Parks, Superintendent of Hobbs Municipal schools, which provides in relevant part:



October 23 Letter to T.J. Parks at 2, filed October 23, 2020 (Doc. 38-1)(citing ████████████ ██████████████████████████████████████████████████████████████ ████

[18]The Governor and the Secretaries contend that the "Plaintiffs must include all superintendents as defendants in this case to obtain the requested relief."   Governor and Secretaries' MTD at 16.  The Court disagrees with this contention, because Governor Grisham and Secretary Stewart have substantial control over the school districts, see N.M.S.A. 1978 §§ 22-2-1, 22-2-2, 22-2-8, and notes that plaintiffs asserting claims under the IDEA against a state department of education may bring claims solely against the department.  See e.g., Winkelman v. Ohio Dept. of Educ., 616 F. Supp. 2d 714, 717-18 (N.D. Ohio 2008)(Oliver, J.)(finding that joinder of the school district was not required in bringing claims under the IDEA against a state department of education).

Rule 12(b)(6) requires the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  The Plaintiffs allege violations of the Equal Protection clause, the Due Process clause, and the IDEA as the basis for their § 1983 claims.  See Am. Compl. at 1-2.  When arguing that the Plaintiffs have failed to state a claim for which relief can be granted, the Defendants repeat largely their standing arguments -- namely, that the Amended Complaint is "totally devoid of any specific allegations showing that the Governor . . . had anything to do with issuing the Reentry Guidance."  Governor and Secretaries' MTD at 18.  When evaluating the rule 12(b)(6) portion of the Governor and Secretaries' MTD, the Court considers: (i) the Amended Complaint's allegations; (ii) documents to which the Amended Complaint refers; and (iii) matters of which the Court may take judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; Jacobsen v. Deseret Book Co., 287 F.3d at 941.

"[W]hile the court must accept all factual allegations in the complaint as true, it is 'not bound to accept as true legal conclusions couched as a factual allegation.'"  FDIC v. Dee, 222 F. Supp. 972, 1014 (D.N.M. 2016)(Browning, J.)(quoting Iqbal, 556 U.S. at 678).  An allegation is conclusory when it does not identify adequately the events that entitle the plaintiff to relief.  The Governor and Secretaries insist that the "Plaintiffs' allegation that the Governor . . . issued the Reentry Guidance is clearly a legal conclusion."  Governor and Secretaries' MTD at 19 (citing McIntyre v. Kelly, 2020 U.S. Dist. LEXIS 97225, at *10).  The Court disagrees with the Defendants' contention.  See J.H. ex rel. J.P. v. Bernalillo Cty., No. CIV 12-0128 JB/LAM, 2014 WL 3421037, at *4 (D.N.M. July 8, 2014)(Browning, J.), aff'd, 806 F.3d 1255 (10th Cir. 2015)(concluding that a statement that a plaintiff is eligible for Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., services is a legal conclusion). The Amended Complaint provides:

On August 27, 2020, the Governor of New Mexico pursuant to the her authorities under the Public Health Emergency Response Act, her Secretary of Health's authorities under the Public Health Act and the authorities vested in her Secretary of Education issued a school reentry plan that delayed the return of in-person schooling for the children of 8 of the 33 Counties in New Mexico, primarily in the southeast portion of the state . . . .

Am. Compl. ¶ 10, at 3.  See id. ¶ 21, at 6-7; id. ¶¶ 50-51, at 11 (detailing similar claims against

Governor Grisham with slightly different phrasing).  This statement mixes factual allegations and

legal conclusions.  The statement's factual conclusion is that "on August 27, 2020, the Governor

of New Mexico . . . issued a school reentry plan that delayed the return of in-person schooling for

the children of 8 of the 33 Counties in New Mexico, primarily in the southeast portion of the

state."[19]  Am. Compl. ¶ 10, at 3.  The statement's legal conclusion is that "Governor of New

---

[19]The Court takes judicial notice of the New Mexico Department of Health's press release, which contains the following statement from Governor Grisham:

I do not feel comfortable beginning any form of in-person learning in the month of August.  I know many parents and educators and students feel the same way.  The current spread of COVID-19 in our state is a cause of great and well-founded anxiety.  Until we can regain control of this virus, until our fight in this public health crisis begins to once again bear real fruit, we will not unduly risk even one New Mexican's health or life or livelihood; we will not move unsafely or too quickly in our efforts to resume some form of new normal in a COVID-positive world.  With another month of strong collective efforts to fight COVID-19, using that time to continue to prepare and to help educators get the professional development they need to thrive in an online and remote environment, I am optimistic the state will be able to begin to adopt a hybrid model for phased groupings of students after Labor Day.

New Mexico Department of Health, State Updates School Reopening Guidance, Hits Pause on "Hybrid Model" for Start of School Year, 2019 Novel Coronavirus (July 23, 2020), https://www.nmhealth.org/news/awareness/2020/7/?view=1066.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 (noting that, at the 12(b)(6) stage, a district court may consider facts of which it may take judicial notice.); Hawaii v. Trump, 839 F.3d 741, 773 n.14 (9th Cir.)(taking judicial notice of President Trump's tweets), vacated on other grounds, 138 S. Ct. 377 (2017); Christa McAuliffe Intermediate Sch. v. de Blasio, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019)(taking judicial notice of Mayor Bill de Blasio's tweets in a § 1983 action); Lane v. Page, 649 F. Supp. 2d 1256, 1301 (D.N.M. 2009)(Browning, J.)(concluding that a "press release . . . f[e]ll within the scope of judicial notice").

