# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CLARISSA HERNANDEZ;
ROBERT HERNANDEZ;
SHANNON WOODWORTH and
DAVID GALLEGOS,

       Plaintiffs,

vs.                                       No. CIV 20-0942 JB\GBW

MICHELLE LUJAN
GRISHAM; RYAN
STEWART; KATHYLEEN
M. KUNKEL and the
STATE OF NEW MEXICO,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Preliminary Injunction, filed September 21, 2020 (Doc. 6)("PI Motion"); (ii) the Plaintiffs' Motion to Amend, filed October 26, 2020 (Doc. 41)("MTA"); and (iii) the Defendants' Motion to Dismiss, filed October 26, 2020 (Doc. 43)("Second MTD"). The Court held a hearing on the Second MTD on November 16, 2020. <u>See</u> Clerk's Minutes at 1, filed November 16, 2020 (Doc. 68). The Court held a hearing on the MTA on November 19, 2020. <u>See</u> Clerk's Minutes at 1, filed November 19, 2020 (Doc. 71). The Court held an evidentiary hearing on the PI Motion on November 19, November 20, and November 23, 2020. <u>See</u> Clerk's Minutes at 1, filed November 23, 2020 (Doc. 74). The Court converts the Second MTD to a Motion for Summary Judgment pursuant to rule 12(d) of the Federal Rules of Civil Procedure. <u>See</u> Minute Order, filed December 2, 2020 (Doc.

---

[1]This version of the Court's Memorandum Opinion and Order is not filed under seal because all references to documents filed under seal, which contain sensitive information, have been omitted.

78).  The primary issues are: (i) whether the Court should grant the Plaintiffs -- Clarissa Hernandez, Robert Hernandez, Shannon Woodworth, and David Gallegos -- leave to amend their Amended Complaint, filed September 17, 2020 (Doc. 4)("Am. Compl.") to include an additional plaintiff: Ronnie Williams, the father of a child with disabilities living in Artesia, New Mexico; (ii) whether the Defendants -- Governor Michelle Lujan Grisham and Secretary Ryan Stewart -- have violated the Plaintiffs' procedural due process rights under the Fourteenth Amendment of the Constitution of the United States of America by issuing the Reentry Guidance, which closes schools in select New Mexico Counties with higher incidence of COVID-19, without providing the Plaintiffs with individual hearings; (iii) whether the Defendants, by issuing the Reentry Guidance, violate the Plaintiffs' substantive due process rights, because they infringe upon the Plaintiffs' fundamental general right to an in-person education under the Constitution; (iv) whether the Defendants violate the Plaintiffs' equal protection rights under the Constitution, because the citizens of Counties, which the Reentry Guidance targets, are members of a suspect class; (v) whether the Defendants violate the Plaintiffs' equal protection rights under the Constitution, because the Reentry Guidance targets students with disabilities; (vi) whether the Defendants' decision to close certain schools rationally relates to their goal of stopping COVID-19's spread; (vii) whether, following the Court's Memorandum Opinion and Order in Hernandez v. Grisham, No. CIV 20-0942 JB\GBW, 2020 WL 6063799, at *1 (D.N.M. Oct. 14, 2020)(Browning, J.)("Hernandez I"), Woodworth's claims are moot, because Woodworth's Individualized Education Program ("IEP") team reconvened following Hernandez I to create a new IEP for Woodworth which aims to provide her with a free and appropriate public education ("FAPE") under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ( the "IDEA"); (viii) whether Woodworth may bring claims under the IDEA, pursuant to 42 U.S.C. § 1983; (ix) whether, in the Counties where the Defendants allow in-

person learning only for children with disabilities, the Defendants have denied every child with disabilities a FAPE, because the children with disabilities are prohibited from socializing in-person at school with children who do not have disabilities; (x) whether, where children with disabilities are offered the same remote instruction that is available to children without disabilities, the remote instruction setting qualifies as a regular educational environment or regular class under the IDEA's least restrictive environment ("LRE") provision; (xi) whether the United States Department of Education's ("USDOE") guidance documents issued since the COVID-19 pandemic's start: (a) are entitled to deference from the Court, or (b) limit the Defendants' responsibilities under the IDEA during the pendency of the pandemic; and (xii) whether the Plaintiffs may sue the Defendants under the IDEA in their individual and official capacities.  The Court concludes that: (i) granting leave to amend would be futile, because Williams has not exhausted his administrative remedies under the IDEA; (ii) the Defendants have not violated the Plaintiffs' procedural due process rights, because: (a) the Defendants have issued the Reentry Guidance during an emergency situation -- the COVID-19 pandemic -- to protect public health and safety, and (b) the Reentry Guidance is a quasi-legislative document; (iii) the Defendants have not violated the Plaintiffs' substantive due process rights, because there is no general right to an in-person education under the Constitution, and, therefore, the Defendants are not infringing upon the Plaintiffs' fundamental constitutional rights; (iv) the citizens of Counties which the Reentry Guidance prohibits from providing in-person learning to students without disabilities are not members of a suspect class, because they do not allege a history of unequal treatment or political powerlessness; (v) the Reentry Guidance is facially neutral regarding students with disabilities, and the Plaintiffs have not shown that the Defendants discriminate intentionally against students with disabilities by issuing the Reentry Guidance; (vi) the Defendants' prohibition on in-person schooling in certain

Counties is rationally related to the Defendants' legitimate purpose of preventing the spread of COVID-19, because students, teachers, and staff spread the virus to one another during in-person learning; (vii) Woodworth's claims are moot, because the IEP team remedied the purely legal defects in her previous IEP when it issued her new IEP, and Woodworth must follow the administrative process to address any other alleged defects; (viii) Woodworth may not bring IDEA claims pursuant to § 1983, because the IDEA includes a comprehensive enforcement scheme; (ix) many students with disabilities may receive a FAPE, although they do not receive in-person socialization with students without disabilities, because remote learning still allows these students to progress towards goals detailed in their IEPs; (x) when children with disabilities are offered the same remote instruction that is available to children without disabilities, the remote instruction setting qualifies as a regular educational environment, or regular class, under the LRE provision, because the provision's plain text and its legislative history indicate that a regular educational environment or regular classroom is any learning environment where a child with disabilities has not been separated from his or her classmates without disabilities; (xi) the USDOE guidance documents: (a) are not entitled to deference, because they are unpersuasive and lack thoroughness, sound reasoning, and consistency with other USDOE guidance, and (b) do not limit the Defendants' responsibilities under the IDEA, but primarily regurgitate the language contained in the IDEA and its regulations; and (xii) the Plaintiffs may sue the Defendants under the IDEA in their official capacities, because the claims are not duplicative.  The Court, therefore, denies the PI Motion and the MTA, and grants the Second MTD.

## FACTUAL BACKGROUND

This case arises from the PED's Reentry Guidance, which limits in-person education in New Mexico during the COVID-19 pandemic.  See New Mexico Public Education Department

Reentry Guidance at 1, New Mexico Public Education Department, https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/ (last visited Dec. 7, 2020)("Reentry Guidance"). The Reentry Guidance requires certain school districts in New Mexico with higher rates of COVID-19 to provide remote or hybrid learning. See Reentry Guidance at 8. The Reentry Guidance also allows -- but does not require -- school districts in the remote category to provide in-person education to children with disabilities in groups of five children or less. See Reentry Guidance at 8.

The Parties do not object to the Court's decision to convert the Second MTD to a motion for summary judgment pursuant to rule 12(d). See Plaintiffs' Notice of Non-Objection, filed November 30, 2020 (Doc. 76)("Plaintiffs' Notice"); Defendants' Notice of Non-Objection, filed December 1, 2020 (Doc. 77)("Defendants' Notice"). See also De Baca v. United States, 399 F. Supp. 3d 1052, 1183 (D.N.M. 2019)(Browning, J.)(discussing why and when the Court converts motions to dismiss to motions for summary judgment). The Defendants ask the Court to consider "evidence presented by Defendants in briefing and at the preliminary injunction hearing," Defendants' Notice at 1, and the Plaintiffs ask the Court "to consider all exhibits attached" to the PI Motion, "all exhibits supplied supplementally to the Court, any relevant testimony from the hearing on the Preliminary Injunction and all exhibits attached to any briefing before the Court," Plaintiffs' Notice at 1. Both parties also submitted supplemental evidence for the Court to consider in the converted motion for summary judgment. See Notice Supplemental Information, filed December 11, 2020 (Doc. 82); Additional Exhibits to Defendants' Motion to Dismiss Pursuant to rule 12(d), filed December 11, 2020 (Doc. 83). Because the Defendants did not submit initially a motion for summary judgment, the parties' facts are not numbered as D.N.M. L.R. 56.1 (Summary

Judgment) requires.  The Court describes the undisputed material facts contained in the foregoing evidence below.

1.   **The Parties.**

Plaintiffs Clarissa and Robert Hernandez are the parents of four children, ages eight to fifteen, in Lea County, New Mexico.  See Am. Compl. ¶ 1, at 2; Declaration of Clarissa Hernandez in Support of Applications for a Temporary Restraining Order ¶¶ 1-9, at 1-2 (executed August 18, 2020), filed September 21, 2020 (Doc. 6-2)("Hernandez Decl."); Transcript of Hearing at 30:21 (taken November 20, 2020)(Hernandez)("Nov. 20 Tr.").  Plaintiff Shannon Woodworth is the parent of a school-aged child with disabilities.  See Declaration of Shannon Woodworth in Support of Applications for a Temporary Restraining Order ¶¶ 5-6, at 2 (executed September 18, 2020), filed September 21, 2020 (Doc. 6-3)("Woodworth Decl."); Am. Compl. ¶ 2, at 2.  Woodworth's child, J.W., has "an individual education program (IEP)" pursuant to the IDEA.[2]  Woodworth Decl. ¶¶ 5-6, at 2.  Plaintiff David Gallegos is an elected representative in the New Mexico House of Representatives and is an elected member of the Board of Education for Eunice Public Schools. See Am. Compl. ¶ 3, at 2; Representative David M. Gallegos, New Mexico Legislature, https://nmlegis.gov/Members/Legislator?SponCode=HGADV (last visited Dec. 7, 2020). Defendant Michelle Lujan Grisham is the Governor of New Mexico.  See Am. Compl. ¶ 4, at 2; Michelle Lujan Grisham, Office of the Governor, https://www.governor.state.nm.us/our-leadership/governor/ (last visited Dec. 7, 2020).  Defendant Ryan Stewart is the Secretary of Education for the State of New Mexico.  See Am. Compl. ¶ 5, at 2; Ryan Stewart, Office of the

---

[2]"The term 'individualized education program' or 'IEP' means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with" 20 U.S.C. § 1414(d).  20 U.S.C. § 1401(14)(no citation for quotation).

Governor,  https://www.governor.state.nm.us/our-leadership/public-education-department/  (last visited Dec. 7, 2020).

      **2.**     **The Pandemic.**

      The coronavirus disease 2019 ("COVID-19") is a pandemic that has spread around the world, within the United States of America, and in New Mexico.  The United States detected its first COVID-19 case on January 21, 2020.  See First Travel-related Case of 2019 Novel Coronavirus Detected in United States, Centers for Disease Control and Prevention (Jan. 21, 2020), https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html.     By December 7, 2020, there had been 66,422,058 confirmed cases of COVID-19 globally, including 1,532,418 deaths.  See WHO Coronavirus Disease (COVID-19) Dashboard, World Health Organization, https://covid19.who.int/ (last visited Dec. 7, 2020).  As of December 7, 2020, the United States has had 14,636,914 confirmed cases of COVID-19, including 281,253 deaths,  see CDC COVID Data Tracker, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Dec. 7, 2020), and New Mexico has had 108,088 cases, including 1,749 deaths,  see COVID-19 in New Mexico, New Mexico Dep't of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Dec. 7, 2020)("COVID-19 in New Mexico").  In addition, in New Mexico, 7,321 people have been hospitalized, and 919 people are hospitalized as of December 7, 2020 because of COVID-19.  See COVID-19 in New Mexico.  Children aged nine and under account for 5,722 of New Mexico's COVID-19 cases, while children aged ten to nineteen account for 12,755 cases. See COVID-19 in New Mexico.  Persons under twenty, therefore, account for 18,477 of total deaths, just over seventeen percent of COVID-19 cases in New Mexico.  See COVID-19 in New Mexico.

Children are a source of COVID-19 transmission, and children, therefore, present a risk of spreading COVID-19 to parents, teachers, school staff, and other children.  See Scrase Decl. ¶ 16, at 9 (citing Mubbasheer Ahmed et al., Multisystem Inflammatory Syndrome In Children: A Systematic Review, The Lancet (Sept. 4, 2020), https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(20)30271-fulltext));  COVID-19 in New Mexico. Children who recover from COVID-19 may experience complications, including cardiac lesions and multisystem inflammatory disorder, after recovering from the disease.  See Scrase Decl. ¶ 16, at 9 (citing Mubbasheer Ahmed et al., Multisystem Inflammatory Syndrome In Children: A Systematic Review, The Lancet (Sept. 4, 2020), https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(20)30271-6/fulltext).

### 3.   New Mexico's COVID-19 Response.

On March 11, 2020, Governor Grisham declared a public health emergency under the Public Health Emergency Response Act, NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015)(the "PHERA"), and invoked the All Hazards Emergency Management Act, NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007)(the AHEMA), by directing all cabinets, departments, and agencies to comply with the declaration's directives and the further instructions of the New Mexico Department of Health (the "NM Health Department").  See Updated: Governor, Department of Health announce first positive COVID-19 cases in New Mexico, Press Releases, Office of the Governor (March 11, 2020), https://www.governor.state.nm.us/2020/03/11/updated-governor-department-of-health-announce-first-positive-covid-19-cases-in-new-mexico/ (last visited Oct. 12, 2020)("Emergency Declaration"). Secretary Kathyleen M. Kunkel subsequently entered a series of public health orders ("PHOs") encouraging New Mexicans to stay in their homes as much as possible, and to

practice precautions when entering public spaces as well as restricting mass gatherings and business operations.  See, e.g., Kathyleen M. Kunkel, Public Health Emergency Order Limiting Mass Gatherings and Implementing Other Restrictions Due to COVID-19, New Mexico Department of Health (March 16, 2020), www.governor.state.nm.us%2Fwp-content%2Fuploads%2F2020%2F03%2FAMENDED-PUBLIC-HEALTH-ORDER.pdf.

After declaring a public health emergency, Governor Grisham ordered all public schools to close from March 16, 2020, to April 6, 2020.  See Governor Michelle Lujan Grisham, Executive Order 2020-005 (March 13, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/03/Executive-Order-2020-005.pdf.  On March 26, 2020, Governor Grisham ordered all public schools to close for the remainder of the 2019-2020 school year because of the increase in COVID-19 cases.  See Governor Michelle Lujan Grisham, Executive Order 2020-012 (March 26, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/03/MLG_EO_2020_012.pdf.

The New Mexico Public Education Department (the "PED") is a constitutionally created entity authorized to "have control, management and direction of all public schools."  N.M. Const. Art. XII, § 6.  See N.M.S.A. 1978 § 22-2-1(A).   The PED "continuously collaborate[s] with the Office of the Governor and the Department of Health to evaluate science-based criteria for deciding whether, when, and to what extent to reopen schools."  Affidavit of Ryan Stewart ¶¶ 2, at 1 (executed September 28, 2020), filed September 28, 2020 (Doc. 14-2)("Stewart Aff.").  See id. ¶ 4, at 2 ("PED collaborates intensively with DOH").  New Mexico employs Los Alamos National Labs ("LANL") to develop an ongoing epidemiological modeling for weekly updates on the virus trajectory in New Mexico.  See Stewart Aff. ¶ 5, at 2.  The LANL modeling, upon which the PED relies, indicates that New Mexico would experience an increase in positive COVID-19

cases if schools return to in-person learning without enhanced safety protocols and limitations on the number of students present in school buildings.  See Stewart Aff. ¶ 5, at 2; Modeling and Forecasting COVID-19 in NM at 22 (dated Aug. 18, 2020), Los Alamos National Laboratory (Doc. 14-2)("COVID-19 Modeling").[3]  "The State," including the PED, "has taken more aggressive action than the CDC has recommended in many aspects of the pandemic response . . . ."  Stewart Aff. ¶ 8, at 2.

On April 1, 2020, the PED published a document addressing frequently asked questions related to providing Free and Appropriate Education ("FAPE") during school closures.  See Providing a Free Appropriate Public Education (FAPE) through a Distance Learning Platform during a Closure to Normal School Operations due to the Coronavirus (COVID-19) Pandemic 2020, New Mexico Public Education Department, https://webnew.ped.state.nm.us/wp-content/uploads/2020/04/Special-Education-FAQ-Final-4-1-20-ddc.pdf (April 1, 2020)("PED Guidance for Providing FAPE During COVID-19").  In the PED Guidance for Providing FAPE During COVID-19, the PED notes: "At this time," April 1, 2020, "there is a statewide Stay at Home Order issued by the Governor and Department of Health that is effective until April 10, 2020.  As long as that, or any subsequent Stay at Home Order, is in place, Schools should not provide face-to-face special education services."  PED Guidance for Providing FAPE During COVID-19 at 2.

The PED Guidance continues:

---

[3]The models that the Defendants provided to the Court make projections only through November 1, 2020.  See COVID-19 Modeling at 22.  Although the Court held a Preliminary Injunction Hearing on November 20, 2020, and the "ongoing epidemiological modeling unit . . . provides weekly updates on the trajectory of the virus and on the impact of reopening decisions on the spread of the virus in the state," the Court has not received updated modeling information from the Defendants.  Stewart Aff. ¶ 5, at 2.

Initially, the US Department of Education issued guidance stating that if Schools do not provide any educational services to the general student population during the school closure, then it would not be required to provide services to students with disabilities during the school closure.  However, on March 21, 2020, new federal guidance was issued and emphasized that "schools should not opt to close or decline to provide distance instruction, at the expense of the students, to address matters pertaining to services for students with disabilities" and stated that "to be clear: ensuring compliance with the Individuals with Disabilities Education Act 1990 (IDEA), Section 504, the Americans with Disabilities Act of 1990 (ADA) should not prevent any school from offering educational programs through distance instruction."

If a School continues to provide educational opportunities to the general student population during a school closure, then it must ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE.  Schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's Individualized Education Plan (IEP) developed under IDEA.

With the extended school closure to the end of this school year, the PED is requiring Schools to provide Continuous Learning to students, to submit assurances about the provision of such learning, and to submit and obtain approval by the PED of a Continuous Learning Plan.  Special Education is an included requirement of the Continuous Learning Plan.

Schools are required by the PED to develop and implement Continuous Learning Plans and provide general education services to the general population and are required to ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE. Schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's IEP developed under IDEA.

PED Guidance for Providing FAPE During COVID-19 at 1.

Next, the PED Guidance for Providing FAPE During COVID-19 describes dispute resolution options for parents such as hearings and mediations, available under the IDEA and under the New Mexico rules for education:

**What Dispute Resolution options are available for Schools and parents to resolve disagreements over IDEA services?**

The full range of Dispute Resolutions required by the IDEA remains available. This includes Mediation, Facilitated IEP meetings, State Complaints and Due Process Hearings. The PED Special Education Division Alternative Dispute Resolution staff are available to answer any questions . . . .

**If a School or parent files a due process hearing request, will the due process hearing take place during the school closure?**

Parents and Schools will continue to be able to file special education due process hearing requests with the PED. The PED requires that Schools have an administrator assigned to receive these complaints through electronic transmission during school closure. The parties to a due process complaint should address any requests for extensions of time to the PED appointed Due Process Hearing Officer. However, as long as a Stay at Home Order remains in effect, mediations, Facilitated IEP Meetings, State Complaints, or due process hearings will take place by telephone, videoconferencing or any other way that ensures effective communication . . . .

**If a state complaint is filed, will it be investigated during the school closure?**

PED will continue to accept State Level Complaints under the IDEA and state special education rules. The PED requires that Schools have an administrator assigned to receive these complaints through electronic transmission during school closure. The parties to a State Complaint should request an extension of time for exceptional circumstances if COVID-19 will prevent them from responding to the complaint or participating in the investigation of a particular complaint.

PED Guidance for Providing FAPE During COVID-19 at 10 (bold in original).

On June 25, 2020, Governor Grisham held a press conference to provide an update on

New Mexico's efforts to combat COVID-19. See Gov. Lujan Grisham 6/25 Press Conference,

Youtube (June 25, 2020), https://www.youtube.com/watch?v=Xp8hgX2nPAw ("Gov. Grisham

June 25 Press Conf.").[4]   Governor Grisham discussed her concerns about reopening schools,

---

[4]The Plaintiffs provide a link to this press conference in the Plaintiffs' Compilation of Press Releases, Press Conferences, News Articles, and Social Media Posts at 1, filed October 12, 2020 (Doc. 25-1)("Plaintiffs' Compilation").

explaining that "we are the fourth state in the country to have the highest median age of educators; knowing age is a factor for COVID-19 and the risks is another issue . . . .  We want to make sure that people are safe."  Gov. Grisham June 25 Press Conf. at 49:36-49:45.  Governor Grisham continued that "the hybrid model is challenging for parents to navigate," but noted that "we are going to do everything in our power to minimize how difficult the navigation is and are clear that we don't have enough childcare options in the current context of the state."  Gov. Grisham June 25 Press Conf. at 49:50-50:16.  Governor Grisham affirmed that "our goal is to not to have a hybrid model and our goal is not to have parents and educators and school districts and all our public education workers challenged by these difficulties."  Gov. Grisham June 25 Press Conf. at 51:25-51:33.  Governor Grisham maintained that "our goal is to full time in the classroom education as quick as we can" depending on "how well we do with our COVID safe practices and how effective we are at maintaining and reducing the rate of spread of COVID in New Mexico."  Gov. Grisham June 25 Press Conf. at 51:34-52:12.  Next, Governor Grisham noted that "New Mexico is a multi-generational living arrangement state, so the opportunity for kids to take this virus and spread it in high risk areas is way too high for our comfort" particularly because "our educators are older and in higher risk groups."  Gov. Grisham June 25 Press Conf. at 58:37-59:12.  Governor Grisham continued "if we have an outbreak at a school . . . it's possible we would close a school until it's cleaned, everyone's tested and we're clear; it's possible that we isolate the virus, we do surveillance testing . . . but we allow the school to be open."  Gov. Grisham June 25 Press Conf. at 1:01:00-1:02:00.

On August 27, 2020, Governor Grisham "and state health and education officials . . . provided a public update on the state's COVID-19 response and recovery efforts" including "New Mexico's preparation for a limited re-entry to in-person learning next month."

Governor Announces Revised Emergency Public Health Order, Office of the Governor: Michelle Lujan Grisham (Aug. 27, 2020), https://www.governor.state.nm.us/2020/08/27/governor-announces-revised-emergency-public-health-order/ ("Aug. 27 Press Release").[5]  She noted that the PED has worked "alongside school districts and charter schools statewide to ensure comprehensive COVID-19 safety and response protocols are established before any district or charter can be approved to begin limited in-person learning for K-5 age groups after Labor Day." Aug. 27 Press Release.

New Mexico uses "gating criteria" when determining when and whether to re-open New Mexico schools.  Scrase Decl. ¶ 7-8, at 4-5.  The gating criteria include: (i) transmission of COVID-19, measured by the rate of spread and New Mexico daily cases;[6] (ii) testing capacity, measured by the number of COVID-19 tests per day, and COVID-19 test positivity rate; (iii) contract tracing and isolation capacity; and (iv) statewide healthcare system capacity, measured

---

[5]The Plaintiffs provide a link to this press release in Plaintiffs' Compilation at 1.

[6]The NM Department of Health defines "rate of spread" as follows:

> Also known as the effective reproduction number, rate of spread is one measure of COVID-19 viral spread in a community. The rate of spread illustrates the mean number of secondary COVID-19 cases produced by one COVID-19 case. NM evaluates the rate of spread regularly to understand how well the state's organizational and individual social distancing measures are working to diminish transmission of the virus. Specifically, the rate of spread is calculated in two formats: 1) a statewide rate of spread; and, 2) regional rates of spreads. Understanding how the rate of spread varies and evolves regionally is critical in responding to community-specific needs and challenges.

Spread of COVID-19, New Mexico Dept. of Health, https://cvmodeling.nmhealth.org/public-health-gating-criteria-for-reopening-nm/rate-of-spread/ (last visited Dec. 7, 2020). The New Mexico Daily Cases is the measurement of how many cases the State or County has adjusted per capita on an average over seven days.  See Scrase Decl. ¶ 8(a), at 5-6.

by adult intensive care unit beds and seven-day supply of personal protective equipment across the primary hospitals.  See Scrase Decl. ¶ 7-8, at 4-5; Stewart Aff. ¶¶ 6, 19, 38, at 3, 6, 11.  The New Mexico Daily Cases measurement is reflected in the different colors -- red, green, and yellow -- on the New Mexico map of Counties.  See Scrase Decl. ¶ 11, at 8; COVID-19 in New Mexico, (last visited Dec. 7, 2020).  The "green level" for Counties on the map is under eighty cases per one million per day or eight cases per 100,000 per day over a fourteen-day rolling average.  Scrase Decl. ¶ 8, at 5.  See COVID-19 in New Mexico (last visited Dec. 7, 2020).  The COVID-19 test positivity rate provides information about the effectiveness of testing results in the state or county.  See Scrase Decl. ¶ 8, at 5.  New Mexico's "target" is a statewide positivity rate below five percent.  Scrase Decl. ¶ 8, at 5

### 4.    The PED's Reentry Guidance.

In July, 2020 the PED issued its official reentry guidance for the 2020 to 2021 school year.  See Reentry District and School Guidance, New Mexico Public Education Department, https://webnew.ped.state.nm.us/reentry-district-and-school-guidance/ (last visited Dec. 7, 2020); New Mexico Public Education Department Reentry Guidance (dated Nov. 24, 2020), https://webnew.ped.state.nm.us/wp-content/uploads/2020/11/20NMPED_ReentryGuide_2.0.pdf ("Reentry Guidance")[7]; Stewart Aff. ¶ 55, at 15. The PED, in the Reentry Guidance, structures school reentry in phases.  See Reentry Guidance at 8.  The Reentry Guidance sets out ten minimum requirements for reentry at public schools.  See Reentry Guidance at 4.

---

[7]The Defendants have provided the Court with a copy of the Reentry Guidance.  See Reentry Guidance (dated July 15, 2020) at 56, filed September 28, 2020 (Doc. 14-3).  The Court relies on the most updated version of the Reentry Guidance, dated November 24, 2020, which differs slightly from the version that the Defendants provide.

Under the Reentry Guidance, public schools may operate in three reentry categories: (i) remote; (ii) hybrid; and (iii) full reentry.  See Reentry Guidance at 9.  Schools in the remote category may, "[i]f feasible, . . . remain open for a limited set of students and staff in order to continue in-person educational services for students in PreK-3rd grade and students with special needs at a maximum 5:1 student to teacher ratio."  Reentry Guidance at 9.  The Reentry Guidance also instructs that "districts and schools" operating remotely "should use [Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (2020)] ('CARES Act') money or other funds to endure that each student has a digital device and support for connectivity in the home."  Reentry Guidance at 8.  Further, "if small groups are meeting," the Reentry Guidance requires remote districts to "keep cohorts together and minimize transitions."  Reentry Guidance at 15.  The hybrid category allows in-person learning if schools space students six feet apart, "adhere to face covering and hygiene requirements," and "identify small groups and keep them together throughout the day (cohorting or podding)."  Reentry Guidance at 8-9.  The full reentry category allows in-person learning for every student five days per week, although students must "practice social distancing to the greatest extent possible" and "participate in contact tracing."  Reentry Guidance at 8-9.  Finally, the Reentry Guidance states that PED will provide "Real Time Support" to students in remote learning, and that schools should "[u]se social emotional programs, groups, and individualized supports to engage students and connect them to tools and resources for remote learning."  Reentry Guidance at 7.

On August 3, 2020, the PED released a Reentry Guidance Addendum, which notes that, for schools operating remotely, small group instruction is allowed in a ratio of five students to one teacher for (i) pre-kindergarten to third grade; (ii) special education children of all ages; and (iii) students needing additional support of all ages.  See Instructional Models for Reentry: Reentry

Guidance Addendum A (dated August 3, 2020) at 1, filed October 5, 2020 (Doc. 22-2)("Reentry Guidance Addendum"). The Reentry Guidance Addendum also notes that "[s]tudents needing additional support shall be determined locally and can include students at risk of dropping out, students least able to participate successfully in remote learning, students with unstable home conditions, and other locally determined support criteria." Reentry Guidance Addendum at 1.

On September 8, 2020, the PED began allowing schools to start the hybrid reentry category if the County in which the school is located has fewer than eight cases per 100,000 per day and test positivity under five percent. See Scrase Decl. ¶¶ 8-9, at 5-6; Stewart Aff. ¶ 38, at 11. A school that meets the PED's gating criteria also must have a PED-approved reentry plan, and the superintendent or charter leader must sign and return an assurance to abide by safety protocols that the PED Reentry Guidance outlines. See Stewart Aff. ¶ 38, at 11. These requirements are applied uniformly across New Mexico. See Stewart Aff. ¶ 19, at 6. During the 2020 to 2021 school year, the PED has not allowed some Counties in New Mexico with higher incidence of COVID-19 than other Counties to begin hybrid reentry. See Scrase Decl. ¶ 11, at 8. Additionally, some schools, such as those in the City of Albuquerque, New Mexico, have decided to delay reopening even though they met the reentry criteria. See Scrase Decl. ¶ 12, at 9 (noting that, "in the city of Albuquerque, which as of [the week of September 28, 2020] in Bernalillo County has only 2.6 cases per 100,000 and a test passivity of 1.3%, the decision was made to delay reopening of schools until 2021").

### 5.   <u>Internet Access in New Mexico</u>.

New Mexico has some of the lowest rates of broadband access in the nation. See <u>COVID-19: Internet Access and the Impact on Tribal Communities in New Mexico</u> at 2, filed September 28, 2020 (Doc. 11-2)("COVID-19: Internet Access"). New Mexico ranks forty-eighth nationally

with respect to households with broadband internet.  See COVID-19: Internet Access at 2. Approximately twenty-six percent of households in New Mexico do not have broadband.  See COVID-19: Internet Access at 2.  Further, nine percent of New Mexicans cannot purchase broadband, because they live in an area without broadband capacity.  See COVID-19: Internet Access at 2.  New Mexico has noted a need for "broadband capital subsidy" in rural areas to address the "broadband gap."  State of New Mexico Broadband Strategic Plan and Rural Broadband Assessment at 11, filed September 28, 2020 (Doc. 11-3)("State Broadband Plan").  Providing broadband across all of rural New Mexico will cost between two billion and five billion dollars. State Broadband Plan at 14.  New Mexico needs federal funding to "close the 'homework gap' -- the struggle of some students to learn effectively when they do not have internet at home."  State Broadband Plan at 21 (no citation for quotation).

In New Mexico, as of August, 2020 "approximately eight percent of students lived in a household without a computer and twenty-one percent lived in a household without an Internet subscription."  LFC Report at 16.  School districts have made some efforts to remedy this issue -- at the start of the school year, for example, Albuquerque Public Schools distributed Chromebooks to every student without a computer.  See LFC Report at 16.  Other school districts in rural areas in New Mexico lack the resources to provide devices, exacerbating the technology access gaps in these areas.  See COVID-19: Internet Access at 8-9.  Further, in Roswell, New Mexico "forty-three percent of families had no internet, or, more commonly, poor connectivity, meaning it might take twenty minutes to upload an assignment." LFC Report at 16.