- 69 -

Mexico pursuant to her authorities under the Public Health Emergency Response Act, her Secretary of Health's authorities under the Public Health Act and the authorities vested in her Secretary of Education . . . ." Am. Compl. ¶ 10, at 3.  Courts have found allegations of unofficial policies in complaints are insufficiently conclusory, under 12(b)(6) standards, particularly "where the complaint does not adequately say what the policy is or offer more than speculation regarding the policy's existence."  Howard M. Erichson, What is the Difference Between a Conclusion and a Fact, 41 Cardozo L. Rev. 899, 911 (2020).  See, e.g., DeLeon v. City of Vista, No. 18CV714 JM(BGS), 2019 WL 969544, at *4-6 (S.D. Cal. Feb. 28, 2019)(Miller, J.)(concluding that a complaint failed to sufficiently allege a municipal custom of law enforcement officers' use of excessive force); Whitener v. Parker, No. 117-CV-01241, 2019 WL 1030544, at *3 (W.D. Tenn. Mar. 4, 2019)(Breen, J.)(dismissing a suit against the Commissioner of Rehabilitative Services at the Department of Correction, because the defendant provided "only conclusions that the Department of Corrections' policies were in play to prevent this medical care").  By contrast, here, the Plaintiffs have specified clearly the policy that causes them harm -- the Reentry Guidance.  See Am. Compl. ¶ 10, at 3.  Furthermore, here, Secretary Stewart is a member of Governor Grisham's cabinet.  See New Mexico PED, NM PED Leadership, https://webnew.ped.state.nm.us/bureaus/nmpedleadership/ (last visited Oct. 23, 2020)("Dr. Ryan Stewart was appointed Secretary of Education for the State of New Mexico by New Mexico Governor Michelle Lujan Grisham.").  It is plausible, therefore, that Governor Grisham and Secretary Stewart work together on creating, implementing, and enforcing the Reentry Guidance.

The Defendants also contend that the "Plaintiffs' legal conclusion that the Governor . . . issued the Reentry Guidance is false."  Governor and Secretaries' MTD at 20.  Yet when the Court evaluates a rule 12(b)(6) motion, the Court views "all facts and draw[s] all

reasonable inferences in favor of the nonmoving party." Brousseau v. Haugen, 543 U.S. 194, 195, n.2 (2004)(per curiam). The Court disregards the Plaintiffs' bare allegations of improper motive as to Governor Grisham -- that the school closures "were done in retaliation for punitive purposes based upon a perception that these communities were defying the authority of the Governor." Am. Compl. ¶ 21, at 6-7. See Trump v. Vance, 977 F.3d 198 (2d Cir. 2020)(concluding that, at the motion to dismiss stage in a § 1983 suit "[a] bare allegation of improper motive will not suffice if there is 'an obvious alternative explanation for the conduct alleged'"); Murray v. Unknown Evert, 84 F. App'x 553, 556 (6th Cir. 2003)(explaining that in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial")(internal quotations omitted); Hyberg v. Enslow, No. 18-CV-00014-RM-NRN, 2019 WL 979026, at *10 (D. Colo. Feb. 28, 2019)(Neureiter, M.J.), aff'd, 801 F. App'x 647 (10th Cir. 2020)(concluding a plaintiff's allegation that a defendant was angry at him was "conclusory and devoid of 'sufficient factual matter to state a claim to relief that is plausible on its face'")(quoting Iqbal, 556 U.S. at 678). The Court may infer reasonably, however, that the Governor -- whom the State Constitution vests with "supreme executive power" -- is responsible for issuing the Reentry Guidance. N.M. Const. Art. V, § 4. See Brousseau v. Haugen, 543 U.S. at 195 n.2. Moreover, the Court may also infer that Governor Grisham has the power to direct her cabinet members to enact policy. The Court will not evaluate this allegation's veracity at the motion to dismiss stage. Consequently, the Court concludes that the Plaintiffs have stated a § 1983 claim against Governor Grisham upon which relief can be granted.

        **IT IS ORDERED** that (i) the Defendants' Motion to Dismiss Governor Grisham, Secretary Kunkel, and Secretary Stewart, filed October 5, 2020 (Doc. 22) is denied in part as to

Governor Grisham and Secretary Stewart, and is moot in part as to Secretary Kunkel; and (ii) the

State of New Mexico's Motion to Dismiss, filed October 5, 2020 (Doc. 23) is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

A. Blair Dunn
Jared R. Vander Dussen
Western Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Matthew L. Garcia
  Chief General Counsel to Governor Michelle Lujan Grisham
Kyle P. Duffy
Maria S. Dudley
  Associate General Counsel to Governor Michelle Lujan Grisham
Office of the Governor
Santa Fe, New Mexico

    *Attorneys for Defendants Governor Michelle Lujan Grisham, Secretary Ryan Stewart, and
    Secretary Kathyleen M. Kunkel*

Hector Balderas
  Attorney General for the State of New Mexico
Erin Elizabeth Lecocq
Nicholas M. Sydow
  Civil Appellate Chief
New Mexico Office of the Attorney General
Santa Fe, New Mexico

    *Attorneys for Defendant State of New Mexico*