Moreover, eighty percent of individuals living on Tribal lands in New Mexico do not have internet services.  See COVID-19: Internet Access at 4.  Reasons for this lack of internet access include: (i) inability to afford the cost of internet services; (ii) location of homes in reservation

areas that prohibit digging; and (iii) structures of adobe homes do not allow for Wi-Fi.  See COVID-19: Internet Access at 4.  Even in Bernalillo County, New Mexico, where Albuquerque is located, American Indians are less likely to have internet access.  See COVID-19: Internet Access at 4.  Parents in Tribal communities "are struggling to keep their children engaged in their K-12 education without a computer at home or reliable Wi-Fi."  COVID-19: Internet Access at 4.  After school closures in March 2020, the PED found over 23,000 American Indian students in New Mexico public schools lacked broadband devices or capabilities.  See COVID-19: Internet Access at 7.  The PED's assessment excludes students in Albuquerque, Rio Rancho, and Santa Fe, New Mexico, and Bureau of Indian Education and Tribally operated schools.  See COVID-19: Internet Access at 7-8.

> 6.      **The Impact of School Closures on Children.**

For some students, remote learning is not an effective model for learning.  See Catlin Rivers et al., Public Health Principles for a Phased Reopening During COVID-19: Guidance for Governors, Bloomberg School of Public Health at Johns Hopkins University at 5 (Apr. 17, 2020), filed September 29, 2020 (Doc. 15-1)("Johns Hopkins Report").  Online education for school age children "is not a substitute for in-person learning and socialization in a school setting."  John Hopkins Report at 5.  Further, "schools and childcare facilities enable parents to work outside the home," and "offer meals, safe environments, and other services, particularly to vulnerable families."  John Hopkins Report at 5.

School closures "can lead to severe learning loss, and the need for in-person instruction is particularly important for students with heightened behavioral needs."  Centers for Disease Control and Prevention, The Importance of Re-opening America's Schools this Fall, COVID-19 (July 23, 2020)       https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/reopening-

schools.html.   Keeping schools closed poses a risk to children's health and safety.  <u>See</u> Declaration of Dr. Mark McDonald in Support of Application for Temporary Restraining Order (executed July 23, 2020), filed September 17, 2020 (Doc. 4-12)(originally filed in <u>Brach et al., v. Newsom et al,</u> Case 2:20-cv-06472-SVW-AFM (C.D. Cal.)), filed on September 16, 2020 (Doc. 28-8))("McDonald Decl.").  For example, "social isolation poses serious mental health risk to students and families."  Status of School Reopening and Remote Education in Fall 2020 at 1 (dated Oct. 28, 2020)), filed November 12, 2020 (Doc. 53-1)("LFC Report").  <u>See</u> <u>id.</u> at 20.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

Following the Court's decision in <u>Hernandez I</u>, Secretary Stewart sent a letter to T.J. Parks,

Superintendent of Hobbs Municipal Schools, stating:

> I . . . direct the district reconvene the IEP team for Ms. Woodworth's daughter and review whether the IEP provides the student with a free appropriate public education under the applicable legal standard as articulated in <u>Endrew F.</u> I further direct the district ensure that the IEP team and parent receive a copy of the Public Education Department's Reentry Guidance. The Reentry Guidance allows the district to provide students with disabilities in-person instruction in small groups (5:1 student/teacher ratio). The Reentry Guidance permits in-person instruction for students with disabilities even when a school district is in the remote instruction category. This option has been available to the district since August 3, 2020. I therefore request the IEP team consider the Reentry Guidance during its review of the student's IEP.

Stewart Letter at 2. The IEP team convened a meeting on November 3, 2020, to update J.W.'s

IEP in accordance with Secretary Stewart's letter and with the Court's Memorandum Opinion and

Order. <u>See</u> November 3, 2020 IEP (dated Nov. 3, 2020), filed November 4, 2020 (Doc. 59)("J.W.

Nov. 3 IEP").



███████████████████████

7.      **The USDOE's Guidance**.

The USDOE has provided guidance on how school reentry can comport with the IDEA during the . See United States Department of Education, Implementation of IDEA Part B Provision of Services in the COVID-19 Environment, Office of Special Education Programs (Sept. 28, 2020), https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/qa-provision-of-services-idea-part-b-09-28-2020.pdf ("September IDEA Guidance"); Second MTD at 24-25 (citing the September IDEA Guidance).  The USDOE "reminds SEAs and LEAs that **no matter what primary instructional delivery approach is chosen, SEAs, LEAs, and individualized education program (IEP) Teams remain responsible for ensuring that a free appropriate public education (FAPE) is provided to all children with disabilities**."  September IDEA Guidance at 2 (bold in original).  Where "State and local decisions require schools to limit or not provide in-person instruction due to health and safety concerns, SEAs, LEAs, and IEP Teams are not relieved of their obligation to provide FAPE to each child with a disability under IDEA."  September IDEA Guidance at 3.  "As conditions continue to change throughout the country, some of the special education and related services included in a child's IEP may need to be provided in a different manner; however, all children with disabilities must continue to receive FAPE and must have the 'chance to meet challenging objectives.'"  September IDEA Guidance at 3-4 (quoting Endrew F. v. Douglas Cty. Sch. Dist., 137 S. Ct. 988, 1000 (2017)).

**PROCEDURAL HISTORY**

On September 16, 2020, the Plaintiffs filed the Plaintiff[]s['] Original Complaint and Request for Temporary Restraining Order.  See Plaintiff[]s['] Original Complaint and Request for Temporary Restraining Order at 1, filed September 16, 2020 (Doc.1)("Original Complaint").  In the Original Complaint, the Plaintiffs allege claims for: (i) violation of the right to equal education without due process of law, under Article XII § 1 of the New Mexico Constitution and the Fourteenth Amendment of the Constitution, see Original Complaint at 11;[8] (ii) denial of equal protection under Article II § 18 of the New Mexico Constitution and the Fourteenth Amendment of the United States Constitution, see Original Complaint at 12; and (iii) failure to provide a free and appropriate public education under 20 U.S.C. § 1401(8), see Original Complaint at 13.  The Plaintiffs request that the Court "certify the classes," Original Complaint ¶ A, at 14, and declare that: (i) the "Defendants have unlawfully denied" the Plaintiffs "a free and uniform public education without providing them due process of law," Original Complaint ¶ B, at 15; (ii) the "Defendants have unlawfully denied" the Plaintiffs "equal protection of the law without reasonable justification for doing so in an arbitrary and capricious manner," Original Complaint ¶ C, at 16; and (iii) "the actions of the Defendants have denied students of a due and owing" free and public education "in violation" of the Individuals with Disabilities Act, Original Complaint ¶ D, at 15. The Plaintiffs also ask the Court to enjoin both preliminarily and permanently the "Defendants from prohibiting in-person instruction without providing equal and acceptable alternatives that provide a uniform educational system that also meets critical socialization requirements." Original Complaint ¶ E-F, at 15.  On September 17, 2020, the Plaintiffs filed the Amended

---

[8]Some parts of the Original Complaint are not numbered by paragraph.

Complaint.  See Am. Compl. at 1.  The only change from the Original Complaint is an "amend[ment] to correct the caption . . . ."  Am. Compl. at 1, n.1.

      1.      **The First Motion to Dismiss.**

On October 5, 2020, Governor Grisham and the Secretaries filed the Defendants' Motion to Dismiss Governor Grisham, Secretary Kunkel, and Secretary Stewart.  See Defendants' Motion to Dismiss Governor Grisham, Secretary Kunkel, and Secretary Stewart, filed October 5, 2020 (Doc. 22)("First MTD").  In the First MTD, Governor Grisham and the Secretaries argue that the Court should dismiss the claims against them under rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  See First MTD at 1.  Governor Grisham and the Secretaries argue that the Plaintiffs' Amended Complaint fails to satisfy Article III standing regarding Governor Grisham, Secretary Kunkel, and Secretary Stewart, and that the Amended Complaint fails to state a § 1983 claim against Governor Grisham and Secretary Kunkel for which relief may be granted.  See First MTD at 2.

Governor Grisham and the Secretaries contend that federal courts have limited jurisdiction and that, if a court lacks jurisdiction, it must dismiss the case.  See First MTD at 7-8 (citing Montoya v. Chao, 296 F.3d 952, 955 (10th Cir. 2002); Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)).  Further, they aver that the Court should dismiss the case for lack of subject-matter jurisdiction under rule 12(b)(1).  See First MTD at 7-8 (citing Fed. R. Civ. P. 12(b)(1)).  They insist that the Court should use a rule 12(b)(6) standard to evaluate rule 12(b)(1) motions.  See First MTD at 8 (citing Muscogee Nation v. Okla. Tax Comm'n, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010)).

Next, Governor Grisham and the Secretaries note that, although on March 26, 2020, Governor Grisham ordered all public schools for the remainder of the 2019-2020 school year, "[t]he Governor has not issued any executive order affecting public schools since the March 26

order." First MTD at 3. Governor Grisham and the Secretaries contend that, for the 2020-2021 school year, the PED issues all orders related to keeping schools closed, and that the PED "is a constitutionally created entity generally authorized to 'have control, management and direction of all public schools.'" First MTD at 4 (quoting NMSA 1978, § 22-2-1(A)(2004); and citing N.M. Const. Art. XII, §§ 6(A), 6(D); NMSA 1978, §§ 22-2-1(A), 22-2-2 (2004); and NMSA 1978, § 22-2-8 (2003)). Governor Grisham and the Secretaries explain that, in June, 2020, the PED issued official Reentry Guidance for the 2020-2021 school year.[9] See First MTD at 5 (citing Reentry Guidance).

Based on this factual predicate, Governor Grisham and the Secretaries argue that the Plaintiffs cannot demonstrate standing, and that thus the Court does not have jurisdiction over Governor Grisham, Secretary Kunkel, and Secretary Stewart. See First MTD at 10. Governor Grisham and the Secretaries argue that "'a plaintiff must show that: (1) she has suffered an injury in fact . . . (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested.'" First MTD at 10 (quoting Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004)). First, Governor Grisham and the Secretaries argue that the Plaintiffs have not demonstrated that their injuries are fairly traceable to Governor Grisham and Secretary Kunkel. See First MTD at 11-15. Second, Governor Grisham and Secretaries argue that the Plaintiffs have not demonstrated a favorable decision will redress their injuries. See First MTD at 15-17.

---

[9]The Reentry Guidance provides schools with guidelines on how to operate, as well as re-opening qualifications, during the COVID-19 pandemic.

Governor Grisham and the Secretaries quote a recent case from the United States Court of Appeals for the Tenth Circuit for the proposition that, "'[t]o satisfy the traceability requirement, the defendant's conduct must have caused the injury.'"  First MTD at 11 (quoting Aptive Envtl., LLC v. Town of Castle Rock, 959 F.3d 961, 977 (10th Cir. 2020)).  Governor Grisham and the Secretaries argue that the

> Plaintiffs' alleged injuries from the temporary suspension of in-person learning in schools cannot be fairly traced to Governor Grisham or Secretary Kunkel . . . . Indeed, Plaintiffs' Amended Complaint is devoid of any allegations that the Governor issued an executive order or that Secretary Kunkel enacted a public health order regarding public schools or the temporary suspension of in-person learning for the 2020-2021 school year.

First MTD at 12.  Governor Grisham and the Secretaries further argue that the Reentry Guidance is under the PED's purview, and that, under New Mexico law, the PED has the authority to issue the Reentry Guidance: "The PED is vested with the powers and duties to related to the control, management, and direction of all public schools in this state."  First MTD at 13 (citing N.M.S.A. 1978, § 22-2-1(A); N.M. Const. Art. XII, §§ 6(A), 6(D)).  Governor Grisham and the Secretaries emphasize that the PED issued the Reentry Guidance.  See First MTD at 13 (citing Reentry Guidance).

Next, Governor Grisham and the Secretaries argue that the Plaintiffs have not shown how Governor Grisham and Secretary Kunkel caused their alleged injuries.  See First MTD at 14. Governor Grisham and the Secretaries argue that the Plaintiffs fail to point to Governor Grisham and Secretary Kunkel's action that prohibits in-person learning at public schools.  See First MTD at 14.   Governor Grisham and the Secretaries contend that local school districts decide which students receive in-person learning, rather than Governor Grisham or Secretary Kunkel, and that "[t]herefore, it is the independent action of the school districts, who are not parties to this case, that are causing Plaintiffs' alleged injuries."  First MTD at 14.

Next, Governor Grisham and the Secretaries argue that the Plaintiffs lack standing to sue Governor Grisham, Secretary Kunkel, and Secretary Stewart, because the Plaintiffs fail to establish redressability.  See First MTD at 14.   Governor Grisham and the Secretaries contend that, to establish redressability, a "'plaintiff must also establish it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  First MTD at 14 (quoting Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir. 1996)).  Governor Grisham and the Secretaries argue that the relief which the Plaintiffs request -- an injunction entered against Governor Grisham and Secretary Kunkel regarding in-person learning -- will not enable students to go back to in-person classes, because "it is the PED that issued the Reentry Guidance pursuant to its powers and duties related to the control, management, and direction of all public schools in this state."  First MTD at 15.

Governor Grisham and the Secretaries argue that even if Secretary Stewart, as PED Secretary, is enjoined, there is no guarantee that the "requested injunction will likely lead to in-person learning because local school districts have the discretion regarding how to operate."  First MTD at 16.  Governor Grisham and the Secretaries contend that many school districts have decided to continue remote learning even when they meet the PED's reentry requirements "in order to prioritize the safety of their students."  First MTD at 16.  Governor Grisham and the Secretaries, argue, therefore, that the "Plaintiffs must include all superintendents as defendants in this case to obtain the requested relief."  First MTD at 16.  Consequently, Governor Grisham and the Secretaries allege that the Plaintiffs have failed to demonstrate redressability.  See First MTD at 16.

Last, Governor Grisham and the Secretaries argue that the Plaintiffs' claims under § 1983 "must allege that each Defendant was a cause of promulgating the purportedly unlawful Reentry

Guidance," and that the Amended Complaint lacks sufficient specific allegations demonstrating that Governor Grisham or Secretary Kunkel were involved in issuing the PED's Reentry Guidance. First MTD at 18.  Governor Grisham and the Secretaries insist that the "Plaintiffs' legal conclusion that Governor Grisham and Secretary Kunkel issued the Reentry Guidance is false," because of the language of the Reentry Guidance and New Mexico law.  First MTD at 20 (citing New Mexico Public Education Department Reentry Guidance, New Mexico Public Education Department (June 29, 2020)(updated July 15, 2020)); N.M. Const. Art. XII, Sec. 6; §§ 22-2-1(A), 22-2-2, 22-2-8; Ellenberg v. N.M. Military Inst., 478 F.3d 1262, 1270 (10th Cir. 2007)).

Governor Grisham and the Secretaries conclude that the Court should dismiss Governor Grisham, Secretary Kunkel, and Secretary Stewart from this action for lack of standing, or that the Court should dismiss Governor Grisham and Secretary Kunkel, because the Plaintiffs fail to demonstrate the causation that § 1983 requires.  See First MTD at 20-21.

### 2.    The Plaintiffs' Notice Voluntarily Dismissing the State of New Mexico.

On October 12, 2020, the Plaintiffs filed a Stipulation of Voluntary Rule 41 Dismissal of The State Of New Mexico, filed October 12, 2020 (Doc. 26).  The Plaintiffs stated that they were "voluntarily dismiss[ing] the State of New Mexico from this matter" pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  Stipulation of Voluntary Rule 41 Dismissal of The State Of New Mexico at 1.  The Plaintiffs did not describe why they had dismissed New Mexico.  See Stipulation of Voluntary Rule 41 Dismissal of The State Of New Mexico at 1.

### 3.    The First Memorandum Opinion and Order.

The Court issued a Memorandum Opinion and Order ("MOO") on October 14, 2020. See Hernandez I, 2020 WL 6063799.  The Court made the following conclusions:

> (i) the Plaintiffs have shown that they likely have standing to bring claims against Secretary Stewart, but have failed to demonstrate that they are likely to have standing to sue Governor Grisham and Secretary Kunkel because they have not

successfully established the causation and redressability prongs of the standing inquiry with respect to these two defendants; (ii) only Woodworth likely has standing under the IDEA, because Hernandez and Gallegos are not parents of special needs children; (iii) New Mexico likely has sovereign immunity with respect to the Plaintiffs' § 1983 claims because the statute does not allow plaintiffs to sue states directly for constitutional violations, but likely lacks sovereign immunity under the IDEA because Congress has abrogated state sovereign immunity under the IDEA; (iv) the Court likely will not certify Plaintiffs' proposed subclasses, because Plaintiffs have not established that they are likely to establish commonality and typicality successfully on the merits pursuant to rule 23(a) of the Federal Rules of Civil Procedure; (v) the Plaintiffs' substantive due process and equal protection claims are unlikely to succeed on the merits because the Reentry Guidance is rationally related to a legitimate state interest, and remote instruction does not per se violate a state's duty to provide adequate free public education; (vi) the Defendants have not violated the Plaintiffs' procedural due process rights because the re-entry guidance is quasi-legislative; (vii) Woodworth need not exhaust the available administrative remedies under the IDEA because the deficiencies in her IEP present a purely legal question; and (viii) a temporary restraining order is appropriate with respect to Woodworth alone because she is likely to succeed in demonstrating that her Individualized Education Plan ("IEP") violates the IDEA.

Hernandez I, 2020 WL 6063799, at *1.  The Court ordered Secretary Stewart to:

instruct the LEA to amend Woodworth's daughter's current IEP -- which allows Woodworth's daughter to [Redacted] and denies her requests for in person instruction because of its incorrect interpretation of "state health regulations," -- pursuant to 34 C.F.R. § 300.324(a)(4), as well as N.M. Admin. Code 6.31.2, so that the amended IEP is "reasonably calculated to enable [Woodworth's daughter] to make progress" Endrew F., 137 S. Ct. at 999 in her classes, regardless of the LEA's preference for remote instruction.

Hernandez I, 2020 WL 6063799, at *69.  Consequently, the Court granted in part and denied in part the Plaintiffs' Motion for Preliminary Injunction and TRO.  Hernandez I, 2020 WL 6063799, at *1.

### 4.    **The Parks Letter**.

Following the Court's decision in Hernandez I, Secretary Stewart sent a letter to T.J. Parks, Superintendent of Hobbs Municipal Schools, stating:

I . . . direct the district reconvene the IEP team for Ms. Woodworth's daughter and review whether the IEP provides the student with a free appropriate public education under the applicable legal standard as articulated in Endrew F.  I

further direct the district ensure that the IEP team and parent receive a copy of the Public Education Department's Reentry Guidance.  The Reentry Guidance allows the district to provide students with disabilities in-person instruction in small groups (5:1 student/teacher ratio).  The Reentry Guidance permits in-person instruction for students with disabilities even when a school district is in the remote instruction category.  This option has been available to the district since August 3, 2020.  I therefore request the IEP team consider the Reentry Guidance during its review of the student's IEP.

October 23 Letter to T.J. Parks at 2, filed October 23, 2020 (Doc. 38-1)("Stewart Letter").  The

IEP team convened a meeting on November 3, 2020, to update J.W.'s IEP in accordance with

Secretary Stewart's letter and with the Court's Memorandum Opinion and Order.  See November

3, 2020 IEP (dated Nov. 3, 2020), filed November 4, 2020 (Doc. 59)("J.W. Nov. 3 IEP").

        **5.    The Motion to Amend the Complaint.**

        On October 26, 2020, the Plaintiffs moved to amend their Amended Complaint.  See MTA

at 1.[10]  The Plaintiffs seek leave to amend "to add Plaintiff Ronnie Williams as a participant in the

lawsuit."  Motion to Amend Complaint at 2.  The Plaintiffs aver that rule 15(d) of the Federal

Rules of Civil Procedure applies here, because, "'to the extent that Plaintiffs' motion . . . sought

the addition of a party, it is controlled by rule 15(a) because it is actually a motion to amend.'"

MTA at 2 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365 (10th Cir. 1993).  The Plaintiffs

contend that the Court should allow them leave to amend because "[r]efusing leave to amend, is

generally only justified upon a showing of undue delay, undue prejudice to the opposing party,

bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or

---

        [10]The Plaintiffs state that they seek "leave to amend the 2st Amended Complaint" and later state that they "seek to amend the 1st Amended Complaint."  Motion to Amend at 1-2.  The Court assumes that the Plaintiffs intend to amend their Amended Complaint, filed September 17, 2020 (Doc. 4), because this pleading is the only Amended Complaint that the Plaintiffs have filed.

futility of amendment."  Motion to Amend Complaint at 2 (citing Castleglen, Inc. v. Resolution Tr. Corp., 984 F.2d 1571, 1585 (10th Cir. 1993)).

**6.       The Second Motion to Dismiss.**

On October 26, 2020, the Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint.  See Motion to Dismiss Plaintiffs' Amended Complaint at 1, filed October 26, 2020 (Doc. 43)("Second MTD").  In the MTD, the Defendants first aver that rational basis review should apply to their emergency public health measures.  See Second MTD at 13 (citing Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11 (1905)).  The Defendants characterize rational basis scrutiny as "so deferential that courts 'must independently consider whether there is any conceivable rational basis for the classification, regardless of whether the reason ultimately relied on is provided by the parties.'"  Second MTD at 14 (quoting Teigen v. Renfrow, 511 F.3d 1072, 1084 (10th Cir. 2007)).  Next, the Defendants assert that the Plaintiffs have failed to allege sufficiently equal protection claims, because they have not alleged "a prima facie case of discriminatory purpose against a suspect class."  Second MTD at 15.  The Defendants continue that there is no evidence that the Reentry Guidance intentionally discriminates against "children with special needs given that the Reentry Guidance applies to all children in each county."  Second MTD at 15 (citing Hernandez v. Grisham, No. CIV 20-0942 JB\GBW, 2020 WL 6063799, at *62 (D.N.M. Oct. 14, 2020)(Browning, J.)("MOO")).  The Defendants insist that the Reentry Guidance has a rational relationship to the legitimate government goal of stopping COVID-19.  See Second MTD at 16 (citing MOO, 2020 WL 6063799, at *62).

The Defendants note that "courts 'apply the fundamental rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action.'"  Second MTD at 17 (quoting Doe v. Woodard, 912 F.3d 1278, 1300 (10th Cir. 2019)).  The Defendants aver that the Court should apply the fundamental rights

approach here, because the Reentry Guidance is quasi-legislative.  See Second MTD at 17 (citing Hernandez I, 2020 WL 6063799, at *64-65).  They continue that the Court should apply rational basis review to the Plaintiffs' substantive due process claims, because education is not a fundamental right.  See Second MTD at 18 (citing Hernandez I, 2020 WL 6063799, at *63).  Although the Defendants acknowledge that the "failure to provide in-person learning could . . . violate Article XII, § 1 of the New Mexico Constitution, state constitutional rights cannot be used as a basis for applying heightened scrutiny under the" Constitution of the United States of America.  Second MTD at 18-19 (citing Hernandez I, 2020 WL 6063799, at *63).  The Defendants insist that, even if some level of education is a fundamental right, remote learning satisfies that right.  See Second MTD at 19-21 (discussing Brach v. Newsom, No. 2:20-cv-06472-SVW-AFM, 2020 U.S. Dist. LEXIS 190361, at *12 (C.D. Cal. Aug. 21, 2020)(Wilson, J.)).  The Defendants reiterate that their Reentry Guidance satisfies rational basis review.  See Second MTD at 22 (citing Hernandez I, 2020 WL 6063799, at *63).  Next, the Defendants discuss the procedural due process claims.  See Second MTD at 23.  The Defendants assert that, because they made the Reentry Guidance available publicly, they need not provide the Plaintiffs any further procedural due process.  See Second MTD at 23.

Next, the Defendants turn to the Plaintiffs' claims under the IDEA.  See Second MTD at 23.  First, the Defendants aver that the IDEA does not require the Defendants to provide in-person education during the COVID-19 pandemic.  See Second MTD at 24.  The Defendants acknowledge that the IDEA's requirements still exist during the pandemic.  See Second MTD at 25.  The Defendants note, however, that the USDOE's guidance allows that, "if it is not possible to provide a student with a disability with" a FAPE "due to restrictions related to the pandemic, there must be consideration of the provision of compensatory education services to remedy any unavoidable

denial of FAPE."   Second MTD at 25 (citing United States Department of Education,
Supplemental Fact Sheet, Addressing the Risk of COVID-19 in Preschool, Elementary and
Secondary Schools While Serving Children with Disabilities, at 2 (March 20, 2020),
https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/Supple%20Fact%20S
heet%203.21.20%20FINAL.pdf).   The Defendants emphasize that their Reentry Guidance
specifically allows for in-person learning for students with disabilities.   See Second MTD at 26.
They urge that the IDEA instructs that schools must deliver children with a FAPE according to
their individualized needs.   See Second MTD at 27.   Consequently, the Defendants contend that
the "Plaintiffs' proposition violates the very purpose of the IDEA as it assumes without merit that
every student with a disability can be treated the same."   Second MTD at 28.   Next, the Defendants
argue that the Reentry Guidance does not violate the least restrictive environment ("LRE")
requirement of the IDEA.   See Second MTD at 29.   The Defendants note:

> The LRE provision requires that school districts ensure that children with
> disabilities are educated with children who are not disabled "[t]o the maximum
> extent appropriate," and that "special classes, separate schooling, or other removal
> of children with disabilities from the regular educational environment occurs only
> when the nature or severity of the disability of a child is such that education in
> regular classes with the use of supplementary aids and services cannot be achieved
> satisfactorily."  Id.; see also L.B. ex rel. K.B. v. Nebo Sch. Dist., 379 F.3d 966, 976
> (10th Cir. 2004). However, the LRE for each child is an individualized
> determination made by the child's IEP team.  20 U.S.C. § 1414(d)(1).

Second MTD at 29.  Many children, the Defendants maintain, are not placed in educational settings
with children without disabilities.  See Second MTD at 29 (citing Daniel R.R. v. State Bd. of Educ.,
874 F.2d 1036, 1049 (5th Cir. 1989)("Daniel R.R.")).  Further, the Defendants note that students
with disabilities have the same opportunities at present as their peers, because they are able to
participate in remote instruction.  See Second MTD at 30.  The Defendants also aver that the PED
does not have the power to change unilaterally students' IEPs.  See Second MTD at 31 (citing
Chavez ex rel. MC v. New Mexico Pub. Educ. Dep't, 621 F.3d 1275, 1288 (10th Cir. 2010)).  They

insist that "[a]t most, an SEA [state education agency] can order an IEP team to meet and develop a plan to provide a FAPE."  Second MTD at 31.

Next, the Defendants argue that Governor Grisham and Secretary Stewart are not proper defendants for the IDEA claims, because the IDEA does not give rise to individual liability. Second MTD at 31 (citing Barr-Rhoderick v. Bd. of Educ. of Albuquerque Pub. Sch., No. CIV 04-0327 MCA/ACT, 2005 WL 8164366, at *6 (D.N.M. Jan. 28, 2005)(Armijo, J.)).  The Defendants argue, therefore, that neither Governor Grisham nor Secretary Stewart may be held liable under the IDEA.  See Second MTD at 32.  Relatedly, the Defendants maintain that Woodworth fails to state a claim under the IDEA. See Second MTD at 32.  In Woodworth's case, the Defendants insist, Woodworth's local education agency ("LEA") -- Hobbs Municipal Schools -- creates the IEP for Woodworth's daughter and "may have misinterpreted the Reentry Guidance to preclude in-person instruction for children with disabilities."  Second MTD at 32, (citing Hernandez I, 2020 WL 6063799, at *63).  The Defendants note that, in Hernandez I, the Court did not require directly the LEA to provide Woodworth's daughter in person instruction.  See Second MTD at 32-33.  The Defendants insist that, now that the LEA has amended Woodworth's IEP, she must address any issues with her new IEP via the administrative process.  See Second MTD at 32-33.  Similarly, the Defendants contend that, if Woodworth is satisfied with the new IEP, then her claim is moot.  See Second MTD at 33.  The Defendants also note that Hernandez and Gallegos lack standing to bring an IDEA claim, because they are not disabled children or parents of disabled children.  See Second MTD at 33.  Next, the Defendants contend that the Court lacks jurisdiction to hear the Plaintiffs' IDEA claims, because Woodworth has not exhausted the IDEA's administrative procedures.  See Second MTD at 33.  The Defendants explain that, in New Mexico, a parent may request a due process hearing:

> to resolve IDEA disputes relating to: (1) the public agency's proposal to initiate or change the identification, evaluation, of educational placement of a student or the provision of FAPE to a student; or (2) the public agency's refusal to the public agency's proposal to initiate or change the identification, evaluation, of educational placement of a student or the provision of FAPE to a student.

Second MTD at 33.  The Defendants continue that, although exceptions to the IDEA's exhaustion requirement exist, the Plaintiffs have not demonstrated that they satisfy this exception.  See Second MTD at 36.  The Defendants aver that, the "pure legal" exception to IDEA exhaustion does not apply here, because the factual record has not been fully developed.  Second MTD at 36-38 (citing Lester H. by Octavia P. v. Gilhool, 916 F.2d 865, 869-70 (3d Cir. 1990)).  Last, the Defendants contend that, Woodworth's "claim of deprivation of a FAPE arises from decisions made by the IEP team outlined in a specific student's IEP rather than any statewide decision made by Defendants" and there is "nothing to prevent a hearing officer from ordering in-person instruction for a student with disabilities . . . ."  Second MTD at 39.

### 7.   The Supplemental Information.

On October 28, 2020, the Plaintiffs filed the Supplemental Information.  See Supplemental Information at 1, filed October 28, 2020 (Doc. 45)("Supp. Info.).[11]  The Plaintiffs intend to provide the Court with "supplemental information regarding transmission of COVID-19 in schools, and

---

[11] "If pertinent and significant authorities come to a party's attention after the party's brief has been filed, or after oral argument but before decision, a party may promptly file a 'Notice of Supplemental Authorities,' setting forth the citations."  D.N.M. LR-Civ 7.8(b).  This notice: (i) "must state the reasons for the supplemental citations, referring either to the page of the brief or a point argued orally"; and (ii) "must not exceed 350 words."  D.N.M. LR-Civ 7.8(c).  Any response "must be filed within seven days of the filing of the Notice and will be limited to 350 words."  D.N.M. LR-Civ 7.8(c).  The Plaintiffs' Supplemental Information more than triples the allowable word limit.  See Supp. Info. at 1-4; D.N.M. LR-Civ 7.8(c).

the importance of in-person instruction." Supp. Info. at 1. The Plaintiffs explain that they have

attached information related to their proposed additional plaintiff, Williams, including Williams'

declaration and the IEP for Williams' son. See Supp. Info. at 2. The Plaintiffs also include CDC

Guidance, published on August 26, 2020, which indicates that "in studies from other countries

most children who contracted COVID-19 contracted the virus from a family member." Supp. Info.

at 2.

8.      **The Response to the MTD**.

The Plaintiffs filed the Response to the Defendants' Motion to Dismiss on November 2,

2020. See Plaintiff's Response to Defendant's Motion to Dismiss, filed November 2, 2020 (Doc.

53)("Second MTD Response"). First, the Defendant cite August 26, 2020, guidance from the

Centers for Disease Control and Prevention ("CDC"), which states:

> Schools provide critical instruction and academic support that benefit
> students and communities in both the short- and long-term. The main role and
> priorities of K-12 educational institutions are to provide age-appropriate instruction
> and support students' academic development. Reopening schools will provide in-
> person instruction for students, facilitate increased communication between
> teachers and students, and provide students with critical academic services,
> including school-based tutoring, special education, and other specialized learning
> supports.

Second MTD Response at 1 (quoting CDC at 6). The Defendants also argue that children in New

Mexico are suffering severe learning disadvantages, because they lack access to an in-person

education. See Second MTD Response at 2 (citing LFC Report). The Defendants maintain that

virtual learning fails to provide students with a basic education. See Second MTD Response at

3.[12] The Plaintiffs suggest that the Court "should not quickly depart from the notion that a basic

---

[12]The Plaintiffs quote and cite the LFC Report, but never provide page numbers for these
citations. See Response at 4-5.

education is not at least quasi-fundamental liberty." Second MTD Response at 4. They insist that the Defendants lack a rational basis for their educational policies, because "preventing the disease is not a rational reason when the alternative is unnecessary educational destruction . . . ." Second MTD Response at 4. Citing a New York Times article, the Plaintiffs note that France and Germany have allowed schools to remain open. See Second MTD Response at 4 (citing Melissa Eddy, Why Is Europe Keeping Its Schools Open, Despite New Lockdowns?, N.Y. Times (Oct. 29, 2020)). The Plaintiffs suggest that a "more compelling government interest apart from attempting the venture of no one getting sick from COVID-19 in vein would be to ensure a better government interest of ensuring a bright future for our young people through education . . . ." Second MTD Response at 4-5. Next, the Plaintiffs turn to the Defendants' argument that the Reentry Guidance affects neither a suspect class nor a fundamental right, and respond that the Reentry Guidance causes Woodworth and Williams "a direct deprivation of a right afforded to them under IDEA and potentially runs afoul of what the Court should at least treat as a quasi-fundamental liberty." Second MTD Response at 5.

Subsequently, the Plaintiffs contend that "education should be determined on the local level." Second MTD Response at 5. The Plaintiffs allege that the Reentry Guidance violates the Equal Protection Clause, because it discriminates against certain counties and school districts. See Second MTD Response at 6 (citing Teigen v. Renfrow, 511 F.3d at 1083; Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)). The Plaintiffs insist that the Reentry Guidance has denied school districts the power to "make the best decisions in regard to what is best for their students including meeting all the requirements of the IDEA." Second MTD Response at 6-7. Consequently, the Plaintiffs argue that the PED should allow school districts to choose "the option for in-person learning for both students with disabilities and without." Second MTD Response at

7.  The Plaintiffs compare this case to <u>United States Department of Agriculture v. Moreno</u>, 413 U.S. 528 (1973)("<u>Moreno</u>"), where the Plaintiffs contend the Supreme Court of the United States of America held that eligibility restrictions on persons receiving food stamps were unconstitutional.  Second MTD Response at 7.  The Plaintiffs argue that, like the defendant in <u>Moreno</u>, the Defendants here have drawn classifications between counties without a rational basis. <u>See</u> Second MTD Response at 7-8 (citing <u>Moreno</u>, 413 U.S. at 538).

Next, the Plaintiffs address the IDEA.  <u>See</u> Second MTD Response at 8.   The Defendants quote 20 U.S.C. § 1400(c)(5), which provides:

> Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by --
>
> (A)     having high expectations for such children and ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible . . . .

Second MTD Response at 8 (quoting 20 U.S.C. § 1400(c)(5)).  The Plaintiffs aver that the IDEA requires that states which receive federal funding under the IDEA must: (i) provide children with disabilities a FAPE; and (ii) educate children with disabilities "'to the maximum extent appropriate' with children" without disabilities.[13]  Second MTD Response at 8 (quoting 20 U.S.C.

---

[13]The Plaintiffs refer to children with disabilities as "handicapped" in this portion of the Second MTD Response.  <u>See</u> Second MTD Response at 8-9.  The Court will use the term "children with disabilities."  <u>See</u> <u>Choosing Words for Talking About Disability</u>, Am. Psychological Ass'n (Oct. 2015), https://www.apa.org/pi/disability/resources/choosing-words (explaining that the term "handicapped" is not the correct way to refer to persons with disabilities); <u>Appropriate Terms to Use</u>, Nat'l Disability Auth., http://nda.ie/Publications/Attitudes/Appropriate-Terms-to-Use-about-Disability/ (last visited Nov. 18, 2020)(noting that "catch-all phrases such as 'the blind,' 'the deaf,' or 'the disabled' do not reflect the individuality, equality, or dignity of people with disabilities," and that the terms "disabled person" or "person with a disability" have replaced the term "handicapped").

§ 1412(5)(A)).[14]   The Plaintiffs argue that children with disabilities need individualized determinations regarding what educational methods might benefit them.   See Second MTD Response at 9-10 (citing Daniel R.R., 874 F.2d 1036, 1048 (5th Cir. 1989)).   The Plaintiffs insist that the Defendants' Reentry Guidance conflicts with the IDEA's "socialization requirement . . . as well as the socialization requirement found in a broad number of" IEPs.   Second MTD Response at 10 (citing City of San Diego v. California Special Educ. Hearing Office, 93 F.3d 1458, 1467 (9th Cir. 1996); Seattle Sch. Dist. V. B.S., 82 F.3d 1493, 1500 (9th Cir. 1996)).   The Plaintiffs

---

[14]The statutory provision provides in relevant part:

(5)     Least restrictive environment

(A)     In general

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

(B)     Additional requirement

(i)     In general

A State funding mechanism shall not result in placements that violate the requirements of subparagraph (A), and a State shall not use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability a free appropriate public education according to the unique needs of the child as described in the child's IEP.

20 U.S.C. § 1412(5).

continue that "[s]ocialization is an aspect of IDEA regardless if the requirement is included in a student's IEP or not." Second MTD Response at 10. The Plaintiffs emphasize the importance of ensuring that students with disabilities integrate into their communities. See Second MTD Response at 10. Next, the Plaintiffs clarify their request for injunctive relief:

> Plaintiffs are not asking this Court to order that the LEA[]s be required to offer in-person instruction to both students with special needs and to those without, rather, Plaintiffs are asking that this Court enjoin the Defendants from violating the IDEA by generally prohibiting in-person education of pre-K through 12th grade students. What Plaintiffs seek is not to force the LEA's to force non-disabled students to return to in-person instruction but rather that the general prohibition demanded by the Defendants be stopped and the option afforded to the LEA[]s to figure out how they will adhere to IDEA and their parents' wishes in each district in light of COVID safe practices. It may very well be that certain LEA[]s undertake a path forward that continues to violate some students' IEP[s], but those students will then have an administrative process through which they can address that individual violation once this generally applicable prohibition has been stopped and lifted.

Second MTD Response at 11.

Last, the Plaintiffs argue that the Court should not dismiss their claims, because the Defendants' "only reason for putting their motion before the court is for malicious reasons." Second MTD Second MTD Response at 11.[15] The Plaintiffs aver that the Reentry Guidance allows students with IEPs only to socialize with students in pre-Kindergarten through third grade, which does not satisfy the IDEA. See Second MTD Response at 12. The Plaintiffs conclude, therefore, that the Reentry Guidance also has harmed students without disabilities in fourth through twelfth grades. See Response at 12.

---

[15]The Plaintiffs do not identify what "malicious reasons" they allege underly the Defendants' Second MTD. Response at 11-12.

9.      **The Response to the Motion to Amend.**

On November 2, 2020, the Defendants filed the Defendants' Response in Opposition to Plaintiffs' Motion to Amend Complaint.  See Defendants' Response in Opposition to Plaintiffs' Motion to Amend Complaint, filed November 2, 2020 (Doc. 54)("Response to MTA").  The Defendants insist that the Court should deny the Motion to Amend, because allowing the Plaintiffs to Amend the Amended Complaint would be futile.  See Response to MTA at 2.  The Defendants note that the Motion to Amend seeks to add "an individual named Ronnie Williams" as a plaintiff, but provides no information regarding "where this person lives, what disabilities their child has, whether the child has an IEP, what that IEP requires, and whether they have exhausted their remedies under IDEA . . . ."  Response to MTA at 2.  The Defendants explain that, currently, Woodworth is the only plaintiff with a child with disabilities, and the only proposed class representative for the Plaintiffs' IDEA class.  See Response to MTA at 3.

The Defendants argue that, although rule 15(a)(2) instructs courts to give leave to amend freely, courts should deny motions to amend, where, as here, leave to amend would be futile.  See Response to MTA at 4-5 (citing Burke v. New Mexico, 696 F. App'x 325, 329 (10th Cir. 2017); Legacy Church, Inc. v. Kunkel, No. CIV 20-0327 JB\SCY, 2020 U.S. Dist. LEXIS 122542, at *189 (D.N.M. July 13, 2020)(Browning, J.)("Legacy II")).  The Defendants note that the Proposed Amended Complaint ("PAC") contains only two references to Williams: (i) "Ronnie Williams is the parent of a school aged son with special needs that is entitled to the protection of the IDEA in his educational needs"; and (ii) "Ronnie Williams brings this action, on behalf of herself and all others similarly situated with school aged children with special needs that are entitled to the protections of the IDEA" in listed counties.  Response to MTA at 6 (quoting PAC at 2, 8).  The Defendants reiterate that the PAC does not "contain *any* other allegations regarding this individual or their child," and, notably, the PAC mentions only "Woodworth" -- but never Williams -- "in its

section discussing their IDEA claim . . . ."  Response at 6 (emphasis in original).  The Defendants explain that it is unclear whether Williams resides in New Mexico, whether Williams' child has an IEP, or what educational services Williams' child currently receives.  See Response at 7.  The Defendants aver that, even if the Plaintiffs had included these facts, their proposed amendment would be futile.  See Response at 7.  The Defendants reiterate arguments from their Second MTD, described in Procedural History §6, supra, to demonstrate that amendment would be futile.  See Response at 8.

### 10.  The Second Memorandum Opinion and Order.

On November 5, 2020, the Court issued a Memorandum Opinion and Order granting the NM MTD, and denying in part, and mooting in part, the First MTD.  See Hernandez v. Grisham, No. CIV 20-0942 JB\GBW, 2020 WL 6526163, at *1 (D.N.M. Nov. 5, 2020)(Browning, J.)("Hernandez II").  The Defendants sought to dismiss the Plaintiffs' claims on standing grounds, and argued that the Plaintiffs had not stated a claim for which relief can be granted under 42 U.S. § 1983 against Governor Grisham and Secretary Kunkel.  See Hernandez II, 2020 WL 6526163, at *1.  The Court concluded that: (i) "the Plaintiffs lack standing as to Secretary Kunkel"; (ii) the Plaintiffs "have standing to sue Governor Grisham and Secretary Stewart"; and (iii) the Plaintiffs "stated a claim for which relief can be granted under § 1983 against Governor Grisham." Hernandez II, 2020 WL 6526163 at *1.  Consequently, the Court dismissed Secretary Kunkel and New Mexico from the case,[16] but the Court did not dismiss Governor Grisham or Secretary Stewart.  See Hernandez II, 2020 WL 6526163 at *1.

---

[16]Before the Court issued Hernandez II, the parties stipulated to the dismissal of New Mexico and Secretary Kunkel.  See Notice of Voluntary Dismissal as to State of New Mexico, filed October 12, 2020 (Doc. 26); Notice of Voluntary Dismissal of Kathyleen M. Kunkel, filed October 23, 2020 (Doc. 39).

11.     __The Reply to the Response to the Second MTD.__

The Defendants filed a Reply to the Second MTD Response on November 9, 2020.  See

Defendants' Reply in Support of Motion to Dismiss Plaintiffs' Amended Original Complaint and

Request for Temporary Restraining Order, filed November 9, 2020 (Doc. 63)("Second MTD

Reply").  First, the Defendants' dispute the Plaintiffs' contention that the COVID-19 "'emergency

has ended.'"  Second MTD Reply at 2 (quoting Supp. Info. at 1).  Instead, the Defendants explain,

the COVID-19 pandemic continues to worsen.  See Second MTD Reply at 2.  The Defendants note

that the Court has already concluded that the Reentry Guidance rationally relates to the

Defendants' legitimate goal of preventing COVID-19's spread, but the Plaintiffs' Response to the

Second MTD "fails to meaningfully address this fatal flaw in their constitutional claims."  Second

MTD Reply at 3.  The Defendants continue that education is not a quasi-fundamental right.  See

Second MTD Reply at 3.  Further, the Defendants explain that the Plaintiffs have not demonstrated

that temporary virtual learning violates their right to a basic education.  See Second MTD Reply

at 3.  The Defendants note that the Amended Complaint "fail[s] to make a singular allegation that

the Reentry Guidance's temporary prohibition of in-person learning fails to provide their children

-- or any child in New Mexico . . . with a minimum, basic education."  Second MTD Reply at 3.

The Defendants explain that the Plaintiffs' "Response relies entirely on arguments and allegations

noticeably absent from their complaint" which "cannot be considered in determining the merits of

a motion to dismiss."  Second MTD Reply at 4 (citing Tal v. Hogan, 453 F.3d 1244, 1252 (10th

Cir. 2006)).  The Defendants also argue that, even if heightened scrutiny applies, "the temporary

pause of in-person learning for children in counties with a high spread rate of a deadly virus would

survive such scrutiny."  Second MTD Reply at 5 n.5 (citing Legacy Church, Inc. v. Kunkel, 455

F. Supp. 3d 1100, 1142 (D.N.M. 2020)(Browning, J.)("Legacy I")("[M]itigating a state pandemic

is a compelling interest.")).   The Defendants argue that their interest in limiting COVID-19's spread is just as compelling now as it was when the Court decided Legacy I in April, 2020, because COVID-19 infection rate is far higher.   See Second MTD Reply at 5 n.5.   Moreover, the Defendants aver that the Reentry Guidance survives rational basis scrutiny and that the Plaintiffs' "citation to other states' and countries' approaches to handling education during this once-in-a-lifetime pandemic has absolutely no bearing on the rationality of New Mexico's approach." Second MTD Reply at 6.   See id. at 6 n.7 (noting that at least eight other states have not re-opened their schools).   The Defendants quote S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613-14 (2020)(Roberts, C.J., concurring):

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement.   Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect."   Jacobson v. Massachusetts, 197 U.S. 11, 38 (1905).   When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad."   Marshall v. United States, 414 U.S. 417, 427 (1974).   Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people.   See Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 545 (1985).

Second MTD Reply at 7 (emphasis in Second MTD Reply).   The Defendants note that the Plaintiffs do not explain why limiting in-person learning in counties with a higher COVID-19 infection rate is irrational.   See Second MTD Reply at 7.

Next, the Defendants argue that the Plaintiffs have failed to plead successfully an IDEA claim.   See Second MTD Reply at 8.   The Defendants aver that the Plaintiffs misunderstand the IDEA's LRE requirement.   See Second MTD Reply at 8.   They insist that the LRE provision's purpose is to give students with disabilities access to the same opportunities available to students without disabilities to the greatest "extent possible while taking into consideration the individual

student's needs." Second MTD Reply at 8.  The Defendants continue that, here, remote instruction does not violate the LRE requirement, because students with disabilities "have the same opportunity to access the remote instruction currently provided to general education classes in the districts at issue."  Second MTD Reply at 9-10.  They acknowledge that, although the IDEA does not require directly in-person instruction, it "may be necessary to ensure the provision of FAPE to a student with a disability."  Second MTD Reply at 10.  Consequently, they explain, students with disabilities have access to in-person small group instruction, along with the opportunity to "continue with their peers without disabilities in remote learning."  Second MTD Reply at 10-11. The Defendants continue that the two United States Court of Appeals for the Ninth Circuit cases upon which the Plaintiffs rely do not support the Plaintiffs' conclusion that social interaction is the IDEA's purpose.  See Second MTD Reply at 11 (citing Cty. of San Diego v. California Special Educ. Hearing Officer, 93 F.3d at 1458; Seattle Sch. Dist. v. B.S., 82 F.3d at 1493).

The Defendants note that County of San Diego v. California Special Educ. Hearing Officer barely discusses the LRE requirement, while Seattle Sch. Dist. v. B.S. upholds an IDEA hearing officer's decision to place a student in a residential treatment facility.  See Second MTD Reply at 11-13.  Further, the Defendants note that the Ninth Circuit decided both of these cases before the Supreme Court issued Endrew F. v. Douglas Cty. Sch. Dist., 137 S. Ct. at 988.  See Second MTD Reply at 13.  Accordingly, the Defendants insist that "aside from two generalized statements . . . there is nothing in either of the cited Nin[]th Circuit cases supporting Plaintiffs' sweeping assertion . . . ."  Second MTD Reply at 14.  Moreover, the Defendants continue that the IDEA does not require "states or LEAs [to] change the instruction provided to a general school population to satisfy the 'socialization' needs of a student's IEP."  Second MTD Reply at 14 (no citation for quotation).  The Defendants aver, therefore, that Woodworth's only contention is that

her daughter is not receiving a FAPE, and that Woodworth should this issue address via the administrative process.  See Second MTD Reply at 14-15.  The Court, the Defendants insist, should review IEPs only after a student has completed the administrative process.  See Second MTD Reply at 15.  Further, the Defendants note that Woodworth's daughter has received a new IEP which "reflects that J.W. has been offered and provided with an array of educational services . . . ." Second MTD Reply at 16.  See id. at 16 n.15 ("On October 29, 2020, Hobbs Municipal Schools began providing J.W. with in-person, direct instruction and support in a classroom with other peers four days per week, which again was de[s]igned to address her academic issues and provide another opportunity for social interaction . . . .").  The Defendants argue that the new IEP illustrates that Woodworth's claims are moot.  See Second MTD Reply at 17 (citing Ind. v. Colo. Dep't of Corr., 801 F.3d 1209, 1213 (10th Cir. 2015)).  Finally, the Defendants complain that the Plaintiffs' allegation that the Defendants filed the Second MTD for malicious purposes is "inappropriate and unbecoming of the profession."  Second MTD Reply at 17.

### 12.   The Defendants' Notice of Supplemental Authority.

The Defendants filed a Notice of Supplemental Authority with the Court to inform the Court about a recent decision in the United States District Court for the Southern District of New York, see J.T. v. de Blasio, CIV No. 20-05878-CM, 2020 WL 6748484 (S.D.N.Y. Nov. 13, 2020)(McMahon, C.J.).  See Notice of Supplemental Authority, filed November 16, 2020 (Doc. 65)("Defendants' Supp. Info.").  The Defendants explain that J.T. v. de Blasio relates to the present case, because it "interprets the guidance issued by the U.S. Department of Education regarding compliance" with the IDEA "during the ongoing pandemic."  Defendants' Supp. Info. at 1.  The case also discusses IDEA administrative exhaustion, and whether schools must provide in-person education under the IDEA during the pandemic.  See Defendants' Supp. Info at 1-2.

13.     **The Plaintiffs' Reply in Support of their MTA.**

The Plaintiffs filed a Reply in Support of their MTA on November 16, 2020.  See Plaintiffs'
Reply in Support of Their Motion to Amend, filed November 16, 2020 (Doc. 66)("MTA Reply").
The Plaintiffs argue that the new IEP for Woodworth's daughter "still prohibit[s]" her "from in-
person learning with her peers without disabilities not by a decision of Hobbs School District, but
by Secretary Stewart's order prohibiting non-disable[d] students from attending in-person school
issued at the direction of his boss, Governor Lujan Grisham."[17]  MTA Reply at 2.  The Defendants
also include additional information about Williams, including that: (i) Williams' son is a student
at Artesia High School in Artesia, New Mexico; (ii) Williams' son has an IEP "that contemplates
that he receives in-person education including socialization and learning with students"; and (iii)
"Artesia Public School District is prohibited by the general order of the New Mexico Education
Department from providing Mr. Williams' son with an education that conforms the operable IEP
for the young man."  MTA Reply at 2.

14.     **The November 16, 2020 Hearing.**

The Court held a hearing regarding the Second MTD on November 16, 2020.  See Clerk's
Minutes at 1, filed November 16, 2020 (Doc. 68).  The Court asked the parties whether the Reentry
Guidance had changed since the Court first reviewed the Reentry Guidance.  See Draft Transcript
of Hearing at 4:4-15 (taken November 16, 2020)(Court)("Nov. 16 Tr.").[18]  The Defendants
responded that the Reentry Guidance has not changed.  See Nov. 16 Tr. at 4:17-20 (Agajanian).

---

[17]The Court assumes that the Plaintiffs refer to the Reentry Guidance.

[18]The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

The Defendants explained that although "a small component of this case may be about Ms. Woodworth's daughter and here IEP, what the case is really about is . . . to open up the schools to all students . . . ."  Nov. 16 Tr. at 4:25-5:4 (Agajanian).

Moreover, the Defendants noted that every student with disabilities has the option to receive in-person education.  See Nov. 16 Tr. at 5:8-11 (Agajanian).  The Court asked the Defendants why students with disabilities in Albuquerque, New Mexico, are not receiving an in-person education because of a shortage of teachers willing to provide in-person instruction.  See Nov. 16 Tr. at 5:14-25 (Court); id. at 6:3-6 (Agajanian)(agreeing that this scenario is occurring, but contending that "this is a decision that's being made at the local level").  The Defendants responded that, if a student with disabilities is not receiving in-person education, that student should address his or her concerns through the administrative process.  See Nov. 16 Tr. at 8:5-13 (Agajanian).  The Court explained that "we've already agreed that a fair chunk" of IEPs "require in-person learning, the state just now needs to order the teachers to start showing up at the schools and providing that."  Nov. 16 Tr. at 9:1-7 (Court).  The Defendants noted that New Mexico's teacher population is "the third oldest in the country, with an average age of fifty-five, so that may be a reason why these teachers are very reluctant to be in school in person . . . ."  Nov. 16 Tr. at 10:23-11:3 (Agajanian).  The Defendants continued that the PED instructs the school districts that they must comply with the IDEA.  See Nov. 16 Tr. at 13:9-13 (Agajanian).  The Court noted that "this seems to be a major breakdown . . . in the sense that teachers are just not at the schools."  Nov. 16 Tr. at 16:17-24 (Court).  The Court continued that it did not know how an administrative hearing officer could provide relief to a broader class.  See Nov. 16 Tr. at 16:22-17:3 (Court).  Next, the Defendants argued that there is no cause of action against Governor Grisham or Secretary Stewart under the IDEA.  See Nov. 16 Tr. at 18:14-19 (Agajanian).  The Defendants noted that

neither the LEAs nor the SEA had been sued directly.  See Nov. 16 Tr. at 19:1-9 (Agajanian, Court).

The Plaintiffs contended that students with disabilities are "not receiving the mainstreaming component of the IDEA, which includes, at least in a couple of circuits, socialization and social interaction as part of the development of these students."  Nov. 16 Tr. at 23:21-24:5 (Dunn).  The Court asked whether J.W.'s IEP indicates that she needs socialization with students without disabilities.  See Nov. 16 Tr. at 24:10-17 (Court).  The Plaintiffs stated that the IEP for Williams' son, B.W., indicates that he needs socialization with students without disabilities, and that J.W., "by nature of her disabilities, would generally only be in a mainstream class."  Nov. 16 Tr. at 25:5-25:14 (Dunn).  The Plaintiffs conceded that J.W.'s IEP does not state "specifically" that J.W. needs socialization with children without disabilities.  See Nov. 16 Tr. at 25:19-26:1 (Dunn).  The Plaintiffs argued, however, that, under the IDEA, "'to the maximum extent appropriate,'" "children with disabilities . . . " "'are educated with children who are not'" "disabled."  Nov. 16 Tr. at 26:17-25 (Dunn)(quoting 20 U.S.C. § 1412(5)(A)).  The Court advised the Plaintiffs that it was "reluctant to say what is inherent in an IEP," because IEPs "are very, very specific."  Nov. 16 Tr. at 27:15-21 (Court).  The Plaintiffs noted that the PED has "recognized the need for mainstreaming when it comes to IEPs," and "they're doing it for younger students," but argued that the IDEA also requires mainstreaming for older students.  Nov. 16 Tr. at 28:22-29:3 (Dunn).

The Court noted that it understands that some IEPs require in-person learning, but that it is skeptical that children with disabilities need in-person education with children without disabilities.  See Nov. 16 Tr. at 30:18-20 (Court).  The Plaintiffs argued that the Court should issue an injunction removing any prohibition on in-person education to allow "school districts to effectuate main-

streaming pursuant to COVID-safe guidelines." Nov. 16 Tr. at 33:22-34:8 (Dunn). The Plaintiffs agreed with the Court that the only relief they would like under the IDEA "is to order Secretary Stewart to remove the prohibition on" the "participation in small groups of no more than five students" for "fourth through twelfth grade." Nov. 16 Tr. at 34:21-35:5 (Court, Dunn). The Court asked the Plaintiffs to address the Defendants' argument that the PED and the LEAs are the proper defendants in this action. See Nov. 16 Tr. at 36:9-12 (Court). The Plaintiffs noted that they "hadn't thought of that before now." Nov. 16 Tr. at 37:3-4 (Dunn). See id. at 39:11-17 (Agajanian)(explaining that the Defendants raised this issue in the Second MTD at 30). The Defendants noted that under the LRE provision, "students with disabilities gets the same opportunities, the same learning environment that the students in the general population get. In this case, that's remote for the older students." Nov. 16 Tr. at 39:21-41:2 (Agajanian). See id. at 41:17-19 (Agajanian)("In this day and age the general education classroom is on Zoom, frankly."). The Defendants also suggested that students with IEPs have opportunities to socialize outside of school -- at church, for example. See Nov. 16 Tr. at 43:2:3 (Agajanian). The Defendants continued that their position is that rational basis review should apply in this case. See Nov. 16 Tr. at 44:3-10 (Agajanian). New Mexico[19] argued that the individualized nature of these claims necessitates that parents of students with disabilities exhaust administrative remedies. See Nov. 16 Tr. at 45:1-17 (Sydow). New Mexico noted that "you might have a claim" if an IEP states that a student "needs to have in-person education" with students without disabilities and "the school district, through the administrative process, was unable to meet that requirement because of" Secretary

---

[19]New Mexico has been voluntarily dismissed from this case without prejudice. See Stipulation of Voluntary Rule 41 Dismissal of The State Of New Mexico at 1.

Stewart's directives.  Nov. 16 Tr. at 46:9-16 (Sydow).  New Mexico concluded, however, that it did "not see those facts as present."  Nov. 16 Tr. at 46:15-16 (Sydow).

The Plaintiffs emphasized that the J.W. IEP requires that J.W. be in a regular classroom forty to seventy percent of the day.  See Nov. 16 Tr. at 47:11-13 (Dunn)(citing J.W. IEP Addendum at 26).  The Plaintiffs cited County of San Diego v. California Special Educ. Hearing Office, 93 F.3d at 1458, and contended that this case indicates that students with IEPs should receive socialization.  See Nov. 16 Tr. at 47:16-24 (Dunn).  The Plaintiffs noted that they remain "unwilling to concede that this is a fundamental liberty under an Obergefell [v. Hodges, 576 U.S. 644 (2015),] or a Roe [v. Wade, 410 U.S. 113 (1973)] analysis."  Nov. 16 Tr. at 48:9-11 (Dunn).  The Defendants responded that City of San Diego v. California Special Educ. Hearing Office, 93 F.3d at 1458, is distinguishable from this case, because, in that case, the student was "hospitalized for psychiatric reasons and wanted the education department to pay for it."  Nov. 16 Tr. at 49:21-50:6 (Agajanian).  The Defendants argued that the Woodworth's claim is moot, and that the Plaintiffs have conceded that Gallegos and Hernandez lack standing, because they did not respond to these arguments in the response brief.  See Nov. 16 Tr. at 50:21-51:12 (Agajanian).  The Plaintiffs concluded that the Defendants' restrictions on in-person learning prevent J.W. and B.W. from receiving a FAPE under the IDEA.  See Nov. 16 Tr. at 52:15-53:6 (Dunn).

**16.   The November 19, 2020 Hearing.**

On November 19, 2020, the Court held a hearing on the PI Motion and the Motion to Amend. See Nov. 19 Tr. at 2:1 (Court).  First, the Court heard argument on the Motion to Amend. See Nov. 19 Tr. at 4:1-3 (Court, Dunn).  The Plaintiffs argued that the Court should allow them leave to amend to add Williams as "another class rep for the IDEA students or parents of those students." Nov 19. Tr. at 5: 1-4 (Dunn).  The Plaintiffs continued: "The issue, of course, under § 1983 is that Mr. Williams is another person that has had his child's IEP left unsatisfied by the

general orders of the PED and the Governor."  Nov. 19. Tr. at 8:10-14 (Dunn).  The Defendants responded that the PAC does not indicate whether Williams' son has an IEP, nor does it include Williams in its discussion of the IDEA claims.  See Nov 19. Tr. at 9:10-12 (Agajanian).  The Defendants continued that adding a new plaintiff at an early stage in the litigation can cause problems, and stated that the "Complaint is just insufficient all the way around in terms of adding Mr. Williams."  Nov. 19 Tr. at 9:18-20 (Agajanian).  The Defendants explained that, because Williams has not exhausted his administrative remedies, allowing the Plaintiffs to add Williams would be futile.  See Nov 19 Tr. at 10:4-11 (Agajanian).  The Plaintiffs insisted that the reason Williams should be added is because "The conditions of the IEP are not being met. And in spite of a current IEP, a free and appropriate public education is still being denied to these children under the IDEA."  Nov 19. Tr. at 12:12-18 (Dunn).  New Mexico also argued that the MTA raises administrative exhaustion issues, and as a result, should be denied for futility reasons.  See Nov. 19 Tr. at 14:5-12 (Sydow).

### 17.   The November 23, 2020 Hearing.

The parties gave closing arguments on the PI Motion.  See Transcript of Hearing at 206:1-3 (taken November 23, 2020)(Dunn)("Nov. 23 Tr.").  First, the Plaintiffs argued that, although they insist that intermediate scrutiny applies here, the Defendants cannot survive even rational basis review.  See Nov. 23 Tr. at 206:11-24 (Dunn).  The Plaintiffs noted that the Defendants' have "actively not taken certain things into consideration," including the impact of school closures on students' mental health, in their epidemiological modeling.  Nov. 23 Tr. at 207:1-7 (Dunn).  The Plaintiffs insisted that the Defendants' actions are "irrational," and, that "if something is irrational, it cannot meet the rational basis test."  Nov. 23 Tr. at 207:13-16 (Dunn).

With respect to the IDEA claims, the Plaintiffs argued that Woodworth's and Williams' testimony indicates that remote instruction does not provide their children with a FAPE in their

LRE.  See Nov. 23 Tr. at 208:2-9 (Dunn).  The Plaintiffs continued that "meeting the elements of a FAPE . . . includes . . . the socialization and it includes the inclusion learning, which can't be accomplished for most students through some level of remote learning."  Nov. 23 Tr. at 209:1-11 (Dunn).  They explained that a lack of in-person socialization is harming students with disabilities and causing suicide rates to increase in the general student population.  See Nov. 23 Tr. at 209:22-210:4 (Dunn).  The Plaintiffs observed that, although Texas has opened its schools for in-person learning, "they're not having this super-spreader type of event go on in these schools" that the Defendants fear.  Nov. 23 Tr. at 210:13-17 (Dunn).  The Plaintiffs also alleged that the Defendants have ignored statement of the CDC Director, Robert Redfield, that schools are the safest place for students.  See Nov. 23 Tr. at 211:1-7 (Dunn); CDC Director Redfield Says Data Supports Face-to-Face Learning in Schools, C-SPAN (Nov. 19, 2020), https://www.c-span.org/video/?c4924557/cdc-director-redfield-data-supports-face-face-learning-schools.  The Plaintiffs maintained that the modeling upon which the Defendants rely is outdated and that they have ignored consistently successful models from other jurisdictions.  See Nov. 23 Tr. at 211:8-15 (Dunn).  The Plaintiffs also suggested that denying students an in-person education "puts them on a path to poverty."  Nov. 23 Tr. at 212:1-8 (Dunn).

The Court asked the Plaintiffs whether they still want a negative injunction against Secretary Stewart stating: "Do not prohibit in-person learning for grades four through twelve."  Nov. 23 Tr. at 212:21-213:1 (Court).  The Plaintiffs explained that they would prefer an affirmative injunction requiring the Defendants to "tell the school districts: You're not allowed to not have students -- the IEP students be provided at least some amount of in-person instruction."  Nov. 23 Tr. at 213:12-15 (Dunn).  The Plaintiffs clarified that their requested injunctive relief would have two components: (i) "the Secretary of Education shall direct the school districts to ensure that

IDEA students are receiving in-person instruction pursuant to their IEPs"; and (ii) "the Secretary of Education and PED shall refrain from prohibiting school districts from taking steps necessary to meet the requirements of the IDEA."  Nov. 23 Tr. at 214:7-20 (Court, Dunn).

Next, the Defendants presented closing arguments.  Nov. 23 Tr. at 216:3-5 (Agajanian). First, the Defendants argued that there is a rational basis for the challenged policies and that rational basis review applies here.  See Nov. 23 Tr. at 216:3-5 (Agajanian).  The Defendants maintained that the "least restrictive environment right now" is remote instruction and that "all students have access to that."  Nov. 23 Tr. at 217:1-5 (Agajanian).  Next, the Defendants explained that the Defendants' provision of in-person learning to students without disabilities in pre-kindergarten through third grades has a rational basis: "In grades pre-K through three, students are learning to read.  In grades four through twelve they are reading to learn. That's the difference." Nov. 23 Tr. at 218:1-5 (Agajanian).  Further, the Defendants submitted that the Ninth Circuit case upon which the Plaintiffs rely -- Cty. of San Diego, 93 F.3d 1458 -- contains the word "socialization," but that "the case isn't about whether a student with an IEP can be required to have socialization with the general education population" but "an entirely different set of circumstances."  Nov. 23 Tr. at 218:7-18 (Agajanian).  The Defendants argued that, consequently, "what's conspicuous in its absence is any case law supporting the plaintiffs' position."  Nov. 23 Tr. at 218:19-21 (Agajanian).  The Defendants also responded to the Plaintiffs' contention that they had failed to consider mental health effects on children, noting that the model in question was an "epidemiological model.  It's not supposed to consider mental health or anything else . . . . It is strictly a model to show the spread of COVID-19."  Nov. 23 Tr. at 219:21-25 (Agajanian).  The Defendants observed that COVID-19 is now worse than it was when LANL created the initial epidemiological modeling.  See Nov. 23 Tr. at 220:1-11 (Agajanian).  The Defendants responded

to the Plaintiffs' characterization of schools in Texas, and noted that the school to which the Plaintiffs refer in Muleshoe, Texas, "is a nightmare waiting to happen, and it's already started. Masks are optional, twenty kids in the high school positive" for COVID-19 "in two weeks."  Nov. 23 Tr. at 221:10-19 (Agajanian).

The Court noted that it does not think the USDOE guidance upon which the Defendants rely is "very useful at all.  It's so general."  Nov. 23 Tr. at 225:1-5 (Court).  The Defendants responded that they do not disagree and that the guidance at issue "essentially said: Keep doing your thing."  Nov. 23 Tr. at 225:8-18 (Agajanian).  See id. at 226:20-21 (Agajanian)(stating that "I don't disagree that" the USDOE guidance is "lacking in detail").  Next, the Defendants discussed the LRE requirements and argued that remote instruction is a general educational environment under the LRE provision, because remote instruction is offered to students without disabilities.  See Nov. 23 Tr. at 227:11-229:14 (Agajanian).  The Defendants acknowledged that, although "a student might thrive a year ago in a general education setting," in which they would have received in-person instruction, "maybe they don't now.  But that's why you've got to adjust their IEP, and then adjust their education accordingly at the local level."  Nov. 23 Tr. at 229:15-19 (Agajanian).  Last, the Defendants clarified their definition of LRE: "the least restrictive environment at the IDEA level has to do with whether or not the child is in a classroom with his or her peers."  Nov. 23 Tr. at 230:12-15 (Agajanian).

New Mexico spoke next, adding that "there is a strong interest in public health right now" and argued that the State is best situated to make public health judgments in consultation with experts.  Nov. 23 Tr. at 237:15-25 (Sydow).  New Mexico emphasized that the "hospitals in New Mexico are effectively full, in terms of their capacity to treat people with COVID-19, in terms of the available" intensive care unit ("ICU") "beds . . . and staffing for those beds," and, therefore

"the State's interest in preserving health and lives of New Mexicans is . . . at its apex."  Nov. 23 Tr. at 238:2-12 (Sydow).  New Mexico insisted that the State has a rational basis for providing remote instruction, because it is trying to protect the public from COVID-19.  See Nov. 23 Tr. at 238:13-19 (Sydow).  New Mexico also emphasized that the Plaintiffs have not made "any claim in the pleadings related to the teachers union or Albuquerque Public Schools," and, accordingly "for such a claim to be brought, the school district, and perhaps the union, are necessary parties . . . ."  Nov. 23 Tr. at 239:8-17 (Sydow).  The Court concluded by asking the Plaintiffs to respond to the holding in J.T. v. de Blasio that, under the IDEA, "children complaining about school closure need to bring individual actions against individual school districts."  Nov. 23 Tr. at 255:2-13 (Court).  The Defendants responded that, because of Statewide "public health orders, the districts' hands are tied."  Nov. 23 Tr. at 255:15-25 (Dunn).

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986); United States v. Nixon, 418 U.S. 683 (1974); Tafoya v. U.S. Dep't of Justice, Law Enf't Assistance Admin., 748 F.2d 1389, 1390 (10th Cir. 1984)).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").  Because "federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction."  U.S. ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999).  Rule 12(b)(1) allows a

party to raise, by motion, the defense of the court's "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1).

The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002). On a facial attack, a plaintiff enjoys safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897 (1981).  When the attack is factual, however,

> a district court may not presume the truthfulness of the complaint's factual allegations.  A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(citations omitted).  See World Fuel Servs., Inc. v. Nambe Pueblo Dev. Corp., 362 F. Supp. 3d 1021, 1086-87 (D.N.M. 2019)(Browning, J.);  Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9 (D.N.M. March 11, 2009)(Browning, J.), aff'd on other grounds by 634 F.3d 1170 (10th Cir. 2011).  The United States Court of Appeals for the Fifth Circuit has stated:

> "[T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the complaint's allegations to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d at 1003.  In those instances, a court's reference to evidence outside the pleadings does not convert necessarily the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, the court determines that jurisdictional issues a rule 12(b)(1) motion raises are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.  See Franklin Sav. Corp. v. United States, 180 F.3d at 1129; Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).  "When subject-matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case, the jurisdictional claim and the merits are considered to be intertwined."  Garcia v. United States, No. CIV 08-0295 JB/WDS, 2009 WL 1300938, at *9 (D.N.M. March 30, 2009)(Browning, J.)(citing Wheeler v. Hurdman, 825 F.2d at 259; Holt v. United States, 46 F.3d at 1003).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the Court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered[.]").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the Plaintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)("Iqbal")). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted). See Duncan v. Citibank, No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements necessary to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). A court will not construe a plaintiff's pleadings

"so liberally that it becomes his advocate."  Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007

WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the line
> from conceivable to plausible."  The allegations must be enough that, if assumed to
> be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly,

550 U.S. at 570)(internal citations omitted)).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs,

278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

 Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v.

Ulibarri, 595 F.3d at 1125.  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91

F. App'x 83 (10th Cir. 2004) states: "When ruling on a Rule 12(b)(6) motion, the district court

must examine only the plaintiff's complaint.  The district court must determine if the complaint

alone is sufficient to state a claim; the district court cannot review matters outside of the

complaint."  91 F. App'x at 85.[20]  There are three limited exceptions to this general principle:

---

[20]Carter v. Daniels is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.
32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their
persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and . . .
> citation to unpublished opinions is not favored . . . . However, if an unpublished
> opinion . . . has persuasive value with respect to a material issue in a case and would
> assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Donahue
v. Kansas Bd. of Educ., 827 F. App'x 846, 853 (10th Cir. 2020); Burke v. New Mexico, 696
F. App'x 325, 329 (10th Cir. 2017); Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007);
Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005); and Carter v. Daniels, 91 F. App'x
83 (10th Cir. 2004), have persuasive value with respect to a material issue, and will assist the Court
in its disposition of this Memorandum Opinion and Order.

(i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005).  The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing.  See Mocek v.

City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court also previously has ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

Conversely, in a securities class action and as an exception to the general rule, the Court concluded that the Court may consider a defendant's operating certification, to which the plaintiffs referred in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg.

Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson,

760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the

complaint, because they were "documents that a court can appropriately view as either part of the

public record, or as documents upon which the Complaint relies, and the authenticity of which is

not in dispute").

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's

case.'" Herrera v. Santa Fe Pub. Sch., 956 F. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting

Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera

v. Santa Fe Pub. Sch.)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving
> party must satisfy its burden of production in one of two ways: by putting evidence
> into the record that affirmatively disproves an element of the nonmoving party's
> case, or by directing the court's attention to the fact that the non-moving party lacks
> evidence on an element of its claim, "since a complete failure of proof concerning
> an essential element of the nonmoving party's case necessarily renders all other
> facts immaterial." Celotex, 477 U.S. at 323-25.  On those issues for which it bears
> the burden of proof at trial, the nonmovant "must go beyond the pleadings and
> designate specific facts to make a showing sufficient to establish the existence of
> an element essential to his case in order to survive summary judgment." Cardoso
> v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets
> omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9,

2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial,

that party must support its motion with credible evidence -- using any of the materials specified in

Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[21]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLCNorthland Piping, Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  See 184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).  Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC

---

[21]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir.

1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."   (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"   Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).   Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find

- 67 -

for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)] explained that the blatant contradictions of the record must

be supported by more than other witnesses' testimony."  Lymon v. Aramark Corp., 728 F. Supp.

2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

To allege a claim for relief, rule 8 of the Federal Rules of Civil Procedure requires a

pleading to contain

> (1)  a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2)  a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3)  a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8.  Parties may allege new claims in motions for summary judgment.  See Evans v. McDonald's Corp., 936 F.2d at 1090-91.  When this occurs, courts treat the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure.  See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998).  The Tenth Circuit has stated that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."  Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quotation marks omitted).  While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case."  Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING THE IDEA

The IDEA provides a comprehensive statutory scheme to ensure provision of special education to students with disabilities.  See 20 U.S.C. §§ 1400 et seq.  The IDEA's overarching purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).

1.    __Policy Underlying the IDEA.__

The IDEA embodies "a strong federal policy to provide an appropriate education for every [disabled] child."  Kruelle v. New Castle Cty. Sch. Dist., 642 F.2d 687, 690 (3d Cir. 1981).  The United States Court of Appeals for the Third Circuit in Kruelle v. New Castle County School District cites various passages of legislative history in explaining that Congress passed the IDEA to further three interrelated purposes.  See 642 F.2d at 690.  First, Congress sought to secure by legislation the right to a publicly-supported equal educational opportunity which it perceived to be mandated by Brown v. Board of Education, and explicitly guaranteed with respect to the students with disabilities by two seminal federal cases, Pennsylvania Association for Retarded Children v. Pennsylvania, 343 F. Supp. 279 (E.D. Pa. 1972) and Mills v. Board of Education, 358 F. Supp. 886 (D.D.C. 1972).  See Kruelle v. New Castle County Sch. Dist., 642 F.2d at 690-91 (citing S. Rep. No. 168, 94th Congress, 1st Sess. 6, reprinted in U.S. Code Cong. & Ad. News 1425, 1430)(footnotes omitted).  Second, "Congress intended the provision of education services to increase the personal independence and enhance the productive capacities of handicapped citizens."  Kruelle v. New Castle County Sch. Dist., 642 F.2d at 691 (citation and footnote omitted).  Third, Congress "acknowledged the need for an expanded federal fiscal role to aid state compliance with the court decisions and to assure protection for the rights of handicapped children." 642 F.2d at 691.  According to the Third Circuit in Kruelle v. New Castle County School District, Congress employed a cost-benefit philosophy: "[i]nstead of saddling the public agencies and taxpayers with the enormous expenditures necessary to maintain the handicapped as lifelong dependents in a minimally acceptable institutionalized existence, Congress reasoned that the early injection of federal money and provision of educational services would remove this burden by

creating productive citizens."  642 F.2d at 691 (citing S. Rep. No. 168, 94th Congress, 1st Sess.,

reprinted in U.S. Code Cong. & Ad. News, 1425, 1434).

     2.    **The IDEA's Basic Structure**.

The IDEA is, on its surface, a funding statute.  See Chavez ex rel. M.C. v. New Mexico

Pub. Educ. Dep't, 621 F.3d at 1287.  The Supreme Court has pointed out, however, that the IDEA

"confers upon disabled students an enforceable substantive right to public education in

participating States."  Honig v. Doe, 484 U.S. 305, 310 (1988). The Office of Special Education

Programming of the United States Department of Education administers the IDEA.  See 20 U.S.C.

§§ 1406, 1417.  States decide whether to participate in the IDEA and accept the funds that it

provides.  New Mexico was the last state to accept federal funding under the IDEA.  See Bd. of

Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 183-84 (1982).  The IDEA

defines the term "free appropriate public education" ("FAPE"):

> The terms "free and appropriate public education" means special education and
> related services that --
>
>     (A)    have been provided at public expense, under public supervision
> and direction, and without charge;
>
>     (B)    meet the standards of the State educational agency;
>
>     (C)    include an appropriate preschool, elementary, or secondary school
> education in the State involved; and
>
>     (D)    are provided in conformity with the individualized education
> programs required under section 1414(d) of [IDEA].

20 U.S.C. § 1401(8).

Through the IDEA, Congress chose a highly detailed procedural scheme to ensure that

children with disabilities receive the special education and related services they need.  See Bd. of

Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 205-06. The Honorable M.

Christina Armijo, United States District Judge for the District of New Mexico, has recognized that the IDEA scheme of ensuring that all children with disabilities receive a FAPE involves parents, schools, and states:

> The IDEA additionally envisions a collaborative effort by which parents, educators, state and others work together not just to create a personalized [individual education plan ("IEP")] through which the individual child will receive the free appropriate public education to which he or she is entitled, but also to effect systemic change.

Sanders v. Santa Fe Pub. Schs., 383 F. Supp. 2d 1305, 1310 (D.N.M. 2004)(Armijo, J.)(citing 20 U.S.C. § 1414(d)(1)-(4))).

Each SEA "must enact procedures and policies to implement the IDEA, and ensure both state and local compliance with the Act. LEAs are given primary responsibility for overseeing the actual provision of special education services to disabled children." Ellenberg, 478 F.3d at 1269 (citing 20 U.S.C § 1412(a)(11); 1413(a)(1); Gadsby v. Grasmick, 109 F.3d 940, 942-43 (4th Cir. 1997)). "SEAs ensure LEA compliance through the power of the purse: Federal IDEA funds are distributed to the SEA, and those funds may not be forwarded to LEAs within the state unless they demonstrate compliance with the IDEA to the satisfaction of the SEA." Ellenberg, 478 F.3d at 1269 (citing 20 U.S.C. § 1413(a), (d)). If an LEA is "unable to establish and maintain programs of free appropriate public education in compliance with IDEA," the SEA must provide special education and related services directly to disabled children. Ellenberg, 478 F.3d at 1269 (citing 20 U.S.C. § 1413(h)(1)).

### 3.    Standard of Review for IDEA Administrative Decisions.

A United States district court undertakes a "modified de novo" review of the underlying IDEA administrative decisions. Erickson v. Albuquerque Pub. Schs., 199 F.3d 1116, 1120 (10th Cir. 1999). The district court must "independently review the evidence contained in the administrative record, accept and review additional evidence if necessary, and make a decision

based on a preponderance of the evidence, while giving 'due weight' to the administrative proceedings below." Murray v. Montrose Cty. Sch. Dist. RE-1J, 51 F.3d 921, 927 (10th Cir. 1995). The district court reviewing the final state administrative IDEA decision reviews questions of law de novo. See O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233, 144 F.3d 692, 698 (10th Cir. 1998). "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005).

### 4.      Supplementation of the Administrative Record.

The IDEA provides that the need for additional evidence is within a district court's discretion. See 20 U.S.C. § 1415(i)(2)(C). The IDEA apparently requires, however, an evidentiary hearing to determine what evidence a district court should consider adding to the record. See 20 U.S.C. § 1415(i)(2)(C)(ii)(stating that the court "shall hear additional evidence at the request of a party"). In light of this mandatory language, the Court observes that there is some tension between 20 U.S.C. § 1415(i)(2)(C)(ii) and the exhaustion requirement under the IDEA, 20 U.S.C. § 1415(i)(2)(A), which requires parties to present arguments and evidence for administrative review before presenting them to a federal court. The Court believes, however, that the tension is resolved through the "modified de novo review" of a plaintiffs' IDEA claims. Murray v. Montrose County Sch. Dist. RE-IJ, 51 F.3d at 927 (explaining that "[t]he district court must therefore independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving 'due weight' to the administrative proceedings below").

### 5.      Enforcing Administrative Orders Under the IDEA's Stay-Put Provision.

The IDEA's stay-put provision, 20 U.S.C. § 1415(j), provides, in pertinent part:

[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall

> remain in the then-current educational placement of the child, or, if applying for
> initial admission to a public school, shall, with the consent of the parents, be placed
> in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).  The statutory stay-put provision thus seeks to maintain the status quo during

the administrative and judicial proceedings that IDEA provides.  "The purpose of the stay-put

provision is to prevent school districts from 'effecting unilateral change in a child's educational

program' during the pendency of IDEA proceedings."  Erickson v. Albuquerque Pub. Schs., 199

F.3d at 1121 (quoting Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 83 (3d Cir. 1996)).

The Tenth Circuit has recognized that the IDEA's stay-put "has been construed to impose

'an automatic statutory injunction' requiring that the child's then-current educational placement

be maintained . . . ."  Miller v. Albuquerque Pub. Schs., 565 F.3d 1232, 1252 n.13 (10th Cir. 2009).

In Laster v. District of Columbia, 394 F. Supp. 2d 60 (D.D.C. 2005)(Urbina, J.), the Honorable

Ricardo M. Urbina, United States District Court Judge for the District of Columbia, stated:

> A parent can invoke the stay put provision when the school system proposes "a
> fundamental change in, or elimination of, a basic element of the [then-current
> educational placement]."  Lunceford v. Dist. of Columbia Bd. of Educ., 745 F.2d
> 1577, 1582 (D.C. Cir. 1984).  A parent moving for a stay put injunction "must
> identify, at a minimum, a fundamental change in, or elimination of a basic element
> of the education program in order for the change to qualify as a change in
> educational placement."  Id.

Laster v. District of Columbia, 394 F. Supp at 64.  The IDEA's stay-put provision becomes

applicable only when a change in a child's placement is proposed.  See Moss v. Smith, 794

F. Supp. 11, 14 (D.D.C. 1992).  See DeLeon v. Susquehanna Cmty. Sch. Dist., 747 F.2d 149, 152

(3d Cir. 1984)(stating that the threshold question is whether there is a proposed change in

"educational placement").

Once a change in educational placement has been proposed, IDEA's stay-put provision

operates as a substitute for traditional preliminary injunction analysis.  See Casey K. ex rel.

Norman K. v. St. Anne Cmty. High Sch.302, 400 F.3d 508 (7th Cir. 2005)(Posner, J.).  In Casey

- 75 -

K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302, the United States Court of

Appeals for the Seventh Circuit, in an opinion authored by the Honorable Richard A. Posner,

United States Circuit Judge, stated: "The stay-put provision has been interpreted as imposing an

automatic statutory injunction . . . like the automatic stay in bankruptcy."  400 F.3d. at 511 (citing

Honig v. Doe, 484 U.S. at 326-27).  "The law is clear that an administrative decision in favor of

the parents is equivalent to an agreement between the state agency and the parents and, therefore,

represents the child's current education placement for purposes of IDEA's 'stay-put' provision."

Bd. of Educ. of Albuquerque Pub. Schs. v. Miller, No. CIV.05-487 MCA/LFG, 2005 WL 6168485,

at *4 (D.N.M. July 22, 2005)(Armijo, J.)(citing 34 C.F.R. § 300.514(c)); Sch. Comm. of Town of

Burlington v. Mass. Dep't of Educ., 471 U.S. 359, 373 (1985); Bd. of Educ. v. Schutz, 290 F.3d

476, 482-84 (2d Cir. 2002); Ga. State Dep't of Educ. v. Derrick C., 314 F.3d 545, 552 (11th Cir.

2002); Susquenita Sch. Dist. v. Raelee S., 96 F.3d at 83-84; Clovis Unified Sch. Dist. v. Cal. Office

of Admin. Hearings, 903 F.2d 635, 641 (9th Cir. 1990); Bd. of Educ. of Pine Plains Cent. Sch.

Dist. v. Engwiller, 170 F. Supp. 2d 410, 413-14 (S.D.N.Y.2002)).  Judge Armijo explained in

Miller v. Board of Education of the Albuquerque Public Schools:

> The Court also must keep in mind that this case presents an unusual situation where
> the Plaintiffs are appealing from an administrative proceeding at which they
> prevailed and received some form of equitable relief as to most of the substantive
> issues . . . . [T]he IDEA does not give Plaintiffs the right to bring a civil action for
> judicial review of the administrative proceedings conducted pursuant to that statute
> unless and until they are "aggrieved" by the result of those proceedings. *See* 20
> U.S.C. § 1415(i)(2)(A); *Robinson v. Pinderhughes*, 810 F.2d 1270, 1275 (4th Cir.
> 1987).  It follows that there is no basis for the Court to review evidentiary rulings
> with respect to those issues on which the AAO found in Plaintiffs' favor and
> awarded adequate relief.
>
> . . . .
>
> That a student is aggrieved by a school district's failure to comply with an
> administrative tribunal's decision in favor of the student is a separate and distinct
> claim that may rest on an entirely different legal theory than the relatively

straightforward IDEA . . . . _See, e.g., Robinson,_ 810 F.2d at 1274-75 (concluding that such non-compliance can be addressed under 42 U.S.C. § 1983).

2006 WL 2786759 at *14, 16.

## LAW REGARDING FEDERAL-QUESTION JURISDICTION

Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction.  See Basso v. Utah Power & Light Co., 495 F.2d at 909; Chavez v. Kincaid, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998).  A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  There is a federal question if the case arises under the Constitution, laws, or treatises of the United States.  See 28 U.S.C. § 1331.  Whether a case arises under a federal law is determined by the "wellpleaded complaint rule," Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 9 (1983), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)).   This determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose."  Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. at 10 (citing Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)).  The Supreme Court has further limited subject-matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action.  See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 25-26.  The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 813 (1986).  See Sandoval v. New Mexico Tech. Grp., L.L.C., 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("Merrell Dow is

- 77 -

the controlling law when invoking subject matter jurisdiction" when a right under state law turns on construing federal law).   District courts must exercise "prudence and restraint" when determining whether a federal question is presented by a state cause of action because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system."   Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810.

In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)).   If the resolution turns on a substantial question of federal law, the federal question must also be "contested."   Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005).   Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." 542 U.S. at 313.   Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts.  542 U.S. at 313.   See Darr v. N.M. Dep't of Game & Fish, 403 F. Supp. 3d 967, 1012 (D.N.M. 2019)(Browning, J.)(explaining that, to establish federal-question jurisdiction, "the federal question must also be 'actually disputed,' and its necessary to the case's resolution" (quoting Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314)); Bonadeo v. Lujan, 2009 WL 1324119, at *7-9.

## LAW REGARDING YOUNGER ABSTENTION

Under the abstention doctrine that the Supreme Court articulates in Younger, 401 U.S. 37, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief. Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)). Younger abstention is not a doctrine only belonging to courts of equity, although the doctrine arose from parties seeking equitable relief from state court proceedings in federal court. The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' [r]ather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief." Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996)). This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs." J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)).

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)("Middlesex")); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001). When all of the elements mandating abstention clearly exist in the record, courts may and should address

application of the Younger abstention doctrine sua sponte.  See Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)(stating that "abstention may be raised by the court sua sponte"); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

"Younger abstention is not discretionary once the [three] conditions are met, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims." Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)(citation omitted).  See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise.").  When the Younger abstention elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation.  Deakins v. Monaghan, 484 U.S. 198, 202 (1988).  For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action.  See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended).  See also Younger, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a state court can address a plaintiff's causes of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the state court proceeding.  In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights.  See 242 F. App'x at 613.  The parent had requested a federal district court to issue an order regarding his parental rights and rights to child support payments, and to award the parent monetary damages recompensing him for his past child support payments.  See 242 F. App'x at 611.  Additionally, the parent alleged that the Colorado state trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court seeking money damages from the state court officials adjudicating his state custody case.  242 F. App'x at 613.  The Tenth Circuit ruled that the district court was right to abstain from hearing the parent's case under Younger.  See Wideman v. Colorado, 242 F. App'x at 614.  The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614.  Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigant any federal constitutional issues that may arise . . . in the Colorado state proceedings." 242 F. App'x at 614.  Thus, where the Younger abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing.

## LAW REGARDING 42 U.S.C. § 1983 CLAIMS

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute.  See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'")(second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1197 (10th Cir. 1998)).  Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court clarified that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Iqbal, 556 U.S. at 676.  Consequently, there is no respondeat superior liability under § 1983.  See Iqbal, 556 U.S. at

- 82 -

676 ("Because vicarious liability is inapplicable to Bivens[22] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in

---

[22]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), the Supreme Court of the United States held that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389.  Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See Bivens, 403 U.S. at 389.  See also Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit has noted, however, that Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The Tenth Circuit illustrated this principle via Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).  The Tenth Circuit noted that, there, the Supreme Court found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush

the nascent labor organizations.'" Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING PRELMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Tr. Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter, 555 U.S. at 19 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.")(citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008)).  The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).  "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282.  "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be

inadequate and difficult to ascertain.'" <u>Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.</u>, 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting <u>Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.</u>, 269 F.3d 1149, 1156 (10th Cir. 2001)(citing <u>Kikumura v. Hurley</u>, 242 F.3d at 963)).  "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm."  <u>Logan v. Pub. Emps. Ret. Ass'n</u>, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing <u>Schrier v. Univ. of Colo.</u>, 427 F.3d 1253, 1266 (10th Cir. 2005).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'"  <u>Schrier v. Univ. of Colo.</u>, 427 F.3d at 1258 (quoting <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. at 395).  In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  <u>Schrier v. Univ. of Colo.</u>, 427 F.3d at 1258 (internal quotation marks omitted)(quoting <u>O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 975 (10th Cir. 2004), <u>aff'd and remanded sub nom.</u> <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418 (2006)("<u>O Centro II</u>")).  <u>Accord</u> <u>Westar Energy, Inc. v. Lake</u>, 552 F.3d 1215, 1224 (10th Cir. 2009).   Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"

> Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979).  The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *40.  When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro II, 389 F.3d at 975.  "The meaning of this category is self-evident."  Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41.  With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued."  Salt Lake Tribune Publ'g Co. v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]"  United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)).  See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available).  Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy.

See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING EQUAL PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'"  Soskin v. Reinertson, 353 F.3d at 1247 (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).  "The Clause 'creates no substantive rights.  Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly.'"  Teigen v. Renfrow, 511 F.3d at 1083 (quoting Vacco v. Quill, 521 U.S. 793, 799 (1997)).

Generally, to state a claim under § 1983 for violation of the Equal Protection Clause, a plaintiff must show that he or she is a member of a class of individuals that is being treated differently from similarly situated individuals who are not in that class.  See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012).  The plaintiff must demonstrate that the "'decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of' the law's differential treatment of a particular class of persons."  SECSYS, LLC v. Vigil, 666 F.3d at 685 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. at 279).  In other words, "a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action."  SECSYS, LLC v. Vigil, 666 F.3d at 685.

A state actor can generally be subject to liability only for its own conduct under 42 U.S.C. § 1983.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  At least in the Tenth Circuit, however, under some

circumstances, harassment by a third-party can subject a supervisor or municipality to liability for violation of the equal-protection clause -- not for the harasser's conduct, per se, but for failure to take adequate steps to stop it.  See Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249-51 (10th Cir. 1999).  The plaintiff "must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority."  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249 (citations omitted).  The failure to prevent discrimination before it occurs is not actionable.  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250 n.7.

### LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).   The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents of

State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d at 1079.  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution.  Rather they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions

are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. at 334. The Supreme Court has explained that:

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful post-deprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires pre-deprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations.  See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing

arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque, 375 F. Supp. 2d at

1299, aff'd, Camuglia v. City of Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that

the City, acting through its inspectors, may close a restaurant to protect the health of patrons and

workers without first providing a hearing to the restaurant owner.").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive

any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.

In general, state actors may be held liable under § 1983 only for their own affirmative acts that

violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma,

519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 197).

"[N]othing in the language of the Due Process Clause itself requires the State to protect the life,

liberty and property of its citizens against invasion by private actors."  DeShaney v. Winnebago

Cty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal

level of safety and security.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at

195.

### 1.      Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-

relationship doctrine -- arises when the state has a custodial relationship with the victim, which

triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of

Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991,

994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a

state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to

create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v.

Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).  "If either the special-

relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2. **Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due process clause is the special-relationship doctrine. A plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

### 3. **Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff

in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496 (citations omitted).

### 4.    Conduct that Shocks the Conscience.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. at 849("[C]onduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the conscience-shocking level.").   "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).   "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of

penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective

action to protect her husband, all of which resulted in him being killed during the escape of three

inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a

§ 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock

the conscience."  265 F.3d at 1134.  The Tenth Circuit agreed with the district court's conclusion,

stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is

not enough to satisfy the danger-creation theory's conscience shocking standard."  265 F.3d

at 1135.

        In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d at 1052, the plaintiffs

alleged that the defendants -- the school district, superintendent, principal, and vice principal of a

middle school -- violated the plaintiffs' substantive due process rights when they did not take

sufficient action to prevent a student at the school from "racking"[23] the plaintiffs' son.  716 F.

Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct did not shock the

conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the
> Defendants were aware of three instances of an unknown eighth-grade student
> racking various sixth-grade students within the span of a month, and failed to
> implement policies to improve hallway monitoring and stop this conduct from
> occurring in time to prevent [the plaintiffs' son] from falling victim to the same
> fate.  Further, the Defendants indicated to the sixth graders that it had policies in
> place to punish individuals that assaulted other students but did not, in fact, have
> such policies.

---

[23]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as
being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations
omitted)(internal quotation marks omitted).

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1074-75.

## **LAW REGARDING AMENDMENTS TO PLEADINGS**

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading. See Fed. R. Civ. P. 15(a).  Otherwise, the party must obtain the opposing parties' consent or the court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or her pleading.  Rule 15(a) provides:

(a)     Amendments Before Trial.

(1)     Amending as a Matter of Course.   A party may amend its pleading once as a matter of course within:

(A)     21 days serving it, or

(B)     if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2)     Other Amendments.  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

(3)     Time to Respond.  Unless the court orders otherwise, any required response to an amended pleading must be made within

- 99 -

> the time remaining to respond to the original pleading or within 14
> days after service of the amended pleading, whichever is later.

Fed. R. Civ. P. 15(a).  Under rule 15(a), the court should freely grant leave to amend a pleading

where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80

(D.N.M. 2010)(Browning, J.).  The Supreme Court has stated that, in the absence of an apparent

reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance

of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Foman v.

Davis, 371 U.S. 178, 182 (1962).  Furthermore, the Tenth Circuit has held that district courts

should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  See Curley

v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D.

at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed

"amendment would be futile."  Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d

848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An

amendment is "futile" if the pleading, "as amended, would be subject to dismissal."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v.

Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny

leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith

or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357,

1365-66 (10th Cir. 1993)).  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule

15(a) ] is to provide litigants the maximum opportunity for each claim to be decided on its merits

rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Sch., No. 05-1165, 2007

WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

<u>ANALYSIS</u>

The Plaintiffs bring their claims -- (i) "violation of the right to equal education without due process of law," Am. Compl. ¶¶ 54-60, at 11-12; (ii) "denial of equal protection," Am. Compl. ¶¶ 61-66, at 13; and (iii) "failure to provide a free and appropriate publication, 20 U.S.C.A. § 1401(8))," Am. Compl. ¶¶ 67-74, at 13-14 -- "pursuant [to] 42 U.S.C.[] § 1983," Am. Compl. at 1. Plaintiffs may enforce a variety of constitutional and federal rights via 42 U.S.C. § 1983. See Maine v. Thiboutot, 448 U.S. 1, 6-8 (1980)(recognizing the "availability of a § 1983 cause of action for statutory claims" and "constitutional claims"). The constitutional rights which the Plaintiffs allege that the Defendants violate -- procedural due process, substantive due process, and equal protection -- are enforceable via § 1983. See Maine v. Thiboutot, 448 U.S. at 6-8. First, a plaintiff's right to procedural due process requires the government to employ constitutionally adequate procedures -- typically, some form of notice and an opportunity to be heard -- before depriving the plaintiff of life, liberty, or property. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 541. Second, a plaintiff's right to substantive due process under the Constitution, however, prohibits the government from violating an individual's fundamental rights and from engaging in conduct that shocks the conscience. See Cty of Sacramento v. Lewis, 523 U.S. 833, 842, 845-46 (1998). Third, the Equal Protection clause requires the government to treat similarly situated individuals the same. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439-40 (1985)). The Plaintiffs, however, "may not rely on § 1983 for their IDEA claims." Donahue v. Kansas Bd. of Educ., 827 F. App'x 846, 853 (10th Cir. 2020)("[Section] 1983 is not a proper avenue for IDEA violations.").

First, the Court denies leave to amend the Amended Complaint, because granting leave to amend would be futile.  See Fed. R. Civ. P. 15(a)(2).  The Defendants did not violate the Plaintiffs' procedural due process, substantive due process, or equal protection rights under the Constitution.  See infra Analysis § II, III, IV, V.  The Court, therefore, grants summary judgment on the Plaintiffs' constitutional claims, because there is no genuine issue of material fact, and the Defendants are entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).  Further, the Plaintiffs' IDEA claims cannot proceed, because Woodworth's IDEA claims are moot, see infra Analysis § I; and Williams has not exhausted his administrative remedies, see infra Analysis § VI.  Accordingly, summary judgment in favor of the Defendants is appropriate.

## I.   THE COURT DENIES THE MOTION TO AMEND, BECAUSE GRANTING LEAVE TO AMEND WOULD BE FUTILE GIVEN THAT WILLIAMS HAS NOT EXHAUSTED HIS ADMINISTRATIVE REMEDIES.

Although rule 15(a)(2)instructs courts to give leave to amend freely, courts should deny motions to amend where, as here, leave to amend would be futile.  See Jones v. Norton, 809 F.3d 564, 579 (10th Cir. 2015)(explaining that the Tenth Circuit will uphold denial of leave to amend where amendment would be futile); Burke v. New Mexico, 696 Fed. App'x at 329.  "'A proposed amendment is futile if the complaint, as amended, would be subject to dismissal.'"  Sikkink v. Williams, 406 F. Supp. 3d 1006, 1021 (D.N.M. 2019)(Browning, J.)(quoting Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc., 521 F.3d 1278, 1288 (10th Cir. 2008)).  Here, the Plaintiffs seek leave to amend to add proposed plaintiff Ronnie Williams.  See PAC at 1 n.1.  The Plaintiffs insist that the Court should allow them leave to amend, and note correctly that "[r]efusing leave to amend, is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."  MTA at 2 (citing Castleglen, Inc. v. Resolution Tr. Corp., 984 F.2d at

1574).  The Plaintiffs' proposed amendment, however, would be futile, because Williams has not exhausted his administrative remedies under the IDEA.  See Jones v. Norton, 809 F.3d at 579.

The IDEA requires plaintiffs to exhaust their administrative remedies before filing a civil action in federal court.  See 20 U.S.C. § 1415; Fry v. Napoleon Cmty. Schs., 137 S. Ct. at 750 (discussing the IDEA's exhaustion requirement); Honig v. Doe, 484 U.S. at 326-27.  The PAC does not indicate that Williams has exhausted his administrative remedies under the IDEA.  See PAC ¶ 3, at 2.  The PAC contains only the following statements about Williams: (i) "Plaintiff Ronnie Williams is the parent of a school aged son with special needs that is entitled to the protection of the IDEA in his educational needs," PAC ¶ 3, at 2; and (ii) "Plaintiff Ronnie Williams brings this action, on behalf of herself [sic] and all others similarly situated with school aged children with special needs . . . for the purpose of asserting the claims alleged in this complaint on a common basis," PAC ¶ 28, at 8.  The MTA Reply, however, indicates that Williams has not begun the administrative process.  See MTA Reply at 2.  Williams, therefore, would be subject to dismissal if the Court allowed leave to amend, because Williams has not alleged that he has exhausted his administrative remedies.  See Carroll v. Lawton Indep. Sch. Dist. No. 8, 805 F.3d 1222, 1230 (10th Cir. 2015)(concluding that the district court "properly dismissed" the plaintiffs' IDEA claims, because the plaintiffs "were required to exhaust their administrative remedies before bringing their claims in the district court"); PAC ¶ 3, at 2.

In a recent case, the Honorable Colleen McMahon, Chief United States District Judge for the Southern District of New York, dismissed a class action lawsuit alleging, in part, widespread denial of a FAPE for students with disabilities.  See J.T. v. de Blasio, 2020 WL 6748484, at *41. The Plaintiffs, here, also bring a class action lawsuit, under the IDEA, on denial of FAPE.  See Am. Compl. ¶¶ 59-60, at 12.  Like the plaintiffs in J.T. v. de Blasio, here, Woodworth and proposed

plaintiff Williams, "do not allege to have exhausted their administrative remedies under the IDEA." J.T. v. de Blasio, 2020 WL 6748484, at *43.  In J.T. v. de Blasio, as here, the plaintiffs argued that exhausting their administrative remedies would be futile.  See J.T. v. de Blasio, 2020 WL 6748484, at *43.  There, the plaintiffs alleged that exhaustion would be futile because of an administrative backlog delaying IDEA due process hearings.  See J.T. v. de Blasio, 2020 WL 6748484, at *43.  Judge McMahon explained that the plaintiffs had not demonstrated futility, because short delays of fewer than thirty days during a pandemic were "inevitable."  See J.T. v. de Blasio, 2020 WL 6748484, at *44.  The Plaintiffs' arguments on futility here are similarly unavailing, and they "have not come close to demonstrating futility."  J.T. v. de Blasio, 2020 WL 6748484, at *44.

Williams has not demonstrated that any of the exceptions to the IDEA's exhaustion requirement apply.  See Hernandez I, 2020 WL 6063799, at *66.  The Court has recognized four exceptions to the requirement: (i) "'where exhaustion would be futile or inadequate'"; (ii) where the "suit presents a purely legal question"; (iii) where the plaintiff's case presents an emergency situation; and (iv) where the gravamen of the plaintiff's "suit is something other than denial of a FAPE." Hernandez I, 2020 WL 6063799, at *66 (quoting Honig v. Doe, 484 U.S. at 327).  See id. (noting that the "exceptions frequently overlap").  Williams bears the burden of demonstrating that "one of these narrow exceptions applies." Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1063 n.6 (10th Cir. 2002).  He appears to argue that a "practice of general applicability" would make exhaustion futile in his case, Ass'n for Cmty. Living v. Romer, 992 F.2d at 1044; he indicates that his LEA "is prohibited by general order of the" PED from providing B.W. "with an education that conforms to the operable IEP for the young man," MTA Reply at 2.  Williams insists that B.W.'s

IEP "contemplates that he receive in-person education including socialization and learning with students without disabilities."  MTA Reply at 2.[24]

Determining whether B.W.'s current educational circumstances -- not receiving an in-person education with students without disabilities -- comport with the IDEA's LRE requirement necessitates "a factually intensive inquiry into the circumstances" of B.W.'s case. Ass'n for Cmty. Living v. Romer, 992 F.2d at 1044.  See McQueen ex rel. McQueen v. Colo. Springs Sch. Dist. No. 11, 488 F.3d 868, 875 (10th Cir. 2007)(same).  Exclusively online learning satisfies the LRE requirement for some students, but not for others, depending upon each student's individual needs.  Compare Eric H. ex rel. John H. v. Methacton Sch. Dist., 265 F. Supp. 2d 513, 520 (E.D. Pa. 2003)(Bartle, J.)(concluding that, after the plaintiff had exhausted his administrative remedies, his LEA had not violated the LRE requirement by refusing to provide the plaintiff with video teleconferencing equipment to allow the plaintiff virtual access to his classroom while he was homebound during leukemia treatment), with M.B. v. Springfield Sch. Dist. No. 19, No. 6:19-CV-01150-MK, 2020 WL 5653986, at *13 (D. Or. Sept. 23, 2020)(Kasubhai, M.J.)(determining, after reviewing the administrative record, that the "[s]tudent's placement in online tutoring was the least restrictive environment based on Student's condition").  Moreover, the Court should not consider IDEA claims where the administrative process "may be able to provide . . . relief . . . ." Carroll v. Lawton Indep. Sch. Dist. No. 8, 805 F.3d 1222, 1229 (10th Cir. 2015)("Carroll").  At Williams' IDEA due process hearing, the hearing officer could determine that the Reentry

_____

[24]Although the Proposed Amended Complaint and the MTA Reply do not refer specifically to the LRE provision when discussing Williams, the Court assumes that they reference the LRE provision, which requires that school districts educate "children with disabilities . . . with children who are not disabled" "to the maximum extent appropriate . . . ."  20 U.S.C. § 1412(a)(5)(A).

Guidance prohibits the officer from allowing B.W. to receive an in-person education with students without disabilities, although (i) this prohibition prevents B.W. from receiving a FAPE; or (ii) virtual learning does not place B.W. in his LRE.  After this due process hearing, however, Williams has the right to appeal the hearing officer's decision to his SEA.  See 20 U.S.C. § 1415(g)(1).  Here, the PED is the SEA, and the PED issued the Reentry Guidance.  See Reentry Guidance at 1.  If the PED determines that its Reentry Guidance prevents B.W. from receiving a FAPE in his LRE, it has the authority to make the necessary alterations to the Reentry Guidance.  See N.M.S.A 1978, § 22-2-1(A)(granting PED the power to control, manage, and direct all public schools and to "adopt, promulgate, and enforce rules to exercise its authority").  The administrative process, therefore, can provide Williams with the relief he seeks.  See Carroll, 805 F.3d at 1229.  Consequently, the Court concludes that Williams' case is "precisely the kind of issue the IDEA's administrative process was designed to address."  Ass'n for Cmty. Living v. Romer, 992 F.2d at 1044.  Williams does not fall within any of the exceptions to the IDEA's exhaustion requirement; leave to amend would therefore be futile, because Williams has not exhausted his administrative remedies.  See Fed. R. Civ. P. 15(a)(2); Jones v. Norton, 809 F.3d at 579; Carroll, 805 F.3d at 1229.  The Court, therefore, lacks subject matter jurisdiction over Williams' claims.  See J.T. v. de Blasio, 2020 WL 6748484, at *44 (dismissing the plaintiffs' IDEA claims sua sponte "for failure to exhaust administrative remedies, which deprives this Court of subject matter jurisdiction").

## II.   JACOBSON GUIDES THE COURT'S APPLICATION OF TIERED SCRUTINY IN ITS CONSTITUTIONAL ANALYSIS.

As the Court explains in Hernandez I, "[d]istrict courts, including the Court, appellate courts, and the Supreme Court have looked to Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11 (1905)('Jacobson') when deciding suits seeking injunctive relief against government

action during the COVID-19 pandemic." Hernandez I, 2020 WL 6063799, at *54 (citing S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 207 L.Ed.2d 154 (2020)(Roberts, CJ., concurring in denial of application for injunctive relief); In re Abbott, 956 F.3d 696, 704 (5th Cir. 2020); Elim Romanian Pentecostal Church v. Pritzker, 962 F.3d 341, 347 (7th Cir. 2020); Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d 1100, 1160 (D.N.M. 2020)(Browning, J.); Prof'l Beauty Fed'n of California v. Newsom, No. 2:20-CV-04275-RGK-AS, 2020 WL 3056126, at *5 (C.D. Cal. June 8, 2020)(Klausner, J.); J.H. by & through N.H. v. Edwards, No. CV 20-293-JWD-EWD, 2020 WL 3448087, at *48 (M.D. La. June 24, 2020)(deGravelles, J.); On Fire Christian Ctr., Inc. v. Fischer, 453 F. Supp. 3d 901, 912 (W.D. Ky. 2020)(explaining that although constitutional law does not "remain rigidly fixed in the time of a national emergency . . . even under Jacobson, constitutional rights still exist")(Walker, J.). But see Gomez v. Trump, No. 20-CV-01419, 2020 WL 5367010 (D.D.C. Sept. 4, 2020)(Mehta, J.)(declining to apply Jacobson to a federal government action)). Jacobson, however, predates the current tiered scrutiny of constitutional analysis. See Roman Catholic Diocese of Brooklyn v. Cuomo, 2020 WL 6948354, at *5 (Gorsuch, J., concurring)(explaining that "Jacobson pre-dated the modern tiers of scrutiny . . ."). The Court, nonetheless, has determined that Jacobson assists the Court with applying tiered scrutiny during public health emergencies. See, e.g., Hernandez I, 2020 WL 6063799, at *54-55 (relying on Jacobson); Legacy II, 2020 WL 3963764, at 69 (same). See Roman Catholic Diocese of Brooklyn v. Cuomo, 2020 WL 6948354, at *5 (Gorsuch, J., concurring)("Jacobson didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, Jacobson applied what would become the traditional legal test associated with the right at issue -- exactly what the Court does today.")

The idea that "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect,'" South Bay, 140 S. Ct., at 1613 (Roberts, C. J., concurring)(quoting Jacobson, 197 U.S. at 38), "should be uncontroversial," Roman Catholic Diocese of Brooklyn v. Cuomo, 2020 WL 6948354, at *9 (Roberts, C.J., dissenting). As the Court explained in Hernandez I:

> "Jacobson instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency." In re Abbot, 956 F.3d at 786 (emphasis in original) . . . .
>
> To be sure, the law permits permit greater intrusions into civil liberties in times of greater communal need. Nevertheless, even during a public health crisis, the Court may not "distort the Constitution to approve all that the" State deems necessary. Korematsu v. United States, 323 U.S. 214, 244 (1944)(Jackson, J., dissenting), abrogated by Trump v. Hawaii, 138 S. Ct. 2392 (2018). Where the State has enacted emergency public health measures, the Court will not uphold policies which (i) have "no real or substantial relation" to the State's public health objectives; or (ii) are "a plain, palpable invasion of rights secured by the fundamental law." Jacobson, 197 U.S. at 31. See Robinson v. Attorney Gen., 957 F.3d 1171, 1182 (11th Cir. 2020)(concluding that a state had "impinge[d] the right to an abortion in a 'plain and palpable' fashion under Jacobson"). Where the State's policies go "far beyond what [is] reasonably required for the safety of the public," the Court is "authorize[d] or compel[led] . . . to interfere . . . ." Jacobson, 197 U.S. at 28.

Hernandez I, 2020 WL 6063799, at *54-55. The Court's COVID-19 decisions thus comport with the notion that "Jacobson hardly supports cutting the Constitution loose during a pandemic." Roman Catholic Diocese of Brooklyn v. Cuomo, 2020 WL 6948354, at *5 (Gorsuch, J., concurring). See Legacy II, 2020 WL 3963764, at *79 (citing Jacobson for the proposition that "no matter how grave the emergency, individual constitutional freedoms . . . constrain State action"); Hernandez I, 2020 WL 6063799, at *54-55. The Court, therefore, has not "mistaken" the Supreme Court's "modest decision in Jacobson for a towering authority that overshadows the Constitution during a pandemic." Roman Catholic Diocese of Brooklyn v. Cuomo, 2020 WL 6948354, at *6 (Gorsuch, J., concurring).

Accordingly, if there has been no "plain, palpable invasion of rights secured by the fundamental law" -- such as discrimination based on a suspect class or violation of a fundamental right under the Constitution -- the Court will evaluate whether the law or policy in question has a "real or substantial relation" to the State's public health objectives -- in other words, whether the State has a rational basis for the challenged policy.  Jacobson, 197 U.S. at 31.  See Second MTD at 13 n.18 ("request[ing] clarification" regarding the Court's interpretation of Jacobson).  As Justice Gorsuch notes, Jacobson "essentially applied rational basis review" to the plaintiff's "challenge to a state law that, in light of an ongoing smallpox pandemic, required individuals to take a vaccine, pay a $5 fine, or establish that they qualified for an exemption."  Roman Catholic Diocese of Brooklyn v. Cuomo, 2020 WL 6948354, at *5 (Gorsuch, J., concurring).  Jacobson, therefore, provides the Court with guidance how to apply tiered scrutiny in the public health emergency context.  See Jacobson, 197 U.S. at 31.

## III.   THE DEFENDANTS HAVE NOT VIOLATED THE PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS, BECAUSE SUMMARY ADMINISTRATIVE ACTION IS JUSTIFIED IN EMERGENCY SITUATIONS TO PROTECT PUBLIC HEALTH AND SAFETY, AND THE REENTRY GUIDANCE IS QUASI-LEGISLATIVE.

The Plaintiffs have a "legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause . . . ."  Goss v. Lopez, 419 U.S. 565, 574 (1975)("Goss").  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "'[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?'"; and (ii) "'[w]as the individual afforded an appropriate level of process?'"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1304 (D.N.M. 2005)(Browning, J.)(same), aff'd, 168 F.3d 1214 (10th Cir. 2006).

The Defendants argue that, although New Mexico children possess a property right in their public education, the Plaintiffs have not been deprived of their right in a public education, because the Defendants "made the Reentry Guidance available to the public, [and] they provided all the procedural due process required under the circumstances." Second MTD at 23 (citing Carmichael v. Ige, No. CV 20-00273 JAO-WRP, 2020 WL 3630738, at *10 (D. Haw. July 2, 2020)(Otake, J.)).  Where a child is expelled or denied enrollment in school without adequate procedural safeguards, the child's procedural due process rights have been violated.  See Goss, 419 U.S. at 575; Alonso as Next Friend of I.A. v. Sch. Bd. of Collier Cty., Fla., No. 216CV379FTM38MRM, 2018 WL 5304813, at *15 (M.D. Fla. Aug. 8, 2018)(McCoy, M.J.)(certifying class action where students were denied enrollment at a school without any due process).  See also Chavez v. Bd. of Educ. of Tularosa Mun. Sch., No. CIV 05-380 JB/RLP, 2006 WL 4060667, at *5 (D.N.M. Oct. 4, 2006)(Browning, J.)(explaining that "[i]f the Plaintiffs had alleged that [defendant] affirmatively acted to exclude [the child] from school, such as by suspension or expulsion," the affirmative exclusion could give rise to procedural due process violations).  Even though a student has a property interest in the "educational process," where a student is denied one of the "innumerable separate components of the educational process, such as participation in athletics and membership in school clubs," that student has not been denied "a property interest subject to constitutional protection."  Seamons v. Snow, 84 F.3d 1226, 1235 (10th Cir. 1996).  See Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1257 (10th Cir. 2008)(explaining that, where a student had been put in time out, "any loss of a property right is de minimis and not subject to procedural protections").  Where a student has been temporarily suspended from school, for example, an informal discussion between the student and school principal satisfies the procedural due process clause.  See Keough v. Tate Cty. Bd. of Educ., 748 F.2d 1077, 1080 (5th Cir. 1984)(concluding

that an "informal give-and-take . . . allows the student an opportunity to state his case as he sees it").

Here, some students have been deprived of all in-person learning for an indefinite period of time, see Reentry Guidance at 1-8, the Court concludes that this deprivation amounts to more than a de minimis taking, because in-person learning is an integral part of the educational process enshrined in Goss.  See Goss, 419 U.S. at 576 ("'[E]ducation is perhaps the most important function of state and local governments,' and the total exclusion from the educational process for more than a trivial period . . . is a serious event . . . .")(quoting Brown v. Board of Education, 347 U.S. 483, 493 (1954)); Couture, 535 F.3d at 1257. As the Tenth Circuit has explained:

> The educational process is a broad and comprehensive concept with a variable and indefinite meaning.  It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement

Albach v. Odle, 531 F.2d 983, 985 (10th Cir. 1976)(citing Goss v. Lopez, 419 U.S. at 576). Although students deprived of in-person education is not a "total exclusion from the educational process," Goss, 419 U.S. at 576, as they still have access to online learning, the lack of in-person education still goes to the heart of educational process by "provid[ing] an atmosphere of intellectual and moral advancement," Albach v. Odle, 531 F.2d at 985.

Although access to an in-person education has more than a de minimis effect on a student's property interest in his or her education, "summary administrative action may be justified in emergency situations."  Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 300 (1981)("Hodel").  "Deprivation of property to protect public health and safety is 'one of the oldest examples' of permissible summary action." Hodel, 452 U.S. at 300 (quoting Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599 (1950).  During the COVID-19 pandemic, district courts across the country have denied procedural due process claims relating to state governments'

COVID-19 policies. See, e.g., Libertas Classical Ass'n v. Whitmer, No. 1:20-CV-997, 2020 WL 6498761, at *1, *10 (W.D. Mich. Nov. 3, 2020)(Mahoney, J.)(denying a Christian school's request for injunctive relief related to the state's "COVID-19 mandates, specifically face coverings, social distancing requirements and size limits on indoor gathering" on procedural due process and First Amendment grounds); Page v. Cuomo, No. CIV 20-732, 2020 WL 4589329, at *12 (N.D.N.Y. Aug. 11, 2020)(Hurd, J.)(dismissing a plaintiff's procedural due process claims related to an Executive Order requiring persons traveling to New York to quarantine for fourteen days upon entry); Carmichael v. Ige, 2020 WL 3630738, at *10 (D. Haw. July 2, 2020)(same); World Gym, Inc. v. Baker, No. CIV 20-11162, 2020 WL 4274557, at *4 (D. Mass. July 24, 2020)(Casper, J.)(denying the plaintiff gym's procedural due process claims related to a statewide shutdown order); 910 E. Main LLC v. Edwards, No. CIV 20-00965, 2020 WL 4929256, at *10 (W.D. La. Aug. 21, 2020)(Summerhays, J.)(denying the plaintiff's procedural due process claims because "COVID-19 is, without a doubt, an unprecedented emergency"); Benner v. Wolf, 2020 WL 2564920, at *4 (M.D. Pa. May 21, 2020)(Jones, J.)(holding that the plaintiffs were not likely to succeed on their deprivation of due process argument and explaining that "individualized pre-deprivation process" would "render[ ] ineffective any public health measure meant to combat viral spread"). COVID-19 in New Mexico, as in the rest of the country, "remains extraordinarily serious and deadly" and, therefore, is an emergency that justifies summary administrative action. Roman Catholic Diocese of Brooklyn v. Cuomo, No. 20A87, 2020 WL 6948354, at *8 (U.S. Nov. 25, 2020)(Kavanaugh, J., concurring). See Hodel, 452 U.S. at 300; COVID-19 in New Mexico, New Mexico Dep't of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Dec. 5, 2020)(noting that, as of December 4, 2020, COVID-19 had killed 1,706 New Mexicans and resulted in 7,184 hospitalizations). See also Jacobson, 197 U.S. at 28. The Reentry Guidance is

an example of a summary administrative action designed to prevent the spread of COVID-19.  See Reentry Guidance at 1-8.  The Reentry Guidance at issue, here, therefore, has not violated the Plaintiffs' due process rights.

Moreover, even if, as the Plaintiffs insist, COVID-19 is no longer an emergency, see Second MTD Response at 2 (contending that although COVID-19 was an emergency in March 2020, COVID-19 is no longer an emergency, because it has now been nine-months since the start of the pandemic),[25] the Reentry Guidance is "quasi-legislative in nature," and the Plaintiffs therefore are not entitled to additional due process, Onyx Properties LLC v. Bd. of Cty. Commissioners of Elbert Cty., No. 10-CV-01482-LTB-KLM, 2015 WL 1361393, at *6 (D. Colo. Mar. 24, 2015)(Babcock, J.)("Onyx I"), aff'd, 838 F.3d 1039 (10th Cir. 2016).  "When the action has a limited focus (only a few people or properties are affected) and is based on grounds that are individually assessed, it may be more adjudicative than legislative and therefore subject to traditional procedural requirements of notice and hearing."  Onyx Properties LLC v. Bd. of Cty. Commissioners of Elbert Cty., 838 F.3d 1039, 1046 (10th Cir. 2016)("Onyx II").  By contrast, "governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient."  Halverson v. Skagit Cty., 42 F.3d 1257, 1261 (9th Cir. 1994).  Here, the Reentry Guidance affects the entirety of New Mexico, and, accordingly is not subject to the traditional notice and hearing requirements.  See Reentry

---

[25]The Court disagrees with the Plaintiff's contention that COVID-19 is no longer an emergency, because the number of confirmed cases and deaths have been hitting record highs during the pendency of this litigation.  See Roman Catholic Diocese of Brooklyn v. Cuomo, 2020 WL 6948354, at *8 (Kavanaugh, J., concurring); COVID-19 in New Mexico.  For the sake of thoroughness, as is this Court's method, the Court will address Plaintiff's contention.

Guidance at 1.  See also Peterson v. Kunkel, No. CIV 20-000898 WJ\CG, 2020 U.S. Dist. LEXIS

183471, *25-26 (D.N.M. Oct. 2, 2020)(Johnson, J.)(concluding that a statewide policy closing

approximately 170 private schools "does not give rise to a procedural due process violation

because the underlying governmental action affects a general class of persons.").  Although the

Reentry Guidance may impact different students in different ways, it is generally applicable.  See

Onyx II, 838 F.3d at 1046.  Further, the Tenth Circuit has held that there must be an "element of

deliberateness in directing the misconduct toward the plaintiff before the Due Process Clause is

implicated."  Archuleta v. McShan, 897 F.2d 495, 498 (10th Cir. 1990).  The Defendants' policies

are based on objective criteria, and not directed at individual students.  See Reentry Guidance at 4

(listing requirements for "all districts and schools across the state").  Finally, the Defendants made

the Reentry Guidance available to the public, providing sufficient "general notice . . . by law."

Halverson v. Skagit Cty., 42 F.3d at 1261.  See Reentry Guidance at 1.

Likewise, under the Mathews v. Eldridge, 424 U.S. at 335, due process balancing approach,

while the Plaintiffs maintain that the Reentry Guidance "violate[s] procedural due process by not

affording Plaintiffs an opportunity to defend themselves from the deprivation of rights[,]"

individualized hearings would be inappropriate here, Second MTD Response at 4 (discussing the

Plaintiffs' procedural due process claims for only half a sentence of the entire Second MTD

Response).  "To determine what process is due, courts must balance: (1) the private interests that

will be affected by the official action; (2) the risk of erroneous deprivation; and (3) the burden on

the government from additional procedural requirements."  Couture, 535 F.3d at 1258 (citing

Mathews v. Eldridge, 424 U.S. at 335).  The Defendants did not provide the Plaintiffs with the

opportunity for individualized hearings.  See Second MTD at 23 (conceding this point).  Further,

as discussed above, the Court agrees with the Plaintiffs that their interest in an in-person education,

affected by the Defendants' Reentry Guidance, is more than de minimis.  Still, "the educational process . . . includes innumerable separate components, such as participation in . . . social groups" and the Court "do[es] not read <u>Goss</u> to establish a property interest subject to constitutional protection in each of these separate components."  <u>Albach v. Odle</u>, 531 F.2d at 985.  Nonetheless, there is no risk of "erroneous deprivation" in this case.  Cf. <u>Harjo v. City of Albuquerque</u>, 307 F. Supp. 3d 1163, 1211 (D.N.M. 2018)(Browning, J.)(discussing a risk of erroneous deprivation where an ordinance required defendants to prove their innocence), <u>modified on reconsideration,</u> 326 F. Supp. 3d 1145 (D.N.M. 2018).  Further, the grant of an individualized hearing to every student in New Mexico would impose a significant burden on the government, and, "where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption."  <u>Bi-Metallic Inv. Co. v. State Bd. of Equalization</u>, 239 U.S. 441, 445 (1915).  The Plaintiffs, therefore, have not demonstrated that there are genuine issues of material fact as to their procedural due process claim, or successfully shown that, as a matter of law on the undisputed facts, the Defendants have violated the Plaintiffs' procedural due process rights.

## IV.   THE COURT GRANTS SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS ON THE PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS, BECAUSE THE MATERIAL FACTS ARE NOT IN DISPUTE AND THE DEFENDANTS HAVE NEITHER VIOLATED THE PLAINTIFFS' FUNDAMENTAL RIGHTS, NOR ENGAGED IN CONDUCT THAT SHOCKS THE JUDICIAL CONSCIENCE.

The Plaintiffs have not demonstrated that the Defendants have violated their substantive due process rights, because the Defendants neither have infringed on the Plaintiffs' fundamental rights, nor deprived the Plaintiffs of life, liberty, or property in a manner so arbitrary that the actions shock the conscience.  See <u>Plyler v. Dole</u>, 457 U.S. 202, 223 (1982)("<u>Plyler</u>"); <u>San Antonio Indep. Sch. Dist. v. Rodriguez</u>, 411 U.S. 1, 37 (1973); <u>Doe v. Woodard</u>, 912 F.3d at 1300.  There are two types of substantive due process claims: (i) where the plaintiff alleges that the government

has infringed upon a fundamental right, see Washington v. Glucksberg, 521 U.S. 702, 721-22 (1997)("Glucksberg"); and (ii) where the plaintiff alleges that a government action has deprived arbitrarily the plaintiff of life, liberty, or property, in a manner that shocks the judicial conscience, see Rochin v. California, 342 U.S. 165, 172 (1952)(concluding that a sheriff's application of stomach pumping to force an arrestee to vomit shocked the conscience).  The Tenth Circuit "appl[ies] the fundamental rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action*." Halley v. Huckaby, 902 F.3d 1136, 1153 (10th Cir. 2018)(emphasis in original), cert. denied, 139 S. Ct. 1347 (2019).  But see Seegmiller v. LaVerkin City, 528 F.3d 762, 768 (10th Cir. 2008)(Tymkovich, C.J.)(explaining that "there is no hard-and-fast rule requiring lower courts to analyze substantive due process cases under only the fundamental rights or shocks the conscience standards").  But see also Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x 624, 636 (10th Cir. 2018)(Tymkovich, C.J., concurring)(noting that "though our circuit has sometimes repeated Seegmiller's 'both tests work' dicta, we do not follow it. Instead, we follow a simple binary approach" which applies the fundamental rights test to legislative actions and the shocks the conscience test to executive actions).[26]  Here, the Plaintiffs do not challenge "the tortious conduct

---

[26] The Court agrees with the Honorable Timothy M. Tymkovich, United States Circuit Judge for the Tenth Circuit's recent clarification regarding the substantive due process tests:

> Looking to the history of Due Process Clause jurisprudence, as well as to the Supreme Court's stated policy concerns in this area, we propose dividing substantive due process into (1) cases challenging legislative action, (2) cases challenging executive action, and (3) cases challenging judicial action (though those distinctions themselves will require line drawing). In those challenging legislative action, plaintiffs must show the law impermissibly or irrationally burdens a fundamental right. In cases challenging executive action, plaintiffs must show they were deprived of a liberty or property interest in such an egregious fashion that the conduct shocks the conscience of federal judges.  The shocks-the-conscience formulation is not to be an empty phrase, though.  In each context,

of an individual agency officer," nor do they challenge a purely "legislative action . . . ." Abdi v. Wray, 942 F.3d 1019, 1027 (10th Cir. 2019). See Am. Compl. ¶ 10, at 3. Although the PED -- a State executive agency -- issues the Reentry Guidance, the fundamental rights approach applies here, because the Reentry Guidance is "akin to a legislative action." Abdi v. Wray, 942 F.3d at 1027. See Reentry Guidance at 1 An "executive action" in the substantive due process analysis context is typically a "specific act of a governmental officer." Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). By contrast, here, the Reentry Guidance is "akin to a . . . legislative action because, as with an act of a lawmaking body, the" PED "here is attempting, through policy, to achieve a stated government purpose." Abdi v. Wray, 942 F.3d at 1027-28. Further, the fundamental rights approach applies where "a government entity's implementation of its official policy is alleged to have caused a substantive due process violation." Abdi v. Wray, 942 F.3d 1019, 1028 n.1 (10th Cir. 2019)(citing Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x at 630). The Court, therefore, will analyze the Reentry Guidance under the "legislative action" fundamental rights framework for substantive due process claims. See Glucksberg, 521 U.S. at 721-22. Accordingly, because the Defendants' Reentry Guidance is rationally related to a legitimate state

---

courts should specify the factors that make a case conscience shocking. In fact, we argue that this is what the more specific tests have already done. What has been unclear until now is that many of the cases creating more specific tests for substantive due process violations are simply manifestations of the shocks-the-conscience approach. Finally, in cases challenging judicial action, a state court decision will violate substantive due process only if it is an "arbitrary or capricious" abuse of power.

Hon. Timothy M. Tymkovich, Joshua Dos Santos, Joshua J. Craddock, A Workable Substantive Due Process, 95 Notre Dame L. Rev. 1961, 1964 (2020). See Chavez v. Martinez, 538 U.S. 760, 787 (2003)(Stevens, J., concurring)(describing the fundamental rights approach and the shocks the conscience approach as separate tests). See also Peter J. Rubin, Square Pegs and Round Holes: Substantive Due Process, Procedural Due Process, and the Bill of Rights, 103 Colum. L. Rev. 833, 845 (2003)(noting that United States v. Salerno, 481 U.S. 739, 746 (1987) "distinguished fundamental rights analysis from shocks-the-conscience analysis").

interest, the Plaintiffs' substantive due process claims cannot succeed on the merits.  See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976).

A.   **THE REENTRY GUIDANCE DOES NOT VIOLATE THE PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS, BECAUSE THE DEFENDANTS HAVE NOT INFRINGED UPON THE PLAINTIFFS' FUNDAMENTAL RIGHTS.**

The fundamental rights approach proceeds in three steps.  See Abdi v. Wray, 942 F.3d at 1028.  First, the Court must evaluate whether a fundamental right is at issue either: (i) "because the Supreme Court or the Tenth Circuit has already determined that it exists"; or (ii) "because the right claimed to have been infringed by the government is one that is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' such that it is 'fundamental.'"  Abdi v. Wray, 942 F.3d at 1028 (quoting Glucksberg, 521 U.S. at 720-21).  Second, the Court determines whether the right at issue "has been infringed through either total prohibition or 'direct and substantial' interference."  Abdi v. Wray, 942 F.3d at 1028 (quoting Zablocki v. Redhail, 434 U.S. 374, 387 (1978)).  Third, if the right is fundamental, the Court must determine whether the government action at issue satisfies strict scrutiny.  Abdi v. Wray, 942 F.3d at 1028 (noting that the government must "me[e]t its burden to show that the law . . . is narrowly tailored to achieve a compelling governmental purpose").  If the right is not fundamental, however, the Court applies rational basis review.  See Reno v. Flores, 507 U.S. 292, 305 (1993)(explaining that strict scrutiny is required "only when fundamental rights are involved").  The Court concludes that (i) it will not recognize a new fundamental right to in-person learning in this case; (ii) because in-person education or even a general right to education is not a fundamental right, the court will apply rational basis review.

First, the educational rights that the Plaintiffs allege that the Defendants violate are not fundamental.  See Am. Compl. ¶ 11, at 3; Second MTD Response at 4.  The Court will not

recognize a new fundamental right in in-person learning, because: (i) the Plaintiffs have not demonstrated the historical importance of an in-person education rather than remote instruction; (ii) the Plaintiffs have not demonstrated that a temporary pause on in-person learning will make it impossible for the Plaintiffs to access other fundamental liberties; (iii) the Plaintiffs have not sufficiently defined the contours of their proposed right, and (iv) the Supreme Court has made plain that no general right to education exists. See Rodriguez, 411 U.S. at 35. The Supreme Court has stopped short of finding a fundamental right to education under the Fourteenth Amendment. See Plyler, 457 U.S. at 223; San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. at 35 (Powell, J.)("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution.  Nor do we find any basis for saying it is implicitly so protected."); Bivens By & Through Green v. Albuquerque Pub. Sch., 899 F. Supp. 556, 561 (D.N.M. 1995)(Campos, J.)("[T]here is no constitutional right to an education at public expense . . . .").  The Tenth Circuit also has declined to recognize a fundamental right to education.  See Petrella v. Brownback, 787 F.3d 1242, 1261 (10th Cir. 2015).

Still, "education is perhaps the most important function of state and local governments." Brown v. Bd. of Ed. of Topeka, 347 U.S. 483, 493 (1954).  Moreover, the Supreme Court has acknowledged that denying children a basic education denies "them the ability to live within the structure of our civic institutions . . . ." Plyler, 457 U.S. at 223 .  Although "[t]he right to education is not recognized in the United States Constitution . . . it is included in many state constitutions." Heidi R. Gilchrist, Higher Education Is A Human Right, 17 Wash. U. Global Stud. L. Rev. 645, 652 (2018).  See id. at 656-67 (noting also that courts in the European Union have recognized a human right to education and higher education).  The New Mexico Constitution, for example, mandates that "[a] uniform system of free public schools sufficient for the education of, and open

to, all the children of school age in the state shall be established and maintained." N.M. Const. art. XII, § 1. The Tenth Circuit has affirmed that "New Mexico's constitution gives each child the right to a free public education." Ellenberg v. New Mexico Military Inst., 478 F.3d at 1270 (citing N.M. Const. art. XII, § 1; NMSA 1978 § 22-1-4.3).

A recent case from the United States Court of Appeals for the Sixth Circuit became the first appellate decision to recognized directly some form of a right to education. See Gary B. v. Whitmer, 957 F.3d 616, 621 (6th Cir. 2020)(Clay, J.)("Gary B."), reh'g en banc granted, opinion vacated, 958 F.3d 1216 (6th Cir. 2020).[27] Among other constitutional claims, the plaintiffs asked the Sixth Circuit "to recognize a fundamental right to a basic minimum education, an issue the Supreme Court has repeatedly discussed but never decided." Gary B., 957 F.3d at 621. The plaintiffs alleged that "that the conditions in their schools are so bad -- due to the absence of qualified teachers, crumbling facilities, and insufficient materials -- that those schools fail to provide access to literacy." Gary B., 957 F.3d at 624. The Honorable Eric L. Clay, United States Circuit Judge the Sixth Circuit, explains:

> Plaintiffs contend that access to literary, as opposed to other educational achievements, is a gateway milestone, one that unlocks the basic exercise of other fundamental rights, including the possibility of political participation. While the Supreme Court has repeatedly discussed this issue, it has never decided it, and the question of whether such a right exists remains open today. After employing the reasoning of these Supreme Court cases and applying the Court's substantive due process framework, we recognize that the Constitution provides a fundamental right to a basic minimum education.

957 F.3d at 642.

Judge Clay continues that, although the Supreme Court has explained that there is no general right to education, it has left open the question whether "'a minimally adequate education

---

[27]Although the en banc panel vacated the opinion, it did so without providing a written opinion. The Court, therefore, looks to Gary B. for its persuasive value.

is a fundamental right.'"  957 F.3d at 644 (quoting Papasan, 478 U.S. at 285).  After applying the framework detailed in "Glucksberg and Obergefell [v. Hodges], and looking to the reasoning of Rodriguez and Plyler," Judge Clay states that "we conclude that the answer is yes."  Gary B., 957 F.3d at 648.  First, Judge Clay notes that "free state-sponsored schools" "were ubiquitous at the time of the Fourteenth Amendment's adoption."  957 F.3d at 648.  Further, Judge Clay explains that Thomas Jefferson emphasized the "essential nature of education" from the nation's founding. Gary B., 957 F.3d at 649 (citing Wisconsin v. Yoder, 406 U.S. 205, 221 (1972)).  Judge Clay continues that "basic literacy education within our broader constitutional framework suggests it is essential to the exercise of other fundamental rights."  957 F.3d at 649.  For example, basic literacy is necessary for "effectively every interaction between a citizen and her government," including "voting, taxes, the legal system, jury duty."  957 F.3d at 652.  Accordingly, Judge Clay concludes that "the state provision of a basic minimum education has a longstanding presence in our history and tradition, and is essential to our concept of ordered constitutional liberty."  957 F.3d at 649. Judge Clay also notes that many, including the dissent (Murphy, J.) in Gary B., maintain that the Fourteenth Amendment provides only negative rights.  See 957 F.3d at 656.  Judge Clay disagrees with the Honorable Eric E. Murphy, United States Circuit Judge for the Sixth Circuit, observing that the Supreme Court has recognized positive rights, including the right to counsel and the right to marry.  See 957 F.3d at 656-57 (citing Strickland v. Washington, 466 U.S. 668, 684-86 (1984); Gideon v. Wainwright, 372 U.S. 335, 339-43 (1963); Loving v. Virginia, 388 U.S. 1, 12 (1967); Turner v. Safley, 482 U.S. 78, 94-96 (1987)).  Judge Clay adds that "the Supreme Court's cases expressly left open the possibility of the right to a basic minimum education, which works to negate the argument that its recognition is impossible given its positive or affirmative nature."  957 F.3d at 657.

The Court declines recognize a new fundamental right to education in this case.  First, the Plaintiffs have not demonstrated the historical importance of an in-person education rather than remote instruction.  Second, the Plaintiffs have not shown that a temporary pause on in-person learning will make it impossible for the Plaintiffs to access other fundamental liberties.  Third, the Plaintiffs have not sufficiently defined the contours of their proposed right.  Fourth, the Supreme Court has stated that no general right to education exists.  See Rodriguez, 411 U.S. at 35.  Although education, including basic literacy, is "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty,"  Glucksberg, 521 U.S. at 720-21[28]; see Gary B., 957 F.3d at 650-56, the Supreme Court has concluded explicitly that a general right to "education . . . is not among the rights afforded explicit protection under our Federal Constitution,"  Rodriguez, 411 U.S. at 35.  Education is important to democracy, but it is not at all clear that creating a new fundamental right to education is the only way to supply that education -- or even the best way to supply it.  Education is a common service -- like other common services provided by the

---

[28]After Obergefell v. Hodges, there has been debate whether Glucksberg is still good law. Compare Laurence H. Tribe, Equal Dignity: Speaking Its Name, 129 Harv. L. Rev. F. 16, 16, (2015)(stating that "Obergefell has definitively replaced Washington v. Glucksberg's wooden three-prong test focused on tradition, specificity, and negativity with the more holistic inquiry of Justice Harlan's justly famous 1961 dissent in Poe v. Ullman, 367 U.S. 497 (1961) a mode of inquiry that was embodied in key opinions" in the 1960s and 1970s), with Ronald Turner, W(h)ither Glucksberg?, 15 Duke J. Const. L. & Pub. Pol'y 183, 216 (2020)(concluding that Obergefell's "generational approach . . . has not yet created a methodological sea change in substantive due process jurisprudence" and therefore "Glucksberg lives").  Obergefell did not overrule Glucksberg, however, and, as a lower court, the Court must apply Glucksberg here.  Still, the Court notes that the Glucksberg test both inconsistent with some of the Supreme Court's case law.  First, the assumption underlying Glucksberg "that a fundamental right exists only if there is a tradition of protecting it is wrong . . . descriptively," Erwin Chemerinsky, Washington v. Glucksberg Was Tragically Wrong, 106 Mich. L. Rev. 1501, 1505 (2008)(citing Roe v. Wade, 410 U.S. 113 (1973); Loving v. Virginia, 388 U.S. 1, and noting that both cases undermine Glucksberg's focus on tradition).  Moreover, the test in Glucksberg is vague and difficult to apply. See Randy E. Barnett, Scrutiny Land, 106 Mich. L. Rev. 1479, 1489 (2008)(noting that there is "much that is unclear about . . . Glucksberg").

government, such as food, clothing, or housing -- rather than a fundamental right.  Gary B., 957 F.3d at 667 (Murphy, J., dissenting)(noting that "the Supreme Court has never treated food, housing, or medical care themselves as 'fundamental rights' triggering heightened scrutiny"). Further, the Court is not convinced that a right to government education is fundamental in the that citizens can expect it from only the government.  Moreover, private education, for example, has longer roots in the nation's history than public education.  See Robert N. Gross, Public vs. Private: The Early History of School Choice in America, at 2 (2018)(explain that public education systems did not become common in the United States until the mid-19th century)

Here, the Plaintiffs insist upon a general "right to equal education" under the Fourteenth Amendment.  See Am. Compl. ¶¶ 54-60 at 11-12.  Under Glucksberg, however, the Plaintiffs must provide a "careful description of the asserted fundamental liberty interest."  521 U.S. at 721.  The Plaintiffs caution that the "Court should not quickly depart from the notion that a basic education is not at least [a] quasi-fundamental liberty . . . ."  Second MTD Response at 4.  The Plaintiffs insist that a "lack of in-person instruction is resulting in a deprivation of a *basic education*." Second MTD Response at 3 (emphasis in original).  These vague and conclusory explanations do not satisfy Glucksberg's "careful description" requirement, because they do not explain how remote instruction deprives the Plaintiffs of a basic education and do not address how in-person instruction is "deeply rooted in Nation's history and tradition."  Glucksberg, 521 U.S. at 720-21. Further, the record does not show that the Defendants' temporary prohibition of in-person learning deprives the Plaintiffs of a basic education.  See generally Am. Compl.

Moreover, a temporary prohibition of in-person learning during the pendency of a pandemic does not rise to the level of total exclusion from the educational system at issue in Plyler, or the failure to provide access to literacy in Gary B.  See Plyler, 457 U.S. at 222-23; Gary B. 957

F.3d at 624.  In <u>Plyler</u>, for example, the plaintiffs were prohibited entirely from registering for school because of their immigration status.  <u>See Plyler</u>, 457 U.S. at 222-23.  Here, by contrast, the Plaintiffs are enrolled in remote learning programs.  Unlike, in <u>Gary B.</u>, the Plaintiffs have not shown that the Defendants' insistence on providing the Plaintiffs with online, rather than in-person, learning for a limited time period will not make it impossible, for example, for students to vote, file taxes, or engage with the legal system.  <u>See Gary B.</u>, 957 F.3d at 652.  Moreover, modes of education have varied substantially since the nation's founding.  <u>See</u> Barry Friedman & Sara Solow, <u>The Federal Right to an Adequate Education</u>, 81 Geo. Wash. L. Rev. 92, 121 (2013).  Until recently, widespread virtual learning that allows teachers to interact with students in real time would not have been possible.  Distance education, however, has been in practice since the 18th century.  <u>See</u> Hope Kentor, <u>Distance Education and the Evolution of Online Learning in the United States</u>, 17 Curriculum & Teaching Dialogue 1, 6 (2015).  Distance learning first became prevalent via correspondence courses, and, as technology evolved, expanded to radio, television, and eventually the internet.  <u>See</u> Hope Kentor, <u>Distance Education and the Evolution of Online Learning in the United States</u>, 17 Curriculum & Teaching Dialogue 1, 6-10 (2015).  Because widespread online education is a relatively recent phenomenon, and because of the historical practice of distance learning, the Court cannot conclude that in-person education is "deeply rooted in this Nation's history and tradition."  <u>Glucksberg</u>, 521 U.S. at 720-21.  The Court, therefore, will not recognize a new fundamental right in this case, because: (i) the Plaintiffs have not demonstrated the historical importance of an in-person education rather than remote instruction; (ii) the Plaintiffs have not demonstrated that a temporary pause on in-person learning will make it impossible for the Plaintiffs to access other fundamental liberties; (iii) the Plaintiffs have not sufficiently defined

the contours of their proposed right, and (iv) the Supreme Court has made plain that no general right to education exists.  See Rodriguez, 411 U.S. at 35.

Even if a constitutional fundamental right to education exists, when a State provides students with online instruction, rather than in-person instruction, the State has not violated automatically a child's right to education.[29]  See Vidovic v. Mentor City Sch. Dist., 921 F. Supp. 2d 775, 793 (N.D. Ohio 2013)(Nugent, J.).  See also Abdi v. Wray, 942 F.3d at 1028 (noting that, even if the right at issue is not fundamental, courts must still analyze whether government action infringes upon the right).  "Education" is "the process of receiving or giving systematic instruction, especially at a school or university."  New Oxford American Dictionary, at 553.  See Jones v. Better Bus. Bureau of Oklahoma City, 123 F.2d 767, 769 (10th Cir. 1941)("Education is defined in Webster's New International Dictionary, Second Edition, as follows: 'The totality of the information and qualities acquired through instruction and training, which further the development of an individual physically, mentally, and morally.'").  Schools may provide "systematic instruction" via online platforms.  New Oxford American Dictionary, at 553.  As the Honorable Donald C. Nugent, United States District Judge for the Northern District of Ohio, has explained that school-aged children do not have a "right to a choice of how education is delivered."  Vidovic

---

[29]In New Mexico, as of August, 2020 "approximately eight percent of students lived in a household without a computer and twenty-one percent lived in a household without an Internet subscription."  LFC Report at 16.  School districts have made some efforts to remedy this issue -- at the start of the school year, for example, Albuquerque Public Schools distributed Chromebooks to every student without a computer.  See LFC Report at 16.  Nonetheless, in Roswell, New Mexico "forty-three percent of families had no internet, or, more commonly, poor connectivity, meaning it might take twenty minutes to upload an assignment." LFC Report at 16.  The Court is concerned that children throughout New Mexico who lack computers or reliable internet service may not be receiving adequate educational services.  None of the Plaintiffs here, however, lack access to the internet or a computer.

v. Mentor City Sch. Dist., 921 F. Supp. 2d at 793 (concluding that, where a school required a student who had been bullied to attend online classes, the student had not been deprived of her education because of the change to online courses).   Here, the Plaintiffs' schools provide systematic instruction remotely, through a combination of direct, real-time virtual instruction and independent assignments.   See LFC Report at 16.   The Plaintiffs insist, however, that remote instruction is "largely failing our students drastically," Second MTD Response at 3, and the undisputed material facts indicate that online education "is not a substitute for in-person learning and socialization in a school setting," John Hopkins Report at 5.   Although "[a] temporary period of slowed educational progress poses important concerns . . . those concerns are categorically different from the effects of lifetime exclusion" from public education.   Brach v. Newsom, 2020 WL 6036764, at *5.   It is a fact that local educators in some areas are failing to provide an education to many students in brick and mortar buildings.   See Gary B., 957 F.3d at 624 (discussing the plaintiffs' allegations that "the conditions in their schools are so bad -- due to the absence of qualified teachers, crumbling facilities, and insufficient materials -- that those schools fail to provide access to literacy").     The Defendants' provision of remote instruction for the duration of a nationwide pandemic, therefore, is not a per se breach of any theoretical right to education, and Plaintiffs cite no contrary authority.   See Second MTD Response at 3.

### B.   THE DEFENDANTS' ACTIONS DO NOT SHOCK THE JUDICIAL CONSCIENCE, BECAUSE THEIR CONDUCT -- LIMITING IN-PERSON INTERACTIONS IN AN EFFORT TO MITIGATE THE PANDEMIC'S SPREAD -- IS NEITHER EGREGIOUS NOR OUTRAGEOUS.

Even if the shocks-the-conscience standard applies here, the Defendants actions do not violate the Plaintiffs' substantive due process rights, because they do not shock the Court's conscience.   See Rochin v. California, 342 U.S. at 172; Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2.   "Executive action that shocks the conscience requires much more

than negligence." Doe v. Woodard, 912 F.3d at 1300.  Rather, "[c]onduct that shocks the judicial conscience" is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice."  Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013).  "The behavior complained of must be egregious and outrageous."  Hernandez v. Ridley, 734 F.3d at 1261 (citing Breithaupt v. Abram, 352 U.S. 432, 435 (1957)).  The Tenth Circuit, for example, recently held that a social worker's behavior was conscience-shocking where the social worker removed a child from his mother's home to place him in his father's home and: (i) withheld information about the father's criminal history, including his conviction for attempted sexual assault against a minor in his care; (ii) withheld concerns about his father "for fear of being fired"; and (iii) was aware of, and failed to "investigate evidence of potential abuse," including the child's report that his father "had hit him with a wooden mop and school official's reports that he had spent significant time in the school nurse's office complaining of body aches and appearing fearful of his father . . . ."  T.D. v. Patton, 868 F.3d 1209, 1230 (10th Cir. 2017).  Ultimately, the child "suffered severe physical and sexual abuse at the hands of his father," and the Tenth Circuit concluded that the social worker had violated the child's substantive due process rights "by knowingly placing" the child "in a position of danger and knowingly increasing" his "vulnerability to danger."  T.D. v. Patton, 868 F.3d at 1212.  By contrast, the Court has held that school officials' conduct did not shock the conscience, where the plaintiffs alleged that the defendants did not take action to protect students at the school from being kicked and punched in the testicles on at least three occasions.  See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1059 n.2.

The Defendants' action in issuing the Reentry Guidance is not "egregious and outrageous." Hernandez v. Ridley, 734 F.3d a 1261.  See Reentry Guidance at 1-9.  First, limiting in-person interactions where possible, mitigates the virus' spread.  See How COVID-19 Spreads, Centers for

Disease Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html.   As discussed below, see Analysis § IV, infra,  the Defendants have a strong interest in stopping the spread of COVID-19, and have chosen to close certain schools for in-person learning to achieve this goal.  See Doe v. Woodard, 912 F.3d at 1300; Reentry Guidance at 8.   Further, a temporary pause on in-person learning is not comparable to knowingly permitting a child to suffer severe, long-term physical and sexual abuse, as in T.D. v. Patton.  See T.D. v. Patton, 868 F.3d at 1212.   The Defendants' actions -- taken to prevent further spread of a deadly virus -- therefore, do not rise to the level of conscience shocking. See Herrin v. Reeves, No. CIV 20-263 MPM\RP, 2020 WL 5748090, at *9 (N.D. Miss. Sept. 25, 2020)(Mills, J.)("[T]his court finds the notion that restrictions designed to save human lives are 'conscious shocking' to be absurd and not worthy of serious discussion.")(no citation for quotation).   Last, although the Plaintiffs alluded to the conscience-shocking standard at the hearings, they do not mention it in their Response to the Second MTD.   See Response at 1-3. Accordingly, "the Court's conscience is not shocked."   Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d at 1075.

### C.   THE REENTRY GUIDANCE IS RATIONALLY RELATED TO THE DEFENDANTS' LEGITIMATE STATE INTEREST IN STOPPING COVID-19'S SPREAD.

Because the Reentry Guidance affects neither a suspect class nor a fundamental right, the Court will evaluate the policy under rational basis review to determine whether the Reentry Guidance is "rationally related to a legitimate state interest."   City of New Orleans v. Dukes, 427 U.S. at 303.   The Plaintiffs contend that the Reentry Guidance violates substantive due process even under rational basis review.   See Second MTD Response at 4 (arguing that the Defendants have not satisfied rational basis review because other jurisdictions have opted to keep schools open).   The Court concludes that the Reentry Guidance satisfies rational basis review.   See City of

New Orleans v. Dukes, 427 U.S. at 303.  A State policy "need not be in every respect logically consistent with its aims to be constitutional.  It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."  Williamson v. Lee Optical of Oklahoma Inc., 348 U.S. 483, 487-88 (1955).  Moreover, "[u]nder this test, the Governor" and Secretary Stewart's "action 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer, 814 F. App'x 125, 128 (6th Cir. 2020)(quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993))).  The Defendants argue that "the PED's decision to suspend in-person learning in counties with higher rates of a deadly virus during an ongoing pandemic is rationally related to a legitimate state interest . . . ."  Second MTD at 22.  The Court agrees with this contention.

The Defendants have a legitimate interest in "the protection and preservation of human life . . . ."  Cruzan v. Dir. Missouri Dep't of Health, 497 U.S. 261 (1990).  See Legacy II, 2020 WL 3963764, at *113.  As of December 4, 2020, 104,935 people have tested positive for COVID-19 and 1,706 people have died of the virus in New Mexico.  See COVID-19 in New Mexico, New Mexico Dep't of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Dec. 4, 2020).  In addition, 7,184 people have been hospitalized, and 934 people are hospitalized currently because of COVID-19.  See COVID-19 in New Mexico, New Mexico Dep't of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Dec. 4, 2020).  Children aged nine and under account for 5,545 of New Mexico's COVID-19 cases, while children aged ten to nineteen account for 12,469 cases.  See COVID-19 in New Mexico, New Mexico Dep't of Health, https://cvprovider.nmhealth.org/public-dashboard.html (last visited Dec. 4, 2020).  According to the CDC, "the more closely a person interacts with others and the longer that

interaction, the higher the risk of COVID-19 spread."  How COVID-19 Spreads, Centers for Disease Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html.  "And at least until vaccines are readily available, the situation may get worse in many parts of the United States," including New Mexico.  Roman Catholic Diocese of Brooklyn v. Cuomo, No. 20A87, 2020 WL 6948354, at *8 (U.S. Nov. 25, 2020)(Kavanaugh, J., concurring).  In-person schooling involves daily, prolonged interactions between large groups of people.  Further, New Mexico has one of the "highest median age of educators" and because "age is a factor for COVID-19" the Defendants "want to make sure that people," including aging educators "are safe."  Gov. Grisham June 25 Press Conf. at 49:36-49:45.  The Defendants' Reentry Guidance, therefore, rationally relates to its legitimate purpose of protecting the health and lives of its citizens by preventing the spread of COVID-19.

The Court need not, and probably should not, decide whether the Defendants have chosen the best path for schoolchildren.  See Powers v. Harris, 379 F.3d 1208, 1217 (10th Cir. 2004)(stating that under the rational basis test, "[s]econd-guessing by a court is not allowed");  FCC v. Beach Communications, Inc., 508 U.S. 307, 313 ("[E]qual protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."); New Orleans v. Dukes, 427 U.S. 297, 303 (1976)(per curiam)("The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . .").  There are powerful arguments that children need to be in school, and that the downsides of being outside of the building outweigh the risks of exposure to young people.  See, e.g., John Hopkins Report at 1.  The Defendants seem to have weighed the real dangers to adult teachers and staff more heavily than the physical, emotional, and educational needs of the children.  The Court's task, however, is to decide whether

the Defendants' chosen path is rationally related to their goal of preventing the spread of COVID-19 transmission, and the Court cannot say that the Defendants' choice is too irrational and has no relationship to the goals of limiting the spread of the virus -- even if the Defendants seem more concerned about the spread to adults than the effective education of children.

## V. THE REENTRY GUIDANCE DOES NOT VIOLATE THE PLAINTIFFS' EQUAL PROTECTION RIGHTS, BECAUSE THE REENTRY GUIDANCE IS NEUTRAL ON ITS FACE AND THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT A DISCRIMINATORY PURPOSE MOTIVATED THE DEFENDANTS' REENTRY GUIDANCE.

"A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race." Washington v. Davis, 426 U.S. 229, 241 (1976)(citing Yick Wo v. Hopkins, 118 U.S. 356 (1880)).   The Plaintiffs argue that the Reentry Guidance violates equal protection, because "denial of education to some isolated group of children poses an affront to . . . the Equal Protection Clause." Second MTD Response at 3.  To establish an equal protection violation, the Plaintiffs first must demonstrate that he or she is a member of a class of persons who is being treated differently than similarly situated individuals outside the class. See SECSYS, LLC v. Vigil, 666 F.3d 678, 688 (10th Cir. 2012)(Gorsuch, J.).  Further, if a statute appears facially neutral, the plaintiff must make out a "prima facie case of discriminatory purpose." Washington v. Davis, 426 U.S. at 241.  See Wayte v. United States, 470 U.S. 598, 610 (1985)(concluding that, even if a government's policy has a discriminatory effect on vocal non-registrants for the Selected Service, the plaintiffs must show that the government intended that discriminatory effect); Curtis v. Oliver, No. CIV 20-0748 JB\JHR, 2020 WL 4734980, at *63 (D.N.M. Aug. 14, 2020)(Browning, J.)("'[A] discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action.'")(quoting SECSYS, LLC v. Vigil, 666 F.3d at 685).  The Plaintiffs must establish a discriminatory purpose in any equal

protection challenge involving a facially neutral law -- not only when the plaintiff alleges racial discrimination.  See, e.g., Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 481 (1997)(holding that the plaintiff in a constitutional vote dilution challenge under the equal protection clause must demonstrate that the defendants "acted with a discriminatory purpose"); Romer v. Evans, 517 U.S. 620 (1996)(invalidating a state constitutional amendment impacting sexual minorities, because its "sheer breadth" was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects").

Here, the Plaintiffs do not allege that a discriminatory purpose or animus towards students with disabilities motivates the Defendants' Reentry Guidance.  See Washington v. Davis, 426 U.S. at 241; Reentry Guidance at 1; Am. Compl. ¶ 22, at 6-7.  First, the Defendants' Reentry Guidance is facially neutral; it does not require only students with disabilities to engage in remote learning.  See Reentry Guidance at 1.  Next, unlike the state constitutional amendment in Romer v. Evans, which solely impacted sexual minorities, the Defendants' Reentry Guidance does not solely impact students with disabilities.  See Romer v. Evans, 517 U.S. at 632.  Rather, the Reentry Guidance requires all children in counties with higher rates of COVID-19 to receive remote instruction.  See Reentry Guidance at 1.  But see   Nor is there any evidence that the Defendants possess a "bare . . . desire to harm" children with disabilities.  Moreno, 413 U.S. 528, 534 (1973).  The Plaintiffs have not attempted to make a prima facie showing of discriminatory purpose or animus; therefore, any equal protection claim relating to children with disabilities necessarily fails.  See Washington v. Davis, 426 U.S. at 241; Reentry Guidance at 1; Am. Compl. ¶ 22, at 6-7.

The Plaintiffs allege, however, that the Defendants' decision "to close certain counties['] schools to in-person learning, are arbitrary and capricious, lacking any justification in law or science, and were done in retaliation for punitive purposes based upon a perception that these

communities were defying the authority of the Governor."  Am. Compl. ¶ 22, at 6-7.  The Equal

Protection Clause prohibits "prejudice against discrete and insular minorities" -- protected or

suspect classes.  United States v. Carolene Prod. Co., 304 U.S. 144, 153 n. 4 (1938).  Citizens of

the listed counties are not members of a suspect class.  See San Antonio Indep. Sch. Dist. v.

Rodriguez, 411 U.S. at 28.  These individuals do not "claim to suffer disabilities, have a history of

unequal treatment, or be politically powerless."  Save Palisade FruitLands v. Todd, 279 F.3d 1204,

1210 (10th Cir. 2002).  Citizens of the listed counties, therefore, are not entitled to heightened

scrutiny because of a suspect classification.  See Palisade FruitLands v. Todd, 279 F.3d at 1210.

Further, even if Governor Grisham is targeting counties that are not taking her orders seriously,

the Court cannot say that such targeting lacks a rational basis.  Areas where people are not obeying

rules may have an increase in COVID-19 cases.  See How COVID-19 Spreads, Centers for Disease

Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-

getting-sick/how-COVID-spreads.html.  Closure orders for schools, therefore, may help reduce

spread in those counties, whereas other counties that are practicing COVID-safe practices may be

able to safely re-open schools for in-person learning.  As the Court has explained, the Reentry

Guidance satisfies rational basis review.  See Analysis § IV, supra.  The Defendants, therefore,

have not violated the Plaintiffs' equal protection rights.

**VI.    WOODWORTH'S IDEA CLAIMS ARE MOOT, BECAUSE HER UPDATED NOVEMBER 3, 2020, IEP DOES NOT CONTAIN PURELY LEGAL ERRORS.**

In Hernandez I, the Court concluded that J.W.'s September 10, 2020 IEP "contains 'purely

legal' errors," therefore, the Court ordered Secretary Stewart to instruct J.W.'s LEA to amend her

IEP "so that the amended IEP is 'reasonably calculated to enable [Woodworth's daughter] to make

progress'"  Hernandez I, 2020 WL 6063799, at *67 (quoting Ass'n for Cmty. Living v. Romer,

992 F.2d at 1044; Endrew F., 137 S. Ct. at 999).  Following Hernandez I, J.W.'s LEA created a

new IEP for her based upon the Court's instruction.  See Stewart Letter at 2 (instructing J.W.'s

LEA to reconvene her IEP team, and reminding the LEA that the "Reentry Guidance allows the

district to provide students with disabilities in-person instruction in small groups"); ████

███████████████████████████████████████████████████████████████████

████ As the Court explained in Hernandez I, however, because Woodworth did not exhaust

her administrative remedies, "judicial review is typically unavailable . . . ."  Hernandez I, 2020

WL 6063799, at *66 (citing Honig v. Doe, 484 U.S. at 327).

The J.W. Nov. 3 IEP renders Woodworth's IDEA claims moot.  See J.W. Nov. 3 IEP.  The

doctrine of mootness arises from Article III's limitation on federal courts' jurisdiction to "cases

and controversies."  U.S. Const. art. III, § 2, cl. 1.  "Mootness is a threshold issue because the

existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction."

McClendon v. City of Albuquerque, 100 F.3d 863, 867 (10th Cir. 1996).  Further, "[t]his

requirement exists at all stages of federal judicial proceedings, and it is therefore not enough that

the dispute was alive when the suit was filed; the parties must continue to have a personal stake in

the outcome."  McClendon v. City of Albuquerque, 100 F.3d at 867.  "A case becomes moot 'when

a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision.'"

Ind v. Colo. Dep't of Corrs., 801 F.3d 1209, 1213 (10th Cir. 2015)(quoting Rhodes v. Judiscak,

676 F.3d 931, 933 (10th Cir. 2012)).  Because the J.W. Nov. 3 IEP eliminated the purely legal

errors in J.W.'s earlier IEP, J.W. "no longer suffers actual injury that can be redressed by a

favorable judicial decision," given that she has not exhausted her administrative remedies.  Rhodes

v. Judiscak, 676 F.3d at 933.

The Court recognizes four exceptions to the IDEA's exhaustion requirement: (i) "'where

exhaustion would be futile or inadequate'"; (ii) where the "suit presents a purely legal question";

(iii) where the plaintiff's case presents an emergency situation; and (iv) where the gravamen of the plaintiff's "suit is something other than denial of a FAPE."  Hernandez I, 2020 WL 6063799, at *66 (quoting Honig v. Doe, 484 U.S. at 327).  Woodworth bears the burden of demonstrating that "one of these narrow exceptions applies." Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1063 n.6 (10th Cir. 2002).  See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 489 (2d Cir. 2002)("[T]he burden of demonstrating futility rests with the party seeking to avoid the exhaustion requirement.").  Here, Woodworth "has not identified 'a practice of general applicability' that justifies eschewing administrative remedies.'" Hernandez I, 2020 WL 6063799, at *67 (quoting Ass'n for Cmty. Living v. Romer, 992 F.2d at 1044).  Additionally, Woodworth has not shown that any deficiencies in her current IEP rise to the level of an "emergency situation," because she does not allege that J.W. "is likely to suffer an irreversible harm, such as irremediable intellectual regression." Hernandez I, 2020 WL 6063799, at *66 n.29 (citing Komninos v. Upper Saddle River Bd. of Educ., 13 F.3d 775, 779 (3d Cir. 1994)(Trump, J.)).  Further, the gravamen of Woodworth's suit is the denial of a FAPE, therefore, none of the exceptions apply.  See Fry v. Napoleon Cmty. Schs., 137 S. Ct. at 748; Am. Compl. ¶ 69, at 13-14; id. ¶ 73, at 14; id. ¶ 14, at 4.  Accordingly, because J.W.'s November 3, 2020, IEP does not contain any purely legal errors, the Court lacks jurisdiction over Woodworth's IDEA challenge, and her IDEA claims are moot. See Ass'n for Cmty. Living v. Romer, 992 F.2d at 1044; J.W. Nov. 3 IEP.

Woodworth alleges that she "w[as] and [is] being denied a free and uniform[30] as [her] child [is] not able to participate in in-person instruction." Am. Compl. ¶ 22, at 7.  Woodworth

---

[30]The Court assumes that the Plaintiffs refer to the FAPE provision of the IDEA here.

insists that "denying . . . in-person instruction that is integral to receiving a FAPE and modifies her IEP in a way that cannot be remedied through a due process hearing."  Am. Compl. ¶ 22, at 7.



The Court's primary concern about J.W.'s September IEP is that it did not provide J.W. with in-person instruction "due to a misinterpretation of 'state health regulations.'" Hernandez I, 2020 WL 6063799, at *68 (quoting J.W. Records at 37).  J.W.'s new IEP addresses the Court's concerns by noting correctly that the Reentry Guidance permits small group in-person instruction for students with disabilities.  See J.W. Nov. 3 IEP at 11-12; Stewart Letter at 2.  The new IEP, therefore, is not based upon a "purely legal" error that allows Woodworth to

bypass the administrative process.  Ass'n for Cmty. Living v. Romer, 992 F.2d at 1044.  See J.W. Nov. 3 IEP at 11-12.  Moreover, the new IEP "sets out an educational program that is 'reasonably calculated to enable the child to receive educational benefits.'"  Endrew F., 137 S. Ct. at 995-96 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 207).  For example, the new IEP discusses Woodworth's failing grades during remote learning, and accordingly allows Woodworth to socialize at recess and to receive in-person instruction four days per week.  See Endrew F., 137 S. Ct. at 1002 (explaining that an IEP must be "reasonably calculated to enable the child to make progress appropriate in light of his circumstances"); J.W. Nov. 3 IEP at 15-16.  Woodworth's claims, therefore, are moot, because, "during the pendency of the case, circumstances change[d] such that the plaintiff's legally cognizable interest in" the case was "extinguished . . . ."  Kan. Judicial Review v. Stout, 562 F.3d 1240, 1245 (10th Cir. 2009). Accordingly, if Woodworth still has concerns about her IEP -- perhaps that ███████████ ████████████████████████████████████ -- the IDEA requires her to "turn first to the statute's administrative framework to resolve any conflicts . . . with the school's educational services," Ellenberg, 478 F.3d at 1275.[31]

---

[31]"Whenever a complaint has been received" regarding "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of" a FAPE to the child, "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the" SEA or LEA. 20 U.S.C § 1415(b)(6); id. § 1415(f)(1)(A)(i).  If the LEA conducts the hearing, "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the" SEA.  20 U.S.C. § 1415(g)(1).  A party has the right to bring a civil action only after completing the due process hearing and appeal, if available.  See 20 U.S.C. § 1415(i)(2). New Mexico law requires hearing officers to make decisions "on substantive grounds based on a determination of whether the child received a free appropriate public education (FAPE)."  N.M. Code R. 6.31.2.13(I)(19)(a).  The same is true under the federal regulations.  See 34 C.F.R. §

**VII.   THE PLAINTIFFS MAY NOT BRING IDEA CLAIMS VIA § 1983, BECAUSE THE IDEA INCLUDES A COMPREHENSIVE ALTERNATIVE ENFORCEMENT SCHEME.**

The Plaintiffs attempt, unsuccessfully, to bring IDEA claims "pursuant to 42 U.S.C.A. § 1983." Am. Compl. at 1.  Litigants rely often on § 1983 to challenge violations of federal statutes.  See Maine v. Thiboutot, 448 U.S. 1, 6-8 (1980).  In the Tenth Circuit, however, plaintiffs may not bring IDEA claims under § 1983.  See Padilla ex rel. Padilla v. Sch. Dist. No. 1 in City & Cty. of Denver, Colo., 233 F.3d 1268, 1273 (10th Cir. 2000)("Padilla").  Although § 1983 provides "a generally and presumptively available remedy for claimed violations of federal law," Congress may prohibit § 1983 suits by either (i) "express words"; or (ii) "providing a comprehensive alternative enforcement scheme."  Livadas v. Bradshaw, 512 U.S. 107, 133 (1994).  Congress has not prohibited expressly § 1983 suits as remedies for IDEA violations.  See 20 U.S.C. §§ 1400 et seq.  The IDEA's exhaustive remedial scheme, however, precludes the Plaintiffs from relying on § 1983 as a basis for their IDEA claims.  See Padilla, 233 F.3d at 1273; Sean E. v. Fraga, No. CIV 07-1191 RB/KBM, 2008 WL 8937906, at *8 (D.N.M. Oct. 30, 2008)(Brack, J.)(concluding that, under Padilla, the "Plaintiffs' § 1983 claims that are based solely on violations of the IDEA . . . must be dismissed").

The Court concludes that the "IDEA's enforcement scheme is so comprehensive that claims alleging IDEA violations under 42 U.S.C. § 1983 are precluded."  L.C. v. Utah State Bd. of Educ., 62 F. App'x 278, 279 (10th Cir. 2003).  Courts of Appeals have split whether plaintiffs

---

300.513(a)(1)("[A] hearing officer's determination of whether a child received FAPE must be based on substantive grounds.").).

may bring IDEA claims under § 1983.  Compare Marie O v. Edgar, 131 F.3d 610, 622 (7th Cir. 1997)("Congress did not intend to foreclose resort to § 1983 in Part H, but it actually provided for its availability to enforce the IDEA."), with A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 799 (3d Cir. 2007)(explaining that § 1983 is not the proper vehicle for IDEA suits).  The Tenth Circuit, however, has held consistently that "1983 claims may not be used to remedy IDEA violations." Donahue v. Kansas Bd. of Educ., 827 F. App'x 846, 853 (10th Cir. 2020)("[Section] 1983 is not a proper avenue for IDEA violations."); Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1067 n.10 (10th Cir. 2002)("We have, however, squarely held that a plaintiff may not use § 1983 as a vehicle for remedying an IDEA violation.").  Accord  Bell v. Bd. of Educ. of the Albuquerque Pub. Sch., No. CIV06-1137JB/ACT, 2008 WL 4104070, at *12 (D.N.M. March 26, 2008)(Browning, J.).[32]  The Plaintiffs here, therefore, may not bring their IDEA claims "pursuant to 42 U.S.C.[] § 1983."  Am. Compl. at 1.  Although the Court continues to analyze the Plaintiffs'

---

[32]The statute provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  The Supreme Court's conclusion in Livadas v. Bradshaw that § 1983 suits may be precluded by comprehensive alternative enforcement schemes is contrary to the statute's text, which allows for suits related to "the deprivation of any rights . . . secured by the Constitution and laws . . . ."  42 U.S.C. § 1983.  The IDEA is a federal law providing children with disabilities the right to a FAPE.  It should, therefore, be enforceable via § 1983.  The Court, however, is bound by the Tenth Circuit's precedent on this matter.

IDEA claims on the merits, the IDEA claims are subject to dismissal on these grounds alone.  See

Bell v. Bd. of Educ. of the Albuquerque Pub. Sch., 2008 WL 4104070, at *12; Am. Compl. at 1.

## VIII.   REMEDIES FOR VIOLATIONS OF FAPE MUST BE INDIVIDUALIZED AND PROCEED VIA THE ADMINISTRATIVE PROCESS.

Every child with disabilities does not require in-person socialization with students without

disabilities to receive a FAPE, as the Plaintiffs argue.  See Am. Compl. at ¶ E-F, at 15.  The

Plaintiffs insist that the Defendants' Reentry Guidance conflicts with the IDEA's "socialization

requirement . . . as well as the socialization requirement found in a broad number of" IEPs.  Second

MTD Response at 10 (citing Cty of San Diego v. California Special Educ. Hearing Office, 93 F.3d

1458, 1467 (9th Cir. 1996)(O'Scannlain, J.)("Cty of San Diego"); Seattle Sch. Dist. V. B.S., 82

F.3d 1493, 1500 (9th Cir. 1996)).  The Plaintiffs insist that "[s]ocialization is an aspect of IDEA

regardless if the requirement is included in a student's IEP or not."  Second MTD Response at 10.

The Plaintiffs rely on two cases from the Ninth Circuit to support their argument that the IDEA

requires that LEAs provide students with disabilities the opportunity to socialize in-person with

students without disabilities during the pandemic.  See Cty of San Diego, 93 F.3d at 1467; Seattle

Sch. Dist. V. B.S., 82 F.3d at 1500.   Both cases upon which the Plaintiffs rely, however, conclude

that the students' placement in a residential care facility was the LRE for that student.  See Cty of

San Diego, 93 F.3d at 1467; Seattle Sch. Dist. V. B.S., 82 F.3d at 1500.  The Ninth Circuit,

therefore, held that other considerations outweighed the IDEA's presumption against removing

children with disabilities from the regular educational environment.  See Cty of San Diego, 93

F.3d at 1467; Seattle Sch. Dist. V. B.S., 82 F.3d at 1500.   The Court concludes that neither case

supports the Plaintiffs' general in-person socialization argument.  See Second MTD Response at

10.

First, in County of San Diego, the Honorable Diarmuid O'Scannlain, United States Circuit Judge for the Ninth Circuit, addressed whether a county could challenge "the state's classification of a minor as seriously emotionally disturbed and its finding ordering residential treatment for which the county is financially responsible." Cty. of San Diego, 93 F.3d at 1461.  First, Judge O'Scannlain held that the county was "not entitled to challenge" the state's classification of the child as "emotionally disturbed," because 20 U.S.C. § 1415(e)(2) does not allow a county to contest the classification of a child's disability.  Cty. of San Diego, 93 F.3d at 1466.  Judge O'Scannlain explained that "the correct standard for measuring educational benefit under the IDEA is not merely whether the placement 'is reasonably calculated to provide the child with educational benefits,' but rather, whether the child makes progress toward the goals set forth in her IEP." Cty. of San Diego, 93 F.3d at 1467 (no citation for quotation).  The child's goals were not solely academic, but also focused on behavioral and emotional progress.  See Cty. of San Diego, 93 F.3d at 1468.  Because placement in a regular school did not allow the child to meet her IEP's goals, Judge O'Scannlain concluded that the child's placement in a residential facility satisfied the LRE provision.  See Cty. of San Diego, 93 F.3d at 1468.

Similarly, in Seattle School District No. 1 v. B.S., the Honorable Betty B. Fletcher, United States Circuit Judge for the Ninth Circuit, concluded that a "residential placement with intensive, round-the-clock care" best allowed the student at issue "to address her behavioral disabilities and enable her to benefit from her education." Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d at 1501.  In a regular educational environment, the child "was able to test appropriately on standardized tests" because she was "exceptionally bright." Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d at 1500.  Still, Judge Fletcher explained that the child's residential placement was appropriate because her education included "'academic, social, health, emotional, communicative, physical and vocational

needs.'" Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d at 1500 (quoting H.R. Rep. No. 410 (1983), as reprinted in 1983 U.S.C.C.A.N. 2088, 2106). The student's residential placement "addresse[d]" her "medical or psychiatric disorders" "in an attempt to ensure" that the student "is able to benefit from her education." Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d at 1500. Judge Fletcher therefore held that the student's placement in a residential care facility satisfied the IDEA's LRE requirement. See Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d at 1500.

The Court agrees with the Plaintiffs that, in some cases, IEPs may include social and emotional goals. See Cty. of San Diego, 93 F.3d at 1467. These goals, however, are explicit rather than "inherent" in a child's IEP, as the Plaintiffs have argued. Tr. at 27:15-21 (Dunn). The B.W. IEP illustrates goals' specificity in IEPs. See B.W. IEP at 9. The B.W. IEP contains "post-secondary goals," and "present levels and annual measurable goals in identified areas of need." B.W. IEP at 9. See also Cty. of San Diego, 93 F.3d at 1467 (discussing IEP goals). The B.W. IEP has a "academic achievement" goals section, with a checklist that denotes the student's "identified area of need." B.W. IEP at 9. The possible "academic" areas of need are: (i) mathematics; (ii) processing skills; (iii) reading; (iv) communication skills; (iv) written language; (v) career readiness; (vi) problem solving; and (vii) other. B.W. IEP at 9. The B.W. IEP also has a "functional performance" goals section, with an "identified area of need" checklist that includes: (i) social/emotional; (ii) life skills; (iii) energy level; (iv) sustained attention; (v) memory function; (vi) impulse; (vii) processing speed; (viii) motor skills; and (viv) other transition. B.W. IEP at 11. After evaluating the B.W. IEP, the Court disagrees with the Plaintiffs' contention that "[s]ocialization is an aspect of IDEA regardless if the requirement is included in a student's IEP or not." Second MTD Response at 10. The B.W. IEP demonstrates that B.W.'s IEP team chose not to put forth any "social/emotional" goals for B.W., although the identified area of need

checklist included this option.  B.W. IEP at 11.  As the Court indicated at the hearing, the Court is

"reluctant to say what is inherent in an IEP," because IEPs "are very, very specific."  Tr. at 27:15-

21 (Court).  Given the IEPs' thorough nature, and given that each IEP is tailored narrowly to a

specific student -- as the B.W. IEP demonstrates -- the Court concludes that IEPs do not contain

"inherent" goals regarding in-person socialization with students without disabilities.  Tr. at 27:15-

21 (Court).  See B.W. IEP at 11.  Any student who does not receive a FAPE because they do not

have the opportunity to socialize with students without disabilities must proceed via the

administrative process.  As the Defendants acknowledge: "[t]here is simply nothing to prevent a

hearing officer from ordering in-person instruction for a student with disabilities if found necessary

for FAPE."  Second MTD at 39.  See also C.M. v. Jara, No. CIV 20-1562, at 3 (D. Nev. Nov. 11,

2020)(Jahan, J.)(denying the plaintiffs' TRO request in a similar case because "the plaintiffs'

requests would place an immense hardship on the defendants").

IX.  **THE IDEA'S TEXT AND LEGISLATIVE HISTORY INDICATE THAT A REGULAR EDUCATIONAL ENVIRONMENT OR REGULAR CLASSROOM IS ANY SITUATION IN WHICH A CHILD WITH DISABILITIES IS NOT SEPARATED FROM CHILDREN WITHOUT DISABILITIES IN HIS OR HER SCHOOLING.**

The IDEA's LRE provision requires:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(A).  <u>See</u> 34 C.F.R. § 300.114 (same).[33]  <u>See also</u> Least Restrictive Environment, <u>Black's Law Dictionary</u> (11th ed. 2019)(defining the LRE as "the school setting that, to the greatest extent appropriate, educates a disabled child together with children who are not disabled[]")(citing 20 USCA § 1412(5)).  The Supreme Court has explained that the LRE provision "requires participating States to educate" children with disabilities "with" children without disabilities "whenever possible."  <u>Rowley</u>, 458 U.S. at 202 (citing 20 U.S.C. § 1415).  Similarly, the Supreme Court has held that the IDEA's "mainstreaming[34] preference" is met when

---

[33]This provision of the statute has not changed significantly since it first appeared in the statute in 1975.  The original provision instructs States

> to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B)(amended 1975)(current version at 20 U.S.C. § 1412(5)(A)).  The only change between the original version and the current version is that the original version uses the term "handicapped children" rather than "children with disabilities."  <u>Compare</u> 20 U.S.C. § 1412(5)(B) <u>with</u>  20 U.S.C. § 1412(5)(A).

[34]The Tenth Circuit has held that:

> The term "mainstreaming" is also frequently used, often interchangeably, with the term LRE.  In fact, they are different.  "Mainstreaming" means placing disabled children in regular classrooms, with non-disabled children.  The IDEA does not require mainstreaming in all cases; "rather, it requires that each student be educated in an environment that is the least restrictive possible and that removal from general education occurs only when absolutely necessary."  Allan G. Osborne, Jr., <u>IDEA's Least Restrictive Environment Mandate: A New Era</u>, 88 Educ. L. Rep. 541 (1994).  The term "inclusion" is increasingly favored over the term "mainstreaming" because "mainstreaming connotes 'the shuttling of the disabled child in and out of the regular class without altering the class to accommodate the child.'"  Abigail L. Flitter, <u>Civil Rights -- A Progressive Construction of the Least Restrictive Environment Requirement of the Individuals with Disabilities</u>

"a child is being educated in the regular classrooms of a public school system, and the system itself monitors the educational progress of the child."  Rowley, 458 U.S. at 202-03.  See id. at 211 (Blackmun, J., concurring)(concluding that the IDEA requires a child's program "viewed as a whole" to "offer[] her an opportunity to understand and participate in the classroom that was substantially equal to that given her" classmates without disabilities).

### A.    THE LRE PROVISION'S TEXT INDICATES THAT REMOTE INSTRUCTION DOES NOT VIOLATE THE IDEA'S PRESUMPTION AGAINST REMOVING CHILDREN WITH DISABILITIES FROM THE REGULAR EDUCATIONAL ENVIRONMENT

The IDEA and its regulations do not define the terms: "with," "regular educational environment," or "regular classes." 20 U.S.C. § 1415.  The Court, therefore, must look to the "ordinary meaning" of the terms.  Mohamad v. Palestinian Auth., 566 U.S. 449, 454 (2012).  See Sterling Islands, 391 F. Supp. 3d at 1050 ("Unless otherwise defined, words in the statute 'will be interpreted as taking their ordinary, contemporary, common' meaning 'at the time Congress enacted the statute.'")(quoting Perrin v. United States, 444 U.S. 37, 42 (1979)).  The New Oxford American Dictionary, Third Edition, defines "class," in this context, as "a group of students who are taught together, an occasion when students meet with their teacher for instruction," or "a course of instruction."  New Oxford American Dictionary (3d Ed. 2010), at 320.  The term "regular" modifies the term "classes" in the statute.  20 U.S.C. § 1415.   "Regular" is defined as "done or

_____

Education Act -- Oberti ex. rel. Oberti v. Board of Educ., 995 F.2d 1204 (3d Cir. 1993), 67 Temp. L. Rev. 371 n.5 (1994)(quoting Oberti, 995 F.2d at 1207 n.1).

Murray By & Through Murray v. Montrose Cty. Sch. Dist. RE-1J, 51 F.3d 921, 926 n.9 (10th Cir. 1995).  See Mainstreaming, Black's Law Dictionary (11th ed. 2019)(defining mainstreaming as "[t]he practice of educating a disabled student in classes with students who are not disabled, in a regular-education setting, as opposed to a special-education class").

happening frequently," "conforming to or governed by an accepted standard of procedure or convention," "used, done, or happening on a habitual basis, usual, customary." New Oxford American Dictionary, at 1470-71. "Educational" is defined as "of or relating to the provision of education: *children with special educational needs*," while "education" is "the process of receiving or giving systematic instruction, especially at a school or university." New Oxford American Dictionary, at 553 (emphasis in original). "Environment," in the context of education, means "the setting or conditions in which a particular activity is carried on: *a good learning environment*." New Oxford American Dictionary, at 580 (emphasis in original). Finally, the dictionary defines "with" as "accompanied by another person or thing." New Oxford American Dictionary, at 1984.

The Court considers the LRE provision's date of enactment to be 1975,, because "subsequent reenactments have been 'recodifications with only slight changes in phraseology.'" See United States v. Sterling Islands, Inc., 391 F. Supp. 3d 1027, 1050 (D.N.M. 2019)(Browning, J.)("Sterling Islands")(quoting Roseman v. United States, 364 F.2d 18, 25 n.9 (9th Cir. 1996)). Nonetheless, although "every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." Wis. Cent. Ltd. v. United States, 138 S. Ct. 2067, 2074 (2018)(emphasis in original). Although real-time remote instruction was not possible in 1975 as it is in 2020, the Court will consider how and whether the understanding of undefined terms in the LRE provision could apply in the remote learning context. See Wis. Cent. Ltd. v. United States, 138 S. Ct. at 2074 (noting that deference to a term's ordinary meaning when the statute was enacted does not "trap[]" a court in a "time warp, forever limited"); See Hope Kentor, Distance Education and the Evolution of Online Learning in the United States, 17 Curriculum & Teaching Dialogue 1, 6-10 (2015).

Under the ejusdem generis canon of statutory interpretation, if a general word follows an enumeration of items in a specific category, the general word should be interpreted in relation to that category.  See Gooch v. United States, 297 U.S. 124, 128 (1936)(explaining that ejusdem generis "limits general terms which follow specific ones to matters similar to those specified").  Accord United States v. West, 671 F.3d 1195, 1200 (10th Cir. 2012)(same).  The LRE provision expresses a rebuttable presumption against "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment . . . ."  20 U.S.C. § 1415; 34 C.F.R. § 300.114(a)(2)(ii)(same).   The Court, therefore, concludes that the term "removal of children with disabilities from the regular educational environment" is a means of separating children with disabilities from children without disabilities similar to "special classes" and "separate schooling."  20 U.S.C. § 1412.  See Gooch v. United States, 297 U.S. at 128.  Cf.  Cooper Distrib. Co. v. Amana Refrigeration, Inc., 63 F.3d 262, 278 (3d Cir 1995)(Alito, J.)(noting that, where the phrase "including, but not limited to" precedes a list, ejusdem generis does not apply because the phrase "plainly expresses a contrary intent").  Providing children with disabilities with online instruction that is the same as the remote instruction that their peers without disabilities receive is not a  "removal of children with disabilities from the regular educational environment," because children with disabilities receive access to the same virtual instruction and materials as their peers without disabilities.  20 U.S.C. § 1412(5)(A).  See Sch. Dist. of Wisconsin Dells v. Z.S. ex rel. Littlegeorge, 295 F.3d 671, 672 (7th Cir. 2002)(Posner, J.)("Littlegeorge")(defining mainstreaming as "educating the disabled child in classes with nondisabled children rather than in special classes or at home"); Murray By & Through Murray v. Montrose Cty. Sch. Dist. RE-1J, 51 F.3d 921, 928-29 (10th Cir. 1995)("Murray")(stating that "while" the LRE provision "clearly

commands schools to include or mainstream disabled children as much as possible, it says nothing about where, within a school district, that inclusion shall take place").

The regulations interpreting the LRE provision support this understanding.  See 34 C.F.R. § 300.116 ("establishing "the educational placement of a child with a disability").  "Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."  34 C.F.R. § 300.116(c).  Here, students without disabilities are also receiving remote rather than in-person instruction.  See Reentry Guidance at 8.  Section 300.116  indicates that the LRE provision seeks to "avoid[], as much as possible the segregation of disabled children from nondisabled children."  Murray, 51 F.3d at 930.  The LRE placement provision requires, therefore, that, if a school is in the remote learning category, there is a rebuttable presumption that any child with disabilities enrolled in that school should receive remote instruction like his or her peers without disabilities unless his or her "education . . . with the use of supplementary aids and services cannot be achieved satisfactorily[]" via remote instruction. 20 U.S.C. § 1412(5)(A).  See Reentry Guidance at 1.  Here, because most students are required to use remote learning, see Reentry Guidance at 1, there is a rebuttable presumption that students with disabilities should likewise receive remote instruction.  See 34 C.F.R. § 300.116.

Finally, Congress' use of the terms "regular educational environment" and "regular classes" -- rather than "regular classroom" -- in the LRE provision indicate that Congress did not intend to confine the terms to a child's physical presence in a room at a school building. 20 U.S.C. § 1415(5)(a).  Moreover, "'where Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  Babbitt v. Sweet Home Chapter of Communities, 515 U.S. 687, 724 (1995)(Scalia, J., dissenting)(quoting Keene Corp. v. United States, 508 U.S. 200,

208 (1993).  The IDEA employs the term "classroom" elsewhere in the statute, e.g.,  20 U.S.C. § 1400(5)(d), and, therefore, the Court presumes that Congress intentionally did not use the term "classroom" in the LRE provision,  see Babbitt v. Sweet Home Chapter of Communities, 515 U.S. at 724.  This omission highlights the Court's "duty to refrain from reading a phrase into the statute when Congress has left it out."  Keene Corp. v. United States, 508 U.S at 208.  The Court, therefore, concludes that an LEA's shift from in-person instruction to remote learning -- for both students with disabilities and students without disabilities -- does not violate the IDEA's presumption against removing "children with disabilities from the regular educational environment."  20 U.S.C. § 1415(5)(a).  See Reentry Guidance at 1.

### B.   THE IDEA'S LEGISLATIVE HISTORY INDICATES THAT REMOTE INSTRUCTION IS A "REGULAR EDUCATIONAL ENVIRONMENT" UNDER THE LRE PROVISION WHEN CHILDREN WITHOUT DISABILITIES ARE RECEIVING A REMOTE EDUCATION.

The IDEA's legislative history demonstrates that: (i) Congress hoped to prevent children with disabilities from being educated separately from children without disabilities; and (ii) Congress contemplated that new technologies -- like the technologies that make remote instruction possible -- could change what a "regular educational environment" looks like for students.  20 U.S.C. § 1412(5)(a).  S. Rep. No. 104-275, at 7 (1996).  See H.R. Rep. No. 101-544, at 27 (1990); Gonzagowski v. United States, No. CIV 19-0206 JB\LF, 2020 WL 5209470, at *53 n. 51 (D.N.M. Sept. 1, 2020)(Browning, J.)(exploring both the plain text and legislative history of the statute at issue).  The LRE provision's primary purpose is to prevent school districts from separating children with disabilities from their peers without disabilities, as long as the children with disabilities could achieve a satisfactory education -- with the use of supplementary aids and services -- in the same class as children without disabilities.  See S. Rep. No. 94-168, at 9 (1975); 20 U.S.C. § 1412(5)(A); 34 C.F.R. § 300.116.    Congress was concerned that children with

disabilities were being placed unnecessarily in residential facilities or separate classes from their peers without disabilities.  See S. Rep. No. 104-275, at 7 (1996).  The drafters wished to remedy this issue by requiring LEAs to place children with disabilities in classes alongside their peers wherever possible.  See H.R. Rep. No. 101-544, at 27 (1990).

In 1975, Congress enacted the Education for All Handicapped Children Act, Pub. L. 94-142 ("EHA") -- renamed the IDEA in 1990 -- with a goal that "providing educational services" to children with disabilities to "ensure against persons needlessly being forced into institutional settings." S. Rep. No. 94-168, at 9 (1975).  When Congress passed the EHA, "it was estimated that one million children" with disabilities "were excluded from the public-school system and another four million children did not receive appropriate educational services to enable them to have an equal educational opportunity."  S. Rep. No. 104-275, at 7 (1996).  Specifically, "most severely disabled children who went to school were segregated in buildings away from their siblings and peers; and many young people with disabilities were destined for lives spent in an institution."  S. Rep. No. 104-275, at 7 (1996).  Children with disabilities considered too disruptive or unruly were often denied access to public education entirely.  See S. Rep. No. 104-275, at 7 (1996).  As a result, Congress was concerned that children with disabilities often "tended to grow up on the streets and at home with no consistent access to an appropriate education."  S. Rep. No. 104-275, at 7 (1996).

In 1990, Congress amended the funding mechanism in the LRE provision because of its concerns about "a very large variation among the states in the numbers of students with disabilities who are educated in separate classes or in separate facilities."  H.R. Rep. No. 101-544, at 27 (1990).  Congress continued that, since 1979, there had been "no significant change nationwide in the use of segregated facilities to educate children with disabilities."  H.R. Rep. No. 101-544, at 27 (1990).  Congress was "concerned that such placement variations may have significant implications on

state and local school system policy and their meeting the least restrictive environment provisions . . . ."  H.R. Rep. No. 101-544, at 27 (1990).

By 1996, Congress explained that the IDEA had allowed "many children with and without disabilities" to "attend school together, and many young people with disabilities are expected to learn life skills and work skills that will allow them to be more independent and productive adults." S. Rep. No. 104-275, at 7 (1996).  The IDEA had "achieved many of the important goals it sought out to achieve" including: (i) "the number of children with developmental disabilities in State institutions has declined by close to 90 percent"; (ii) "the number of young adults with disabilities enrolled in postsecondary education has tripled"; and (iii) "the unemployment rate for individuals with disabilities in their twenties is almost half that of their older counterparts."  S. Rep. No. 105-17, at 5 (1997).  Accordingly, children with disabilities were "more likely to be valued members of school communities . . . ." S. Rep. No. 104-275, at 7 (1996).  Nonetheless, Congress emphasized that "[i]t is imperative that more is done to make general education and special education systems, that blend together to help children with disabilities and children at risk of failure, succeed." S. Rep. No. 104-275, at 7 (1996).  The following year, Congress again noted that the LRE provision contains a presumption that children with disabilities should be educated alongside children without disabilities.  See S. Rep. No. 105-17, at 5 (1997).  The IDEA, therefore, "requires that the IEP include an explanation of the extent, if any, to which a child with a disability will not participate with nondisabled children in the regular class and in the general education curriculum including extracurricular and nonacademic activities."  S. Rep. No. 105-17, at 5 (1997).

A precursor to the IDEA, the 1968 Vocational Education Amendments, P.L. 90-576, contains a provision similar to the IDEA's current LRE provision that seeks to integrate persons with disabilities.  See S. Rep. No. 94-882, at 76 (1976).  When passing the EHA, Congress

observed that "a literal interpretation of this requirement" in the 1968 Vocational Educational Amendments "resulted in automatic segregation of handicapped persons in separate programs apart from their non-handicapped colleagues." S. Rep. No. 94-882, at 76 (1976). Specifically, seventy "percent of all handicapped students enrolled in vocational education were enrolled in segregated classes away from their non-handicapped colleagues." S. Rep. No. 94-882, at 76 (1976). Congress explained that this segregation is "not intended," and that P.L. 90-576's legislative history "is quite clear and forceful" that "vocational education facilities and programs" should "be modified to enable handicapped persons to receive vocational education along with their non-handicapped colleagues." S. Rep. No. 94-882, at 76 (1976). The EHA's drafters sought to avoid the same segregation as a result of the LRE provision. See S. Rep. No. 94-882, at 76-77 (1976).

Moreover, Congress contemplated that, with technological improvements, educators would need continually to adapt educational methods for children with disabilities. See S. Rep. 94-168, at 10 (1975); H.R. Rep. No. 101-544, at 27 (1990); H.R. Rep. No. 104-514, at 258 (1996). Congress noted in 1975 that "[t]elecommunications devices . . . may be used to enhance the handicapped individual's participation in society." S. Rep. 94-168, at 10 (1975). In 1990, Congress contemplated that technology "w[ould] redefine an 'appropriate placement in the least restrictive environment' and allow greater independence and productivity.'" H.R. Rep. No. 101-544, at 27 (1990). Likewise, in 1996, Congress observed that "[t]echnology research and development activities supported under the IDEA have led to the development of innovative tools and strategies that help children with disabilities become active, independent learners at school and at home." H.R. Rep. No. 104-514, at 258 (1996). Without new technologies, Congress explained, "many children with disabilities would remain dependent on their families or the

government, rather than acquiring the knowledge, skills, and self-confidence they need to lead personally fulfilling and productive lives." H.R. Rep. No. 104-514, at 258 (1996). Congress therefore concluded that new technologies allow children with disabilities to "overcome their disabilities and learn in an infinite variety of ways," including allowing "school-aged children to learn in regular classes, and adults to function independently in work and society . . . ." H.R. Rep. No. 104-514, at 258 (1996). See H.R. Rep. No. 101-544, at 27 (1990)("Since the passage of the EHA, advances in the development and use of assistive technology have provided new opportunities for children with many disabilities to participate in educational programs.").

The Court, therefore, concludes that the LRE provision's legislative history focuses on the import of avoiding separating children with disabilities from children without disabilities in the learning environment as much as possible. See Rep. No. 94-882, at 76-77 (1976). Likewise, the drafters understood that methods of delivering education would vary as technology improved. See H.R. Rep. No. 104-514, at 258 (1996). Providing children with disabilities access to the same remote instruction that children without disabilities receive, therefore, fits within the statute's presumption in favor of placement in a "regular educational environment." 20 U.S.C. § 1412(5)(A).

Relatedly, even absent a pandemic, the United States Court of Appeals for the Seventh Circuit has held that a student's physical placement in his or her home while receiving his or her education satisfies the LRE requirement for some students. See Littlegeorge, 295 F.3d at 676. In Littlegeorge, the Honorable Richard A. Posner, Circuit Judge for the Seventh Circuit, examined whether homebound instruction satisfied the LRE requirement for a student with symptoms

characteristic of autism.   See Littlegeorge, 295 F.3d at 672.[35]   The student had attended a specialized residential mental health facility for one year, and "did pretty well there." Littlegeorge, 295 F.3d at 673.   After the student left the facility, he returned to public school for several weeks "in regular classes," but was "disruptive" and "violent" at school.   Littlegeorge, 295 F.3d at 673. The student then spent several weeks at a different, nonresidential, specialized school, but this placement also went poorly.   See Littlegeorge, 295 F.3d at 673.   Finally, the LEA, fearing that returning the student to public school "might irreparably damage the prospects of his ever being able to get along with other children, chose instead . . . a program of homebound instruction for him." Littlegeorge, 295 F.3d at 673.   The LEA "hired a retired special-education teacher to teach him for six hours a week at home, and an occupational therapist to give him another hour's instruction each week, in the hope that after a while it would be possible for him to return to school." Littlegeorge, 295 F.3d at 673.   Judge Posner explained that, given the student's history, "there was no basis for believing that . . . he could function successfully in a regular school environment." Littlegeorge, 295 F.3d at 676.   Specifically, Judge Posner noted that the school would have struggled to "restrain" the student "when he started kicking and biting people, tearing his clothes, breaking furniture, and otherwise acting out as he had been doing for years, with no sign of improvement, and as he could be expected to continue doing . . . ." Littlegeorge, 295 F.3d at 676.   Judge Posner concluded, therefore, that the student had received "'some educational benefit and [was] educated alongside his non-disabled classmates to the maximum extent possible'" under the "program of home instruction . . . ." Littlegeorge, 295 F.3d at 677 (quoting Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1038 (8th Cir. 2000)).   Likewise, here, students

---

[35]The Court agrees with Judge Posner that, in some cases, home instruction is the LRE for students even absent a pandemic. The Plaintiffs' arguments, therefore, that virtual learning is a per se violation of the LRE provision, are unavailing.

with disabilities should have access to the same remote classes as their peers without disabilities "to the maximum extent possible." Littlegeorge, 295 F.3d at 677. For many students with disabilities, such programs provide "educational benefit," Littlegeorge, 295 F.3d at 677, particularly when coupled with "the use of supplementary aids and services" 20 U.S.C. § 1412(5)(A). Students for whom "education . . . cannot be achieved satisfactorily" through remote instruction, despite supplementary aids, should have access to "special classes" in-person. 20 U.S.C. § 1412(5)(A).

Finally, the Court must balance the "competing requirements" of the IDEA's "dual mandate: a free appropriate public education that is provided, to the maximum extent appropriate, in the regular education classroom." Daniel R.R., 874 F.2d at 1048. The Tenth Circuit applies the two-part test from Daniel R.R. to determine whether a school district has complied with the IDEA's LRE requirement. See T.W. v. Unified Sch. Dist. No. 259, 136 F. App'x 122, 127 (10th Cir. 2005)("In determining whether a school district has complied with the LRE mandate, we follow the so-called Daniel R.R. test."); L.B. ex rel. K.B. v. Nebo Sch. Dist., 379 F.3d 966, 977 (10th Cir. 2004)("[T]his court is persuaded by the Daniel R.R. test and by the reasoning of the other circuits who have adopted it."); G.W. v. Boulder Valley Sch. Dist., No. 16-CV-00374-PAB-SKC, 2019 WL 4464130, at *14 (D. Colo. Sept. 18, 2019)(Brimmer, C.J.)("[C]ourts in the Tenth Circuit apply the two-part test from Daniel R.R. . . . ."). But see C.D. by & through M.D. v. Natick Pub. Sch. Dist., 924 F.3d 621, 631 (1st Cir. 2019)("There is no need to add complexity to the LRE mandate in the form of Daniel R.R.'s judicial gloss, and every reason not to do so."), cert. denied, 140 S. Ct. 1264 (2020); Beth B. v. Van Clay, 282 F.3d 493, 499 (7th Cir. 2002)(declining to adopt the Daniel R.R. test, because the IDEA "itself provides enough of a framework for our discussion"). In applying this test, the Court's task is "not to second-guess state and local policy

decisions," but to evaluate "whether state and local school officials have complied with the act." Daniel R.R., 874 F.2d at 1048.   First, the Court assesses "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child."   Daniel R.R., 874 F.2d at 1048.   Next, "if [education] cannot [be achieved satisfactorily in the regular classroom] and the school intends to provide special education or to remove the child from regular education," the Court asks "whether the school has mainstreamed the child to the maximum extent appropriate."   Daniel R.R., 874 F.2d at 1048.   If a student with disabilities believes that he or she is not receiving an education in his or her LRE, the student must first exhaust the administrative process.   The Daniel R.R. test would apply in such a case.

## X.   THE COURT DECLINES TO GIVE DEFERENCE TO THE UNPERSUASIVE USDOE GUIDANCE DOCUMENTS TO WHICH THE DEFENDANTS CITE, BECAUSE THEY LACK THOUROUGHNESS, VALID REASONING, AND CONSISTENCY.

The Defendants argue that the USDOE "has not interpreted the IDEA or any other federal laws relating to education as requiring in-person learning if schools are closed due to public health and safety orders related to the pandemic."   Second MTD at 24.   True enough -- but neither does the IDEA create any emergency exception excusing funding recipients from delivering a FAPE to students with disabilities.   See 20 U.S.C. § 1401(9)(defining FAPE).   Some children with IEPs can receive a FAPE through remote instruction; some cannot.[36]   Regardless, the IDEA requires funding

---

[36]The IDEA covers children with a wide variety of disabilities:

**(3)   Child with a disability**

**(A)   In general**

The term "child with a disability" means a child --

**(i)**   with   intellectual   disabilities,   hearing impairments (including deafness), speech or

recipients to provide children with disabilities with a FAPE, even if that means providing in-person learning during a pandemic.  See 20 U.S.C. § 1401(9).

An agency document, like the guidance documents that the Defendants present here, which lacks force of law, is not entitled to Chevron v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), deference, but may be given respect according to its persuasiveness under Skidmore v.

---

> language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and
>
> **(ii)** who, by reason thereof, needs special education and related services.
>
> **(B)** **Child aged 3 through 9**
>
> The term "child with a disability" for a child aged 3 through 9 (or any subset of that age range, including ages 3 through 5), may, at the discretion of the State and the local educational agency, include a child--
>
> **(i)** experiencing developmental delays, as defined by the State and as measured by appropriate diagnostic instruments and procedures, in 1 or more of the following areas: physical development; cognitive development; communication development; social or emotional development; or adaptive development; and
>
> **(ii)** who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(bold in original).  Depending upon the disability, therefore, some children with disabilities may be able to adapt more easily to remote instruction than others.

Swift & Co., 323 U.S. 134, 140 (1944)("Skidmore").  See United States v. Mead Corp., 533 U.S. 218, 221 (2001); Second MTD at 25-26.  "[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade.'" Christensen v. Harris Cty., 529 U.S. 576, 587 (2000)(quoting Skidmore, 323 U.S. at 140).  Accord De Baca v. United States, 399 F. Supp. 3d 1052, 1178 n.184 (D.N.M. 2019)(Browning, J.)(same).  Under Skidmore, if a federal statute is ambiguous, the Court must give the agency interpretation "weight . . . depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  Skidmore, 323 U.S. at 140.

Here, the Defendants rely upon four pieces of guidance from the USDOE.  See Second MTD at 24-25 (citing Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak, at 2 (March 12, 2020), https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/qa-covid-19-03-12-2020.pdf  ("Q&A I"); Fact Sheet: Addressing the Risk of COVID-19 in Schools While Protecting the Civil Rights of Students, at 1 (March 16, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/ocr-coronavirus-fact-sheet.pdf ("Fact Sheet I"); Supplemental Fact Sheet, Addressing the Risk of COVID-19 in Preschool, Elementary and Secondary Schools While Serving Children with Disabilities, at 2 (Mar. 20, 2020), https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/Supple%20Fact%20Sheet%203.21.20%20FINAL.pdf ("Fact Sheet II"); and September IDEA Guidance at 1.  The Court declines to extend Skidmore deference to these guidance documents, because they lack the "power to persuade."  Skidmore, 323 U.S. at 140.

First, there is no "thoroughness evident" in the guidance documents' consideration.
Skidmore, 323 U.S. at 140.  The USDOE released three of the four documents between March 12,
2020 and March 20, 2020.  See Q&A I at 1, Fact Sheet I at 1, Fact Sheet II at 1.  States began
closing schools on March 16, 2020.  See Holly Peele & Maya Riser-Kositsky, Map: Coronavirus
and School Closures in 2019-2020, Education Week (last updated Sept. 16, 2020),
https://www.edweek.org/leadership/map-coronavirus-and-school-closures-in-2019-2020/2020/03
.[37]  The USDOE issued three of the four guidance documents, therefore, within four days before
or after the initial wave of school closures.  See Q&A I at 1, Fact Sheet I at 1, Fact Sheet II at 1.
This short time frame demonstrates that the agency's consideration was not particularly
"thorough."  Skidmore, 323 U.S. at 140.  Four days or less does not provide a meaningful
opportunity to seek public input, for example.  Moreover, there is no evidence that the USDOE
has "extended a degree of care" to creating these documents -- for example, "by way of
roundtables" or "responses to comments."  New Mexico ex rel. Balderas v. Google, LLC, No. CIV
20-0143 NDF, 2020 WL 5748353, at *6 (D.N.M. Sept. 25, 2020)(Freudenthal, J.).  None of the
guidance, in fact, contains any information about what methods or procedures it employs to reach

---

[37]The following states ordered schools to close on March 16, 2020: Alaska, Arizona,
Delaware, Iowa, Louisiana, Maryland, Michigan, Nevada, New Hampshire, New Mexico, North
Carolina, North Dakota, Oregon, Pennsylvania, South Carolina, Utah, Virginia, West Virginia.
See Peele & Riser-Kositsky, Map: Coronavirus and School Closures in 2019-2020, Education
Week (last updated Sept. 16, 2020).  The District of Columbia, Guam, and Puerto Rico also ordered
closure on March 16, 2020.  See Peele & Riser-Kositsky, Map: Coronavirus and School Closures
in 2019-2020, Education Week (last updated Sept. 16, 2020).  The follow states recommended
closure on the same day: Florida, Kentucky, Maine, and South Dakota.  See Peele & Riser-
Kositsky, Map: Coronavirus and School Closures in 2019-2020, Education Week (last updated
Sept. 16, 2020).  Other states ordered or recommended closure over the following eight days.  See
Peele & Riser-Kositsky, Map: Coronavirus and School Closures in 2019-2020, Education Week
(last updated Sept. 16, 2020).

its conclusions.  See Stauffer v. Internal Revenue Serv., 285 F. Supp. 3d 474, 49192 (D. Mass.

2017)(explaining that an agency's "failure provide any insight explaining the deliberative process

it went through" gave "rise to the concern that the IRS did not thoroughly consider the implications

of interpreting the word "physician" as it did . . . or how, if the IRS did consider such things, why

the policy should nonetheless be enforced").  Moreover, all four guidance documents are fewer

than ten pages; Fact Sheet I is just four pages. See Q&A I at 9, Fact Sheet I at 4, Fact Sheet II at

5, September IDEA Guidance at 7.  The Court, therefore, concludes that the guidance documents

do not satisfy the Skidmore analysis' "thoroughness" component.  Skidmore, 323 U.S. at 140.

Next, the guidance documents lack robust analysis or clear conclusions.  See Skidmore,

323 U.S. at 140.  For example, the Fact Sheet II notes that "it is important to emphasize that federal

disability law allows for flexibility in determining how to meet the individual needs of students

with disabilities."  Fact Sheet II at 2.  Yet there is no citation here -- or anywhere in Fact Sheet II

-- to specific IDEA provisions.  See Fact Sheet II at 1-5.  Fact Sheet II continues that "the

determination of how FAPE is to be provided may need to be different in this time of

unprecedented national emergency."  Fact Sheet II at 2.  This proclamation leaves the reader with

more questions than answers -- how might provision of FAPE "be different"?  Fact Sheet II at 2.

Fact Sheet II provides no clarification.  See Fact Sheet II at 2.  The USDOE also indicates that,

"where we can offer flexibility" during the pandemic, "we will."  Fact Sheet II at 2.  Again, this

declaration's lack of specificity renders it unhelpful.  See Fact Sheet II at 2.  Likewise, the Q&A I

proclaims that, when "an LEA closes its schools to slow or stop the spread of COVID-19, and does

not provide any educational services to the general student population, then an LEA would not be

required to provide services to students with disabilities during that same period of time."  Q&A I

at 2.  The Q&A I, then, does not provide any support or explanation for this statement.  See Q&A

I at 2.  Yet, as discussed above, the IDEA itself does not provide exceptions to its FAPE requirement.  See 20 U.S.C. § 1401(9).  The USDOE's unsupported assertion, therefore, appears to contradict directly the statute.  See Q&A I at 2.  In sum, the guidance documents do not explain why USDOE has reached its conclusions or even provide definitive conclusions.  See Fact Sheet II at 5.  For example, Fact Sheet II states that the "pandemic could be considered an 'exceptional family circumstance'" pursuant to 34 C.F.R. § 303.310(a).  Fact Sheet II at 5 (quoting 34 C.F.R. § 303.310(a)).  Is the pandemic an "exceptional family circumstance"?  Fact Sheet II at 5.  The Court cannot tell from Fact Sheet II whether the pandemic qualifies.  See Fact Sheet II at 5.  Further, the Defendants have agreed with the Court that the guidance is "so general" that it is not "very useful at all" and is "lacking in detail."  Nov. 23 Tr. at 225:1-226:20 (Agajanian, Court).  This lack of clear analysis and reasoning leads the Court to conclude that the guidance documents do not meet Skidmore's "valid reasoning" prong.  Skidmore, 323 U.S. at 140.

Third, the guidance documents are inconsistent with the USDOE's prior guidance.  For example, Fact Sheet II states that, although the USDOE "has previously advised that unavailability of staff is not an exceptional circumstance that would warrant an extension of the 60-day complaint resolution timeline, the COVID-19 pandemic could be deemed an exceptional circumstance if a large number of SEA staff are unavailable or absent."  Fact Sheet II, at 4.  Moreover, September IDEA Guidance acknowledges that the current circumstances are "new and unexpected" and "continue to rapidly change."  September IDEA Guidance, at 1.  These guidance documents, therefore, cannot -- by their nature -- be consistent with past guidance, because they address a new challenge.  See Fact Sheet II, at 4; September IDEA Guidance, at 1.

Finally, a legal disclaimer accompanies all four guidance documents.  See, e.g., September IDEA Guidance at 2.  For example, Q&A I states "the responses presented in this document

generally constitute informal guidance representing the interpretation of the Department of the applicable statutory or regulatory requirements in the context of the specific facts presented here and are not legally binding." Q&A I at 2. Similarly, September IDEA Guidance notes that "the contents of this guidance do not have the force and effect of law and are not meant to bind the public." September IDEA Guidance at 2. Although not an explicit Skidmore factor, these disclaimers counsel against the Court giving serious consideration to the guidance documents. See September IDEA Guidance at 2. Accordingly, the Court concludes that the guidance documents to which the Defendants cite are unpersuasive, because they lack thoroughness, valid reasoning, and consistency with prior guidance. See Skidmore, 323 U.S. at 140.

## XI.  THE PLAINTIFFS CAN SUE GOVERNOR GRISHAM AND SECRETARY STEWART IN THEIR OFFICIAL CAPACITIES UNDER THE IDEA, BECAUSE THE PLAINTIFFS' CLAIMS ARE NOT DUPLICATIVE.

As the Court explained in Hernandez II, the Plaintiffs have standing to sue Governor Grisham and Secretary Stewart under the IDEA. See Hernandez II, 2020 WL 6526163, at *1. Nevertheless, the Defendants insist that the Plaintiffs' IDEA claims against Governor Grisham and Secretary Stewart "are fatally flawed because they have directed them at several state officials not 'individually' responsible for compliance with the IDEA or providing a FAPE to students with disabilities." Second MTD at 31 (no citation for quotation). The Defendants maintain that the Plaintiffs, therefore, "cannot state a claim for violation of the IDEA against" Governor Grisham or Secretary Stewart. Second MTD at 30. The Court disagrees with the Defendants' argument and concludes that the Plaintiffs may maintain a suit against the Defendants in their official capacities. See Wright and Miller, Federal Practice and Procedure Jurisdiction § 4232 (3d ed.)(Oct. 2020 update)(discussing the complexities of the Ex Parte Young doctrine); Hernandez II, 2020 WL 6526163, at *1.

The Defendants are correct that "the IDEA does not permit an award of *any* monetary relief, including tuition reimbursement and compensatory education, against individual school officials who are named in their personal capacities as defendants in an IDEA action." Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 34-35 (1st Cir. 2006)(emphasis in original).  See Second MTD at 30-31.  The Plaintiffs, however, seek injunctive and declaratory relief, and not damages. See Am. Compl. at 15.  Further, the Plaintiffs bring this action against Governor Grisham "individually, acting in her capacity as the Governor of New Mexico" and against Secretary Stewart "individually, acting in his capacity as the Secretary of the state of New Mexico Department of Education . . . ."  Am. Compl. at 1.  The Plaintiffs are suing Governor Grisham and Secretary Stewart in their both individual and official capacities.  See Am. Compl. at 1.  When a governmental official is sued in both his or her official capacity and individual capacity for acts performed in each capacity, those acts are "'treated as the transactions of two different legal personages.'"  Johnson v. Bd. of Cty. Comm'rs for Cty. of Fremont, 85 F.3d 489, 493 (10th Cir. 1996)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 543 n.6 (1986)).  Moreover, "a federal court is not barred by the Eleventh Amendment from enjoining state officers from acting unconstitutionally, either because their action is alleged to violate the Constitution directly or because it is contrary to a federal statute or regulation that is the supreme law of the land."  Wright and Miller, Federal Practice and Procedure Jurisdiction § 4232 (3d ed.)(Oct. 2020 update).

The Defendants rely on Barr-Rhoderick, 2005 U.S. Dist. LEXIS 43689, *1, to support the proposition that Governor Grisham and Secretary Stewart cannot be "held liable" under the IDEA, because the IDEA does not create individual liability.  Second MTD at 31.  The portion of Barr-Rhoderick to which the Defendants cite states that the IDEA "does not set forth an unambiguous condition that would impose liability on individual employees in their personal capacity."  Barr-

Rhoderick, 2005 U.S. Dist. LEXIS 43689, *19.  See Am. Compl. at 1.   Judge Armijo dismissed

the plaintiffs' official capacity claims without prejudice, because the defendants argued "that such

claims simply duplicate the claims already asserted against the institutional entity," and because

the "Plaintiffs provide no explanation or authority as to why it is necessary to name the individual

Defendants in their official capacity in this case."  Barr-Rhoderick, 2005 U.S. Dist. LEXIS 43689,

*14-15.  Likewise, the second case that the Defendants cite, Mueller v. Henrico Cty. Sch. Bd., No.

CIV 18-848 2019 U.S. Dist. LEXIS 139315 (E.D. Va. Aug. 16, 2019)(Lauck, J.), states that "[i]t

is duplicative to bring the same claim against a defendant in his [or her] official capacity and

against the government entity that employs that defendant, and in such a case the official capacity

claim should be dismissed."  2019 U.S. Dist. LEXIS 139315, *10-11 (quoting Howard v. City of

Durham, No. CIV 17-477, 2018 WL 1621823, at *8 (M.D.N.C. March 31, 2018)(Schroeder, J.)).

By contrast, here, the Plaintiffs have not named the PED as a defendant, so their claim against

Secretary Stewart is not duplicative.  See Barr-Rhoderick, 2005 U.S. Dist. LEXIS 43689, *14-15;

Am. Compl. at 1.  Similarly, New Mexico is no longer a party to the case, and the Plaintiffs' claim

against Governor Grisham, therefore, is not duplicative.  See Barr-Rhoderick, 2005 U.S. Dist.

LEXIS 43689, *14-15; Notice of Voluntary Dismissal as to State of New Mexico at 1.  The third

and final case to which the Defendants cite in support of this proposition discusses an attempt to

sue the leaders of the SEA and the County Board of Education in both their official and individual

capacities under the IDEA.  See B.I. v. Montgomery Cty. Bd. of Educ., 750 F. Supp. 2d 1280,

1283 (M.D. Ala. 2010)(Albritton, J.).   The Honorable Harold W. Albritton III, United States

District Judge for the Middle District of Alabama, concluded that, for official capacity purposes,

"the claims will be treated as claims against Alabama DOE and Montgomery BOE, respectively,

because Morton is an employee of Alabama DOE and Thompson is an employee of Montgomery

BOE." B.I. v. Montgomery Cty. Bd. of Educ., 750 F. Supp. 2d at 1283. Judge Albritton dismissed the claims against the defendants in their individual capacities, however, because the "IDEA does not create liability against individual defendants." B.I. v. Montgomery Cty. Bd. of Educ., 750 F. Supp. 2d at 1283. The Court, therefore, concludes that the Plaintiffs' individual claims against the Defendants are inappropriate, because the IDEA does not create liability for individuals in their personal capacities. See Barr-Rhoderick, 2005 U.S. Dist. LEXIS 43689, *14-15; Mueller v. Henrico Cty. Sch. Bd., U.S. Dist. LEXIS 139315, *10-11; B.I. v. Montgomery Cty. Bd. of Educ., 750 F. Supp. 2d at 1283. Nevertheless, the Plaintiffs' claims against the Defendants in their official capacities are appropriate, because they are not duplicative. See Barr-Rhoderick, 2005 U.S. Dist. LEXIS 43689, *14-15; Mueller v. Henrico Cty. Sch. Bd., U.S. Dist. LEXIS 139315, *10-11; Am. Compl. at 1.

"It is . . . well-established that official-capacity § 1983 claims against a state official (like . . . [a] Governor . . . ) are claims against the state." Donahue v. Brownback, 772 F. App'x 749, 751 (10th Cir. 2019). See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). The Court, therefore, treats official-capacity claims against Governor Grisham as claims against New Mexico.[38] See Will v. Mich. Dep't of State Police, 491 U.S. at 71; Am. Compl. at 1. Likewise, the Court treats official-capacity claims against Secretary

---

[38]As the Court has explained, "New Mexico has waived sovereign immunity under the IDEA." Hernandez I, 2020 WL 60663799, at *59. The IDEA provides that states "shall not be immune under the 11th Amendment . . . from suit in federal court." 20 U.S.C. §1403(a). Because New Mexico accepts federal funds under the IDEA, it has waived its sovereign immunity. See Ellenberg v. New Mexico Military Inst., 478 F.3d at 1270 (explaining that New Mexico "has chosen to accept IDEA funds and has adopted rules to comply with IDEA's requirements accordingly").

Stewart as claims against the PED.  See Will v. Mich. Dep't of State Police, 491 U.S. at 71; Am. Compl. at 1

Both the PED and the State are proper defendants under the IDEA because of their responsibilities under the statute.  See 20 U.S.C. § 1401(9).  Although the LEA provides IEPs, the State is a proper party to an injunctive suit under the IDEA, because the State has primary responsibility under the IDEA to provide a FAPE and to ensure compliance with its requirements. See M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark, 344 F.3d 335, 340 (3d Cir. 2003)(explaining that "the participating state retains primary responsibility for ensuring compliance with the IDEA and for administering educational programs for disabled children"). Further, as the Court noted in Hernandez II, "it cannot 'be disputed that the Governor' has 'responsibility of the enforcement of the laws of the state.'"  Hernandez II, 2020 WL 6526163, at *29 (quoting Petrella v. Brownback, 697 F.3d at 1294).  The SEA is a proper party to IDEA suits, which, as here, implicate a statewide policy -- like the Reentry Guidance.  See M.G. v. New York City Dep't of Educ., 15 F. Supp. 3d 296, 306 (S.D.N.Y. 2014)(Scheindlin, J.)(requiring the plaintiffs to join the SEA as a defendant under rule 19 of the Federal Rules of Civil Procedure because their claims "implicate[d] state-level procedures"); Quatroche v. E. Lyme Bd. of Educ., 604 F. Supp. 2d 403, 412 (D. Conn. 2009)(Thompson, J.)("The state education agency is a proper party to actions involving claims of systemic violations of the IDEA."); Second MTD at 23 (acknowledging that the Reentry Guidance "affected the entirety of New Mexico").  Accordingly, the Court concludes that Governor Grisham and Secretary Stewart are proper parties for the IDEA's purposes.  See Hernandez II, 2020 WL 6526163, at *1.

**IT IS ORDERED** that (i) the Plaintiffs' Motion for Preliminary Injunction, filed September 21, 2020 (Doc. 6), is denied;  (ii) the Plaintiffs' Motion to Amend, filed October 26,

2020 (Doc. 41) is denied; and (iii) the Defendants' Motion to Dismiss, filed October 26, 2020

(Doc. 43) is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Marshall J. Ray
Law Offices of Marshall J. Ray LLC
Albuquerque, New Mexico

-- and --

A. Blair Dunn
Jared R. Vander Dussen
Western Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

      *Attorneys for the Plaintiffs*

Holly Agajanian
  Chief General Counsel to Governor Michelle Lujan Grisham
Kyle P. Duffy
  Associate General Counsel to Governor Michelle Lujan Grisham
Maria S. Dudley
  Associate General Counsel to Governor Michelle Lujan Grisham
Office of the Governor
Santa Fe, New Mexico

      *Attorneys for Defendants Governor Michelle Lujan Grisham, Secretary Ryan Stewart,*
      *and Secretary Kathyleen M. Kunkel*

Hector Balderas
    Attorney General for the State of New Mexico
Erin Elizabeth Lecocq
Nicholas M. Sydow
    Civil Appellate Chief
New Mexico Office of the Attorney General
Santa Fe, New Mexico

    *Attorneys for Defendant State of New Mexico*